**IN THE
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANTHONY REID, RICARDO NATIVIDAD, | : | |
| MARK NEWTON SPOTZ, RONALD GIBSON, | : | |
| and JERMONT COX, on their own behalf | : | |
| and on behalf of a class of similarly situated persons, | : | |
| | : | |
| *Plaintiffs*, | : | |
| v. | : | CIVIL ACTION NO. |
| | : | |
| JOHN E. WETZEL, Secretary of Corrections | : | _____ |
| of the Commonwealth of Pennsylvania, | : | |
| ROBERT D. GILMORE, Superintendent of State | : | |
| Correctional Institution Greene, and | : | |
| CYNTHIA LINK, Superintendent of State | : | |
| Correctional Institution Graterford, | : | |
| | : | COMPLAINT – |
| *Defendants*. | : | CLASS ACTION |

**CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF**

This class action challenges the policies and practices of the Commonwealth of Pennsylvania that cruelly and baselessly hold death-sentenced prisoners in permanent, degrading, and inhumane solitary confinement until their capital sentence is overturned, or they die by execution or natural causes.

**PRELIMINARY STATEMENT**

1.     Based solely on their death sentences, and pursuant to the Pennsylvania Department of Corrections' Capital Case Policy,[1] Anthony Reid, Ricardo Natividad, Mark Newton Spotz, Ronald Gibson, and Jermont Cox (collectively, "Plaintiffs") have been held in

---

[1] *See* Pa. Dep't of Corrections, Capital Case Procedures Manual 6.5.8 (the "Capital Case Policy"). The DOC has designated the entirety of its Capital Case Policy "confidential" in other cases. Although Plaintiffs do not agree with this designation, out of respect for the DOC's position they do not attach a copy here, but will provide it to the Court on request.

1

solitary confinement on Pennsylvania's death row for between sixteen and twenty-seven years.[2] All of the 156 prisoners currently sentenced to death in the Commonwealth are male, almost eighty percent of them have been held in solitary confinement for more than a decade,[3] and none of them has ever had a meaningful opportunity to challenge his placement in solitary confinement.

2.      Plaintiffs and the similarly situated death-sentenced prisoners (the "Class Members") are subjected to indefinite isolation, devoid of mental stimulation, with only limited and sporadic human interaction.   A death-sentenced prisoner in Pennsylvania is segregated entirely from the general prison population.  On most weekdays, he is confined alone for twenty-two hours a day in a small cell, the size of a regular parking spot.  Each cell and cell block are illuminated by artificial light 24 hours a day, interfering with normal sleep.  On weekday mornings, weather permitting, the prisoner is allowed to go outside to exercise in a small enclosure for no more than two hours.  Other than his thrice-weekly shower, occasional trips to the library, and sporadic, exclusively non-contact, visits from clergy or family members, those brief exercise periods are the only time a death-sentenced prisoner is out of his cell each day.  On

---

[2] Under the United Nations Standard Minimum Rules for the Treatment of Prisoners (the "Nelson Mandela Rules"), "solitary confinement" is defined as "confinement of prisoners for 22 hours or more a day without meaningful human contact," and "prolonged solitary confinement" is defined as "a time period in excess of 15 consecutive days."  U.N. Office on Drugs & Crime, *The United Nations Standard Minimum Rules for the Treatment of Prisoners* ("Mandela Rules") R. 44 at 14, available at goo.gl/cPT93i (last viewed Dec 18,2017).

The United States Department of Justice has similarly defined "isolation" or "solitary confinement" as "the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others. . . . An isolation unit means a unit where all or most of those housed in the unit are subjected to isolation."  U.S. Dep't of Justice, Letter to the Hon. Tom Corbett, Re: Investigation of the State Correctional Institution at Cresson and Notice of Expanded Investigation, May 31, 2013, at p. 5, *available at* http://www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf (last viewed Dec. 18,2017) (citing additionally to *Wilkinson v. Austin*, 545 U.S. 209, 214, 224 (2005), where the United States Supreme Court described solitary confinement as limiting human contact for 23 hours per day, and *Tillery v. Owens*, 907 F.2d 418, 422 (3d Cir. 1990), where the Third Circuit described it as limiting human contact for 21 to 22 hours per day).

[3] Persons Sentenced to Execution in Pennsylvania as of Dec. 1, 2017 ("DOC Death-Sentenced Report"), at http://www.cor.pa.gov/General%20Information/Documents/Death%20Penalty/Current%20Execution%20list.pdf (last viewed Dec. 18, 2017).

the weekends, a death-sentenced prisoner is confined to his cell for twenty-four hours a day and thus may be denied human contact and interaction for as long as 70 consecutive hours between Friday morning and Monday morning.[4]

3.      The devastating effects of such prolonged isolation are well known among mental health experts, physicians, and human rights experts in the United States and around the world. It is established beyond dispute that solitary confinement puts prisoners at risk of substantial physical, mental and emotional harm.

4.      In recent years, leaders in the United States have condemned the use of solitary confinement as unnecessary and inhumane. As Justice Anthony Kennedy noted, "[R]esearch still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price." *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring) (citation omitted).  In describing the *Davis* case, in which a death-sentenced prisoner had been held in isolation for twenty-five years, Justice Kennedy told the House Appropriations Subcommittee on Financial Services and General Government: "This idea of total incarceration just isn't working.  And it's not humane. . . . Solitary confinement literally drives men mad."[5] Similarly, Justice Stephen Breyer recently wrote that "if extended solitary confinement alone raises serious constitutional questions, then 20 years of solitary confinement, all while under threat of execution, must raise similar questions, and to a rare degree, and with particular intensity." *Ruiz v. Texas*, 137 S. Ct. 1246, 1247 (2017).

5.      These dehumanizing conditions are detrimental to the Class Members and have caused them serious, irreversible physical and psychological harm.  Over time, Class Members

---

[4]  In instances where a holiday abuts a weekend, this period of isolation may extend an additional 24 hours.

[5] Supreme Court Fiscal Year 2016 Budget at 30:42-31:22 (C-SPAN television broadcast Mar. 23, 2015), available at goo.gl/8Hkuvj (last viewed Dec. 18, 2017).

have experienced a decline in their cognitive capacities and ability to communicate effectively. Additionally, some Class Members' pre-existing mental illnesses have been exacerbated by isolated confinement, and some Class Members have begun to suffer from mental illnesses as a result of their prolonged incarceration in solitary confinement.

6.     Social interaction and meaningful activity are crucial to human well-being. By definition, solitary confinement isolates individuals and denies them mental, emotional, and environmental stimulation.  Even healthy adults, if subjected to very short periods of isolation, display impaired neurological functioning.  Here, the prolonged nature of the confinement has had a devastating impact on the Class Members.

7.     There is no legitimate penological reason to place Class Members in solitary confinement based exclusively on their sentence.  Numerous corrections officials across the United States use prison classification systems based on several objective factors, such as age and prison disciplinary history, because these factors, unlike a prisoner's sentence, are predictive of potential security concerns.[6]  Similarly, a 2016 report by the United States Department of Justice ("DOJ") recommends the use of solitary confinement only when it serves a specific penal purpose and when accompanied by regular review by a multi-disciplinary committee.[7]

---

[6] A number of states have mainstreamed death-sentenced prisoners (that is, moved them into the general population) or eliminated automatic solitary confinement.  *See* Mark D. Cunningham, et al., *Is Death Row Obsolete?*, *A Decade of Mainstreaming Death-Sentenced Inmates in Missouri,* 23 BEHAV. SCI. LAW 307, 316-19 (2005);  Randall Chase, *"Delaware Quietly Disbands Death Row,"*   Delaware State News, Dec. 9, 2016, available at http://delawarestatenews.net/news/delaware-quietly-disbands-death-row/ (last viewed Dec. 18, 2017); Condemned Manual 15 § 301 (describing California's two-track system of behavior based classification for death-sentenced prisoners), San Quentin Operational Procedure, No. 608 (2013) [on file with counsel];  State of N.C., Dep't of Correction, Div. of Prisons, Policy & Procedures, Ch. C § .1200 Conditions of Confinement at 1216(b), 1218(a) (including death-sentenced prisoners in work assignment policies) (Nov. 1, 2011), available at http://www.doc.state.nc.us/dop/policy_procedure_manual/C1200.pdf (last viewed Dec. 18, 2017); Arthur Liman Public Interest Program, Yale Law School *Rethinking Death Row:  Variations in the Housing of Individuals Sentenced to Death,* , July 2016, at 15-16 (describing Colorado's mainstreaming of death-sentenced prisoners), available at https://goo.gl/JZB1KG (last viewed Dec. 18, 2017).

[7] U.S. Dep't Justice, Rep. & Recommendations Concerning the Use of Restrictive Housing at 99 (Jan. 2016), available at goo.gl/ky0xEg (last viewed Dec. 18, 2017).

8.     Class Members, however, irrespective of their good behavior, are held in solitary confinement for decades without any rational justification—and without being afforded any process or mechanism to challenge their confinement or to rectify the harm it has inflicted on them. The extreme, cruel, and unusual conditions of their confinement violate the Eighth and Fourteenth Amendments to the United States Constitution.

9.     Defendants, who are employed by the Commonwealth of Pennsylvania, have acted and are acting under color of state law to deprive Class Members of their constitutionally protected rights to be free of cruel and unusual punishment, guaranteed by the Eighth Amendment to the United States Constitution, and to due process of law, guaranteed by the Fourteenth Amendment.  Class Members seek declaratory and injunctive relief to address these violations of their constitutional rights.

## JURISDICTION AND VENUE

10.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution.

11.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343.

12.     Venue is proper pursuant to 28 U.S.C § 1391(b) because one or more of the defendants resides or has his or her principal place of business, and a substantial part of the events giving rise to the claims herein occurred, in this district.

## PARTIES

13.     Plaintiff Anthony Reid is a 50-year-old prisoner who has spent the past 27 years in solitary confinement.  He is housed at SCI Greene.  He was sentenced to death in Philadelphia County in 1990.

14.     Plaintiff Ricardo Natividad is a 49-year-old prisoner who has spent the past 19 years in solitary confinement.  He is housed at SCI Graterford.  He was sentenced to death in Philadelphia County in 1997.

15.     Plaintiff Mark Newton Spotz is a 46-year-old prisoner who has spent the past 21 years in solitary confinement at SCI Greene.  He was sentenced to death in Schuylkill County in 1996.

16.     Plaintiff Ronald Gibson is a 49-year-old prisoner who has spent the past 26 years in solitary confinement.  He is housed at SCI Greene.  He was sentenced to death in Philadelphia County in 1991.

17.     Plaintiff Jermont Cox is a 46-year-old prisoner who has spent the past 22 years in solitary confinement.  He is housed at SCI Graterford.  He was sentenced to death in Philadelphia County in 1995.

18.     Defendant John E. Wetzel ("Wetzel") is the Secretary of Corrections of the Commonwealth of Pennsylvania and heads the state's Department of Corrections (the "DOC"). He became Secretary of the DOC in December 2010. In this capacity, Defendant Wetzel is responsible for the overall management and operation of the entire adult corrections system in the Commonwealth and for protecting the constitutional rights of all individuals in the custody of the Department of Corrections, including death-sentenced prisoners.[8]  Additionally, Defendant Wetzel determines rules, regulations, and policy regarding management, personnel, and the overall operation of the Department, including the death rows maintained at the two Department facilities that house death-sentenced prisoners.  Defendant Wetzel authorizes or condones the unconstitutional policy of housing all death-sentenced prisoners in solitary confinement

---

[8]     Pa.     Dep't     of     Corr.,     Overview,     "Office     of     the     Secretary"     at http://www.cor.pa.gov/About%20Us/Documents/Overview.pdf (last viewed Dec. 18, 2017).

indefinitely, as described herein. Therefore, Defendant Wetzel directly and proximately has caused and continues to cause the constitutional violations set forth herein. At all relevant times, Defendant Wetzel was acting under color of state law and as an official representative of the Department. Defendant Wetzel is sued in his official capacity for declaratory and injunctive relief.

19.     Defendant Robert D. Gilmore is the Superintendent of SCI Greene, which is located in Waynesburg, Pennsylvania. He was appointed to this position in August 2015. As Superintendent of SCI Greene, Defendant Gilmore makes operational decisions concerning staffing, budget and administration of the prison, including its death row. As such, Defendant Gilmore authorizes or condones the unconstitutional policy of housing death-sentenced prisoners at SCI Greene in solitary confinement indefinitely, as described herein. Therefore, he directly and proximately has caused and continues to cause the constitutional violations set forth herein. At all relevant times, Defendant Gilmore was acting under color of state law and as an official representative of SCI Greene and the Department. Defendant Gilmore is sued in his official capacity for declaratory and injunctive relief.

20.     Defendant Cynthia Link is the Superintendent of SCI Graterford, which is located in Schwenksville, Pennsylvania. She was appointed to this position in August 2015. As Superintendent of SCI Graterford, Defendant Link makes operational decisions concerning staffing, budget and administration of the prison, including its death row. As such, Defendant Link authorizes or condones the unconstitutional policy of housing death-sentenced prisoners at SCI Graterford in solitary confinement indefinitely, as described herein. Therefore, she directly and proximately has caused and continues to cause the constitutional violations set forth herein. At all relevant times, Defendant Link was acting under color of state law and as an official

representative of SCI Graterford and the Department.  Defendant Link is sued in her official capacity for declaratory and injunctive relief.

## FACTS COMMON TO ALL CAUSES OF ACTION

21.     The DOC's Capital Case Policy requires that every death-sentenced prisoner be held in solitary confinement in one of Pennsylvania's death row facilities until his capital sentence is overturned or he dies by execution or natural causes.  Pennsylvania's death row facilities and the DOC's death row practices thus deny death-sentenced prisoners meaningful human contact for years on end.

22.     Further, under the DOC's Capital Case Policy, death-sentenced prisoners are denied any opportunity to challenge their placement in solitary confinement through administrative means, and are not given periodic reviews to determine whether their continued solitary confinement can be justified.  In fact, even after years of exemplary behavior, death-sentenced prisoners cannot challenge their solitary confinement unless their death sentence is overturned.  In such circumstances, they may seek but are not assured release to the general prison population.  *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549 (3d Cir. 2017) (Pennsylvania's practice of holding death-sentenced prisoners in solitary confinement, without any opportunity to be heard, during appeals from orders vacating their death sentences held unconstitutional under Fourteenth Amendment).

### *Pennsylvania Death Row Facilities*

23.     Prisoners who have been sentenced to death in Pennsylvania are automatically placed in one of two prisons, SCI Greene or SCI Graterford.  Currently there are 135 death-sentenced prisoners at SCI Greene and 21 at SCI Graterford.[9]

---

[9] DOC Death-Sentenced Report, *supra* note 3.

24.     In these two prisons, death-sentenced prisoners are held in a separate area—"death row"—where they are segregated from other prisoners.  Moreover, within each death row, each death-sentenced prisoner is held in an individual cell and isolated from every other death-sentenced prisoner in solitary confinement.

25.     Each death row cell is approximately 8 feet by 12 feet in size, about the size of a parking space, and is composed of concrete walls, a concrete floor and ceiling, and a door of solid steel or interlocking steel bars with only a small slot through which food trays are delivered and retrieved.  Within each cell is a poured concrete sleeping platform, a toilet and a sink, which, collectively, leave very limited room for movement.  To the extent that cells have windows, they are narrow apertures, partially obscured by steel bars, and look out onto a brick wall or the prison yard.  The cells are laid out on each tier of the cell block in a staggered formation, such that no prisoner can see another prisoner from his cell.

*Conditions of Solitary Confinement on Pennsylvania's Death Row*

26.     Prisoners are held in solitary confinement at SCI Greene and SCI Graterford solely because they have been sentenced to death, and not based on violation of any prison rules or specific behavioral considerations.

27.     Death-sentenced prisoners are not given a permanent cell assignment in the death row area.  Rather, they are forced to relocate within death row every 90 days.  Thus, death-sentenced prisoners continually move from one cell to another within death row, always in solitary confinement.  As a result, death-sentenced prisoners suffer substantial stress and a heightened sense of disorientation and instability.

28.     On a typical weekday, a death-sentenced prisoner is confined to his one-person cell for at least twenty-two hours, and deprived of environmental stimulation and meaningful

human interaction.  Physical contact is forbidden, and the absence of stimulation and interaction severely harms prisoners' mental and physical health.

29.     On weekdays, weather permitting, a death-sentenced prisoner is allowed out of his cell to "exercise" in a small outdoor pen, often alone, for no more than two hours.  Three times a week, on weekdays, a death-sentenced prisoner may also leave his cell to shower under heavy security in the death row area.  Death-sentenced prisoners are also allowed occasional trips to the law library.

30.     On weekends, a death-sentenced prisoner is not allowed out of his cell at all, except on occasion for a single non-contact visit, which may occur Friday to Sunday.  During these visits, a glass and concrete partition separates the prisoner from his visitor(s).  A death-sentenced prisoner who does not have a visitor on the weekend must spend as much as 70 consecutive hours alone in his cell.

31.     Nighttime, whether weekday or weekend, is not markedly different from daytime on death row, with each individual cell illuminated at night almost as brightly as it is during the day.  Officers perform a cell check every 15 minutes during the day and every 30 minutes at night, which is substantially more frequent than prisoners in the general population experience. A cell check requires an officer to enter and exit each tier in the death row area through a solid steel door set in the cell block's concrete walls, which fills the tier with the jarring sound of colliding steel.  The process of repeated entry and exit from each tier, and the use of bright flashlights by officers to perform cell checks, throughout the night make it extremely difficult for death-sentenced prisoners to sleep.  The problem is even worse in the winter months, when inadequate heat leaves death-sentenced prisoners cold and unable to sleep.

32.     On the occasions when a death-sentenced prisoner is permitted to leave his cell, he is subjected to a full strip search, then must place his hands through the small slot in the cell door to be handcuffed, and is then manacled on both feet and around his waist.  When in the visiting area, the death-sentenced prisoner remains fully shackled and is not permitted physical contact with his visitor.  Prisoners in the general population are not subjected to strip searches every time they exit their cells.  Nor are they routinely shackled hand, foot and waist.

33.     Death-sentenced prisoners cannot participate in any vocational, recreational or educational programs at the prison.  Hence, death-sentenced prisoners spend almost all of their time idle and alone in their cells.

34.     Finally, a death-sentenced prisoner, unlike other prisoners, is not allowed to participate in any form of communal religious worship or prayer.  His only outlet for religious worship is solitary expression in his cell or a non-contact meeting with a spiritual advisor, such as a priest, minister, rabbi or imam.

35.     These restrictions, taken *in toto*, deprive death-sentenced prisoners of virtually all meaningful human contact.  Indeed, on weekdays when no exercise is permitted and on most weekends, a few words exchanged with an officer as a food tray is delivered or removed may be the only human contact that a death-sentenced prisoner experiences—if he experiences even that.

36.     By contrast, though they also live in a maximum security setting at SCI Greene and SCI Graterford, prisoners in the general population have comparatively few restrictions. They live in a dormitory setting or in a cell-block with others and are constantly interacting. They have opportunities for socialization—one-on-one or group conversations; multiple periods of congregate indoor and/or open-air exercise each day; and educational classes, vocational training, and recreational programs.  Prisoners in the general population also have access to

indoor and outdoor exercise equipment, and to employment opportunities that take them to different parts of the prison, allow them to spend time outside, and offer a chance to advance to higher skill levels and higher pay. Prisoners in the general population eat together in a cafeteria, have contact visits, are not limited in the number of phone calls they may place, and may engage in private consultations with medical and mental health staff. Moreover, they are allowed to move through a vastly greater area of the prison, are only strip-searched in response to a particular security threat, and are required to change cells with considerably less frequency.

37.    Other prisoners at SCI Greene and SCI Graterford who have been convicted of murder, including former death-sentenced prisoners now serving life sentences, are frequently housed with the general prison population, are able to participate in prison programming, and are not locked in their cells for twenty-two hours a day.

38.    Many death-sentenced prisoners suffer from mental illness, which is exacerbated by long-term isolation. Indeed, after prolonged solitary confinement, otherwise healthy prisoners mentally decompensate and lose their ability to function normally. Plaintiff Mark Newton Spotz, who has been held in continuous solitary confinement in SCI Greene for 21 years, describes his experience as "psychological torture," where prisoners are "treated like animals" and forced to "depend on everybody for everything." He feels "trapped in [his] cell" – and his "mind is like a popcorn machine." Plaintiff Jermont Cox, after 23 years in solitary confinement at SCI Graterford, has difficulty with memory and concentration; he "forgets stuff often" and it "takes [him] a while to read a book." At the same time, he experiences fixations, ruminations and accompanying paranoia and obsessive-compulsive disorder symptoms.

39.    Anthony Reid, Ricardo Natividad, Mark Newton Spotz, Ronald Gibson, and Jermont Cox and all the Class Members whom they seek to represent, spend all or almost all of

each and every day in isolation, denied the normal human interaction that is necessary to sustain mental health and physical well-being. The Commonwealth's blanket policy of subjecting death-sentenced prisoners to automatic and permanent solitary confinement, without any means to challenge that placement, violates the Class Members' constitutional rights.

### *Plaintiffs' Solitary Confinement*

### *Anthony Reid*

40. Plaintiff Anthony Reid has been in solitary confinement at SCI Greene for 27 years. Reid suffers from stress; heightened anxiety; difficulty in concentrating, reading, and writing; irritability; and hopelessness—all of which are recognized effects of prolonged isolation. His psychological problems have been caused and/or exacerbated by his permanent solitary confinement. Yet he remains in solitary confinement, with no opportunity to challenge that confinement under the DOC's blanket policy.

### *Ricardo Natividad*

41. Plaintiff Ricardo Natividad has been in solitary confinement at SCI Graterford for 20 years. Natividad suffers symptoms consistent with prolonged isolation, including anxiety, panic attacks and depression; his prison records identify him as suffering from mental health problems including depression and emotional deterioration. His psychological and medical problems have been caused and/or exacerbated by his permanent solitary confinement. Yet he remains in solitary confinement, with no opportunity to challenge that confinement under the DOC's and SCI Graterford's blanket policy.

### *Mark Newton Spotz*

42. Plaintiff Mark Newton Spotz has been in solitary confinement at SCI Greene for 21 years. Spotz is experiencing severe symptoms of prolonged isolation, including anxiety, stress, short-term memory problems, depression, hopelessness, and auditory and visual

hallucinations. He has been diagnosed with acute stress disorder and post-traumatic stress disorder, among other diagnoses, and he experiences nightmares, hallucinations and flashbacks. He has been prescribed medications for his depression and anxiety disorders over the years, but they have not relieved his symptoms. He attempted suicide in 2017. His psychological and medical problems have been caused and/or exacerbated by his permanent solitary confinement. Yet he remains in solitary confinement, with no opportunity to challenge his continuing isolation under the DOC's blanket policy.

### *Ronald Gibson*

43.     Plaintiff Ronald Gibson has been in solitary confinement at SCI Greene for 26 years. Gibson suffers from many symptoms of prolonged isolation, including high levels of anxiety, a diminished ability to concentrate, short-term memory loss, and feelings of hopelessness and depression. He is also now suffering from uveitis, which requires that he protect his eyes from the glare of the lights on death row. His psychological and medical problems have been caused and/or exacerbated by his permanent solitary confinement. Yet he remains in solitary confinement, with no opportunity to challenge that confinement under the DOC's blanket policy.

### *Jermont Cox*

44.     Plaintiff Jermont Cox has been in solitary confinement at SCI Graterford for 23 years. Cox's prolonged isolation has led to anxiety and panic attacks, depression, sound and light sensitivity, sleeping difficulties, feelings of anger and difficulties in dealing with others. He also suffers from memory and concentration problems, and experiences mental fixation, rumination, and paranoiac and obsessive-compulsive behaviors. His psychological and medical problems have been caused and/or exacerbated by his permanent solitary confinement. Yet he

remains in solitary confinement, with no opportunity to challenge that confinement under the DOC's blanket policy.

### *Prisoners Housed in Prolonged Solitary Confinement Suffer Severe Harm*

45.     Plaintiffs' psychological and medical symptoms mirror those reported in the literature about individuals held in prolonged solitary confinement.  Indeed, the extreme duration of Plaintiffs' and Class Members' confinement has meant that, for them, the effects of solitary confinement have become even more damaging.

46.     Prolonged solitary confinement causes painful, severe and sometimes irreversible harm.  The physical and psychological toll of prolonged solitary confinement is well-established: A substantial body of literature over the last two hundred years documents distinctive and inescapable patterns of physiological and psychological harm when individuals are placed in long-term solitary confinement.  In fact, over a century ago the U.S. Supreme Court noted that:

> [Prisoners subject to solitary confinement] fell, after even a short confinement, into a  semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane;  others still,  committed suicide; while those who stood  the ordeal better were not generally reformed, and in most cases did not recover sufficient  mental activity to be of any subsequent service to the community.

*In re Medley*, 134 U.S. 160, 168 (1890).[10]

---

[10] Even earlier, Charles Dickens was commenting on the effects of solitary confinement—including at Pennsylvania's own Eastern State Penitentiary.  Dickens wrote:

> I believe that very few men are capable of estimating the immense amount of torture and agony which this dreadful punishment, prolonged for years, inflicts upon the sufferers; and in guessing at it myself, and in reasoning from what I have seen written upon their faces, and what to my certain knowledge they feel within, I am only the more convinced that there is a depth of terrible endurance in which none but the sufferers themselves can fathom, and which no man has a right to inflict upon his fellow creature. . . .

> I hold this slow and daily tampering with the mysteries of the brain to be immeasurably worse than any torture of the body; and because its ghastly signs and tokens are not so palpable to the eye and sense of touch as scars upon the flesh; because its wounds are not upon the surface, and it extorts few cries that human ears can hear; therefore the more I denounce it, as a secret punishment which slumbering humanity is not roused up to stay.

Charles Dickens, *American Notes for General Circulation* 238-239 (London, Chapman and Hall, 1842).

47.     There is broad consensus in the medical and psychiatric communities, as well.[11]
Indeed, as far back as the 1960s, studies of solitary confinement reported observable negative
effects among prisoners subjected to such conditions.[12]  As one prison staff psychiatrist stated in
2002, "[i]t's a standard psychiatric concept, if you put people in isolation, they will go insane . . .
Most people in isolation will fall apart."[13]  An amicus brief filed in the U.S. Supreme Court by
psychologists and psychiatrists observed, "[n]o study of the effects of solitary or supermax-like
confinement that lasted longer than 60 days failed to find evidence of negative psychological
effects."  Br. of Professors and Prac. of Psychol. & Psychiatry as *Amici Curiae* in Support of
Resp. at 4, *Wilkinson v. Austin*, No. 04-4995 (U.S. Mar. 3, 2005), available at
https://goo.gl/nbHV9u (last viewed Dec. 18, 2017).  "The overall consistency of th[o]se findings
– the same or similar conclusions reached by different researchers examining different facilities,

---

And a decade previously, Alexis de Tocqueville said this about solitary confinement at the Auburn Penitentiary in New York:  "[I]n order to reform them, they had been submitted to complete isolation; but this absolute solitude, if nothing interrupt it, is beyond the strength of man; it destroys the criminal without intermission and without pity, it does not reform, it kills."  Gustave de Beaumont & Alexis de Tocqueville, *On the Penitentiary System in the United States:  And Its Application in France* 5 (Philadelphia, Carey, Lea & Blanchard, 1833), available at https://babel.hathitrust.org/cgi/pt?id=pst.000001152418 (last viewed Dec. 18, 2017).

[11] There is, for example, consensus in the literature that prisoners subjected to solitary confinement, even for a relatively short amount of time, risk severe emotional, psychological and physiological damage.  *See, e.g.*, Alison Shames et al., *Solitary Confinement: Common Misconceptions and Emerging Safe Alternatives* 17, Vera Inst. of Justice (May 2015) (noting that after only seven days in solitary confinement, prisoners experience a range of symptoms including "hypersensitivity to stimuli, distortions and hallucinations, increased anxiety and nervousness, diminished impulse control, severe and chronic depression, appetite loss and weight loss, heart palpitations, talking to oneself, problems sleeping, nightmares, [and] self-mutilation"), available at goo.gl/tmH1nc (last viewed Dec. 18, 2017); Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. UNIV. J.L. & POL'Y 325, 338 (2006) ("By now the potentially catastrophic effects of restricted environmental stimulation have been the subject of a voluminous medical literature."); Ass'n of State Corr. Adm'rs, The Arthur Liman Pub. Interest Program, Yale L. Sch., *Aiming to Reduce Time-In-Cell: Reports from Correctional Systems on the Numbers of Prisoners in Restricted Housing and on the Potential of Policy Changes to Bring About Reforms* at 22 (Nov. 2016).

[12] *See* Bruno M. Cormier & Paul J. Williams, *Excessive Deprivation of Liberty*, 11 CANADIAN PSYCHIATRIC ASS'N J. 470-484 (1966); Hans Toch, *Men in Crisis: Human Breakdowns in Prison* (1975); Craig Haney & Mona Lynch, *Regulating Prisons of the Future*: *A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. REV. L. & SOC. CHANGE 477 (1997).

[13] Human Rights Watch, *Ill-Equipped: U.S. Prisons and Offenders with Mental Illness* 149 & n.512 (2003), available at goo.gl/ZxgPRB (emphasis omitted) (last viewed Dec. 18, 2017).

in different parts of the world, in different decades, using different research methods – is striking." *Id.* at 22.

48.     By definition, solitary confinement isolates prisoners from social interactions, restricts environmental stimulation, and strips them of all control over their daily life.  This combination of factors results in a number of harmful psychiatric effects, including hypersensitivity to external stimuli, perception distortions, claustrophobia, delusions and hallucinations, and panic attacks.  Minimal social and environmental stimulation has serious effects on an individual's mental functioning.  Prisoners housed in solitary confinement report difficulty with thinking, concentration and memory, intrusive obsessional thoughts, increased anxiety and nervousness, overt paranoia, severe and chronic depression, and problems with impulse control.[14]

49.     Researchers have found that negative physiological effects may be directly caused by the prisoners' physical state of confinement.[15]  For example, lower levels of brain function as a result of solitary confinement, including a decline of electroencephalogram activities after only seven days in solitary confinement, have been observed.[16]  Additionally, prisoners complain of abdominal pains, as well as muscle pains in the neck and back, which may be caused by long periods of forced inactivity.[17]  Further, many researchers conclude that some adverse

---

[14] Am. Civil Liberties Union, *The Dangerous Overuse of Solitary Confinement in the United States* 4 & nn.15-25 (Aug. 2014) (citing numerous studies discussing the effects of solitary confinement), available at goo.gl/Iwcbq3 (last viewed Dec. 18, 2017); Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQUENCY 124, 130-132 (2003) (referencing various studies on solitary confinement), available at goo.gl/0Qfp2V (last viewed Dec. 18, 2017); Sal Rodriguez, Solitary Watch, Fact Sheet: Psychological Effects of Solitary Confinement 1 (2011), available at goo.gl/NCsvHY (last viewed  Dec. 18, 2017).

[15] *See* Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates*: *A Brief History and Review of the Literature*, 34 CRIME & JUSTICE 441 (2006), available at goo.gl/2glujG (last viewed Dec. 18, 2017).

[16] Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. UNIV. J.L. & POL'Y at 335-336.

[17] Smith, *supra* note 15, at 489.

consequences of solitary confinement are a direct result of sensory deprivation.[18]  This sensory deprivation often leads to an oversensitivity to normal stimuli; for example, for someone experiencing this kind of deprivation, even a closing door could lead to sleeping difficulties.[19]

50.     Studies have also shown that depriving individuals of social interactions by placing them in solitary confinement over a long period of time can destroy their ability to function normally.[20]   Additionally, studies have found that many individuals in solitary confinement will suffer permanent harm as a result of their confinement, even after its termination.[21]  As one survivor of solitary confinement explained, "[l]ife in the vacuum of a cell is spirit-killing, mind-altering, and the zenith in human cruelty . . . . Deprived of the frame of reference that social interaction provides, you lose the sense of yourself as part of a larger whole, the context in which your existence has meaning.  You struggle to keep your sanity because in the vacuum of that cell, where there is no meaning, your mind tries to create meaning out of nothing, and this can lead you to confuse fantasy with reality."[22]

51.     The risk of self-harm, self-mutilation and suicide is much higher for individuals in solitary confinement.  A 2007 study investigating attempted suicide in six state prison facilities in Oregon identified solitary confinement as one of the main risk factors in suicidal thoughts and suicide attempts.[23]  One study recently found that prisoners in solitary confinement in New York

---

[18] *Id*.

[19] *Id.*

[20] Haney & Lynch, *supra* note 12.

[21] Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. UNIV. J.L. & POL'Y at 332-333.

[22] Wilbert Rideau & Linda LaBranche, *44 Years in Solitary Confinement is Even Worse Than You Can Imagine*, MOTHER JONES, Feb. 22, 2016, available at goo.gl/yr5X9G (last viewed Dec. 18, 2017).

[23] Ildiko Suto, Doctoral Dissertation, *Inmates Who Attempted Suicide in Prison: A Qualitative Study* at 43, Pac. Univ. (July 27, 2007), available at goo.gl/1ZGqpo (last viewed Dec. 18, 2017); Am. Psychiatric Ass'n, *Psychiatric Services in Correctional Facilities* at 14 (3d ed. 2016).

City jails were 6.9 times more likely to harm themselves than those in the general population.[24] Even more tragically, approximately fifty percent of all prisoner suicides occur among prisoners in solitary confinement, even though prisoners in solitary usually constitute only a small percentage of the total prisoner population.[25]  One court recently noted that solitary confinement in Indiana resulted in a disproportionately higher percentage of suicides among prisoners in solitary confinement compared with those in the general population.[26]

52.     Adverse psychological effects of isolation are especially significant for persons with serious mental illness.  The extreme deprivations imposed by solitary confinement exacerbate symptoms of mental illness or provoke a recurrence, and can cause severe impairment in one's ability to function.[27]  As the United States Department of Justice ("DOJ") noted in a 2014 investigation of the Pennsylvania Department of Corrections, isolating prisoners with serious mental illness "exacerbates their mental illness and leads to serious psychological and physiological harm . . . including severe mental deterioration, psychotic decompensation, and acts of self-harm."[28]

53.     A 2016 DOJ report, aimed at offering recommendations for safely reducing the use of "restrictive housing" (a euphemism for solitary confinement), includes guiding principles for American correctional facilities.  The Guidelines state that "inmates with serious mental

---

[24] Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 AM. J. PUB. HEALTH 442, 442- 447 (Mar. 2014), available at goo.gl/dma34K (last viewed Dec. 18, 2017).

[25] Stuart Grassian & Terry Kupers, *The Colorado Study vs. the Reality of Supermax Confinement* at 11 (2011), available at goo.gl/ERzw3z (last viewed Dec. 18, 2017).

[26] *Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r*, No. 1:08-CV-01317-TWP-MJD, 2012 WL 6738517, at *16 (S.D. Ind. Dec. 31, 2012).

[27] Human Rights Watch, Callous and Cruel: Use of Force against Inmates with Mental Disabilities in US Jails and Prisons at 32-36 (May 2015), available at goo.gl/3n2j9S (last viewed Dec. 18, 2017).

[28] Letter from Jocelyn Samuels, Acting Assistant Att'y Gen., Civil Rights Div., U.S. Dep't of Justice, to Hon. Tom Corbett, Governor, Feb. 24, 2014, at 3, available at goo.gl/TyUZyT (investigation of the Pennsylvania Department of Corrections' Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities) (last viewed Dec. 18, 2017).

illness (SMI) should not be placed in restrictive housing."[29]   Similarly, Human Rights Watch recommends that prisoners with mental disabilities should not be housed in solitary confinement.[30]

54.     In addition to the negative mental health consequences of isolation, conditions in solitary confinement units are also associated with harm to physical health.  For example, social isolation and loneliness are critical risk factors for the development and/or worsening of many serious medical conditions.[31]   Imposed social isolation has been studied in animals and has been shown to promote a wide range of adverse health outcomes including decreased lifespan, obesity and Type 2 Diabetes mellitus, increased circulating stress hormones, poor prognosis following stroke, and others.[32]   In humans, studies show that social isolation has a significant adverse effect on physical and mental health, immune responses, functional ability, and important health behaviors capable of hastening the onset and course of medical illness (such as medication adherence, inactivity, and smoking).[33]   Other studies have shown that loneliness is a significant, independent risk factor for memory impairment, including dementia and Alzheimer's disease.[34]   Prisoners of older age, with chronic medical conditions, and/or with physical disabilities, are also at high risk of immediate and future harm from the conditions

---

[29] U.S. Dep't Justice, Rep. and Recommendations Concerning the Use of Restrictive Housing at 99 (Jan. 2016), available at goo.gl/ky0xEg (last viewed Dec. 18, 2017).

[30] Human Rights Watch, Callous and Cruel, *supra* note 27.

[31] Aparna Shankar et al., Loneliness, Social Isolation, and Behavioral and Biological Health Indicators in Older Adults, 30 HEALTH PSYCHOL. 377, 383 (2011), available at https://pdfs.semanticscholar.org/c468/3c7b9c807385fe85a2b341a20fd225d4ab4d.pdf (last viewed Dec. 18, 2017).

[32] John T. Cacioppo & Louise C. Hawkley, *Perceived Social Isolation and Cognition*, 13 TRENDS IN COGNITIVE SCI. 447, 447–54 (Oct. 2009).

[33] Shankar et al., *supra* note 31 at 382-83.

[34] Reijo S. Tilvis et al., *Predictors of Cognitive Decline and Mortality of Aged People over a 10-Year Period*, 59A J. GERONTOLOGY MED SCIS. 268, 268–74 (2004); Robert S. Wilson et al., *Loneliness and Risk of Alzheimer Disease*, 64 ARCHIVES OF GEN. PSYCHIATRY 234, 234–40 (Feb. 2007).

in solitary confinement due to the deconditioning that results from extreme idleness and an inability to engage in appropriate levels of physical activity.[35]

55.     Increasingly, neuroscientists are also raising concerns over the potential impact of solitary confinement on the human brain.   An expert panel convened by the American Association for the Advancement of Science pointed out that although few human studies have been done, there is a vast body of research about how the brain responds to elements of solitary confinement, such as lack of physical interaction with the natural world, lack of social interaction, lack of touch and visual stimulation – and each of these elements alone can dramatically alter the brain.[36]   The brain's architecture can actually change over time when humans are subjected to extended periods of stress or depression.   For example, the hippocampus, which is critical to memory, geographic orientation, cognition and decision-making, will dramatically shrink in the brains of people subjected to such conditions.[37]

56.     Recognizing the dangers associated with prolonged solitary confinement, numerous legal and medical organizations have issued statements opposing long-term solitary confinement.   For example, the American Bar Association (ABA) urges that "[s]egregated housing should be for the briefest term and under the least restrictive conditions practicable."[38]

---

[35] *See, e.g.*, Christine K. Cassel, *Use It or Lose It: Activity May Be the Best Treatment for Aging*, 288 JAMA 2333, 2333–35 (2002); Angela Gillis & Brenda MacDonald, *Deconditioning in the Hospitalized Elderly*, 101 Can. Nurse 16, 16–20 (2005).

[36] Nadia Ramlagan, *Solitary Confinement Fundamentally Alters the Brain, Scientists Say*, AM. ASS'N FOR THE ADVANCEMENT OF SCI. (Feb. 15, 2014), available at https://www.aaas.org/news/solitary-confinement-fundamentally-alters-brain-scientists-say (last viewed Dec. 18, 2017).

[37] Joseph Stromberg, *The Science of Solitary Confinement*, SMITHSONIAN.COM (Feb. 19, 2014), available at https://www.smithsonianmag.com/science-nature/science-solitary-confinement-180949793/ (last viewed Dec. 18, 2017).

[38] ABA Standards for Criminal Justice, *Treatment of Prisoners* Standard 23-2.6(a), at 50 (3d ed. 2011), available at goo.gl/zIBJ8E (last viewed Dec. 18, 2017); *see also* National Commission on Correctional Health Care, Solitary Confinement (Isolation) (2016), available at http://www.ncchc.org/solitary-confinement (acknowledging that "[p]rolonged (greater than 15 consecutive days) solitary confinement is cruel, inhumane, and degrading treatment, and harmful to an individual's health" and correctional health professionals should not "condone" or "participate" in such treatment) (last viewed Dec. 18, 2017).

57.    Similarly, a bipartisan Commission on Safety and Abuse in America's Prisons commissioned by the Vera Institute of Justice recommended that correctional facilities "[e]nd conditions of isolation," calling solitary confinement "expensive and soul-destroying."[39] Members of the Commission include a former Chief Judge of the U.S. Court of Appeals for the Third Circuit, a former Attorney General of the United States, a former Director of the Southern Center for Human Rights, a former prisoner, and a former federal prison warden.[40]

58.    In 2012, the American Psychiatric Association (APA) issued a formal policy statement against solitary confinement, noting that "[p]rolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates."[41]

*Requiring All Death-Sentenced Prisoners to be Housed in Solitary Confinement Does Not Promote Safety and Security and is Inconsistent with Mainstream Correctional Practice*

59.    As set forth above, the Class Members' placement in solitary confinement is not based on disciplinary violations or individualized considerations of their behavior.  In the Commonwealth, the DOC automatically places the Class Members in permanent solitary confinement based solely on their criminal sentence.

60.    A 2016 report by the DOJ concerning the use of restrictive housing recommends that "[c]orrectional systems should always be able to clearly articulate the specific reason(s) for an inmate's placement and retention in restrictive housing," "[t]he reason(s) should be supported by objective evidence," and placement should extend "for no longer than necessary to address

---

[39] John J. Gibbons & Nicholas deBelleville Katzenbach, *Confronting Confinement: A Report of The Commission on Safety & Abuse in America's Prisons*, 22 WASH. UNIV. J. LAW & POLICY 385, 470 (June 2006), available at https://goo.gl/YdoFCp (last viewed Dec. 18, 2017).

[40] John E. Dannenberg, *Confronting Confinement, A Report On Safety and Abuse In America's Prisons* (Feb. 15, 2007), Prison Legal News, available at goo.gl/OfiEJb (last viewed Dec. 18, 2017).

[41] APA, Position Statement on Segregation of Prisoners with Mental Illness (2012), available at goo.gl/r2LXEl (last viewed Dec. 18, 2017).

the specific reason(s) for placement."[42]   Additionally, the report observes that "[r]estrictive housing should always serve a specific penological purpose."[43]

61.     The DOC's blanket policy of housing all death-sentenced prisoners in solitary confinement serves no penological purpose.

62.     A report by the National Institute of Justice of the DOJ found that "almost no literature documents the utility of [administrative segregation] or demonstrates that the use of [restrictive housing] has achieved specific aims in demonstrable ways . . . . [I]t is virtually impossible to find empirical evidence supporting its utility or efficacy."[44]

63.     The DOC's blanket policy of housing all death-sentenced prisoners in permanent solitary confinement also is inconsistent with accepted correctional practices.   Studies show prisoners convicted of murder are not more violent and are no more of a security risk than prisoners convicted of other crimes.   Additionally, their rates of "violent or assaultive rule infractions" have been found to be "below or near the mean for the entire inmate cohort."[45]

64.     A study conducted by forensic psychologists comparing the institutional violence histories of death-sentenced prisoners with those of other prisoners at Potosi Correctional Center, a maximum-security facility in Missouri, shows death-sentenced individuals who are classified using the same processes as other prisoners and are sometimes integrated into general population have rates of institutional violence that are comparable to those of prisoners sentenced to life

---

[42] Rep. and Recommendations Concerning the Use of Restrictive Housing, *supra* note 29, at 94.

[43] *Id*.

[44] Natasha A. Frost & Carlos E. Monteiro, *Administrative Segregation in U.S. Prisons: Executive Summary* at 4, Nat'l Inst. of Justice (Mar. 2016), available at goo.gl/43Qt8t (last viewed Dec. 18, 2017).

[45] Jon Sorensen & Mark D. Cunningham, *Conviction Offense and Prison Violence: A Comparative Study of Murderers and Other Offenders*, 56 CRIME & DELINQUENCY 103, 114 (Jan. 2010), available at goo.gl/ecg3qR (last viewed Dec. 18, 2017).

without parole and significantly lower than those of parole-eligible prisoners.[46]  In fact, death-sentenced prisoners are statistically less violent than prisoners who are eligible for parole.[47]

65.     Accepted correctional practice dictates that an individualized assessment and classification is appropriate for death-sentenced prisoners, rather than automatic assignment to solitary confinement.  In an amicus brief supporting a prisoner challenging another State's similar death row solitary confinement policy, corrections professionals, including former directors of several state prison systems, cited evidence showing that individualized assessment and classification based on objective factors, such as age and disciplinary history, is more predictive for security purposes than classifications based on conviction status.[48]  They cited the work of Dr. James Austin, who has researched and written extensively on prison classification. Dr. Austin advocates introducing a classification model that focuses on objective factors that are predictive of a prisoner's behavior, such as age, recent disciplinary action, and history of violence while incarcerated, rather than non-predictive factors such as the severity of the offense or sentence length.[49]

66.     The Association of State Correctional Administrators has issued a report calling prolonged isolation of prisoners "a grave problem in the United States."[50] That report analyzes the use of solitary confinement across the country and notes nationwide efforts to improve

---

[46] Mark D. Cunningham et al., *Is Death Row Obsolete? A Decade of Mainstreaming Death-Sentenced Inmates in Missouri*, 23 BEHAV. SCI. LAW 307, 316-319 (2005).

[47] *Id*. at 316.

[48] Brief of *Amici Curiae* Correctional Experts in Support of Appellee at 21, Doc No. 36-1, *Prieto v. Clarke*, No. 13-8021 (4th Cir. June 4, 2014), available at https://www.aclu.org/sites/default/files/assets/amicusbrieffiled.pdf (last viewed Dec. 18, 2017).

[49] James Austin, *Findings in Prison Classification and Risk Assessment* at 5, Nat'l Inst. of Corr., U.S. Dep't of Justice (June 25, 2003), available at goo.gl/Tx0rYw ("Very few persons convicted of murder, a sex offense, or with a long prison term become management problems or escape.") (last viewed Dec. 18, 2017).

[50] Ass'n of State Corr. Adm'rs, The Arthur Liman Pub. Interest Program, Yale L. Sch., *Aiming to Reduce Time-In-Cell: Reports from Correctional Systems on the Numbers of Prisoners in Restricted Housing and on the Potential of Policy Changes to Bring About Reforms* at 1 (Nov. 2016).

"restrictive housing" conditions, focusing specifically on jurisdictions revising the criteria for being placed in solitary confinement.[51]

67.     In addition, several states have successfully integrated death-sentenced prisoners into the general prison population or have eliminated their practice of automatically assigning death-sentenced prisoners to solitary confinement.  Delaware, for example, integrated all death-sentenced prisoners in August 2016, allowing death-sentenced prisoners to live with other, non-death-sentenced inmates and increasing five-fold the amount of recreation time for death-sentenced prisoners.[52]  Colorado engaged in a similar transition in 2014, eliminating its prior policy of automatically assigning all death-sentenced prisoners to solitary confinement.[53]  California determines the housing environment of death-sentenced prisoners based on behavioral criteria, not merely the nature of their sentence.[54]  In Missouri, death-sentenced prisoners have been classified using the same criteria as all other prisoners since 1991.[55]  And North Carolina allows death-sentenced prisoners to shower and exercise unshackled and in a group setting.[56]  As these examples show, eliminating the solitary nature of death-sentenced prisoners' incarceration is neither impossible nor impractical.

68.     The ABA's *Standards for Criminal Justice, Treatment of Prisoners,* instructs that while death-sentenced prisoners might be separated from other prisoners, they should be housed

---

[51] *Id*. at 4-5.

[52] Randall Chase, *Delaware Quietly Disbands Death Row*, Delaware State News, Dec. 9, 2016, available at http://delawarestatenews.net/news/delaware-quietly-disbands-death-row/ (last viewed Dec. 18, 2017).

[53] *See* Arthur Liman Public Interest Program, Yale Law School, *Rethinking Death Row: Variations in the Housing of Individuals Sentenced to Death,* July 2016, at 15, available at https://goo.gl/JZB1KG (last viewed Dec. 18, 2017).

[54] Cal. Condemned Manual at 15, § 301; San Quentin Operational Procedure, No. 608 (2013) [on file with counsel].

[55] Mark D. Cunningham et al., *ls Death Row Obsolete? A Decade of Mainstreaming Death-Sentenced Inmates in Missouri,* 23 BEHAV. SCI. LAW 307 (2005).

[56] State of N.C., Dep't of Correction, Div. of Prisons, Policy & Procedures, Ch. C. § 1200, Conditions of Confinement, § 1216(b), (Nov. 1, 2011), available at http://www.doc.state.nc.us/dop/policy_procedure_manual/C1200.pdf (last viewed Dec. 18, 2017); *see also id.* § 1218(a) (authorizing death-sentenced prisoners to receive work assignments).

in conditions comparable to those of the general population, with solitary confinement being used only for brief periods, only when related to compelling reasons of security, crime or discipline, and only with adequate procedural protections.[57]

*Solitary Confinement of Death-Sentenced Prisoners Violates*
*Internationally Recognized Human Rights Law*

69.     The United States is a party to international treaties bearing on prolonged solitary confinement.[58]  The United States has ratified the International Covenant on Civil and Political Rights (ICCPR) (in 1992) and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) (in 1994), both of which prohibit torture and other cruel, inhuman, or degrading treatment or punishment.  As treaties signed by the President and ratified by the Senate, these treaties are "the supreme law of the land."  U.S. Const. Art. VI cl. 2. Both treaties have been interpreted to prohibit the use of prolonged solitary confinement.

70.     Article 7 of the ICCPR provides that "[n]o one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."  Article 10 of the ICCPR mandates that "the penitentiary system shall comprise treatment of prisoners the essential aim of which shall be their reformation and social rehabilitation."[59]  The Human Rights Committee (HRC) has clarified

---

[57] ABA Standards for Criminal Justice, *Treatment of Prisoners supra* note 38, at 50, 57 (Standards 23-2.6(a), 23-2.9).

[58] International tribunals have also unanimously condemned the use of prolonged solitary confinement. The Inter-American Court of Human Rights has repeatedly found violations of international human rights law based on prolonged solitary confinement. For example, in *Aranguren   (Detention Center of Catia) v. Venezuela,* the Court held that "solitary confinement cells must be used as disciplinary measures or for the protection of persons only during the time necessary and in strict compliance with the criteria of reasonability, necessity and legality." Judgement ¶ 94 (July 5, 2006) (footnote omitted), available at goo.gl/83ighj (last viewed Dec. 18, 2017). In *Velásquez-Rodríguez v. Honduras,* the Inter-American Court held that "prolonged isolation and deprivation of communication is in itself cruel and inhuman treatment which harms the psychological and moral integrity of the person, and violates the right of every detainee ... to treatment respectful of his dignity."  Judgement ¶ 187 (July 21, 1989), available at goo.gl/4SvJAV (last viewed Dec. 18, 2017). Similarly, the European Court of Human Rights held in *A.B. v. Russia* that detaining an individual in solitary confinement for three years constituted a violation of Article 3 of the European Convention on Human Rights which prohibits "torture or inhuman or degrading treatment or punishment." App. No. 1439/06, Judgement ¶ 99 (Oct. 14, 2010), available at goo.gl/nKbrBc (last viewed Dec. 18, 2017).

[59] ICCPR, art. 10, Dec. 19, 1966, 999 U.N.T.S. 176.

that the ICCPR's prohibition of torture and other cruel, inhuman or degrading treatment under international law includes physical as well as mental pain and asserted "that prolonged solitary confinement" may violate this prohibition.[60] The HRC has repeatedly heard alleged violations of Articles 7 and 10 of the ICCPR from prisoners subjected to solitary confinement. On multiple occasions, the HRC has found that prolonged solitary confinement violates these articles.[61] The HRC has also repeatedly recommended that in order to fulfill its obligations under the ICCPR, the United States "should impose strict limits on the use of solitary confinement, both pretrial and following conviction, in the federal system as well as nationwide . . . ."[62]

71.     Article 1 of the CAT defines torture as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . punishing him for an act he or a third person has committed . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.[63]

72.     In a 2011 report to the General Assembly, the United Nations (U.N.) Special Rapporteur on torture, Juan Mendez, concluded that prolonged solitary confinement was prohibited by the ICCPR and CAT.  Mendez wrote, "No prisoner, including those serving life

---

[60] Human Rights Comm. on Its Forty-Fourth Session, General Comment 20, art. 6, U.N. Doc. HRI/GEN/1/Rev.9 (Mar. 1992), http://ccprcentre.org/ccpr-general-comments.

[61] *See, e.g.*, Xavier Evans v Trinidad and Tobago, U.N. Human Rights Comm., Commc'n No. 908/2000, U.N. Doc. CCPR/C/77/D/908/2000 (1999); Violeta Stetlich v Uruguay, U.N. Human Rights Comm., Commc'n No. 63/1979, U.N. Doc. CCPR/C/OP/1 (1985); Estrella v Uruguay, U.N. Human Rights Comm., Commc'n No. 74/1980, U.N. Doc. CCPR/C/18/D/74/1980 (1983).

[62] U.N. Human Rights Comm., *Concluding Observations of the Human Rights Committee: United States of America* ¶ 20 (2014), U.N. Doc. CCPR/C/USA/CO/4/; U.N. Human Rights Comm., *Concluding Observations of the Human Rights Committee: United States of America* ¶ 32 (2006), U.N. Doc. CCPR/C/USA/CO/3/Rev. 1 (Dec. 18, 2006) ("It is particularly concerned by the practice in some such institutions to hold detainees in prolonged cellular confinement, and to allow them out-of-cell recreation for only five hours per week, in general conditions of strict regimentation in a depersonalized environment.  It is also concerned that such treatment cannot be reconciled with the requirement in article 10 (3) that the penitentiary system shall comprise treatment the essential aim of which shall be the reformation and social rehabilitation of prisoners.").

[63] ICCPR, art. 1, Dec. 10, 1984, 1465 U.N.T.S. 113-114, available at https://goo.gl/PrU2g7 (last viewed Dec. 18, 2017).

sentence and prisoners on death row, shall be held in solitary confinement merely because of the gravity of the crime."[64]

73.    In the Commonwealth, death-sentenced prisoners are held in solitary confinement based solely upon their sentence.  The automatic, prolonged, and permanent nature of their confinement is in violation of the ICCPR and CAT.

74.    Additionally, in 2015, the U.N. General Assembly adopted the U.N. Standard Minimum Rules for the Treatment of Prisoners, known as the "Nelson Mandela Rules."  The Rules specifically prohibit solitary confinement that is "indefinite" or "[p]rolonged," and emphasize that solitary confinement should be used only as a last resort and for the shortest possible amount of time, and should be subject to independent review by a competent authority.[65]  Solitary confinement is defined by the Nelson Mandela Rules as "confinement of prisoners for 22 hours or more a day without meaningful human contact," and "prolonged solitary confinement" is defined as "a time period in excess of 15 consecutive days."[66]  The Rules also prohibit imposition of solitary confinement by virtue of a prisoner's sentence and likewise disallow the use of solitary confinement when it would exacerbate a prisoner's pre-existing mental or physical disabilities.[67]

75.    Additionally, in its Periodic Report to the U.N. Committee Against Torture, the United States confirmed that persons with a "serious mental illness" cannot be held in solitary confinement because it violates the Eighth Amendment's prohibition on cruel and unusual punishment.  It further confirmed that subjecting a prisoner to solitary confinement without an

---

[64] Rep. of the Special Rapporteur on Its Sixty-Eighth Session, *Torture and other cruel, inhuman or degrading treatment or punishment*, ¶ 61, U.N. Doc. A/68/295 (Aug. 9, 2013), available at goo.gl/0VntF3 (last viewed Dec. 18, 2017).

[65] *See supra* note 2.

[66] Mandela Rules R. 44 at 14, available at goo.gl/cPT93i (last viewed Dec. 18, 2017).

[67] *Id.* R. 45 at 14

administrative hearing is a violation of the Fourteenth Amendment's guarantee of due process.[68] As a result, the Committee Against Torture has stated, "The [United States] should . . . [l]imit the use of solitary confinement as a measure of last resort, for as short [a] time as possible, under strict supervision and with the possibility of judicial review."[69]

76.     The Inter-American Commission on Human Rights (IACHR) issued a 2011 report that specifically addressed solitary confinement of death-sentenced prisoners, concluding that these prisoners should not be subjected to harsher conditions of imprisonment solely because of their sentence, and more specifically, that they should not be held in prolonged and indefinite solitary confinement.   Prisoners "sentenced to death should not be subjected to harsher conditions of imprisonment than those of the rest of the prison population just because of their status."[70]   The report further stated, "[i]t is not reasonable to presume that all convicts sentenced to capital punishment necessarily have to be imprisoned under maximum security."[71]

77.     Additionally, the IACHR has reiterated its concerns about the use of solitary confinement, stating that "Member States must adopt strong, concrete measures to eliminate the use of prolonged or indefinite isolation under all circumstances."[72]   The Commission has specifically stated that the use of solitary confinement "should be absolutely prohibited . . . for

---

[68] United Nations Committee Against Torture, Periodic Rep. of the U.S. of Am., Art. 16 ¶ 209, Aug. 12, 2013, available at, https://www.state.gov/j/drl/rls/213055.htm. (Dec. 18, 2017).

[69] Comm. against Torture, *supra* note 2, available at goo.gl/K4331B (last viewed Dec. 18, 2017).

[70] IACHR, Rep. on the Human Rights of Persons Deprived of Liberty in the Americas ¶ 517 (Dec. 31, 2011), available at goo.gl/ychkrJ (last viewed Dec. 18, 2017).

[71] *Id.*

[72] Press Release, IACHR Expresses Concern over Excessive Use of Solitary Confinement in the United States (July 18, 2013), available at goo.gl/xgJa8j (last viewed Dec. 18, 2017).

persons with mental disabilities, and for death row and life-sentenced prisoners by virtue of their sentence."[73]

*The DOC Acknowledges the Harms Caused by Prolonged
Solitary Confinement – Except for Death-Sentenced Prisoners.*

78.   The DOC acknowledged publicly in 2016 "the need to reduce the use of administrative segregation (known as restrictive housing in Pennsylvania)" and vowed that it "is committed to doing this."  The DOC reported that "[m]any concepts are now being piloted (or tested, in other words)."[74]

79.   The DOC's commitment and its pilot programs, however, do not include death-sentenced prisoners, all of whom remain subject to the DOC's blanket policy of automatic and permanent solitary confinement.[75]

80.   On February 13, 2017, several of the undersigned sent a letter to Secretary John Wetzel of the Department of Corrections, in an effort to address the issues raised in this lawsuit without litigation.  In that letter, counsel outlined many of the same facts canvassed herein, including the solitary-confinement conditions automatically imposed on all death-sentenced prisoners in Pennsylvania, the decades-long duration of many death-sentenced prisoners' incarceration in these conditions, the arbitrary and incontestable nature of death-sentenced prisoners' solitary confinement, and the profoundly damaging effects that such confinement has

---

[73] *Id.*  In examining death row practices in Texas, for example, the IACHR affirmed that holding death row inmates in solitary confinement for protracted periods violates Article 5 of the American Convention on Human Rights which prohibits the use of "torture or cruel, inhuman, or degrading punishment or treatment." *See, e.g.*, Edgar Tamayo Arias v. United States, Case 12.783, Inter-Am. Comm'n H.R., Report No. 44/14, OEA/Ser.L/V/II.151, doc. 9 ¶ 180 (Jul. 17, 2014); Felix Rocha Diaz v. United States, Case 12.833, Inter-Am. Comm'n H.R., Report No. 11/15, OEA/Ser.L/V/II.154, doc. 5 ¶¶ 88-101 (Mar. 23, 2015).

[74] "Testing Concepts to Reduce Violence and Use of Restricted Housing," Pa. Dept. of Corrections (March 2017), available at https://goo.gl/VPebhr (last viewed Dec. 18, 2017).

[75] Letter from Theron R. Perez, Chief Counsel, Dep't of Corrs. to Witold Walczak, June 9, 2017 ("the Department has determined to continue to administer its current capital housing policy").

on those prisoners' physical and mental health.[76]   Counsel proposed a number of remedial measures, including applying to death-sentenced prisoners housing-classification procedures that resemble the procedures already in use for all other prisoners.

81.     Counsel met with representatives from the DOC on April 3, 2017, to discuss their proposals to modify the Department's policy of automatically and irreversibly assigning all death-sentenced prisoners to indefinite solitary confinement.

82.     In a letter dated June 9, 2017, the DOC rejected those proposals and "determined to continue to administer its current capital case housing policy."[77]

## CLASS ACTION ALLEGATIONS

83.     Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), (b)(1) and (b)(2).

84.     Plaintiffs seek to represent a class consisting of all current and future death-sentenced prisoners in the Commonwealth of Pennsylvania.

85.     The class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). As of November 2017, there are at least 156 death-sentenced prisoners who are living in solitary confinement on death row at SCI Greene and SCI Graterford.  Eighty percent of these prisoners have been held in solitary confinement for over ten years.  The class is also fluid, as prisoners regularly enter and leave the class as a result of court decisions.

86.     There are questions of law and fact common to the members of the class, including but not limited to: (1) whether the Commonwealth's policy that all death-sentenced prisoners be housed in automatic, permanent solitary confinement violates the due process rights

---

[76] Letter from Witold Walczak to John E. Wetzel, Sec'y, Pa. Dep't of Corrs., Feb. 13, 2017, at 1-3.

[77] Letter from Theron R. Perez, Chief Counsel, Dep't of Corrs. to Witold Walczak, June 9, 2017.

guaranteed by the Fourteenth Amendment; and (2) whether this policy constitutes cruel and unusual punishment proscribed by the Eighth Amendment.

87.     The claims of the named Plaintiffs are typical of those of the class.  The named Plaintiffs and the Class Members are all suffering a deprivation of basic human needs due to the same conditions of confinement, imposed pursuant to a single statewide policy, and are all deprived of liberty without due process of law.  While the exact harms suffered may differ slightly for each prisoner, the source of the harm for each individual is the DOC's policy and practice of automatically placing all death-sentenced prisoners in conditions of permanent solitary confinement.

88.     Plaintiffs are capable of fairly and adequately representing and protecting the interests of the class.  Plaintiffs do not have interests that are inconsistent with those of the class, and they are adequately represented by counsel who are experienced in class action cases and civil rights, specifically prisoners' rights, litigation.

89.     This action is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1).  The number of Class Members creates a risk that prosecution of separate actions by individuals would result in inconsistent and varying adjudications that would establish incompatible standards of conduct for Defendants.  Additionally, prosecution of separate actions by individuals would substantially impede the ability of other members to protect their interests.

90.     This action is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) because the DOC's policy of subjecting all death-sentenced prisoners to automatic and permanent solitary confinement is applicable to all Class Members, and injunctive relief is an appropriate remedy for all members of the class.

## CAUSES OF ACTION

### First Cause of Action

**Declaratory Judgment and Injunctive Relief for Violations of Eighth and Fourteenth Amendments (Cruel and Unusual Punishment) Against All Defendants in their Official Capacities on behalf of the Named Plaintiffs and the Class Members**

91.     Plaintiffs bring this claim on their own behalf, and on behalf of the Class Members, against all Defendants.

92.     The DOC's policy and practice of automatically and permanently placing all death-sentenced prisoners in solitary confinement have deprived and continue to deprive Plaintiffs and the Class Members of basic human needs, subjecting them to a substantial risk of serious harm.  This practice violates their human dignity and their constitutional right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments of the Unites States Constitution.   Specifically, Defendants' policies and practices are cruel and unusual because they deprive Plaintiffs and the Class Members of basic human needs, threaten and cause serious and irreparable psychological and physical injury, and violate minimal standards of human dignity.

### *Deprivation of Basic Human Needs*

93.     The physical and psychological consequences of long-term isolation constitute a severe deprivation of fundamental human needs, including but not limited to human interaction, environmental stimulation, sleep, and adequate physical exercise.

### *Serious Psychological and Physical Injury*

94.     This extensive deprivation of basic human needs causes intense psychological anguish and is likely to result in lasting psychological and physical injury to Plaintiffs and the Class Members.

95.     The permanent and undetermined length of solitary confinement to which Plaintiffs and the Class Members are subjected poses significant risk of incapacitation and permanent mental illness and physical harm.

*Deprivation of Human Dignity in Violation of Contemporary Standards*
*of Human Decency and Disproportionate Punishment*

96.     Defendants' policy of permanent placement in solitary confinement inflicts disproportionate punishment on Plaintiffs and the Class Members.

97.     Housing prisoners in these cruel conditions simply because they were sentenced to death serves no valid, lawful purpose.  This policy has no legitimate rationale and does not serve any security needs.

98.     Defendants' years of infliction of mental and physical harm on Plaintiffs and the Class Members strips them of their dignity and worth, transgresses civilized society's notions of decency, and constitutes a practice that is disavowed in modern society.

99.     The fact that Defendants' practices with respect to Plaintiffs and the Class Members violate present-day society's standards of human dignity is also evidenced by the international community's universal condemnation of extended solitary confinement.

*Defendants' Deliberate Indifference to the Deprivations Suffered by Plaintiffs*

100.     The policies that the DOC applies to death-sentenced prisoners have been and continue to be implemented by Defendants with deliberate indifference to the substantial risk of serious harm created by those policies.

101.     The literature on prolonged and indefinite solitary confinement is extensive and unanimous in its conclusions on the harms of solitary confinement.  Defendants have been on notice and continue to be on notice of all of the deprivations stated above and yet have continued to implement the solitary confinement policies described herein.

102.    The mental anguish and suffering arising out of the conditions in which Plaintiffs and the Class Members are confined, and the long-term effects of those conditions, are known to Defendants.  Defendants have frequently been made aware, through administrative grievances and written complaints, that Plaintiffs and the Class Members are presently suffering substantial and ongoing injury.  Moreover, Defendants were made aware, in counsel's February 13, 2017, letter and April 3, 2017, meeting with Defendants' representatives, of these conditions, their damaging impacts, and reasonable alternatives that would mitigate those impacts. Notwithstanding this notice, Defendants have taken no remedial action, and have elected to maintain the current conditions for Plaintiffs and the Class Members.

103.    As a direct and proximate result of Defendants' constitutional violations described above, Plaintiffs and the Class Members have suffered serious harm, and are at substantial risk of serious harm in the future.  Plaintiffs and the Class Members have no adequate remedy at law for Defendants' actions.  Plaintiffs and the Class Members will continue to suffer irreparable harm unless Defendants are enjoined from continuing their unlawful policies, practices and/or customs which have directly and proximately caused these constitutional violations.

104.    Additionally, an actual controversy exists regarding the constitutionality of Defendants' practices and policies regarding the automatic placement of all death-sentenced prisoners in solitary confinement.  A declaration on this issue will resolve that portion of the controversy between the parties, and the Court's determination of the issues will guide Defendants' actions.

## Second Cause of Action

**Declaratory Judgment and Injunctive Relief for Violations of the Fourteenth Amendment (Due Process) Against All Defendants in their Official Capacities on behalf of the Named Plaintiffs and the Class Members**

105.   Plaintiffs bring this claim on their own behalf, and on behalf of the Class Members, against all Defendants.

106.   By denying Plaintiffs and the Class Members any review whatsoever of their prolonged placement in solitary confinement and providing no possibility of removal from complete isolation, Defendants are depriving Plaintiffs and the Class Members of liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

107.   The conditions and the length of confinement to which Plaintiffs and the Class Members are subjected constitute an atypical and significant hardship as compared with the ordinary incidents of prison life for three reasons: (1) the complete isolation on death row; (2) the indefinite and permanent nature of their confinement; and (3) their inability to challenge their placement in solitary confinement.

### Conditions on Death Row

108.   The conditions of death row at SCI Greene and SCI Graterford are unjustifiably severe.  Death-sentenced prisoners are forced to live in isolation in small cells for twenty-two to twenty-four hours a day, seven days a week.  Their ability to exercise is severely limited, and they are denied meaningful human interaction and mental stimulation.

### Duration of Confinement

109.   Plaintiffs and the Class Members have been held in these devastating conditions for years on end.  Over eighty percent of the death-sentenced prisoners have been held in solitary confinement for ten years or more.

*Lack of Any Process*

110.     Plaintiffs and the Class Members are provided no notice of what they can do to be removed from solitary confinement, and there is no process to challenge their ongoing solitary confinement or to determine whether they require confinement in complete isolation.

111.     Defendants violate the due process rights of Plaintiffs and the Class Members by forcing them to live in conditions that impose atypical and significant hardship without procedural protections.

112.     As a direct and proximate result of Defendants' constitutional violations described above, Plaintiffs and the Class Members have suffered serious harm, and are at substantial risk of serious harm in the future.  Plaintiffs and the Class Members have no adequate remedy at law for Defendants' actions.  Plaintiffs and the Class Members will continue to suffer irreparable harm to their constitutional rights unless Defendants are enjoined from continuing their unlawful policies, practices and/or customs which have directly and proximately caused these constitutional violations.

113.     Additionally, an actual controversy exists regarding the constitutionality of Defendants' practices and policies regarding the automatic placement of all death-sentenced prisoners in solitary confinement.  A declaration on this issue will resolve that portion of the controversy between the parties, and the Court's determination of the issues will guide Defendants' actions.

**WHEREFORE**, the named Plaintiffs and Class Members pray for judgment against the Defendants:

(a)     Declaring that this lawsuit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1) and (2);

(b)     Appointing the undersigned class counsel pursuant to Federal Rule of Civil Procedure 23(g);

(c)     Declaring that Defendants' policies and practices of automatically confining all death-sentenced prisoners in indefinite solitary confinement with no opportunity for review violates the Eighth and Fourteenth Amendments of the United States Constitution;

(d)     Granting permanent injunctive relief enjoining Defendants and their predecessors, successors, present or former agents, representatives, those acting in privity and concert with them, or on their behalf, from automatically confining all death-sentenced prisoners in indefinite solitary confinement with no opportunity for review;

(e)     Granting permanent injunctive relief requiring Defendants to present a plan to the Court within 30 days that provides for:

  i.     the promulgation of a meaningful, individualized housing placement procedure for death-sentenced prisoners that is based on validated risk assessment instruments and each prisoner's individual circumstances; is not arbitrary and capricious; and allows death-sentenced prisoners the opportunity to qualify for access to the same housing opportunities as non-death-sentenced prisoners, including placement in either (1) a general population unit, or (2) a modified general population unit, in which the prisoners segregated from the general population have the same privileges as do prisoners in general population;

      ii.    application of the above-described procedures to Pennsylvania's current population of death-sentenced prisoners and all future death-sentenced prisoners;

      iii.    alleviation of the conditions of confinement of all death-sentenced prisoners so that they are no longer are incarcerated under conditions of isolation, sensory deprivation and lack of social and physical human contact; and

      iv.    all other relief to which the class is entitled;

(f)    Awarding Plaintiffs and Class Members their costs and reasonable attorney's fees; and

(g)    Granting such other and further relief as the Court deems just and proper.

Dated: January 25, 2018          Respectfully submitted,

/s/ Witold J. Walczak

Witold J. Walczak, PA 62876
**ACLU OF PENNSYLVANIA**
247 Fort Pitt Blvd.
Pittsburgh, PA  15222
Phone:  (412) 681-7864
Fax:  (412) 681-8707
vwalczak@aclupa.org

David Fathi, WA 24893*
Amy Fettig, DC 484883
Desiree Sholes, VA 92706*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street NW, 7th Floor
Washington, DC  20005
Phone:  (202) 393-4930
Fax:  (202) 393-4931
dfathi@aclu.org
afettig@aclu.org
dsholes@aclu.org

*Not admitted in DC; practice limited to federal courts*

Bret Grote, PA 317273
Jamelia N. Morgan, NY 5351176
**ABOLITIONIST LAW CENTER**
P.O. Box 8654
Pittsburgh, PA  15221
Phone:  (412) 654-9070
bretgrote@abolitionistlawcenter.org
jamelia@alcenter.org

Jonathan H. Feinberg, PA 88227
Susan M. Lin, PA 94184
**KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN LLP**
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA  19106
Phone:  (215) 925-4400
Fax:  (215) 925-5365
jfeinberg@krlawphila.com
slin@krlawphila.com

Barry Gross, PA 21563
Wilson M. Brown, III, PA 25846
Mira E. Baylson, PA 209559
Mark D. Taticchi, PA 323436
**DRINKER BIDDLE & REATH LLP**
One Logan Square, Suite 2000
Philadelphia, PA  19103
Phone:  (215) 988-2700
Fax:  (215) 988-2757
Wilson.Brown@dbr.com
Barry.Gross@dbr.com
Mira.Baylson@dbr.com
Mark.Taticchi@dbr.com

*Attorneys for Plaintiffs*