**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANTHONY REID, RICARDO NATIVIDAD, MARK NEWTON SPOTZ, RONALD GIBSON, and JERMONT COX, on their own behalf and on behalf of a class of similarly situated persons, | : | CIVIL ACTION NO. 18-CV-00176-JEJ |
| *Plaintiffs*, | : | |
| v. | : | (Judge John E. Jones III) |
| JOHN E. WETZEL, Secretary of Corrections of the Commonwealth of Pennsylvania, ROBERT D. GILMORE, Superintendent of State Correctional Institution Greene, and CYNTHIA LINK, Superintendent of State Correctional Institution Graterford, | : | CLASS ACTION |
| *Defendants*. | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR UNOPPOSED MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

Witold J. Walczak, PA 62876
**ACLU OF PENNSYLVANIA**
247 Fort Pitt Blvd.
Pittsburgh, PA 15222
Phone: (412) 681-7864
Fax: (412) 681-8707
vwalczak@aclupa.org

David Fathi, WA 24893*
Amy Fettig, DC 484883
Desiree Sholes, VA 92706*
**ACLU NATIONAL PRISON PROJECT**

915 15th Street NW, 7th Floor
Washington, DC  20005
Phone: (202) 393-4930
Fax: (202) 393-4931
dfathi@aclu.org
afettig@aclu.org
dsholes@aclu.org

*Not admitted in DC; practice
limited to federal courts*

Bret Grote, PA 317273
Jamelia N. Morgan, NY 5351176
**ABOLITIONIST LAW CENTER**
P.O. Box 8654
Pittsburgh, PA  15221
Phone: (412) 654-9070
bretgrote@abolitionistlawcenter.org
jamelia@alcenter.org

Jonathan H. Feinberg, PA 88227
Susan M. Lin, PA 94184
**KAIRYS, RUDOVSKY, MESSING,
FEINBERG & LIN LLP**
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA  19106
Phone: (215) 925-4400
Fax: (215) 925-5365
jfeinberg@krlawphila.com
slin@krlawphila.com

Barry Gross, PA 21563
Wilson M. Brown, III, PA 25846
Mira E. Baylson, PA 209559
Mark D. Taticchi, PA 323436
**DRINKER BIDDLE & REATH LLP**
One Logan Square, Suite 2000
Philadelphia, PA  19103
Phone: (215) 988-2700

Fax: (215) 988-2757
Wilson.Brown@dbr.com
Barry.Gross@dbr.com
Mira.Baylson@dbr.com
Mark.Taticchi@dbr.com

***Attorneys for Plaintiffs***

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION. ...................................................................................1

II.  FACTUAL BACKGROUND...................................................................2

    A.   Plaintiffs' Challenges to the DOC's Capital Case Policy. ..................2

    B.   Solitary Confinement on Pennsylvania's Death Row.........................3

    C.   Recognized Effects of Prolonged Solitary Confinement. ...................7

        1.   Generally. ....................................................................................7

        2.   Declaration of Craig Haney, Ph.D, J.D.....................................8

    D.   Unsound and Cruel Penology, as Even the DOC
        Acknowledges. .................................................................................12

    E.   The Plaintiffs. ..................................................................................15

    F.   The Defendants.................................................................................19

    G.   The Proposed Class. .........................................................................19

III. ARGUMENT..........................................................................................19

    A.   Standards for Class Certification.......................................................19

    B.   The Class Meets All of the Requirements of Rule 23(a). .................22

        1.   The Class Is Ascertainable and So Numerous that Joinder
            Is Impracticable.........................................................................22

        2.   Members of the Class Have Questions of Law and Fact
            in Common.................................................................................24

        3.   The Claims of the Named Plaintiffs are Typical of Those
            of the Class................................................................................27

        4.   The Named Plaintiffs Will Fairly and Adequately Protect
            the Interests of the Class. ..........................................................29

    C.   Plaintiffs Meet the Requirements of Federal Rule 23(b)(2). ............31

    D.   Plaintiffs Also Meet the Requirements of Federal Rule 23(b)(1)......33

    E.   Counsel Meets the Criteria of Rule 23(g). .......................................36

IV.  CONCLUSION.......................................................................................36

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997)............................................................................2, 34, 35

*Ashker v. Governor of State of California*,
  2014 WL 2465191 (N.D. Cal. June 2, 2014)........................................35

*Baby Neal for and by Kanter v. Casey*,
  43 F.3d 48 (3d Cir. 1994) ..........................................................*passim*

*Beck v. Maximus, Inc.*,
  457 F.3d 291 (3d Cir. 2006) ....................................................27, 28

*Berry v. Baca*,
  226 F.R.D. 398 (C.D. Cal. 2005)........................................................35

*Cannon v. Cherry Hill Toyota, Inc.*,
  184 F.R.D. 540 (D.N.J. 1999)........................................................22

*Clarke v. Lane*,
  267 F.R.D. 180 (E.D. Pa. 2010)........................................27, 28, 33

*Clarkson v. Coughlin*,
  783 F. Supp. 789 (S.D.N.Y. 1992) ....................................................32

*Cohen v. Chicago Title Ins. Co.*,
  242 F.R.D. 295 (E.D.Pa. 2007)........................................................35

*Cole v. Livingston*,
  No.4:14-CV-1698, 2016 WL 3258345 (S.D. Tex, June 14, 2016),
  *aff'd*, 868 F.3d 354, 2017 WL 3574968 (5th Cir. Aug. 18, 2017) ....................33

*Coley v. Clinton*,
  635 F.2d 1364 (8th Cir. 1980) ....................................................21, 32

*Colon v. Passaic County*,
  No. 08-4439, 2009 WL 1560156 (D.N.J. May 27, 2009) ..................................33

*Death Row Prisoners of Pennsylvania v. Ridge*,
    169 F.R.D. 618 (E.D. PA 1996) .......................................................................33

*Dittimus-Bey v. Taylor*,
    244 F.R.D. 284 (D.N.J. 2007)...................................................23, 25, 26, 33

*Gates v. Rohm and Haas Co.*,
    655 F.3d 255 (3d Cir. 2011) ..........................................................................20

*Graham v. Parker*,
    No. 16-CV-01954, 2017 WL 1737871 (M.D. Tenn. May 4, 2017) ..................35

*Grant v. Sullivan*,
    131 F.R.D. 436 (M.D. Pa. 1990) ...................................................................23

*Hagan v. Rogers*,
    570 F.3d 146 (3d Cir. 2009) ..........................................................................26

*Hassine v. Jeffes*,
    846 F.2d 169 (3d Cir. 1988) ....................................................................24, 32

*Holmes v. Godinez*,
    311 F.R.D. 177 (N.D. Ill. 2015).....................................................................27

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008) ..................................................................... 19-20

*Ingles v. City of New York*,
    2003 WL 402565 (S.D.N.Y. Feb. 20, 2003) ...........................................35, 36

*Johnston v. HBO Film Mgmt., Inc.*,
    265 F.3d 178 (3d Cir. 2001) ..........................................................................27

*Kalow & Springut, LLP v. Commence Corp.*,
    272 F.R.D. 397 (D.N.J. 2011)........................................................................29

*Logory v. County of Susquehanna*,
    277 F.R.D. 135 (M.D. Pa. 2011) ..............................................................24, 26

*Markocki v. Old Republic Nat'l Title Ins. Co.*,
    254 F.R.D. 242 (E.D. Pa. 2008)................................................................34, 35

*McGee v. Pallito*,
  No. 1:04-CV-0335-JGM, 2015 WL 5177770 (D. Vt. Sept. 4, 2015)................32

*Montgomery Ctny. ex rel. Becker v. Merscorp, Inc.*,
  298 F.R.D. 202 (E.D. PA. 2014) ................................................................23

*New Directions Treatment Servs. v. City of Reading*,
  490 F.3d 293 (3d Cir. 2007) ................................................................29

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999).............................................................................21

*In re OSB Antitrust Litig.*,
  No. 06-826, 2007 U.S. Dist. LEXIS 56617 (E.D. Pa. Aug. 3, 2007)................23

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014), (D. Ariz. 2013) ............................................27, 33

*Scott v. Clarke*,
  61 F. Supp. 3d. 569 (W.D. Va. 2014)....................................................25, 27, 28

*Shelton v. Bledsoe*,
  775 F.3d 554 (3d Cir. 2015) ...........................................................19, 20, 21, 31

*Stewart v. Abraham*,
  275 F.3d 220 (3d Cir. 2001) .................................................................21, 23

*Sullivan v. DB Invs., Inc.*,
  667 F.3d 273 (3d Cir. 2011) .............................................................21

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338, 131 S. Ct. 2541 (2011).......................................................*passim*

*Williams v. City of Philadelphia*,
  270 F.R.D. 208 (E.D. Pa. 2010)............................................................23, 30, 33

*Williams v. Secretary Pennsylvania Department of Corrections*,
  848 F.3d 549 (3d Cir. 2017) ................................................................3

## STATUTES, RULES & REGULATIONS

Fed. R. Civ. P. 23 ................................................................2, 30, 31, 34

Fed. R. Civ. P. 23(a)............................................................................*passim*

Fed. R. Civ. P. 23(a)(1) .................................................................22, 23

Fed. R. Civ. P. 23(a)(2) .................................................................24, 26

Fed. R. Civ. P. 23(a)(3) ......................................................................28

Fed. R. Civ. P. 23(a)(4) .................................................................29, 31

Fed. R. Civ. P. 23(b) ............................................................19, 22, 31

Fed. R. Civ. P. 23(b)(1) .......................................................2, 21, 33, 34

Fed. R. Civ. P. 23(b)(1)(A) ............................................................34, 35

Fed. R. Civ. P. 23(b)(1)(B) .......................................................34, 35, 36

Fed. R. Civ. P. 23(b)(2) ...............................................................*passim*

Fed. R. Civ. P. 23(g) ..........................................................................36

## OTHER AUTHORITIES

7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and
    Procedure* § 1762 (3d ed. 2005) ........................................................22

DOC Death-Sentenced Report at
    http://www.cor.pa.gov/General%20Information/Documents/Death
    %20Penalty/Current%20Execution%20list.pdf ..................................22

Rubenstein, Newberg on Class Actions, § 3:27 (5th ed.) .......................................25

U.S. Constituion, Eighth Amendment ............................................................*passim*

U.S. Constituion, Fourteenth Amendment..............................................1, 13, 25, 34

## I.    INTRODUCTION.

A person sentenced to death in Pennsylvania is held in solitary confinement from the time he is sentenced until he dies by execution or of natural causes.  This is a long-standing written policy of Pennsylvania's Department of Corrections ("DOC").  It admits of no exceptions.  Indeed, a death-sentenced prisoner can avoid solitary confinement only if his death sentence is overturned.  The Commonwealth's policy is cruel, degrading, inhumane and unconstitutional. Plaintiffs bring this lawsuit to end it.

Plaintiffs are five of the 150 prisoners, all male, currently housed on death row in State Correctional Institution Greene ("SCI Greene) and State Correctional Institution Graterford ("SCI Graterford").  Plaintiffs claim that the Commonwealth's policy of automatic, permanent solitary confinement of death-sentenced prisoners (1) constitutes cruel and unusual punishment prohibited by the Eighth Amendment, and (2) violates due process rights guaranteed by the Fourteenth Amendment.  They seek injunctive and ancillary declaratory relief to invalidate the policy—and they do so not only for themselves but for a class comprised of "all current and future death-sentenced prisoners in Pennsylvania" ("the Class").

Plaintiffs now move that the Court certify their lawsuit as a class action. Defendants do not oppose certification.  This Court nonetheless must be satisfied

that Rule 23's requirements are met. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 619–20 (1997). As demonstrated below, Plaintiffs and the proposed class meet all the requirements of Federal Rule 23(a), and Plaintiffs' suit squarely fits the criteria of Federal Rules 23(b)(1) and 23(b)(2). Accordingly, Plaintiffs' unopposed motion should be granted.

## II.    FACTUAL BACKGROUND.

### A.    Plaintiffs' Challenges to the DOC's Capital Case Policy.

Pursuant to the DOC's policy on capital case administration (the "Capital Case Policy")[1] every death-sentenced prisoner in the Commonwealth is held in solitary confinement until his capital sentence is overturned or he dies by execution or of natural causes. Complaint ¶ 21. Two Pennsylvania prisons, SCI Greene and SCI Graterford, provide such extreme, continuous isolation and currently house all of the State's death-sentenced prisoners. *Id.* ¶¶ 23-24.

Plaintiffs' claims are directed not only to the cruel, inhumane treatment the Commonwealth gives those on death row. The DOC's Capital Case Policy provides a death-sentenced prisoner no opportunity to challenge his placement in solitary confinement unless and until his death sentence is overturned—and, even

---

[1] *See* Pa. Dep't of Corrections, Administrative Manual 6.5.8, Capital Case Administration. The DOC has designated the entirety of its Capital Case Policy "confidential" in other cases. Although Plaintiffs do not agree with this designation, out of respect for the DOC's position they do not attach a copy here, but will provide it to the Court on request.

then, Pennsylvania has not assured his release to the general prison population.  *Id.*
¶ 22.  *See Williams v. Secretary Pennsylvania Department of Corrections*, 848
F.3d 549 (3d Cir. 2017) (holding unconstitutional the Commonwealth's
continuation of solitary confinement following an order vacating a prisoner's death
sentence).

### B.    Solitary Confinement on Pennsylvania's Death Row.

Under the Capital Case Policy, prisoners sentenced to death in Pennsylvania
are housed in separate "death row" cellblocks in SCI Greene or SCI Graterford.
Complaint ¶¶ 23-24.  Within these cellblocks, each death-sentenced prisoner is
kept alone in a separate cell, isolated from every other prisoner, where "I eat, sleep,
wash, urinate and defecate."  Declaration of Anthony Reid, attached hereto as Ex.
A ("Reid Decl. (Ex. A)"), ¶¶ 7-8;  Declaration of Ricardo Natividad, attached
hereto as Ex. B ("Natividad Decl. (Ex. B)"), ¶¶ 8-9; Ex. C, Declaration of Mark
Newton Spotz, attached hereto as Ex. C ("Spotz Decl. (Ex. C)"), ¶¶ 7-8;
Declaration of Ronald Gibson, attached hereto as Ex. D ("Gibson Decl. (Ex. D)"),
¶¶ 7-8; Declaration of Jermont Cox, attached hereto as Ex. E ("Cox Decl. (Ex.
E)"), ¶¶ 7-8.

Each cell on death row measures about 8 x 12 feet, the size of a parking
space.  It has concrete walls and floors, a poured concrete sleeping platform, a
toilet, and a sink—and a door of solid steel or interlocking solid steel bars, with a

small slot through which food trays are delivered and retrieved. The cells in death row are arranged so one prisoner cannot see another from his confines. Complaint ¶¶ 24-25. Moreover, all death row cell assignments are temporary. Every 90 days, each death-sentenced prisoner is relocated within the death row cellblocks, aggravating his stress and disorientation. Complaint ¶ 27; Reid Decl. (Ex. A) ¶ 10; Natividad Decl. (Ex. B) ¶ 11; Spotz Decl. (Ex. C) ¶ 13; Gibson Decl. (Ex. D) ¶ 9; Cox Decl. (Ex. E) ¶ 17.

Night and day are not markedly different for death-sentenced prisoners. The death row areas at SCI Greene and SCI Graterford are illuminated at all hours. Officers perform cell checks every 15 to 30 minutes, creating thunderous clangs when gates open and close that impair normal sleep. Complaint ¶ 31; Reid Decl. (Ex. A) ¶ 9; Natividad Decl. (Ex. B) ¶ 10 ("I barely sleep and never feel fully rested."); Spotz Decl. (Ex. C) ¶¶ 9-12; Gibson Decl. (Ex. D) ¶ 18 ("Having the lights on 24 hours per day is like torture."); Cox Decl. (Ex. E) ¶¶ 9-11.

A death-sentenced prisoner typically spends 22-24 hours each day alone in his cell. Physical contact with others is forbidden. Complaint ¶ 28. On weekdays, for two hours in the early morning, weather and the shift commander permitting, death-sentenced prisoners are allowed to "exercise" in small outdoor pens, often alone. They are led to these cages as though they were animals. Complaint ¶ 29; Reid Decl. (Ex. A) ¶ 14; Natividad Decl. (Ex. B) ¶ 14; Spotz Decl. (Ex. C) ¶ 16;

Gibson Decl. (Ex. D) ¶ 12-13 ("I feel as though I'm being taken out for a walk like a dog, except there are no open spaces for me to run around in."); Cox Decl. (Ex. E) ¶ 20.

On three weekdays a death-sentenced prisoner is allowed to shower by himself under heavy guard, following a degrading full strip search. Complaint ¶ 29; Reid Decl. (Ex. A) ¶¶ 11-13 (describing strip search process); Natividad Decl. (Ex. B) ¶¶ 12-13; Spotz Decl. (Ex. C) ¶¶ 14-15 (same); Gibson Decl. (Ex. D) ¶¶ 10-11; Cox Decl. (Ex. E) ¶¶ 18-19 (same). Death sentenced prisoners may also occasionally visit the prison law library during the workweek, but again only if they submit to a strip search both before and after the visit. Complaint ¶ 32.

Moreover, on the rare occasions he leaves his cell, a death-sentenced prisoner is handcuffed and manacled on both his feet and his waist. *Id.*; Reid Decl. (Ex. A) ¶ 13 (cuffing and manacles); Spotz Decl. (Ex. C) ¶ 15; Gibson Decl. (Ex. D) ¶ 11. Prisoners in the general prison population are not so treated. Complaint ¶ 32.

On weekends, a death-sentenced prisoner is locked in his cell for up to 70 consecutive hours. He is allowed a single family or social visit on a weekend; any visitors he receives are separated from him by a glass partition. Complaint ¶ 30; Reid Decl. (Ex. A) ¶¶ 16-18 (describing visiting process); Natividad Decl. (Ex. B) ¶ 15 ("It hurts me to be denied the opportunity to even touch my family."); Spotz

Decl. (Ex. C) ¶ 18; Gibson Decl. (Ex. D) ¶ 30; Cox Decl. (Ex. E) ¶¶ 23-24 ("I will not get to hug my grandmother before she dies.").  He is not allowed any other shower, visit or off-death row excursion.

Death-sentenced prisoners are not permitted to participate in any vocational, recreational or educational programs.  Complaint ¶ 33; Reid Decl. (Ex. A) ¶ 21; Natividad Decl. (Ex. B) ¶ 20; Spotz Decl. (Ex. C) ¶ 22; Gibson Decl. (Ex. D) ¶ 17; Cox Decl. (Ex. E) ¶ 25.  Nor can they participate in any form of communal religious worship or prayer.  Complaint ¶ 34; Natividad Decl. (Ex. B) ¶ 18; Spotz Decl. (Ex. C) ¶¶ 20-21; Gibson Decl. (Ex. D) ¶ 16.  Consequently, death-sentenced prisoners spend almost all of their time in their cells, idle and alone.

Other prisoners at SCI Greene and SCI Graterford—maximum security prisons housing the state's most serious offenders, including many persons convicted of murder and serving life sentences—live in dormitory settings or cellblocks with others, with multiple, regular opportunities for socialization, learning and recreation, and without the indignities of manacles, strip-searches and the like.  Complaint ¶¶ 36-37.  Death-sentenced prisoners, by contrast, as a matter of policy are denied meaningful human contact, day in and day out, year after year after year.  *Id.* ¶ 35.

Plaintiffs and many other death-sentenced prisoners suffer from mental impairments and illnesses that are exacerbated by long-term isolation.  Indeed,

after long-term isolation, otherwise healthy prisoners decompensate and lose their ability to function normally. Complaint ¶¶ 38-39. The Plaintiffs' suffering, which is typical of what the Commonwealth's policy of automatic, permanent solitary confinement causes, is more specifically detailed in Section II., E, below.

### C. Recognized Effects of Prolonged Solitary Confinement.

#### 1. Generally.

A substantial body of literature over the last two hundred years documents distinctive patterns of psychological and physiological harm when individuals are held in long-term solitary confinement. Indeed, every study of the effects of solitary confinement that lasted longer than 60 days, wherever conducted, has found evidence of negative psychological effects on those so confined. Complaint ¶¶ 46-47. Solitary confinement isolates prisoners from social interaction, restricts environmental stimulation and strips them of all control over their daily life. This has profound impacts on mental health (resulting in, among other things, loss of concentration and memory, hypersensitivity to external stimuli, obsessional thoughts, anxiety, nervousness, depression and paranoia) and physical well-being. *Id.* ¶¶ 48-49.

Studies show that depriving prisoners of social interaction through solitary confinement over long periods can destroy normal mental functioning and result in permanent harm. *Id.* ¶ 50. Prison studies have also found that the risk of self-harm

and suicide is much higher for prisoners in solitary confinement than those in the general prison population. *Id.* ¶ 51. The adverse psychological effects of long term isolation on prisoners are especially severe for those with mental illnesses—a finding emphasized in a U.S. Department of Justice investigation of Pennsylvania's DOC in 2014, *id.* ¶ 52 & n.28, and in U.S. Department of Justice guidelines issued in 2016. *Id.* ¶ 53.

Studies also establish that prolonged solitary confinement can have serious negative physiological consequences. Animal and human studies show that social isolation promotes a range of adverse health outcomes, including decreased lifespan, obesity, and impaired immune response, and is a significant independent risk factor for memory impairment, including dementia and Alzheimer's disease. *Id.* ¶ 54. There is also evidence that long-term isolation can lead to physiological changes in the human brain. *Id.* ¶ 55. For these reasons, prolonged solitary confinement is opposed by numerous professional organizations and study groups, including the American Bar Association, the American Psychiatric Association and a diverse, bipartisan Commission on Safety and Abuse in America's Prisons. *Id.* ¶¶ 56-58.

### 2.   Declaration of Craig Haney, Ph.D, J.D.

The adverse consequences of the prolonged isolation of Plaintiffs and other class members are addressed in the initial Declaration of Plaintiffs' expert, Craig

Haney, Ph.D, J.D, dated March 27, 2018, attached hereto as Ex. F ("Haney Decl. (Ex. F)").   Dr. Haney is a recognized expert in the psychological effects of various prison conditions, including isolation or "supermax" prison conditions, and has written, consulted and testified widely on this subject.  *Id.*  ¶¶ 1-11.  Dr. Haney's initial Declaration is based on his review of the Commonwealth's Capital Case Policy, the Complaint, and the Declarations of the Named Plaintiffs; his own knowledge of Pennsylvania's prison practices derived from prior engagements; and his experience and his review of the extensive published literature on the effects of solitary confinement.  *Id.*  ¶¶ 12-15.  His opinions at this stage are preliminary because he has not yet been able to visit SCI Greene or SCI Graterford, interview staff there, or review prisoner files and other documents that will be produced in the course of the litigation.  *Id.* ¶ 24.

Based on the information presently available, however, Dr. Haney is of the opinions that:

- "The living conditions to which the Pennsylvania DOC confines death-sentenced individuals, including the named plaintiffs, constitute precisely the kinds of conditions of confinement that scientific theory and a sizable empirical literature have established create risks of severe psychological damage and harm." Haney Decl. (Ex. F) ¶ 17.

- "[T]here is also a scientific, correctional and human rights consensus about the painfulness and harmfulness of punitive isolation that has existed for a number of years …. [and] has been significantly broadened and considerably deepened in recent years, especially in the last ten years."  *Id.* ¶ 18.

- In his decades of research on the effects of solitary confinement on prisoners, Dr. Haney has "encountered only a very small number of people in the United States who have been kept in isolation for the length of time the majority of the Class Members in this case have endured …. [The Named Plaintiffs'] sixteen to twenty-seven years in solitary confinement … represents an extraordinarily long period of confinement under extremely adverse conditions.  Scientific theory and empirical research indicate that such treatment inflicts psychological pain and places these individuals at significant risk of serious psychological harm."  *Id.* ¶ 19.

- This is supported by "numerous empirical studies," virtually every one of which "has documented the pain and suffering that isolated prisoners endure and the risk of psychological harm that they confront."  *Id.* ¶ 20.

- These empirical studies are, moreover, theoretically sound:  "That is, there are sound theoretical reasons to expect that long-term isolation, the

absence of meaningful social interaction and activity and the other severe

deprivations that are common under conditions of isolated or solitary

confinement would have harmful psychological consequences. Those

conditions and experiences are known to produce adverse psychological

effects in contexts other than prison and it makes perfect theoretical sense

that they produce similar outcomes in correctional settings." *Id.* ¶ 21.

- The Commonwealth, based on the documents Dr. Haney has thus far

  reviewed, appears to be "placing death-sentenced prisoners at serious risk

  of substantial mental and emotional harm by keeping them in indefinite

  solitary confinement for no penological purpose. Indeed, the

  Pennsylvania DOC has failed to provide these individuals with any

  opportunity or pathway to reduce or end their time in solitary

  confinement . . . . without a clear rationale or the means with which to

  reduce or end their suffering." *Id.* ¶ 23.

Dr. Haney buttresses his opinions with substantial scientific research on

solitary confinement, Haney Decl. (Ex. F) ¶¶ 29-60, as well as evidence of a

shifting correctional consensus that prolonged isolated confinement is painful and

harmful. *Id.* ¶¶ 61-63. He also details the emergence of human rights standards

that address these adverse effects, limit use of solitary confinement to very brief

periods and only on a clear showing of necessity, and exclude from even such

limited confinement those suffering from mental illness or other vulnerability.  *Id.*
¶¶ 64-76.

### D.    Unsound and Cruel Penology, as Even the DOC Acknowledges.

The U.S. Department of Justice's 2016 report on the use of "restrictive housing" (another term for solitary confinement) counsels that prison officials "should always be able to clearly articulate the specific reason(s) for an inmate's placement and retention in restrictive housing," these reasons "should be supported by objective evidence," and such confinement should extend "for no longer than necessary to address the specific reason(s) for placement. … Restrictive housing should always serve a specific penological purpose."  Complaint ¶ 60 & nn.42-43.  Pennsylvania's policy of placing all death-sentenced prisoners in permanent solitary confinement based solely on their sentence, however, serves no penological purpose.

Indeed, Pennsylvania's blanket policy is inconsistent with generally accepted correctional practices nationwide.  Studies show death-sentenced prisoners are not more violent or a greater security risk than other prisoners; in fact, they are below or near the mean of the entire prisoner cohort, and they are statistically *less* violent than prisoners who are eligible for parole.  Complaint ¶¶ 63-64.  Under an individualized assessment and classification model—which

accepted correctional practice counsels—death-sentenced prisoners would be no more deserving of solitary confinement than other prisoners. *Id.* ¶¶ 65-66.

A number of states have eliminated automatically assigning death-sentenced prisoners to solitary confinement and still others have integrated death-sentenced prisoners into the general prison population. Complaint ¶ 67. Likewise, American Bar Association standards for the treatment of prisoners make clear that death-sentenced prisoners should be housed in conditions comparable to the general prison population, with solitary confinement used for only brief periods, only for compelling reasons, and only with adequate procedural safeguards. *Id.* ¶ 68.

Pennsylvania's Capital Case Policy not only violates sound penological practice in the United States, but contravenes international human rights treaties and standards. These include:

> (A)    The International Covenant on Civil and Political Rights and the Convention against Torture, both of which were ratified and signed by the United States two decades ago and are therefore controlling federal law. Complaint ¶¶ 69-73. The United States has confirmed to the U.N. Committee Against Torture that holding those with "serious mental illness" in solitary confinement violates the Eighth Amendment, and placing a prisoner in solitary confinement without an administrative hearing violates the due process guarantee of the Fourteenth Amendment. *Id.* ¶ 74. The

Commonwealth's Capital Case Policy violates these treaties and commitments and constitutes torture thereunder.

(B)    The Standard Minimum Rules for the Treatment of Prisoners (the "Nelson Mandela Rules"), adopted by the United Nations, expressly prohibit solitary confinement that is "indefinite" or "prolonged" and stipulate that such confinement should be used only a last resort and for a short period.  ("Solitary confinement" is defined as isolation for 22 or more hours a day, and a prolonged period is one exceeding 15 days.)  *Id.* ¶ 75. They explicitly prohibit solitary confinement based solely upon a prisoner's sentence.  The Capital Case Policy contravenes these principles.

(C)    The Inter-American Commission on Human Rights, of which the United States is a member, issued a report on death-sentenced prisoners in the United States, concluding they "should not be subjected to harsher conditions of imprisonment than those of the rest of the prison population just because of their status," urging member states to "adopt strong, concrete measures to eliminate the use of prolonged or indefinite isolation in all circumstances," and prohibiting solitary confinement for death-sentenced prisoners based on their sentence.  *Id.* ¶¶ 76-77.  Pennsylvania's Capital Case Policy contravenes the commission's guidelines.

14

The DOC itself acknowledged publicly in 2016 that its solitary confinement practices do not comport with penological best practices, and vowed then that it was committed to "reduc[ing] the use of administrative segregation (known as restrictive housing in Pennsylvania)." This resolve, however, does not extend to death-sentenced prisoners: All of these prisoners, including the Plaintiffs, remain subject to the DOC's blanket policy of automatic, continuous solitary confinement. Complaint ¶¶ 78-82.

### E.    The Plaintiffs.

The Plaintiffs are:

**Anthony Reid.** Reid is 50 years old. He was sentenced to death in 1990. Complaint ¶ 13; Reid Decl. (Ex. A) ¶¶ 2-3. Reid has spent almost every day of the past 27 years in solitude, with no meaningful social interactions. Reid Decl. (Ex. A) ¶¶ 8, 22. He has been denied physical contact even with his biological parents, both of whom died without ever having a chance to embrace him again after he began serving his sentence. *Id.* ¶¶ 16-17. The harsh and unrelenting conditions of Reid's confinement have had a negative effect on his mental, physical and emotional well-being. *Id.* ¶¶ 5, 15. Reid suffers from stress; heightened anxiety; difficulty in concentrating; irritability; hopelessness; and suicidal feelings—all recognized effects of prolonged isolation. Complaint ¶ 40; Reid Decl. (Ex. A) ¶¶ 23-30. "[T]o be made to remain in solitary confinement

with no recourse takes a small piece of me each day. … If I allow my mind to focus on the fact that I am in isolation, it would feel like pure torture. … It feels like I am in a maze with no exits." Reid Decl. (Ex. A) ¶¶ 27-28. Yet, Reid has no chance to challenge his continued, permanent isolation under the DOC's Capital Case Policy. Complaint ¶ 40.

**Ricardo Natividad**. Natividad, age 48, was sentenced to death in 1997 and has been incarcerated at SCI Graterford in solitary confinement now for over 20 years. Complaint ¶ 14; Natividad Decl. (Ex. B) ¶¶ 1-5. For Natividad, the strip-search process, which precedes every exit from and most returns to his cell, is "one of the most humiliating and degrading acts that I have ever experienced" and "comparable to sexual assault." Natividad Decl. (Ex. B) ¶ 13. The exercise pen denies him proper exercise given the physical limitations he has. *Id.* ¶ 17. And, the absence of vocational and educational programs in which he can participate "makes me feel as if I'm useless." *Id.* ¶ 20. Natividad barely sleeps, and suffers from anxiety, panic attacks and depression, difficulty concentrating, as well as emotional deterioration, all symptoms of prolonged solitary confinement. *Id.* ¶¶ 10, 16, 21-23.

**Mark Newton Spotz**. Spotz, now 46 years old, was sentenced to death in 1996 and has spent the last 21 years in solitary confinement in SCI Greene. Complaint ¶ 15; Spotz Decl. (Ex. C) ¶¶ 2-4. Spotz is experiencing numerous

symptoms of prolonged isolation, including anxiety, stress, short-term memory problems, depression, hopelessness, and audio-visual hallucinations.  Spotz Decl. (Ex. C), ¶¶ 5, 12-13, 15, 17, 19, 21, 23-39.

Spotz experiences severe sleep disturbance because of the continuous lighting and constant cell checks on SCI Greene's death row, practices that are "a brutal assault on my mind."  Spotz Decl. (Ex. C) ¶¶ 9-12, 24.  When he leaves his cell he is subjected to a full strip search that is "humiliating, degrading and for someone like me who has suffered extreme sexual abuse, traumatic." *Id.* ¶¶ 15, 26. Because of the strip searches and the severe anxiety he has developed, Spotz sometimes declines even the rare opportunities he is allowed to leave his cell; thus perpetually confined, Spotz "feel[s] somehow like I am not human" and a victim of "psychological torture." *Id.* ¶¶ 16-19, 23.  Additionally, because the Capital Case Policy denies Spotz any opportunity for communal Jewish worship, he is "empty, alone and marginal," living in a state of "hopelessness" and "spiritual desolation." *Id.* ¶ 21.

Spotz's mental health has deteriorated over his 21 years of continuous isolation.  He struggles with suicidal thoughts and has made several attempts to take his own life.  Spotz Decl. (Ex. C) ¶¶ 30-34.  He suffers from PTSD, paranoia, hallucinations, waking dreams and night terrors. *Id.* ¶¶ 28, 35-37.  He feels that in

solitary "we are being treated like we are animals;" he is "trapped in [his] cell." *Id.* ¶¶ 38-39.

**Ronald Gibson.** Gibson is 49 years old. Gibson was sentenced to death in 1991, and he has been in solitary confinement in SCI Greene for 26 years. Complaint ¶ 16; Gibson Decl. (Ex. D) ¶¶ 2-4. Gibson sleeps only about three hours a day in isolation, and suffers from high levels of anxiety, diminished concentration, short-term memory loss, and hopelessness and depression, all symptoms of prolonged isolation. Gibson Decl. (Ex. D) ¶¶ 23-28. He is also living with iritis, an inflammation of middle layer of the eye, and fears for his vision in the unremitting light in his cell. *Id.* ¶¶ 19-22. A devout Christian put in permanent isolation, Gibson has no opportunity to share in his faith with others. *Id.* ¶ 16. He has lost several family members while isolated on death row. "[N]ot being able to touch and comfort my family took a bite out of my soul." *Id.* ¶¶ 28-30.

**Jermont Cox.** Cox, age 46, was sentenced to death in 1995 and has spent the past 22 years in solitary confinement in SCI Graterford. Complaint ¶ 17; Cox Decl. (Ex. E) ¶¶ 2-4. There is no natural sunlight in the isolation cells, "[t]here is no such thing as fresh air," and conditions there are "horrible"—it is never dark, rarely quiet, and often smelly. Cox Decl. (Ex. E) ¶¶ 9-15. Cox endures sleeplessness and depression on death row, experiencing an emotional pain that

18

"gives suicide meaning." *Id.* ¶¶ 28-29. Cox also suffers from anxiety and panic attacks, memory and concentration problems, mental fixation, rumination, and paranoiac and obsessive-compulsive behaviors—all symptomatic of and exacerbated by prolonged isolation. *Id.* ¶¶ 30-39.

### F.    The Defendants.

Defendants in this action, sued in their official capacities, are the Secretary of the Pennsylvania Department of Corrections and the Superintendents of SCI Greene and SCI Graterford. Complaint ¶¶ 18-20.[2]

### G.    The Proposed Class.

Plaintiffs propose to represent themselves and a class of consisting of:

> All current and future death-sentenced
> prisoners in the Commonwealth of
> Pennsylvania.

Complaint ¶¶ 83-84.

## III.    ARGUMENT.

### A.    Standards for Class Certification.

To obtain class certification, Plaintiffs must establish by a preponderance of the evidence the four elements of Federal Rule 23(a) and at least one provision of Federal Rule 23(b). *Shelton v. Bledsoe*, 775 F.3d 554, 562 (3d Cir. 2015); *In re*

---

[2] Tammy Ferguson was recently named Superintendent of SCI-Graterford. Her name has been substituted for Cynthia Link in the caption of this action.

*Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 306 (3d Cir. 2008); *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48 (3d Cir. 1994); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, 2548 (2011).

Under Rule 23(a), Plaintiffs must show that:

> (1)    the class is so numerous that joinder of all members is impracticable,

> (2)    there are questions of law or fact common to the class,

> (3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

> (4)    the representative parties will fairly and adequately protect the interests of the class.

Fed R. Civ. P. 23(a).

Under Rule 23(b)(2), Plaintiffs must show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  To make this showing, the class must demonstrate that "a single injunction or declaratory judgment would provide relief to each member of the class." *Gates v. Rohm and Haas Co.*, 655 F.3d 255, 262 (3d Cir. 2011) (quoting *Wal-Mart Stores,* 131 S. Ct. at 2557 (internal quotations omitted)); *see also Shelton*, 775 F.3d at 561.

Certification of a Rule 23(b)(2) class is particularly apt where, as here, Plaintiffs seek only declaratory and injunctive relief.  *Shelton*, 775 F.3d at 562;

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 296 (3d Cir. 2011). Rule 23(b)(2) was largely crafted to permit cases pursuing injunctive relief on behalf of a group of individuals against a general course of conduct. *Shelton*, 775 F.3d at 561; *Stewart v. Abraham*, 275 F.3d 220, 228 (3d Cir. 2001); *Baby Neal*, 43 F.3d at 64. Rule 23(b)(2) classes are "especially appropriate vehicles for civil right actions seeking such declaratory relief for prison and hospital reform" because of the potential for common resolution. *Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980) (internal quotations omitted).

Alternatively, under Rule 23(b)(1), Plaintiffs must demonstrate that the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for the Defendants or would substantially impede the ability of other class members to protect their interests. Fed. R. Civ. P. 23(b)(1). Where "the shared character of rights claimed or relief awarded entails that any individual adjudication by a class member disposes of, or substantially affects, the interests of absent class members," Rule 23(b)(1) certification is appropriate. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 834 (1999).

Plaintiffs seek injunctive and declaratory relief on behalf of the class to bring an end to the DOC's unconstitutional practices through the established and favored vehicle of a 23(b)(2) class. Further, allowing individual death-sentenced

prisoners to proceed separately to enforce their rights to be freed from permanent solitary confinement could lead to incompatible decisions regarding the DOC's responsibilities, and might impede other similarly-situated prisoners in protecting their interests—all of which a 23(b)(1) class would prevent.  Because Plaintiffs satisfy the criteria of Rule 23(a) and at least two prongs of Rule 23(b), the Court should grant class certification.

**B.    The Class Meets All of the Requirements of Rule 23(a).**

      **1.    The Class Is Ascertainable and So Numerous that Joinder Is Impracticable.**

The proposed class currently numbers 150 death-sentenced prisoners, identifiable in a listing published monthly by the DOC.[3]  The class thus satisfies the numerosity requirement of Rule 23(a)(1).  Impracticability of joinder does not mean impossibility, only that joinder would be difficult.  *Cannon v. Cherry Hill Toyota, Inc.*, 184 F.R.D. 540, 543 (D.N.J. 1999) ("[Under Rule 23(a)(1)], [t]he plaintiff need not precisely enumerate the potential size of the proposed class, nor is the plaintiff required to demonstrate that joinder would be impossible."); *see also* 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1762 (3d ed. 2005) ("'Impracticable' does not mean 'impossible.'  The

---

[3] Persons Sentenced to Execution in Pennsylvania as of March 1, 2018 ("DOC Death-Sentenced Report"), at http://www.cor.pa.gov/General%20Information/Documents/Death%20Penalty/Current%20Execution%20list.pdf (last viewed 3/27/2018)

representatives only need to show that it is extremely difficult or inconvenient to join all the members of a class.").  Moreover, "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."  *Stewart,* 275 F.3d at 226–27; *accord Williams v. City of Philadelphia*, 270 F.R.D. 208, 214–15 (E.D. Pa. 2010) ("[C]ourts in this circuit have generally found that a class of 40 or more plaintiffs satisfies the numerosity requirement."); *Dittimus-Bey v. Taylor*, 244 F.R.D. 284, 290 (D.N.J. 2007) (same). This Court, in particular, has recognized that it "may certify a class even if it is composed of as few as 14 members."  *Grant v. Sullivan*, 131 F.R.D. 436, 446 (M.D. Pa. 1990).

The foregoing shows not only that the numerosity requirement of Rule 23(a)(1) is met, but that class members are readily ascertainable:  They are identified in the State's published monthly list.  *See Montgomery Ctny. ex rel. Becker v. Merscorp, Inc.,* 298 F.R.D. 202, 209–210 (E.D. Pa. 2014) (ascertainability "easily" satisfied where identity of each class member a matter of public record); *In re OSB Antitrust Litig.,* No. 06-826, 2007 U.S. Dist. LEXIS 56617, at *36–37 (E.D. Pa. Aug. 3, 2007).   While the class is potentially fluid, with prisoners entering and leaving as a result of court decisions, at any given time its members can be easily determined.

23

## 2. Members of the Class Have Questions of Law and Fact in Common.

The proposed class meets the commonality requirement of Rule 23(a)(2),

which "does not require that the representative plaintiff ha[s] endured precisely the

same injuries that have been sustained by the class members, only that the harm

complained of be *common* to the class." *Hassine v. Jeffes*, 846 F.2d 169, 177 (3d

Cir. 1988) (emphasis in original); *see also Logory v. County of Susquehanna*, 277

F.R.D. 135, 141 (M.D. Pa. 2011). This means that whether class members' claims

are common depends on whether there is a "common contention . . . of such a

nature that it is capable of classwide resolution – which means that determination

of its truth or falsity will resolve any issue that is central to the validity of each one

of the claims in one stroke." *Wal-Mart Stores*, 131 S. Ct. at 2551; *Logory*, 277

F.R.D. at 141 (noting commonality is not determined by the existence of classwide

questions, "but instead the potential for a 'classwide resolution.'").

It is well established that even one common issue will satisfy Rule 23(a)(2).

*Baby Neal*, 43 F.3d at 56; *see also Wal-Mart Stores*, 131 S. Ct. at 2556 (noting a

"single common question will do") (internal punctuation omitted). Indeed,

"because the requirement may be satisfied by a single common issue, it is easily

met." *Baby Neal*, 43 F.3d at 56. And injunctive and declaratory actions, by their

very nature, often present common questions satisfying Rule 23(a)(2) "because

they do not also involve an individualized inquiry for the determination of damage

awards." *Dittimus-Bey*, 244 F.R.D. at 290 (quoting *Baby Neal*, 43 F.3d at 57 (internal citations omitted)).  *See also Scott v. Clarke*, 61 F. Supp. 3d. 569, 586 (W.D. Va. 2014) ("While the claims of the class members must arise from similar practices and be based on the same legal theory, the commonality requirement does not require that all class members share identical factual histories.");  Rubenstein, Newberg on Class Actions, § 3:27 (5th ed.).

This litigation presents common questions of law as to (1) whether the Commonwealth's Capital Case Policy mandating that all death-sentenced prisoners be housed in automatic, permanent solitary confinement constitutes cruel and unusual punishment proscribed by the Eighth and Fourteenth Amendments; and (2) whether that Policy, by providing death-sentenced prisoners no opportunity to challenge their automatic permanent placement in solitary confinement, violates due process rights guaranteed by the Fourteenth Amendment.

The litigation also presents common questions of fact with respect to, among other matters, (1) the policies, processes and procedures adopted by the DOC for the confinement of death-sentenced prisoners; (2) the conditions of confinement of death-sentenced prisoners in Pennsylvania; and (3) the physical and mental health effects of prolonged solitary confinement under the conditions Pennsylvania imposes on death-sentence prisoners.

These issues lie at the heart of this litigation. Resolution of them in Plaintiffs' favor would entitle the class to injunctive and declaratory relief, making each issue sufficient to meet the commonality requirement under Rule 23(a)(2). *See Wal-Mart Stores,* 131 S. Ct. at 2551. Actions seeking an injunction against a common policy imposed on incarcerated persons are regularly found to raise common questions in this Circuit. *Hagan v. Rogers*, 570 F.3d 146, 158–159 (3d Cir. 2009) (reversing district court's denial of class certification for a class on commonality and typicality when plaintiff alleged common threat of injury to incarcerated population); *Logory*, 277 F.R.D. at 143; *Dittimus-Bey*, 244 F.R.D. at 290.

Commonality thus is easily established here. The proposed class members are death-sentenced prisoners at SCI Greene and SCI Graterford. They are all subject to the Capital Case Policy implemented at those facilities by the DOC. All of them are suffering common deprivations and common harms (or the risk of harm)[4] as a result of this Policy and will continue to suffer such deprivations and harm as a result of the unconstitutional conditions it creates and from which they have no relief under the Policy or otherwise. The proposed class thus meets Rule

---

[4] As the *Baby Neal* Court wrote, "[C]lass members can assert such a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are *subject* to the same harm will suffice." *Baby Neal*, 43 F.3d at 56 (emphasis in original).

23(a)(2)'s commonality requirement. *See also Parsons v. Ryan,* 754 F.3d 657, 676 (9th Cir. 2014), *aff'g* 289 F.R.D. 513 (D. Ariz. 2013) (where a claim alleges "that ADC policies and practices of statewide and systemic application" expose similarly-situated prisoners to a substantial risk of serious harm, the commonality requirement is satisfied); *Holmes v. Godinez*, 311 F.R.D. 177, 220 (N.D. Ill. 2015) (challenge by hearing-impaired prisoners to inadequate prison accommodations meets commonality requirement); *Scott,* 61 F. Supp. 3d at 587 (common pattern and practice of denying female prisoners medical care subject to class treatment).

### 3.     The Claims of the Named Plaintiffs are Typical of Those of the Class.

Typicality asks "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Beck v. Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006); *Clarke v. Lane*, 267 F.R.D. 180, 197 (E.D. Pa. 2010) (finding typicality met when all putative class members suffered "constitutional violations under a uniform system").

For class representatives' claims to be typical, they do not need to be identical to the claims of the class members. *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 184 (3d Cir. 2001). Factual differences will not render a claim atypical, so long as the claims of the named plaintiffs and proposed class members arise from the same practice or course of conduct by the defendants and the class

members' claims are based on the same legal theory. *Clarke*, 267 F.R.D. at 197

(citing *Beck*, 457 F.3d at 295-96). As the Third Circuit has noted, "even relatively

pronounced factual differences will generally not preclude a finding of typicality

where there is a strong similarity of legal theories." *Baby Neal*, 43 F.3d at 58; *see*

*Scott,* 61 F. Supp. 3d at 588–89.

Central to the Plaintiffs' claims is Pennsylvania's Capital Case Policy, which

places every death-sentenced prisoner in automatic, permanent solitary

confinement, from which he can obtain no relief unless and until his sentenced is

overturned. Because Plaintiffs' claims arise out of the policy, and the policy

applies to all class members, the Plaintiffs' claims are typical of the class.

Moreover, the deprivations Plaintiffs and other class members experience under

the Capital Case Policy are the same: All are housed in separate cells in death row

cellblocks for 22 to 24 hours each day; all are fed their meals in solitary through

slots in the door; all are regularly shackled and manacled on the few occasions

when they leave their cells; and so forth. Although the adverse health effects of

the Capital Case Policy may differ in their particulars from one class member to

another, the indignities, mistreatment and general physical and mental harm (and

risk of harm) they suffer at the Commonwealth's hands does not. Plaintiffs' claims

are therefore typical within the meaning of Rule 23(a)(3).

### 4.    The Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Class.

The proposed class meets the final requirement of Rule 23(a), which is that the named plaintiffs must fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4).  The adequacy inquiry has two components: (1) whether the attorneys retained by the named plaintiffs are qualified, experienced, and generally able to conduct the litigation; and (2) whether the named plaintiffs have interests that are antagonistic to or in conflict with those they seek to represent. *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007); *Kalow & Springut, LLP v. Commence Corp.*, 272 F.R.D. 397, 405 (D.N.J. 2011).

First, Plaintiffs' attorneys are qualified and experienced in conducting class action prisoners' rights litigation.  Plaintiffs' counsel includes a team of lawyers from Drinker Biddle & Reath LLP, including one, Barry Gross, with extensive prosecutorial and prisoners' civil rights experience and three others, Wilson Brown, Mira Baylson and Mark Taticchi, with substantial class action litigation experience.  Plaintiffs are also counseled by Jonathan Feinberg and Susan Lin from Kairys, Rudovsky, Messing & Feinberg, LLP, a law firm that regularly represents prisoners in state and federal prisons and county jails on civil rights issues, and whose attorneys, including Mr. Feinberg and Ms. Lin, have extensive experience in federal court class action litigation.  Plaintiffs are also represented

29

by Bret Grote and Jamelia Morgan of the Abolitionist Law Center, a
Pennsylvania-based legal services organization which regularly represents death-
sentenced prisoners confined in state and federal prisons throughout the
Commonwealth.  Finally, Plaintiffs are represented by David Fathi, Amy Fettig
and Desiree Sholes of the American Civil Liberties Union, who litigate prisoners'
rights issues, including issues relating to solitary confinement, in class actions
nationally, and by Witold Walczak of the ACLU of Pennsylvania, who has
handled many prisoners' rights class actions in the Commonwealth.  Plaintiffs'
counsel are amply qualified to litigate this case as a class action.  They will assure
the "vigorous prosecution of claims" Rule 23 demands.

Second, as explained in III.B.3, above, Plaintiffs' interests align with the
interests of the proposed class as a whole.  Plaintiffs do not have any interests
antagonistic to those of any other member of the proposed class.  Antagonism may
exist between the named plaintiff and other class members when a unique defense
could be asserted against a named plaintiff that would distract from the class
claims or defenses.  *See Williams*, 270 F.R.D. at 216 (finding that the named
plaintiffs "fairly and adequately protect the interests of the class" because, in part,
there are no "unique defenses that would consume a disproportionate amount of
time and attention").  No such circumstances are present here.  On the contrary, the
Plaintiffs' interests coincide with those of the proposed class to seek a declaration

that the Capital Case Policy and attendant practices alleged in the complaint are unconstitutional as well as a permanent injunction prohibiting Defendants from further implementing the Policy and their practices thereunder. The granting of the relief Plaintiffs seek would benefit all class members and would not impair any future class member's claims.

Finally, each of the Named Plaintiffs is engaged with counsel and committed to this litigation. Reid Decl. (Ex. A) ¶¶ 5-6; Natividad Decl. (Ex. B) ¶¶ 6-7; Spotz Decl. (Ex. C) ¶¶ 5-6; Gibson Decl. (Ex. D) ¶¶ 5-6; Cox Decl. (Ex. E) ¶¶ 5-6. They will fairly and properly represent the Class. Accordingly, the proposed class meets Rule 23(a)(4)'s adequacy requirement.

## C.    Plaintiffs Meet the Requirements of Federal Rule 23(b)(2).

Rule 23 requires that, "in addition to satisfying the requirements of Rule 23(a), a putative class must also comply with one of the parts of subsection (b)." *Baby Neal*, 43 F.3d at 55–56; *Shelton*, 775 F.3d 554 at 559. Plaintiffs' claims satisfy two parts of subsection (b).

Rule 23(b)(2) provides that a class action is appropriate when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). The Third Circuit has interpreted this requirement to mean that "the interests of

class members are so like those of the individual representatives that injustice will not result from their being bound by such judgment in the subsequent application of principles of *res judicata*." *Hassine*, 846 F.2d at 179. As the Supreme Court explained, the key to the 23(b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2557 (citation omitted).

Courts have recognized that Rule 23(b)(2) certification is especially appropriate in prisoners' civil rights actions like this one, which seeks a common resolution through declaratory and injunctive relief. *See Coley*, 635 F.2d at 1378 (certifying class of prisoners at a state hospital under Rule 23(b)(2)); *McGee v. Pallito*, No. 1:04-CV-0335-JGM, 2015 WL 5177770 (D. Vt. Sept. 4, 2015) (certifying class of prisoners challenging state policy of constant illumination of prison cells, noting that (b)(2) certification is proper "where a centralized policy is alleged to impact a large class of plaintiffs, even when the magnitude (and existence) of impact may vary by class member"); *Clarkson v. Coughlin*, 783 F. Supp. 789, 797 (S.D.N.Y. 1992) ("[t]he class action device is particularly well-suited in actions brought by prisoners").

This Circuit, in fact, has a long history of using Rule 23(b)(2) to adjudicate prisoners' systemic challenges to the conditions of their confinement. *See, e.g.*,

*Williams*, 270 F.R.D. at 222 (certifying Rule 23(b)(2) class of prisoners); *Colon v.*

*Passaic County*, No. 08-4439, 2009 WL 1560156, at *2 (D.N.J. May 27, 2009)

(certifying class for those who are currently, or may become, incarcerated in

county jail); *Dittimus-Bey*, 244 F.R.D. at 293 (certifying Rule 23(b)(2) class of

individuals incarcerated at Camden County Correctional Facility on overcrowding

claim); *Death Row Prisoners of Pennsylvania v. Ridge,* 169 F.R.D. 618,  623

(E.D. Pa. 1996) (certifying Rule 23(b)(2) class of death-row detainees).

Here, as a result of the DOC's Capital Case Policy, Plaintiffs' and other

class members' claims are so inherently intertwined that injunctive and declaratory

relief as to any would be injunctive and declaratory relief to all.  *Clarke*, 267

F.R.D. at 198.  Thus, Plaintiffs meet the requirements of Rule 23(b)(2).  *See Cole*

*v. Livingston*, No.4:14-CV-1698, 2016 WL 3258345 (S.D. Tex, June 14, 2016),

*aff'd*, 868 F.3d 354, 2017 WL 3574968 (5th Cir. Aug. 18, 2017) (certifying Rule

23(b)(2) class of prisoners subjected to extreme heat during summer months and

alleging Eighth Amendment violation); *Parsons v. Ryan,* 754 F.3d at 684–85

(affirming certification of a Rule 23(b)(2) class challenging prison medical policies

and confinement in isolation cells under the Eighth Amendment).

### D.    Plaintiffs Also Meet the Requirements of Federal Rule 23(b)(1).

Rule 23(b)(1) provides that "[a] class action may be maintained if Rule 23(a)

is satisfied and if prosecuting separate actions by or against individual class

members would create" one of two risks. The first is where separate actions "would create a risk of 'establish[ing] incompatible standards of conduct for the party opposing the class,' Rule 23(b)(1)(A), such as 'where the party is obliged by law to treat the members of the class alike.'" *Wal-Mart*, 131 S. Ct. at 2558 n.11 (quoting *Amchem*, 521 U.S. at 614). The second is where individual adjudications "as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests, Rule 23(b)(1)(b)." *Id.* (internal quotations omitted). Both prongs of Rule 23(b)(1) rest on the same underlying rationale: "Classes certified under [Rule 23](b)(1) . . . share the most traditional justifications for class treatment – that individual adjudications would be impossible or unworkable.…" *Wal-Mart Stores*, 131 S. Ct. at 2558. *See also Markocki v. Old Republic Nat'l Title Ins. Co.,* 254 F.R.D. 242, 250 (E.D. Pa. 2008).

The Commonwealth is obligated under the Eighth and Fourteenth Amendments to refrain from subjecting its death-sentenced prisoners to cruel and unusual punishment and to assure such prisoners due process of law. To require that individual death-sentenced prisoners sue separately to challenge the Capital Case Policy and to enforce the Commonwealth's constitutional obligations would create a clear risk of establishing disparate rules and incompatible standards of conduct for identically situated prisoners. In light of that risk, Rule 23(b)(1)(A)'s

34

requirements are met. *Amchem*, 521 U.S. at 614; *Markocki*, 254 F.R.D. at 250

("[E]ach of Plaintiffs' cause of action seeks to enforce duties and obligations owed

the proposed class members in a collective and indivisible fashion. 'Separate

actions would risk inconsistent verdicts, but adjudication as to one class member

would fairly dispose of the claims of all class members.'" (quoting *Cohen v.*

*Chicago Title Ins. Co.*, 242 F.R.D. 295, 303 (E.D.Pa. 2007))).  *See Graham v.*

*Parker,* No. 16-CV-01954, 2017 WL 1737871 (M.D. Tenn. May 4, 2017)

(certifying Rule 23(b)(1)(A) class of prisoners challenging state policies limiting

treatment for Hepatitis C based on risk of inconsistent adjudications); *Ashker v.*

*Governor of State of California*, 2014 WL 2465191, at *7 (N.D. Cal. June 2, 2014)

(certifying prisoner class under Rule 23(b)(1)(A)); *Berry v. Baca*, 226 F.R.D. 398,

405-06 (C.D. Cal. 2005) (same); *Ingles v. City of New York*, 2003 WL 402565 at

*7 (S.D.N.Y. Feb. 20, 2003) (same).

   Likewise, separate actions, even if not dispositive, would as a practical

matter substantially impair or impede death-sentenced prisoners' ability to protect

their interests.  Separate suits might lead, in different cases, to disparate

interpretations or applications of the Capital Case Policy that would impair,

forestall or limit the claims of other identically-situated death-sentenced prisoners.

The Commonwealth's policy should apply equally and even-handedly to all such

prisoners.  A class action will assure that, and Rule 23(b)(1)(B)'s requirements are

also satisfied. *See Ingles,* 2003 WL 402565 at *7 (certifying prisoners action for injunctive relief under Rule 23(b)(1)(B)).

### E.    Counsel Meets the Criteria of Rule 23(g).

The undersigned counsel, who have investigated and presented these claims, include experienced civil rights and class action lawyers from some of the most respected organizations and firms in this Circuit and nationally in these areas. *See* pp. 22–23, above. Counsel will fairly and adequately represent the Class in this litigation.

## IV.    CONCLUSION.

For all of the foregoing reasons, the Court should grant Plaintiffs' motion and should certify a class consisting of "All current and future death-sentenced prisoners in the Commonwealth of Pennsylvania," and approve the appointment of the attorneys listed below as Class Counsel.

Dated:  March 29, 2018                 Respectfully submitted,

                                       */s/ Wilson M. Brown, III*
                                       Witold J. Walczak, PA 62876
                                       **ACLU OF PENNSYLVANIA**
                                       247 Fort Pitt Blvd.
                                       Pittsburgh, PA  15222
                                       Phone: (412) 681-7864
                                       Fax: (412) 681-8707
                                       vwalczak@aclupa.org

David Fathi, WA 24893*
Amy Fettig, DC 484883
Desiree Sholes, VA 92706*
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street NW, 7th Floor
Washington, DC  20005
Phone: (202) 393-4930
Fax: (202) 393-4931
dfathi@aclu.org
afettig@aclu.org
dsholes@aclu.org

*Not admitted in DC; practice
limited to federal courts*

Bret Grote, PA 317273
Jamelia N. Morgan, NY 5351176
**ABOLITIONIST LAW CENTER**
P.O. Box 8654
Pittsburgh, PA  15221
Phone: (412) 654-9070
bretgrote@abolitionistlawcenter.org
jamelia@alcenter.org

Jonathan H. Feinberg, PA 88227
Susan M. Lin, PA 94184
**KAIRYS, RUDOVSKY, MESSING,
FEINBERG & LIN LLP**
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA  19106
Phone: (215) 925-4400
Fax: (215) 925-5365
jfeinberg@krlawphila.com
slin@krlawphila.com

Barry Gross, PA 21563
Wilson M. Brown, III, PA 25846
Mira E. Baylson, PA 209559

Mark D. Taticchi, PA 323436
**DRINKER BIDDLE & REATH LLP**
One Logan Square, Suite 2000
Philadelphia, PA  19103
Phone: (215) 988-2700
Fax: (215) 988-2757
Wilson.Brown@dbr.com
Barry.Gross@dbr.com
Mira.Baylson@dbr.com
Mark.Taticchi@dbr.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF CONCURRENCE PURSUANT TO LR 7.1**

I, Wilson M. Brown, III, hereby certify that counsel for the Defendants was contacted about Defendants' possible concurrence in this Motion, and counsel for Defendants indicated that Defendants concurred with the relief sought herein.


*/s/ Wilson M. Brown, III*
Wilson M. Brown, III

One of the Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, Wilson M. Brown, III, hereby certify that on March 29, 2018, a copy of the foregoing Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Counsel was filed electronically. Notice of this filing will be sent to all parties who have appeared in this action via the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Wilson M. Brown, III*
Wilson M. Brown, III

One of the Attorneys for Plaintiffs