# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY REID, et al., | : | Honorable John E. Jones, III |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | No. 18-CV-0176 |
| | : | |
| JOHN WETZEL, et al., | : | |
| | : | |
| Defendants. | : | Complaint filed January 25, 2018 |

## SETTLEMENT AGREEMENT

## I.    INTRODUCTION

A.    On January 25, 2018, Plaintiffs filed this lawsuit on behalf of a class of prisoners currently sentenced to execution and confined within the Capital Case Units ("CCU") of the Pennsylvania Department of Corrections ("DOC"). Plaintiffs challenge conditions of their confinement and allege, *inter alia*, that Defendants have violated the Eighth and Fourteenth Amendments to the United States Constitution.  Defendants expressly deny that they have violated any constitutional rights of Plaintiffs.

B.    Counsel for Plaintiffs have conducted an extensive investigation of the conditions of confinement of class prisoners and have obtained many policies, directives, prisoners' medical and disciplinary records, and other pertinent materials.

1

C.      Defendants have provided, through counsel, further documents set out in requests made by Plaintiffs, and Plaintiffs' experts have conducted on-site tours of the State Correctional Institutions containing CCUs.

D.      Plaintiffs and Defendants, without conceding any infirmity in their claims or defenses, and prior to completing formal discovery, have engaged in extensive settlement negotiations in an effort to resolve the claims raised in this litigation.  They now desire to achieve an appropriate remedy amicably to resolve this litigation, avoid the risks and expense of further litigation, and provide relief based on constitutional principles.

E.      The Parties acknowledge that the DOC and Defendants have implemented and continue to implement improvements and that these improvements have been ongoing throughout the litigation.

F.      Defendants are entering into this Settlement Agreement ("Agreement") for the purpose of settlement.  Nothing contained herein may be taken as or construed to be an admission or concession of any violation of law or regulation, or of any other matter of fact or law, or of any liability or wrongdoing (including allegations of the Complaint), all of which the Defendants expressly deny. The Defendants do not admit to any violation of law, and do not admit to any wrongdoing that was or could have been alleged by the Plaintiffs before the Effective Date of this Agreement. No part of this agreement shall constitute evidence of any liability, fault, or wrongdoing by Defendants, the DOC or the Commonwealth of Pennsylvania.

## II.   <u>DEFINITIONS</u>

As used in this Agreement, the following terms have the following meanings:

A.   "A Roster" refers to prisoners who have no currently identified Psychiatric/Intellectual Disability needs and no history of such.

B.   "Action" refers to the above-entitled action captioned *Anthony Reid, et al., v. John Wetzel, et al.,* Case No. 18-CV-0176, in the United States District Court for the Middle District of Pennsylvania.

C.   "Administrative Custody" refers to a status of confinement in segregated housing units for non-disciplinary reasons, which provides closer supervision, control and protection than is provided in general population.

D.   "B Roster" refers to prisoners placed on the inactive Mental Health/Intellectual Disability roster, but not currently identified as SMI. Prisoners on this roster have a history of Psychiatric/Intellectual Disability needs but are not current consumers of mental health services.

E.   "Capital Case Unit" or "CCU" refers to distinct housing units currently contained at SCI-Greene, SCI-Phoenix and SCI-Muncy that exclusively house prisoners sentenced to execution, and any like housing units hereafter established at other correctional facilities in the Commonwealth.

F.   "Capital Case Prisoners" or "CCU Prisoners" refers to prisoners sentenced to execution.

G.   "C Roster" refers to prisoners placed on the active Mental Health/Intellectual Disability roster, but not currently identified as SMI.

H.     "Commencement Date" refers to the date, on the same date or following the Effective Date, on which all provisions of Section V of this Agreement have been implemented.

I.     "D Roster" refers to prisoners on the active Mental Health/Intellectual Disability roster who are classified as SMI.

J.     "Defendants" refers to John Wetzel, Secretary of the Pennsylvania Department of Corrections; Robert Gilmore, Superintendent of SCI-Greene; and Tammy Ferguson, Superintendent of SCI-Phoenix, in their official capacities, and their successors in office, subordinates, and agents.

K.     "Department" and/or "DOC" refers to the Pennsylvania Department of Corrections.

L.     "Diversionary Treatment Unit" refers to a secure unit that provides expanded and personalized mental health services primarily to prisoners with a SMI who have committed disciplinary infractions or are on administrative custody status, but sometimes also to C-Roster prisoners.

M.     "Effective Date" refers to the date upon which the Court grants final approval to this Agreement.

N.     "General Population Unit" refers to a DOC housing unit for L-2, L-3, and/or L-4 prisoners who are not in need of being housed in a unit that requires enhanced security restrictions. General Population Units are organized to effectuate out of cell time without the use of restraints, and provide a variety of

programmatic opportunities, including but not limited to recreational, educational, rehabilitative, and religious activities off unit.

O.    "Parties" refers to the Plaintiffs and the Defendants in the lawsuit captioned above.

P.    "Plaintiffs" refers to the plaintiff class certified by the Court, comprising "all current and future death-sentenced prisoners in the Commonwealth of Pennsylvania."

Q.    "Preliminary Approval Date" is the date on which the Court gives preliminary approval to this Agreement.

R.    "Restricted Housing Unit" is a segregated housing unit used by the DOC to house prisoners placed in Disciplinary and Administrative Custody.

S.    "Serious Mental Illness" or "SMI" is defined according to Department Policy 13.8.1, Section 2(B), and includes a current diagnosis or recent significant history of Substance-Induced Psychotic Disorder, Schizophreniform Disorder, Schizophrenia, Delusional Disorder, Brief Psychotic Disorder, Schizoaffective Disorder, Bipolar I and II and Major Depressive Disorder; "SMI" also includes diagnoses commonly characterized by breaks with reality leading to a significant functional impairment involving acts of self-harm; "SMI" also includes a diagnosis of an intellectual disability or other cognitive disorder that results in a significant functional impairment; "SMI" also includes any prisoner sentenced under the classification of Guilty But Mentally Ill.

### III.   <u>GENERAL PROVISIONS</u>

A.   <u>Warranty and Voluntary Agreement</u>

Plaintiffs and Defendants warrant that they have entered into this agreement voluntarily and of their own accord without reliance on any inducement, promise or representation by any other party, except those that are expressly set forth in this Agreement. This Agreement contains and constitutes the entire understanding and agreement between the Plaintiffs and Defendants respecting the subject matter hereof and may not be changed or altered in any way except as expressly set forth herein.

B.   <u>Warranty of Understanding and Acknowledgement</u>

Plaintiffs and Defendants have carefully read this Agreement, know and understand its contents, and freely and voluntarily agree to all of its terms and conditions.

C.   <u>Governing Law</u>

The parties agree that, except to the extent any provision is governed by federal law that supersedes state law, this Agreement shall be construed and governed by the laws of the Commonwealth of Pennsylvania.

D.   <u>Construction</u>

No party shall be considered the drafter of this Agreement, or any provision contained herein, for the purposes of any statute, case law, or rule of interpretation or construction, that would or might cause any provision to be construed or interpreted as against the drafter. The parties also agree that signed

electronic .pdf versions of this Agreement shall have the same force and effect as original copies of the Agreement.

E.      Entire Agreement

The terms of this Agreement and its exhibits as written constitute the entire agreement between the Parties, and there are no other terms relied upon by the Parties, verbal or otherwise.

F.      Severability

If any part of this Agreement is or shall be declared invalid or unenforceable by operation of law, or by any tribunal of competent jurisdiction, the remainder of this Agreement shall not be affected thereby, but shall continue in full force and effect. If any provision of this Agreement, or application of such provision to any person or circumstance, shall be held invalid by a court of competent jurisdiction, the remainder of this Agreement, or the application of such provision to persons or circumstances other than to those as to which it is held invalid, shall not be affected thereby unless to do so would destroy the essential purpose of this Agreement.

G.      Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

H.    <u>Authorization</u>

   The representatives executing this Agreement on behalf of Plaintiffs and Defendants are empowered to do so and thereby bind Plaintiffs and Defendants in accordance with the terms of this Agreement.

I.    <u>Further Assurances</u>

   The parties agree to take all actions reasonably necessary to effectuate the approval, performance, validity and enforceability of this Agreement.

J.    <u>Waiver and Amendment; Preservation of Remedies</u>

   This Agreement may be amended only by an agreement in writing executed by all of the parties hereto, pursuant to Section VII(A), *infra*. The failure by any party hereto to insist upon strict performance of any of the terms or conditions of this Agreement shall not be deemed a waiver of any of the rights or remedies that such party may have, and shall not be deemed a waiver of any subsequent breach or default. To be effective, any waiver with regard to this Agreement must be in writing and signed by the party granting the waiver, and any such waiver shall apply only to the matter or instance specifically waived.

## IV.   <u>SETTLEMENT APPROVAL</u>

A.    <u>Preliminary Approval</u>

   As soon as practicable following execution of this Agreement, the parties shall apply to the Court for a preliminary order:

1.      Granting preliminary approval of this Agreement for purposes of disseminating notice to Plaintiffs;

2.      Approving the form, contents, and dissemination of the notice of this Agreement to Plaintiffs; and

3.      Scheduling a fairness hearing to review comments and/or objections regarding this Agreement, consider the fairness, reasonableness, and adequacy of this Agreement, and consider whether the Court should order final approval of this Agreement and grant class counsel's requested fee award.

B.      <u>Final Approval</u>

1.      This Agreement shall be subject to the final approval of the Court.  The parties shall cooperate in presenting this Agreement to the Court for final approval and/or at any hearing under Rule 23(e) of the Federal Rules of Civil Procedure.  If the Court does not grant final approval, this Agreement shall be null and void and of no force and effect, and nothing herein shall be deemed to prejudice the position of any party with respect to this Action or otherwise, and neither the existence of this Agreement, nor any of its terms or provisions, nor any of the negotiations or proceedings connected with it, shall be admissible in evidence, referred to for any purpose in the Action or in any other litigation or proceeding, or construed as an admission, presumption, or concession by any Defendant of any liability or the truth of any of the allegations in the Action.

## V.    MODIFICATION OF CONDITIONS OF CONFINEMENT IN THE CCUs

A.    Development of General Population Setting in the CCU

1.    The CCU shall be operated as a general population unit that exclusively houses prisoners sentenced to death. The CCU shall no longer be classified as a Level 5 housing unit requiring enhanced security protocols. The CCU shall not be classified as Administrative Custody and shall not be subject to any Department of Correction policies (such as DC-ADM 802) specific to the operation of an Administrative Custody unit. Prisoners confined to the CCU shall be provided with all the rights and privileges afforded to those prisoners housed on standard general population units at the various institutions of the DOC system.

2.    Comparable to other general population units, prisoners confined in the CCU shall have access to the following:

a)    All newly received Capital Case Prisoners shall be assessed by a registered nurse or licensed psychologist, depending upon the time of intake, for purposes of completing a Suicide Indicator Checklist; appropriate mental health follow-up contacts shall be made in accordance with 13.8.1, Access to Mental Health Care.[1]

---

[1] Department policy 13.8.1, effective March 9, 2015, and entitled "Access to Mental Health Care," governs the provisions of this agreement that concern the provision of psychological, psychiatric, or mental-health services. The version of that policy dated March 9, 2015, last modified on December 18, 2018, and attached hereto as Exhibit 1 shall remain the controlling version of that policy unless modified as set forth below. Any proposed modification to policy 13.8.1 that would impact the care, treatment, or services provided to prisoners housed in the Capital Case Unit will be disclosed to Plaintiffs' counsel no less than 30 days prior to such modification taking effect. If Plaintiffs' counsel conclude that the proposed modification would have a significant

b)      Movement-related Use of Restraints and Strip Searches

(i)      Because the CCU shall be operated as a general population housing unit, prisoners confined in the CCU shall not be subjected to strip-searching or to shackling, tethering, or other physical restraints when moving about within the unit, unless such security measures are required by officers responding to a temporary, emergent situation or as part of efforts to restore order during a security disturbance.

(ii)     Prisoners confined to the CCU likewise shall not be subjected to strip-searching or to shackling, tethering, or other physical restraints when traveling outside the CCU unless either (1) an individualized determination is made by the Superintendent that a security concern necessitates the measures being applied; or (2) such measures are the standard procedure

---

adverse effect on the care, treatment, or services provided to prisoners housed in the Capital Case Unit, they shall have the right to bring the proposed modification before the Court. If the Court agrees that the proposed modification would have a significant adverse effect on the care, treatment, or services provided to prisoners housed in the Capital Case Unit, it shall not take effect. Policy modifications that merely correct grammar or spelling mistakes, reformat or renumber policy provisions, or address other non-substantive issues shall not require advance disclosure.

for all prisoners in the applicable circumstances (*e.g.*, search of prisoner following a contact visit). All individualized determinations with respect to prisoners confined in the CCU shall be reconsidered by the Superintendent every three months and the reasons for extending these measures beyond three months shall be documented.

c)    Prisoners confined in the CCU shall not be required to wear clothing of a different color or style from those worn by non-CCU Prisoners.

d)    Prisoners confined in the CCU shall be permitted to obtain a work assignment. Such work assignments shall include on-unit jobs, as well as jobs occurring outside, but adjacent to, the CCU—including, but not limited to, work in the satellite kitchen at SCI-Greene, and groundskeeping, snow-removal, and grass-mowing work in the areas surrounding the CCU.

e)    Prisoners confined in the CCU shall be permitted to use the telephone system on a daily basis, for no less than fifteen (15) minutes per usage, and whenever available.

f)    Prisoners confined in the CCU shall be permitted to purchase televisions, tablets, radios, and all other approved items available to prisoners in standard general population units.

g)      Within thirty (30) days of the Effective Date, prisoners confined in the CCU shall be offered at least four (4) hours of out-of-cell time for activities per day, seven (7) days a week, and a total of at least forty-two and a half (42.5) hours of out-of-cell time for activities per week. This out-of-cell time shall be offered during normal waking hours (7:00 am to 9:00 pm). Although the foregoing are required minimum standards, the parties agree that the goal in managing the CCU is to approximate as closely as possible the residential setting of prisoners confined in general population units. Prisoner participation in out-of-cell activities shall be logged and recorded on the tracking form appended here as Exhibit 2.

h)      The out-of-cell activities offered to every CCU Prisoner shall include, but are not limited to:

(i)      Yard and outdoor exercise

(ii)     "Block out" time

(iii)    Law library

(iv)    Congregate meals

(v)     Treatment or counseling team meetings

(vi)    Religious worship and congregation

(vii)   Work assignments

(viii)  Organized educational or vocational programming

(ix)    Treatment or recreational programming

13

i)      The requirement of out-of-cell time set forth in paragraph g, *supra*, shall not be satisfied by such activities as showers, medical appointments, attorney meetings, classification or disciplinary hearings, or court hearings.

j)      The Parties agree that the failure to offer the forty-two and a half (42.5) hours of weekly out-of-cell time required by paragraph g, *supra*, for a period of up to two (2) consecutive weeks, shall not itself qualify as substantial noncompliance with this Agreement.

k)      Outdoor exercise shall be offered for a minimum of two (2) hours per day, seven (7) days a week, weather permitting. Prisoners shall have access to water during exercise periods, or be permitted to bring water with them. When weather does not permit outdoor exercise, "block out" time shall be offered as an alternative.

l)      Prisoners confined in the CCU shall be permitted to shower and shave daily.

m)      Re-socialization Assistance.

            (i)      For prisoners on the active mental-health roster (*i.e.*, those assigned to the C Roster or D Roster), psychology staff and treatment teams shall ensure that each prisoner's individualized recovery plan includes elements designed to aid the individual's re-socialization and transition

14

from a solitary-confinement setting to a general-population setting. For any such prisoner whose participation in out-of-cell opportunities falls below twenty-five (25) hours in two (2) weeks in any rolling four-week period, that prisoner's treatment team will engage with the prisoner in a confidential setting in order to encourage the prisoner to engage in more out-of-cell activities and to create a written action plan for achieving that result.

(ii)    For prisoners not on the active mental-health roster (*i.e.*, those assigned to the A Roster or B Roster), if any such prisoner's participation in out-of-cell opportunities falls below twenty-five (25) hours in two (2) weeks in any rolling four-week period, the staff member responsible for tracking the prisoner's out-of-cell time will initiate a referral of the prisoner to the appropriate psychological staff, who then will be responsible for ascertaining the reason for the non-participation in out-of-cell activities, including through engagement with the prisoner

15

in a confidential setting and, if appropriate, development of an individualized, written recovery plan for the prisoner that is designed to increase the prisoner's participation to out-of-cell activities.

n)      No less frequently than every ninety (90) days, the Licensed Psychologist Manager shall conduct a written programming audit of all group programs (including organized educational or vocational programming and treatment or organized recreational programming) that have been offered in the CCU in the period since the most recent programming audit was completed (the "audit period"). This written audit shall include, at a minimum, (i) an analysis of the nature and quality of the programming offered during the audit period; and (ii) an assessment of whether the programming offered during the audit period adequately addresses the needs of CCU Prisoners, including, in particular, their need for meaningful social interaction.   The written audit shall be provided promptly to Plaintiffs' counsel.

o)      Prisoners confined in the CCU shall have access to educational programming, and shall be made aware of educational opportunities available at their institution. Such programming shall include both out-of-cell and in-cell options for Adult Basic Education, General Equivalency

Diploma courses, and individual or self-study programs. All educational programming shall be provided at no cost to the prisoner.

p)      Prisoners confined in the CCU shall have access to congregate religious activities. On a weekly basis, each faith representative will visit the CCU for the purpose of providing a congregate religious activity. Congregate religious activities and worship shall occur during prescribed "block out" or dayroom times. Religious audiotapes and reading materials shall also be available.

q)      Prisoners confined in the CCU shall have access to legal materials and a law library, including:

(i)      Each housing unit in which Capital Case Prisoners are housed shall contain a law library that gives prisoners direct and personal access to a legal database of caselaw, statutes, and legal treatises (such as Westlaw or Lexis-Nexis);

(ii)     Each law library shall provide adequate lighting, seating for no fewer than two (2) people, desk space adequate for a work area, and shelving that is secure;

(iii)    Each CCU Prisoner shall be given written instructions containing a current list of materials available in the law library, the procedures to

17

request use of the law library, and the hours the law library is available. A typewriter, computer, or word processor shall be kept in each law library for CCU Prisoners to use; if a computer or word processor is used, the associated printer shall likewise be located in the law library;

(iv)   The law library shall be open and available to CCU Prisoners during daily out-of-cell time for a minimum of six (6) hours per day, seven (7) days a week;

(v)   The Officer-in-Charge of the CCU shall schedule use of the law library;

(vi)   A CCU Prisoner may request two-hour blocks of time to work in the law library. If no other prisoner is scheduled to use the law library after the two-hour block of time, the prisoner shall be permitted to continue using the law library until such time as another prisoner is scheduled to use the library;

(vii)   Two (2) or more Phase I CCU Prisoners may work together in the law library provided the prisoners agree to use the library together;

(viii) A CCU Prisoner may request to be put on an "on call" list to use the law library if no one is scheduled to use it during the daily out-of- cell time.

(ix) A logbook shall be maintained recording prisoner use of the law library, including each prisoner's name and number, date of use, length of time used and whether the prisoner worked with another CCU Prisoner;

(x) At least once a week, or more often if necessary, the facility law librarian/designee shall deliver requested legal materials from the facility's general population law library and pick up requests for legal materials from the CCU;

(xi) The facility librarian shall be responsible for ensuring that all legal materials required by policy to be maintained in the capital case law library are available. If any materials are destroyed or go missing, the librarian shall be immediately notified by unit staff, or alternatively can be notified by a DC-135 prisoner request to staff member form, and will initiate the replacement process. A record of the inventory shall be maintained;

19

(xii)   If a CCU Prisoner does not have representation and is illiterate or non- English speaking, he/she may be permitted, with the approval of the Facility Manager/designee, to exchange legal information with another CCU Prisoner. Prisoners assisting one another with legal work shall be permitted to exchange legal materials directly.

(xiii)   A CCU Prisoner shall be permitted to exchange legal materials from his or her cell with legal materials being held in storage at least once every thirty (30) days. The Unit Management Team shall authorize more frequent exchanges based upon demonstrated need.

r)   Prisoners confined in the CCU shall have access to the same non-legal reading materials as the prisoners in each institution's standard general population units. CCU Prisoners shall be permitted to retain reading materials in accordance with the same policies governing the retention of reading materials for the standard general population units in each institution.

s)   Prisoners confined in the CCU shall be able to purchase sleeping masks from the commissary and shall be permitted to wear them in their cells.

t)      Frosted cell windows in SCI-Phoenix shall be replaced with transparent glass or other transparent material.

u)      CCU exercise yards shall be configured as set forth in Exhibits 3 and 4 attached hereto.

v)      Because the CCU will no longer be a Level 5 unit, a CCU Prisoner shall not be required to change cells every ninety (90) days unless there is a finding of elevated escape risk for that prisoner.

w)      Because the CCU will no longer be a Level 5 unit, cells on the CCU shall not be constantly illuminated during nighttime hours.

B.    **CCU Prisoner Discipline**

1.      Prisoners confined in the CCU shall be subject to the same disciplinary rules and procedures as prisoners housed in standard general population units.

2.      A CCU Prisoner who is seriously mentally ill shall be subject to the same disciplinary rules and procedures as seriously mentally ill prisoners housed in standard general population units and shall be subject to disciplinary custody sanctions to be served in the Restricted Housing Unit or Diversionary Treatment Unit, if clinically indicated.

3.      At the expiration of the sanction term, the prisoner shall be returned to the CCU.

C.    **Mental Health Care of CCU Prisoners**

1.      Mental health care, including psychiatric care, of prisoners confined in the CCU shall be rendered in accordance with 13.8.1, Access to Mental Health

Care, the frequency and acuity of which shall be determined by the prisoner's roster status.

2.      Any prisoner confined in the CCU whom staff notices to be exhibiting signs of mental decompensation shall immediately be referred for emergency mental health treatment, a suicide indicator checklist screening, and the implementation of an Individualized Treatment Plan, if medically indicated.

3.      Prisoners confined in the CCU shall have access to all DOC mental health and health care units (including those at other DOC facilities), if their treatment needs require such housing. Those units include, but are not limited to, Psychiatric Observation Cells, Medical Observation Cells, Mental Health Unit, Special Assessment Unit, Special Observation Unit, Secure Residential Treatment Unit, Behavior Management Unit, and institutional infirmary cells.

D.    <u>Physical and Mental Baseline Evaluations</u>

1.      Within six (6) months of the Effective Date of this Agreement, the Department shall arrange for all prisoners confined in the CCU to receive a physical and mental health evaluation for purposes of establishing baselines.

2.      The evaluations shall be made by independent and licensed physicians, not employed by the DOC or its health care contractor, who shall conduct the aforementioned evaluations at the facility. The proposed physicians should have correctional experience, which may include the monitoring of correctional systems. The parties must agree on the physicians who shall conduct the aforementioned evaluations at the facility. No more than six (6) physicians

22

shall be retained at any one time for purposes of completing the evaluation. Any dispute over the proposed physicians may be submitted to the court for resolution. Should a physician need to terminate his or her affiliation with this project for any reason, the process set forth above shall be used for selecting a replacement.

3.    The medical evaluation shall include tests routinely conducted during a yearly medical check-up, with considerations made for age, pre-existing conditions, and readily apparent conditions.

4.    The mental health evaluation shall include an assessment by the appointed physicians to determine the accuracy and appropriateness of the prisoner's current mental health diagnosis, roster status and psychotropic medication regimen. Both parties shall have an opportunity to review and, if the parties are unable to agree on a resolution, raise with the court, any concerns regarding either the evaluation of a particular prisoner or a particular physician's evaluations.

5.    The mental health evaluations shall also include an inquiry by the appointed physicians into and assessment of the impact of long-term restrictive housing on each prisoner. Plaintiffs' expert shall develop a proposed assessment that will then be shared with Defendants' counsel and expert(s) for their review and comment. If the parties agree on the contents of the assessment, it shall be adopted and performed by the physicians retained to perform the required mental health evaluations. If the parties are unable to agree on the contents of the assessments, they shall submit the assessment proposed by Plaintiffs' expert, along

with Defendants' objections and proposed modifications, to the Court for resolution. The purpose of this assessment is to assist the Defendants in developing appropriate individualized plans for re-integration and re-socialization of CCU Prisoners into a general population setting, as well as to identify patterns that require adjustments to policies and protocols in order to promote mental health and prosocial interaction.

6.      The evaluations, including any modifications that result from any dispute between the parties regarding the prisoner's initial evaluation shall become part of the prisoner's institutional medical record, to be referred to for all follow-up treatment.

7.      Nothing in this section shall be read as requiring a CCU Prisoner to undergo a physical or mental health examination should that prisoner wish to decline such examination(s); nor shall any such refusal by a CCU Prisoner preclude that CCU Prisoner from subsequently consenting to the performance of such examination(s).

E.      Phased Contact Visitation

1.      Within thirty (30) days after the Effective Date of this Agreement, Defendants shall allow prisoners confined in the CCU to have contact visits with their attorney(s) and spiritual advisor(s), unless an individualized determination is made by the Superintendent that contact visits for a particular CCU Prisoner present a serious security threat.

2.     Within sixty (60) days after the Effective Date of this Agreement, Defendants shall allow each CCU Prisoner to have at least one (1) contact visit per month with individuals who have been approved for the prisoner's visitor list, unless an individualized determination is made by the Superintendent that contact visits for a particular CCU Prisoner present a serious security threat. Individuals listed on a prisoner's visitor list are subject to the same screening and security measures as are individuals on the visitor lists of non-CCU Prisoners. Defendants shall not limit a person's eligibility for inclusion on a CCU Prisoner's visitor list based on the lack of a familial or legal relationship between the CCU Prisoner and the person seeking inclusion on that prisoner's visitor list. The visits provided for in this paragraph shall be in addition to the legal or religious contact visits provided for in Section V(E)(1).

3.     Within one hundred and eighty (180) days after the Effective Date of this Agreement, Defendants shall allow all visits of CCU Prisoners to be contact visits, unless an individualized determination is made by the Superintendent that contact visits for a particular CCU Prisoner present a serious security threat or temporary institutional needs dictate that all visits, regardless of prisoner classification or housing, must be non-contact.

4.     All non-contact visit orders made pursuant to paragraphs 1-3 above shall be reconsidered by the Superintendent every three (3) months and the reasons for continuing such an order beyond three (3) months shall be documented.

5.      All visits shall be not less than one (1) hour in duration.

6.      If during the life of this Agreement DOC documents multiple serious security breaches that lead DOC to conclude that this policy of allowing contact visits to CCU Prisoners needs to be re-evaluated, the DOC may initiate a review of this sub-section. If DOC seeks such a reconsideration, it shall in the first instance discuss proposed changes to contact visitation practices with Plaintiffs' counsel. If the parties cannot agree on proposed changes, the matter will be presented to the court for resolution.

F.      <u>Phased Integration into the General Population</u>

1.      CCU Prisoners whose convictions or capital sentences are modified by the court, either through direct appeal, Post-Conviction Relief filing, or habeas petition shall be re-integrated into the standard general population of the Department of Corrections.  The re-integration shall include re-classification of the prisoner and transfer to a temporary general population unit, where the prisoner will be assigned dedicated security and treatment staff to ameliorate any re-integration or re-socialization issues that may arise. The temporary unit shall include all privileges associated with standard general population, but will reflect a smaller population. While housed in the temporary unit, the prisoner shall still be subject to all disciplinary procedures imposed upon standard general population prisoners for any infraction of institution rules. After the prisoner has spent an appropriate amount of time in the temporary unit, the prisoner shall be transferred to his permanent institution and housing unit as dictated by the re-

classification process and based upon his individualized security level, medical and mental health needs, and all other factors contemplated by the classification process. In the event that the Commonwealth of Pennsylvania seeks appellate review of the decision modifying the prisoner's conviction or sentence, re-classification and any modifications to the prisoner's housing or conditions of confinement will not occur until the resolution of the appeal.  The Parties agree, however, that the provisions of the foregoing sentence shall be deemed revised to conform to the decision of the U.S. Court of Appeals for the Third Circuit in *Ernest Porter v. Pennsylvania Department of Corrections, et al.*, No. 18-3505, or any other case before that court which resolves this issue prior to the release of a decision in *Porter*.

2. The Department commits to continually and constantly re-evaluate the CCUs. These evaluations will consider the efficacy of operating two separate CCUs, and specifically consider security needs, CCU Prisoner population decreases, costs, and other logistical concerns associated with the operation of those units. If and when the CCU Prisoner population decreases to a level at which the operation of two separate CCUs becomes impracticable, the Department may elect to consolidate the CCUs. Similarly, if and when the CCU Prisoner population significantly decreases to a level such that the security benefits of operating a separate CCU are no longer realized or are outweighed by the operational requirements of such a system, the Department may elect to employ individualized

determinations of those remaining CCU Prisoners to integrate them into non-CCU units that meet their various security and treatment needs.

3.      In the event that, prior to the reclassification provided for in Section V(F)(1) above: (a) a final judgment is issued in which imposition of the death penalty is held unconstitutional in the Commonwealth of Pennsylvania, and that final judgment retroactively declares that all death-sentenced prisoners be re-sentenced to a life sentence or some other appropriate sentence, or directs the trial courts to resentence all death-sentenced prisoners to a life sentence or some other appropriate sentence; or (b) imposition of the death penalty is otherwise declared unlawful in the Commonwealth of Pennsylvania and that declaration is applied retroactively to all currently death-sentenced prisoners, Defendants shall, within thirty (30) days of the effective date of that determination, re-classify each CCU Prisoner under the Pennsylvania Additive Classification Tool and transition that prisoner into a housing setting commensurate with his or her needs, behavior and risk assessment under the same guidelines as prisoners who are serving a life sentence.

## VI.    <u>IMPLEMENTATION OF AGREEMENT</u>

A.      Defendants shall, in consultation with Plaintiffs, draft a written implementation plan specifying time and manner in which each substantive provision of this Agreement shall be implemented. In no event, however, shall Defendants' implementation plan provide for a period of implementation that extends more than one hundred eighty days (180) from the Effective Date.

B.      Defendants may, for good cause, modify their implementation plan, provided, however that (a) Defendants provide Plaintiffs with at least fourteen (14) days' advance notice of any proposed change and the facts that justify the proposed change; and (b) absent Plaintiffs' express written agreement, no such modification may extend the implementation period beyond the one hundred eighty (180) day deadline included in Section VI(A), *supra*.

C.      If Plaintiffs believe that good cause to modify the implementation plan is lacking or that Defendants are in substantial noncompliance with the terms of the implementation plan, Plaintiffs may, after providing Defendants with 14 days' written notice, submit the dispute to the Court for resolution.

D.      Should any provision of Defendants' implementation plan conflict with a provision of this Agreement, the provisions of this Agreement shall control.

## VII.   MONITORING OF AGREEMENT

A.      <u>Commencement of Monitoring</u>

        The Parties agree that monitoring shall commence on the Effective Date and shall remain in effect until the Agreement is terminated as set forth in Section IX, *infra*.

B.      <u>Technical Compliance Consultant Selection, Authority and Autonomy</u>

        1.      The Parties have jointly selected Mr. Rick Raemisch to serve as the initial Technical Compliance Consultant ("TCC") to assess and report to the Parties and the Court on the DOC's implementation of the terms of this Agreement.

2.      Once selected, the TCC shall operate independently of the Parties' control.

3.      The TCC will serve until the Agreement is terminated as set forth in Section IX, *infra*.

4.      The TCC may contract or consult with other persons or entities (collectively, "Technical Compliance Team" or "TC Team") to assist in the evaluation of compliance.

5.      If a selected TCC is unable or unwilling to serve or continue serving as the TCC, the Parties will confer within forty-five (45) days of the notice of the TCC's inability or unwillingness to serve to jointly select a successor. If the Parties are unable to agree upon the selection of a new TCC, each Party will submit two (2) names along with resumes or curriculum vitae and cost proposals to the Court, which will select a replacement.

6.      The TCC may be terminated at any time by agreement of the Parties. The Parties will confer within fifteen (15) days of termination to jointly select a new TCC.  If the Parties are unable to agree upon the selection of a new TCC, each Party will submit two (2) names along with resumes or curriculum vitae and cost proposals to the Court, which will select a replacement.

7.      After notice to the other Party, a Party may unilaterally seek to terminate the TCC for good cause by filing an appropriate motion with the Court. In the event the Court decides that good cause for termination has been

established, a new TCC will be selected via the procedure set forth in Paragraph 5, *supra*.

8.      The TC Team is permitted to engage in *ex parte* communications with either Party, either Party's counsel, and the Court.

C.      Technical Compliance Consultant Access

1.      The TC Team will have full and complete access to the CCUs, and all other areas of the facilities to which CCU prisoners have access, for the purpose of assessing compliance with the terms of this Agreement.

2.      The TC Team will have access to all prisoner security/classification records; prisoner medical and mental health records; logs of out-of-cell participation; applicable policies; and other documents necessary and relevant to ensure compliance with the Agreement.

3.      The TC Team will be permitted to conduct confidential interviews with all personnel who work with CCU Prisoners or whose work otherwise affects the implementation of the provisions of this Agreement.

4.      The TC Team will be permitted to conduct confidential interviews with CCU Prisoners. However, CCU Prisoners are not required to speak with the TC Team and such refusal on the part of a CCU prisoner shall not be construed as a refusal to cooperate on the part of the Plaintiffs.

5.      Defendants will encourage all employees and contract staff to fully cooperate with the TCC.

D.    Technical Compliance Consultant Onsite Visits and Reporting

1.    The TC Team will be permitted to conduct up to four (4) visits per calendar year, each consisting of up to five (5) eight-hour days of onsite compliance assessments, during the term of this Agreement. All onsite visits will take place on specific dates and times mutually agreed upon by the Parties.  If the Parties are unable to agree on dates and times, the TC Team may visit upon giving no less than ten (10) days' notice to the Parties.

2.    Within thirty (30) days of the Commencement Date, the TC Team will conduct an orientation site visit of both CCUs. Each orientation site visit may take up to three (3) eight-hour days.

3.    The TC Team will deliver to the Parties and the Court an initial "Compliance Report" within ninety (90) days of the Commencement Date, and then no less frequently than every six (6) months thereafter. The TCC's initial Compliance Report will provide a detailed report of the conditions at the time of the visit, and inform the Parties what information the TCC will require Defendants to routinely report and with what frequency as the assessment proceeds.

4.    Defendants shall provide to the TC Team information reasonably related to the terms and subject matter of this Agreement. Defendants shall provide requested information to the TC Team and to Plaintiffs within fifteen (15) days of the request, with the exception of data or documents requested in conjunction with a site visit, which Defendants shall provide at least seven (7)

days prior to the site visit. Should any dispute arise regarding the TC Team's access to the CCUs or to documents or information, either Party or the TC Team may bring that dispute to the Court for resolution; the Parties and the TC Team shall have an opportunity to present to the Court their views on the dispute.

5.      The TCC shall provide a draft Compliance Report to the Parties for comment at least thirty (30) days prior to its official release to the Parties and the Court. The Parties shall provide comments, if any, to the TCC within fifteen (15) days of receipt of the draft. The TCC shall consider the responses of the Parties and make appropriate changes, if any, before delivering to the Parties and the Court the final Compliance Report for that reporting period.

6.      The TCC's Compliance Reports shall describe the steps taken by Defendants to implement this Agreement and evaluate the extent to which Defendants have complied with each substantive provision of the Agreement. Each TCC Compliance Report:

a)      Shall evaluate the status of compliance for each provision of the Agreement using the following standards: (1) Substantial Compliance; (2) Partial Compliance; and (3) Non-compliance. The TCC will review a sufficient number of pertinent documents and interview a sufficient number of staff and prisoners to accurately assess current conditions. The TC Team may also communicate with ex-prisoners, family members, and community members to assist the TCC's assessment of current conditions;

33

b)      Shall describe the steps taken to analyze conditions and assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of the TCC's findings; and

c)      for each of the provisions in the Agreement the TCC shall outline recommended actions for at least the next six (6) months that will assist Defendants in achieving/maintaining compliance with the particular provision.

7.      In any proceeding seeking termination of the Agreement pursuant to Section IX, *infra*, the TCC's evaluations of DOC's compliance status (Substantial Compliance, Partial Compliance, or Non-compliance) shall be deemed presumptively correct but may be disputed by one or both of the Parties. In such proceeding the TCC's evaluations of DOC's compliance status shall not be overturned unless clearly erroneous.

8.      Nothing in this section shall prohibit the TCC from issuing interim reports to the Parties and the Court should she or he deem it necessary.

E.      <u>Prohibition Against Retaliation</u>

Defendants shall not retaliate against any person because that person has provided information or assistance related to this Agreement to the TC Team, the Plaintiffs, or the Plaintiffs' counsel.

F.      <u>Confidentiality</u>

All information obtained by the TC Team will be maintained in a confidential manner. Defendants shall not assert any privilege with respect to

34

monitoring of this Agreement by the TC Team. Within seven (7) days of receipt, the TC Team will distribute to Plaintiffs' counsel all documents, forms, assessments, and reports submitted by Defendants unless Defendants have already distributed such items to Plaintiffs' counsel. The Parties and the TC Team will treat all personally identifiable information obtained pursuant to this Agreement as confidential.

G.      Technical Compliance Consultant Cost and Budget

1.      The cost of the TCC's fees and expenses shall be borne by Defendants pursuant to a reasonable budget to be agreed upon by and between Defendants and the TCC.

2.      Defendants shall provide the TCC with a budget sufficient to carry out the responsibilities described in this Agreement.

3.      The TCC shall pay for the services of any person or entity employed or otherwise retained by the TCC to assist with fulfilling the duties required by this Agreement out of his/her approved budget.

4.      Any dispute regarding payment of the TCC's fees or expenses may be presented to the Court for resolution.

H.      Access to Facilities, Documents and Personnel by Plaintiffs' Counsel

1.      Plaintiffs' counsel, agents, and experts shall have reasonable access to the CCUs of SCI-Greene, SCI-Phoenix, and SCI-Muncy for purposes of touring and inspecting the operations of the CCUs. Plaintiffs' counsel shall be permitted to observe daily and routine operations of the CCUs, including out-of-cell

programming, congregate meals, yard and exercise time, and all other non-emergency events occurring regularly during the time of the tour. Plaintiffs shall provide notice of no less than ten (10) days of their intention to inspect the CCUs.

2.     Plaintiffs' counsel may request relevant documents from Defendants, which documents shall include, but not be limited to prisoner security/classification records; prisoner medical and mental health records; logs of out-of-cell participation; applicable policies; and other documents necessary and relevant to ensure compliance with the Agreement. Defendants shall provide the requested documents within fifteen (15) days of receiving Plaintiffs' counsel's request, unless the volume or complexity of the request, or other intervening factors, requires more time for production, provided that such additional time may not exceed fifteen (15) days absent the consent of Plaintiffs' counsel. Plaintiffs' counsel may disclose to their agents and experts any such documents received from Defendants.

3.     Plaintiffs' counsel, agents, and experts will continue to have the right to conduct confidential interviews with CCU Prisoners and with Defendants' staff and contractors. DOC counsel will be permitted to be present at all such staff interviews.

4.     If Defendants refuse a request for access to facilities, documents, or personnel submitted by Plaintiffs' counsel, the Parties may submit their dispute to the Court to resolve whether the request is reasonably calculated to aid in assessing DOC's compliance with the Agreement.

## VIII. <u>MODIFICATION; DISPUTE RESOLUTION</u>

A.     The Parties may jointly agree to a modification of this Agreement by a written amendment to the Agreement, signed by both Parties.

B.     If Plaintiffs have a reasonable basis to believe that Defendants are in substantial noncompliance with one or more provisions of this Agreement, Plaintiffs will notify Defendants in writing of the specific compliance issue(s). This notice will identify, with particularity, the basis of the claim that Defendants are not in substantial compliance and the specific provision(s) of this Agreement that are implicated.

C.     Within thirty (30) days of receipt of the notification, Defendants shall provide a good-faith written response to the Plaintiffs' notification with a full factual explanation as to why Defendants believe they are in substantial compliance with the specified provision(s), or an explanation of Defendants' plans to achieve full compliance with the specified provision(s).

D.     If the Parties are unable to resolve the dispute within forty-five (45) days, the Plaintiffs may seek intervention from the Court by filing a motion for enforcement of the provision(s) identified through the aforementioned notice of substantial noncompliance.

## IX.   <u>TERMINATION OF AGREEMENT; DISMISSAL</u>

A.     Subject to the exceptions set forth in paragraphs (B)-(D), *infra*, this Agreement shall remain in force for a period of three (3) years from the Commencement Date.

B.      Notwithstanding the provisions of paragraph (A), *supra*, if Defendants maintain substantial compliance with all material provisions of this Agreement for a period of twenty-four (24) consecutive months following the Commencement Date, either Defendants or Plaintiffs, or the Parties jointly, may file a motion with the Court seeking termination of this Agreement.

C.      If the Court determines that Defendants have been in substantial noncompliance with one or more material terms of this Agreement at any point during the second or third year of the term provided for in paragraph (A), *supra*, the term of this Agreement shall be deemed extended by an additional one (1) year beyond the expiration date set forth in paragraph (A), *supra*.

D.      If at the end of the extended term provided for by paragraph (C), *supra*, or at the end of any further extension authorized by this paragraph, Plaintiffs have reason to believe that Defendants are in substantial noncompliance with one or more material terms of this Agreement, they may petition the Court to extend the term of this Agreement by an additional one (1) year. This Agreement may not be terminated while any petition for its extension is pending with the Court.

E.      The parties understand and agree that the Court will maintain jurisdiction of this civil action throughout the duration of the Agreement to enforce the provisions of the Agreement and that the Plaintiffs may seek to enforce the Agreement, pursuant to Section VII, *supra*. The parties also agree that, upon termination of the Agreement, they will sign and submit a joint stipulation of

dismissal with prejudice pursuant to F. R. Civ. P. 41(a), thereby ending the Court's jurisdiction over this case.

## X.   NOTICE

All notices required under this Agreement will be sent overnight mail or overnight courier to the following people:

If to the Plaintiffs:

> Amy Fettig, Esq.
> ACLU National Prison Project
> 915 15th St. N.W., 7th Floor
> Washington, DC  20005

If to the Defendants:

> Timothy A. Holmes, Esq.
> Acting Chief Counsel
> Department of Corrections
> Office of Chief Counsel
> 1920 Technology Parkway
> Mechanicsburg, PA 17050

## XI.   MISCELLANEOUS PROVISIONS

A.     Any headings or subheadings used herein are for reference purposes only and do not affect the substantive provisions of the Agreement.

B.     Based upon the entire record, the parties stipulate, and jointly request that the Court find, that this Agreement satisfies the requirements of 18 U.S.C. § 3626(a)(1)(A) in that it is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right of the Plaintiffs.

C.     To allow time for the remedial measures set forth in this Agreement to be fully implemented, the Parties shall not move to terminate this Agreement or to decertify the class for a period of four (4) years from the date of its approval by the Court, except that either party may move at any time to terminate this Agreement pursuant to Section VIII(B) based upon a claim of substantial compliance.

D.     Neither this Agreement nor any policies or procedures referenced herein, shall define any state or federal constitutional rights.

## XII.   ATTORNEYS' FEES AND COSTS

A.     The Department will pay costs and reasonable attorneys' fees, in an amount to be determined by the Court, in full and complete satisfaction of any and all Plaintiffs' claims for attorneys' fees and costs up to the Effective Date of the Agreement. The payment shall be made by check and delivered to Witold J. Walczak, ACLU of Pennsylvania.

B.     Plaintiffs agree not to seek further fees and costs with respect to work incurred prior to Effective Date.

C.     DOC shall pay reasonable fees and costs to the Plaintiffs' attorneys, and their experts, for time spent in the monitoring phase of the litigation. Counsel and experts shall submit invoices for their time and costs on a semi-annual basis. Any disputes over fees and costs shall be adjudicated by the Court.

D.     If Plaintiffs are the prevailing party in any proceedings to enforce the terms of this Agreement, Plaintiffs shall be entitled to receive reasonable attorneys' fees

and costs, including expert costs, incurred in connection with those proceedings.

Any disputes over fees and costs shall be adjudicated by the Court.

For Plaintiffs

Wilson M. Brown, III
Barry Gross
Mark D. Taticchi
**DRINKER BIDDLE &**
**REATH LLP**
One Logan Square, Suite 2000
Philadelphia, PA 19103
(215) 988-2700
(215) 988-2757
Wilson.Brown@dbr.com
Barry.Gross@dbr.com
Mark.Taticchi@dbr.com

Witold J. Walczak, PA 62876
**ACLU OF PENNSYLVANIA**
247 Fort Pitt Blvd.
Pittsburgh, PA 15222
Phone: (412) 681-7864
Fax: (412) 681-8707
vwalczak@aclupa.org

Bret Grote, PA 317273
Jamelia N. Morgan, NY 5351176
**ABOLITIONIST LAW CENTER**
P.O. Box 8654
Pittsburgh, PA 15221
Phone: (412) 654-9070
bretgrote@abolitionistlawcenter.org
jamelia@alcenter.org

For Defendants

Timothy A. Holmes
Joseph G. Fulginiti
Chase M. DeFelice
Maria G. Macus
**OFFICE OF CHIEF COUNSEL,**
**PENNSYLVANIA DEPARTMENT**
**OF CORRECTIONS**
1920 Technology Parkway
Mechanicsburg, PA 17050
Phone: (717) 728-7763
Fax: (717) 728-0312
tholmes@pa.gov
josfulgini@pa.gov
chdefelice@pa.gov
mmacus@pa.gov

42

David Fathi, WA 24893*
Amy Fettig, DC 484883
**ACLU NATIONAL PRISON PROJECT**
915 15th Street NW, 7th Floor
Washington, DC 20005
**Phone: (202) 393-4930**
**Fax: (202) 393-4931**
dfathi@aclu.org
afettig@aclu.org

*Not admitted in DC; practice limited to federal courts*

Jonathan H. Feinberg, PA 88227
Susan M. Lin, PA 94184
**KAIRYS, RUDOVSKY,
MESSING, FEINBERG &
LIN LLP**
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
Phone: (215) 925-4400
Fax: (215) 925-5365
jfeinberg@krlawphila.com
slin@krlawphila.com


Dated: November 12, 2019

43

# Exhibit 1



|  | POLICY STATEMENT<br>Commonwealth of Pennsylvania • Department of Corrections |
|---|---|

| Policy Subject: | Policy Number: |
|---|---|
| **Access to Mental Health Care** | **13.8.1** |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| **March 2, 2015** | **Signature on File**<br>**John E. Wetzel** | **March 9, 2015** |

## I.    AUTHORITY

The Authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, 71 P.S. §§61, 66, 186, and 310-1, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II.    APPLICABILITY

This policy is applicable to all facilities operated under the jurisdiction of, or conducting business with the Department of Corrections, Department employees, volunteers, contract personnel, visitors and inmates.

## III.    POLICY

It is the policy of the Department to deliver a broad continuum of mental health services to ensure that regardless of how major or minor the emotional disturbance, services are available to every inmate in the Department.[1]

A. screening for mental health problems on intake as approved by the mental health professional (refer to **Section 2 - Delivery of Mental Health Services** of this procedures manual);

B. outpatient services  for the detection, diagnosis, and treatment of mental illness (refer to **Section 2** of this procedures manual);

---

[1] 4-4368

C. crisis intervention and the management of acute psychiatric episodes (refer to **Section 2** and **Section 3 - Delivery of Psychiatric Services** of this procedures manual);

D. stabilization of the mentally ill and the prevention of psychiatric deterioration in the correctional setting (refer to **Section 2, Section 3,** and **Section 5 - Residential Treatment Units [RTUs]** of this procedures manual);

E. preventive treatment (refer to **Section 1** and **Section 2** of this procedures manual);

F. provision for referral and admission to a licensed mental health unit/facility (refer to **Section 2 and Section 4 - Temporary Transfer of Mental Health Commitments** of this procedures manual);

G. facilities for an offender whose psychiatric needs exceed the treatment capability of the facility (refer to **Section 5**, **Section 7 – Special Assessment Unit**, **Section 10 – Intermediate Care Unit** of this procedures manual); and

H. procedures for obtaining and documenting informed consent (refer to **Section 2** of this procedures manual).

## IV. PROCEDURES

A. The systematic method of delivering psychological services to every inmate includes, but is not limited to, the below listed vehicles.

1. Intellectual, Academic and Mental Health Assessment

   The Department provides psychological and psychiatric assessments of levels of intellectual functioning, academic achievement, personality dynamics, and mental health needs to identify each inmate's strengths and weaknesses in order to make prescriptive program and treatment recommendations to help him/her develop the necessary skills for successful adjustment while incarcerated and upon release in the community.[2]

2. Individual Treatment and Program Planning

   The mental health treatment service needs of each inmate are addressed via his/her **DC-43, Integrated Correctional Plan (ICP)**, which is developed with participation of the inmate and is updated annually. In addition, the special needs of an inmate with mental illness are further addressed via the Individual Recovery Plan (IRP).

3. Mental Health Tracking

   An inmate with mental health problems is tracked on the automated Mental Health/Intellectual Disability (MH/ID) tracking system to ensure continuity of care.

---

[2] 4-4305

4. Outpatient Treatment Services

   Outpatient psychiatric and psychological services are provided upon an inmate's initial intake and as needed throughout his/her period of incarceration at every facility. Individual and group treatment services are developed to assist an inmate in emotional growth and/or prevention/management of mental illness, managing the behaviors that lead led to his/her offense(s), coping with the prison environment and external stressors, and preparing for reentry into the community as law abiding citizens.

5. Inpatient Treatment Mental Health Services

   Inpatient psychiatric services are provided in Mental Health Units (MHUs) and the Forensic Treatment Center (FTC) at Waymart. The MHUs are small inpatient units that are licensed by the Department of Human Service's Office of Mental Health and Substance Abuse Services (OMHSAS) and provide short-term treatment. The FTC is a psychiatric hospital licensed by OMHSAS, which provides long-term inpatient psychiatric services.

6. Special Needs Housing

   Specialized housing is available for inmates that require that level of care in a Special Needs Unit (SNU), Intermediate Care Unit (ICU), Special Assessment Unit (SAU), Residential Treatment Unit (RTU), Secure Residential Treatment Unit (SRTU), Behavior Management Unit (BMU), Diversionary Treatment Unit (DTU) and Special Observation Unit (SOU). SNUs are non-licensed living areas or blocks located where an inmate with special mental health or medical needs can receive additional or more intense treatment services, support and/or protection. The ICU at Waymart is a 93-bed living unit that accepts an inmate who has a history of serious mental illness, psychiatric hospitalizations, and SNU/RTU placements. The ICU prepares an inmate for living in a SNU/RTU. The SAU provides additional diagnostic and assessment services for an inmate with mental illness who displays serious behavioral problems. The SOU is an observation and assessment unit for newly committed inmates who are experiencing stress and are suspected of having mental health problems.[3]

7. Community Based Residential and Treatment Services

   CCCs for a mentally ill inmate are located in Philadelphia and Allegheny Counties to help these men and women transition back into community life.

B. All pertinent procedures for staff are contained in the procedures manual for this policy.

---

[3] 4-4305

## V.   SUSPENSION DURING AN EMERGENCY

In an emergency or extended disruption of normal facility operation, the Secretary/designee may suspend any provision or section of this policy for a specific period.

## VI.   RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual.  This policy should be interpreted to have sufficient flexibility to be consistent with law and to permit the accomplishment of the purpose(s) of the policies of the Department of Corrections.

## VII.   RELEASE OF INFORMATION AND DISSEMINATION OF POLICY

### A.   Release of Information

1.   Policy

This policy document is public information and may be released upon request.

2.   Confidential Procedures (if applicable)

Confidential procedures for this document, if any, are <u>not public information</u> and may not be released in its entirety or in part, without the approval of the Secretary of Corrections/designee. Confidential procedures may be released to any Department of Corrections employee on an as needed basis.

### B.   Distribution of Policy

1.   General Distribution

The Department of Corrections' policy and procedures shall be distributed to the members of the Central Office Executive Staff, all Facility Managers, and Community Corrections Regional Directors on a routine basis.  Distribution of confidential procedures to other individuals and/or agencies is subject to the approval of the Secretary of Corrections/designee.

2.   Distribution to Staff

It is the responsibility of those individuals receiving policies and procedures, as indicated in the "General Distribution" section above, to ensure that each employee expected or required to perform the necessary procedures/duties is issued a copy of the policy and procedures either in hard copy or via email, whichever is most appropriate.

## VIII.  SUPERSEDED POLICY AND CROSS REFERENCE

### A.  Superseded Policy

1.  Department Policy

    13.8.1, Access to Health Care, issued May 24, 2004 by Secretary Jeffrey A. Beard, Ph.D.

2.  Facility Policy and Procedures

    This document supersedes all facility policy and procedures on this subject.

### B.  Cross Reference(s)

1.  Administrative Manuals

    a.  DC-ADM 003, Release of Information;

    b.  DC-ADM 201, Use of Force;

    c.  DC-ADM 801, Inmate Discipline;

    d.  DC-ADM 802, Administrative Custody Procedures;

    e.  2.1.1, Planning, Research, Statistics and Grants;

    f.  4.1.1, Human Resources and Labor Relations;

    g.  5.1.1, Staff Development and Training;

    h.  6.3.1, Facility Security;

    i.  6.5.1, Administration of Security Level 5 Housing Units;

    j.  6.5.8, Capital Case Administration;

    k.  6.7.2, Special Response Teams;

    l.  11.2.1, Reception and Classification;

    m. 11.4.1, Case Summary;

    n.  11.5.1, Records Office Operations;

    o.  13.1.1, Management and Administration of Health Care; and

    p.  13.2.1, Access to Health Care

2. ACA Standards

   a. Adult Correctional Institutions: 4-4191, 4-4257, 4-4258, 4-4286, 4-4305, 4-4350, 4-4351, 4-4366, 4-4368, 4-4369, 4-4371, 4-4372, 4-4373, 4-4374, 4-4399, 4-4401, 4-4404, 4-4411, 4-4416

   b. Adult Community Residential Services: None

   c. Correctional Training Academies: None

3. PREA Standards

   None



| | PROCEDURES MANUAL |
|---|---|
| | Commonwealth of Pennsylvania • Department of Corrections |

| Policy Subject: | Policy Number: |
|---|---|
| **Access to Mental Health Care** | **13.8.1** |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| **March 2, 2015** | **Signature on File** | **March 9, 2015** |
| | **John E. Wetzel** | |

Release of Information:

**Policy Document**: The Department of Corrections policy document on this subject is public information and may be released to members of the public, staff, legislative, judicial, law enforcement, and correctional agencies and/or inmates upon request.

**Procedure Manual**: The procedures manual for this policy may be released in its entirety or in part, with the prior approval of the Secretary/designee. Unless prior approval of the Secretary/designee has been obtained, this manual or parts thereof may be released to any Department employee on an as needed basis only.

**Procedure Development**: All required procedures will be developed in compliance with the standards set forth in this manual and/or the governing policy.  These standards may be exceeded, but in all cases these standards are the minimum standard that must be achieved. In the event a deviation or variance is required, a written request is to be submitted to the appropriate Regional Deputy Secretary and the Standards and Practices Unit for review and approval prior to implementation.  Absent such approval, all procedures set forth in this manual must be met.

### 13.8.1 Access to Mental Health Care Procedures Manual
### Table of Contents

## Section 1 – Psychological Services

A. Diagnostic Center ................................................................................................ 1-1
B. Facility Functions and Procedures ....................................................................... 1-2
C. Treatment ........................................................................................................... 1-14
D. Procedure for Preparation of Commutation Psychological Evaluations ............. 1-15
E. Training, Consultation, and Peer Review ............................................................ 1-15
F. Central Office Oversight, Quality Improvement, and Quality Assurance Activities .......... 1-16


DC-97, Mental Health Referral Form ...................................................... Attachment 1-A
Guidelines for Department Psychological Evaluations for Parole and Other Assessments
Required by Policy or Referral ................................................................ Attachment 1-B
Procedure for Preparation of Commutation Psychological Evaluations ............... Attachment 1-C
PCRA and Psychological Evaluation for Parole ..................................... Attachment 1-D
Psychological Evaluation and Clinical Risk Assessment ...................... Attachment 1-E
DC-510, Suicide Indicators Checklist ..................................................... Attachment 1-F
DC-560, Mental Health Contact Note ..................................................... Attachment 1-G
RHU C & D Roster Inmate Review Tracking Sheet ............................... Attachment 1-H
DC-560A, Initial Reception Mental Health Questionnaire ..................... Attachment 1-I
Format for Commutation Psychological Reports..................................... Attachment 1-J
Psychological Screening Report Form .................................................... Attachment 1-K
Role of the Psychologist in Personnel Selection of COTS................................... Attachment 1-L

## Section 2 - Delivery of Mental Health Services

A. Identifying Mental Health Needs of Inmates ....................................................... 2-1
B. Definition of Serious Mental Illness .................................................................... 2-2
C. Clinical Guidelines for Functional Impairment .................................................... 2-4
D. Intellectual Disability (ID) ................................................................................... 2-4
E. Processing ......................................................................................................... 2-9
F. Mental Health Commitments .............................................................................. 2-11
G. Continuity of Care Procedures for Inmates with Mental Illness Being Transferred.......... 2-15
H. Continuity of Care Procedures for an Inmate with Mental Illness Being Discharged ....... 2-18
I. Limits of Confidentiality ...................................................................................... 2-24
J. Guilty But Mentally Ill (GBMI) Inmates............................................................... 2-25
K. Dealing with a Potentially Suicidal Inmate and an Inmate Who Attempts Suicide........... 2-30
L. Suicide Prevention Committee ........................................................................... 2-42
M. Mental Health Services Review Committee (MHSRC) ....................................... 2-43


Initial – Individual Recovery Plan .......................................................... Attachment 2-A
Change of Status – Individual Recovery Plan....................................... Attachment 2-B
Review – Individual Recovery Plan ........................................................ Attachment 2-C
DC-551, Continuity of Care and Transfer Individual Treatment Plan ................... Attachment 2-D
MH 783, Application for Involuntary Emergency Examination & Treatment......... Attachment 2-E
MH 783-A, Patient's Bill of Rights ......................................................... Attachment 2-F
MH 784, Application for Extended Involuntary Treatment.................................... Attachment 2-G
Voluntary Application for Mental Health Treatment (Section 201) ...................... Attachment 2-H
MH 781-Z, Explanation of Voluntary Admission Rights ........................ Attachment 2-I

**13.8.1 Access to Mental Health Care Procedures Manual**
**Table of Contents**

MH 781-A, Initial Evaluation ................................................................. Attachment 2-J
DC-484, Mental Health Confidentiality Disclosure Statement-English & Spanish Attachment 2-K
Referral Procedure for Cromisa Project............................................... Attachment 2-L

## Section 3 - Delivery of Psychiatric Services

A.  Documentation of Psychiatry Services ...................................................... 3-1
B.  Provisions of Psychiatric Services by a Certified Registered Nurse Practitioner –
      Psychiatric Services (PCRNP)......................................................... 3-3
C.  Psychiatric Therapeutic Restraints ................................................... 3-5
D.  Guidelines for Psychiatric Observations Cells (POC) ............................... 3-5
E.  Involuntary Administration of Psychotropic Medications............................ 3-14
F.  Sleep Medications .................................................................. 3-17
G.  Benzodiazepines.................................................................... 3-17
H.  Psychiatric Medication Monitoring ................................................. 3-18


DC-472C, Outpatient Psychiatry Progress Notes ................................ Attachment 3-A
DC-452D, Informed Consent for Psychotropic Medication ....................... Attachment 3-B
DC-452D, Informed Consent for Psychotropic Medication (Spanish) ............. Attachment 3-C
DC-474A, POC Discharge Summary.............................................. Attachment 3-D
DC-447, Psychiatric Observation Cell Orders................................. Attachment 3-E
DC-483, Psychiatric Observation Monitoring Form............................. Attachment 3-F
DC-486C, Antipsychotic Medication Flow Sheet ............................... Attachment 3-G
DC-486B, Lithium, Depakote, Trileptal, Tegretol Flow Sheet ................ Attachment 3-H

## Section 4 - Temporary Transfer of Mental Health Commitments

A.  General Considerations............................................................ 4-1
B.  Eligibility Criteria for Intra-Facility Transfer ................................. 4-1
C.  Department Mental Health Unit Commitment Process ................................. 4-2
D.  Department Regional Mental Health Unit (MHU) Responsibilities.................... 4-3


Request for Temporary Transfer to a Mental Health Unit ..................... Attachment 4-A
Inmate Property Approved for Transfer to a Mental Health Unit .............. Attachment 4-B

## Section 5 – Residential Treatment Units (RTUs)

A.  Program Mission .................................................................. 5-1
B.  Admission Criteria and Process for Transfer ...................................... 5-1
C.  RTU Cell Assignment .............................................................. 5-3
D.  Individual Recovery Plans (IRPs) and Psychiatric Review Team (PRT) .............. 5-3
E.  Treatment Team Meetings .......................................................... 5-4
F.  Treatment Programming ............................................................ 5-4
G.  Milieu/Unit Atmosphere ........................................................... 5-8
H.  Treatment Team Responsibilities .................................................. 5-10
I.   Medications ..................................................................... 5-12
J.  Razors ........................................................................... 5-13
K.  Staff Training and Development ................................................... 5-13

**13.8.1 Access to Mental Health Care Procedures Manual**
**Table of Contents**

L.  Behavioral Adjustment Cell (BAC)...................................................................... 5-13
M. Discharge and Transfer Procedures................................................................. 5-14

Involuntary Double-Celling Checklist .........................................................Attachment 5-A
Initial Individual Recovery Plan (IRP).........................................................Attachment 5-B
Change of Status IRP .................................................................................Attachment 5-C
Review IRP ..................................................................................................Attachment 5-D
IRP Guidelines ............................................................................................Attachment 5-E
Group Therapy Resources for RTU Inmates ............................................Attachment 5-F
RTU Program Schedule...............................................................................Attachment 5-G
Behavioral Adjustment Cell (BAC) Tracking Sheet..................................Attachment 5-H

### Section 6 - Post Traumatic Stress Disorder Treatment Program

A.  Awareness and Education Phase.................................................................... 6-1
B.  Evaluation ...................................................................................................... 6-1
C.  Treatment Program ........................................................................................ 6-2
D.  Training .......................................................................................................... 6-4
E.  Program Discharge ........................................................................................ 6-4

DC-553, Military Veterans Scale...............................................................Attachment 6-A
DC-552, Military Experience of Combat Veterans ...................................Attachment 6-B

### Section 7 - Special Assessment Unit (SAU)

A.  Mission/Purpose............................................................................................ 7-1
B.  Time Frame.................................................................................................... 7-1
C.  Location.......................................................................................................... 7-1
D.  Admission Criteria ......................................................................................... 7-1
E.  Process for Transfer to SAU.......................................................................... 7-2
F.  Transportation ............................................................................................... 7-4
G.  Orientation..................................................................................................... 7-5
H.  Admission Process ........................................................................................ 7-5
I.  Assessment Process ..................................................................................... 7-5
J.  Discharge Process ........................................................................................ 7-6

### Section 8 - Intermediate Care Unit (ICU)

A.  Admission Criteria and Custody Level Overrides ......................................... 8-1
B.  Process for Transfer...................................................................................... 8-1
C.  Transfers and Transportation ....................................................................... 8-2
D.  Bureau of Health Care Services (BHCS) Responsibilities............................ 8-3
E.  Orientation for an ICU Inmate ...................................................................... 8-3
F.  Treatment Programs/Levels of Treatment.................................................... 8-3
G.  Discharge Procedures................................................................................... 8-4

*13.8.1 Access to Mental Health Care Procedures Manual*
*Table of Contents*

## Section 9 - Staffing and Security of Mental Health Units

A. Responsibilities ................................................................................................ 9-1
B. Corrections Officer Staffing Levels and Inmate Custody Levels in the MHUs .................. 9-4
C. Tracking System Access ...................................................................................... 9-6
D. Discharge Procedures ......................................................................................... 9-6

## Section 10 – Secure Residential Treatment Unit (SRTU)

A. Program Mission ................................................................................................ 10-1
B. Location............................................................................................................ 10-2
C. Staffing ........................................................................................................... 10-2
D. Determination and Maintenance of Staffing Levels for the SRTUs............................... 10-6
E. Chain of Command ............................................................................................. 10-7
F. Staff Training ................................................................................................... 10-8
G. Admission Criteria ............................................................................................. 10-8
H. Process for Transfers ........................................................................................ 10-8
I. Transportation ................................................................................................. 10-10
J. Admission and Orientation ................................................................................. 10-11
K. Transfers of Inmates in the SRTU System ........................................................... 10-13
L. Treatment Programs/Levels of Treatment ........................................................... 10-13
M. Accountability Status ........................................................................................ 10-19
N. Structured Versus Unstructured Programming...................................................... 10-22
O. Phase Modification ........................................................................................... 10-23
P. Incentive Program ............................................................................................ 10-23
Q. Misconducts .................................................................................................... 10-25
R. Changes in Status ............................................................................................ 10-25
S. Release of SRTU Inmates.................................................................................. 10-26
T. Discharge Procedures ....................................................................................... 10-27
U. Release via Sentence Complete (Formerly Final Discharge Maximum Expiration)....... 10-29
V. Unit Operation Evaluation ................................................................................. 10-29

Institutions with SRTUs Listing ..............................................................Attachment 10-A
SRTU Accepted/Refused Structured Out-of-Cell Program Log ........................Attachment 10-B
SRTU Accepted/Refused Unstructured Out-of-Cell Program Log ....................Attachment 10-C
SRTU Shift Pass Down Form .................................................................Attachment 10-D
STRU Program Review Sheet .................................................................Attachment 10-E
Definition of a Serious Mental Illness Outline ..........................................Attachment 10-F
SRTU Inmate Handbook Receipt Form .....................................................Attachment 10-G
SRTU Initial Annual Recovery Treatment Plan..........................................Attachment 10-H
SRTU Property, Privileges, and Services Chart .......................................... Attachment 10-I
SRTU Recovery Treatment Plan Review....................................................Attachment 10-J
SRTU Incentive Order Form ..................................................................Attachment 10-K
SRTU Accountability Status Restriction Form ........................................... Attachment 10-L
SRTU Accountability Status – Individual Recovery Plan ............................... Attachment 10-M
SRTU Group Participation Form..............................................................Attachment 10-N
Weekly Structured/Unstructured Out-of-Cell Program Report .........................Attachment 10-O
SRTU Weekly Point Summary.................................................................Attachment 10-P

**13.8.1 Access to Mental Health Care Procedures Manual**
**Table of Contents**

SRTU Monthly Point Summary ..........................................................Attachment 10-Q
SRTU Semi-Annual Report..............................................................Attachment 10-R

## Section 11 - Sex Offender Treatment (SOT)

A.  Standards, Guidelines, and Theoretical Orientation for the Assessment and Treatment of Adult Sex Offenders ...................................................................................... 11-1
B.  Risk/Need Assessment ........................................................................................ 11-1
C.  Sex Offender Treatment (SOT) Programming................................................... 11-6
D.  Support Groups ..................................................................................................... 11-9
E.  Delivery of Sex Offender Booster ...................................................................... 11-9
F.  Staff Qualifications and Minimum Training ..................................................... 11-10
G.  Multidisciplinary Treatment and Management of the Sex Offender............... 11-11
H.  Record Keeping.................................................................................................... 11-12
I.   Assistor/Peer Programs ..................................................................................... 11-14
J.   Managing Program Participants who are Found Guilty of Misconduct(s) ..... 11-14
K.  Managing Inmates without a Sexual Conviction who Sexually Assault during Incarceration........................................................................................................ 11-15
L.  Collaborating with the Sexual Offender Assessment Board (SOAB)............. 11-15


Standards and Guidelines for Assessment, Evaluation, and Treatment
  of Sex Offenders................................................................................Attachment 11-A
Static-99R Coding Rules, Revised 2016.........................................Attachment 11-B
Coding Form Preamble......................................................................Attachment 11-C
DC-577, Sex Offender Data Collection Instrument ...........................Attachment 11-D
DC-578, Sex Offender Program Evaluation ......................................Attachment 11-E
Creating and Managing Groups in the Unit Management System....................Attachment 11-F
Procedure for Implementing Victim Scrapbook Process....................Attachment 11-G
Four-Stage Model of Group Development .........................................Attachment 11-H
DC-580, Limits of Confidentiality ...................................................... Attachment 11-I
Conditions of Participation (English and Spanish) ............................Attachment 11-J
Sex Offender Treatment Booster ......................................................Attachment 11-K
Sex Offender Booster FAQs ............................................................. Attachment 11-L
Sex Offender Booster Assessment ...................................................Attachment 11-M
DC-579, Summary of Progress in Sex Offender Treatment ..............Attachment 11-N

## Section 12 – Behavior Management Unit (BMU)

A.  Program Mission ................................................................................................... 12-1
B.  Location................................................................................................................. 12-2
C.  Staffing.................................................................................................................. 12-2
D.  Determination and Maintenance of Staffing Levels for the BMUs .................. 12-6
E.  Chain of Command .............................................................................................. 12-7
F.  Staff Training........................................................................................................ 12-7
G.  Admission Criteria ............................................................................................... 12-8
H.  Process for Transfers .......................................................................................... 12-8
I.   Transportation ...................................................................................................... 12-10

**13.8.1 Access to Mental Health Care Procedures Manual**
**Table of Contents**

J.  Admission and Orientation ............................................................................ 12-11
K.  Transfers of Inmates in the BMU System ................................................... 12-13
L.  Treatment Programs/Levels of Treatment ................................................... 12-13
M.  Accountability Status ................................................................................... 12-19
N.  Structured Versus Unstructured Programming ............................................ 12-22
O.  Phase Modification ...................................................................................... 12-23
P.  Incentive Program ....................................................................................... 12-23
Q.  Misconducts ................................................................................................. 12-25
R.  Change in Status .......................................................................................... 12-25
S.  Release of BMU Inmates ............................................................................. 12-26
T.  Discharge Procedures .................................................................................. 12-27
U.  Release via Sentence Complete (Formerly Final Discharge Maximum Expiration)....... 12-29
V.  Unit Operation Evaluation ........................................................................... 12-30

BMU Accepted/Refused Structured Out-of-Cell Program Log .......................... Attachment 12-A
BMU Accepted/Refused Unstructured Out-of-Cell Program Log ..................... Attachment 12-B
BMU Shift Pass Down Form ............................................................................. Attachment 12-C
BMU Program Review Sheet ............................................................................ Attachment 12-D
BMU Inmate Orientation Handbook Receipt Form............................................ Attachment 12-E
BMU Initial Recovery Treatment Plan .............................................................. Attachment 12-F
BMU Property, Privileges, and Services Chart .................................................. Attachment 12-G
BMU Recovery Treatment Plan Review ............................................................ Attachment 12-H
BMU Incentive Order Form............................................................................... Attachment 12-I
BMU Accountability Status Restriction Form.................................................... Attachment 12-J
BMU Accountability Status – Recovery Treatment Plan ................................... Attachment 12-K
BMU Group Participation Form......................................................................... Attachment 12-L
Weekly Structured/Unstructured Out-of-Cell Program Report ......................... Attachment 12-M
BMU Weekly Point Summary ........................................................................... Attachment 12-N
BMU Monthly Point Summary.......................................................................... Attachment 12-O
BMU/SRTU Information Resolution Action Form ............................................ Attachment 12-P
BMU Semi-Annual Report ................................................................................ Attachment 12-Q

## Section 13 – Special Needs Unit (SNU)

A.  Facility Responsibilities ................................................................................ 13-1
B.  Admission Guidelines and Process for Transfer ........................................... 13-1
C.  SNU Cell Assignment ................................................................................... 13-3
D.  Staffing......................................................................................................... 13-4
E.  SNU Yard and Activities .............................................................................. 13-4
F.  Discharge and Transfer Procedures .............................................................. 13-4

On-Unit Activities Schedule ............................................................................. Attachment 13-A

## Section 14 – Diversionary Treatment Units (DTU)

A.  General ......................................................................................................... 14-1
B.  Admission Criteria ........................................................................................ 14-1
C.  General Procedures and Provisions................................................................ 14-1

**13.8.1 Access to Mental Health Care Procedures Manual**
**Table of Contents**

D.  Staff Training .................................................................................. 14-7
E.  Unit Operation Evaluation ................................................................ 14-7

Accepted/Refused Structured Out-of-Cell Program Log ..................... Attachment 14-A
DTU Accepted/Refused Unstructured Out-of-Cell Program Log ........ Attachment 14-B
Structured/Unstructured Out-of-Cell Program Report ......................... Attachment 14-C
DTU Semi-Annual Report ................................................................... Attachment 14-D

## Section 15 – Certified Peer Specialist (CPS) Initiative

A.  General Considerations................................................................... 15-1
B.  CPS Candidate Selection................................................................ 15-4
C.  CPS Training Program .................................................................... 15-5
D.  Supervisory Staff ........................................................................... 15-7
E.  General Conduct ............................................................................ 15-8
F.  CPS Guidelines for Level 5 Housing .............................................. 15-9
G.  CPS Guidelines for Psychiatric Observation Cells ......................... 15-9

CPS Confidentiality Acknowledgement Form ..................................... Attachment 15-A
CPS Orientation Checklist ................................................................. Attachment 15-B
CPS Continuing Education Certificate ................................................ Attachment 15-C
CPS Training Tracking Form .............................................................. Attachment 15-D
CPS Defined Power Point .................................................................. Attachment 15-E
Letter of Recommendation ................................................................ Attachment 15-F

## Section 1 – Psychological Services

### A. Diagnostic Center

1. Every inmate entering the Department shall be given a psychological evaluation conducted at the Diagnostic and Classification Center (DCC).[1] The DCC shall administer basic psychometric testing and interview the inmate upon reception. DCC will provide further assessments only for an inmate who evidences a need for more comprehensive evaluation, e.g., those inmates scoring 70 or below on the intellectual screening to rule out intellectual deficiency.

2. The purpose of this psychometric testing is to provide screening in the areas of intelligence, achievement, personality, and emotional stability. Whenever screening indicates a need for more in-depth study, such shall be provided. Basic Assessment will be conducted with results and recommendations made available to appropriate staff for the purpose of initial classification in accordance with Department policy **11.2.1, "Reception and Classification."**

   a. Personality Assessment Inventory (PAI)

      (1) The psychology staff will administer the PAI.

      (2) PAIs will be administered in an appropriate testing environment without interruption.

      (3) A recorded version of the PAI will be administered to an illiterate inmate.

      (4) The complete protocol and computer narrative will be reviewed the same day it is administered and forwarded to the receiving facility along with a completed clinical interview form and the **Pennsylvania Clinical Risk Assessment (PCRA)**. If the initial review reveals clinically indicated concerns, an interview will be conducted the next working day.

   b. **DCC-PCRA**: the psychology staff will complete the **DCC-PCRA** form and forward it to the receiving facility.

   c. Revised Beta III

      (1) The psychology staff will administer the Beta III to every inmate.

      (2) An inmate who scores 70 or below will receive additional assessment at the DCC to "rule out intellectual disability (ID)/development disabilities (DD)." ID/DD assessment will include intelligence testing on the Wechsler Abbreviated Scale of Intelligence (WASI), the Wechsler Adult Intelligence Scale, adaptive behavior

---

[1] 4-4286

Issued: 1/30/2017
Effective: 2/6/2017

testing measured by the Vineland and research to determine whether the condition occurred before the age of 18.

d.  More Comprehensive Assessments

(1)  Mental Illness: An inmate with evidence of mental illness will receive a more comprehensive assessment. The Psychiatrist/Certified Registered Nurse Practitioner – Psychiatric Services (PCRNP) will conduct a comprehensive psychiatric evaluation in each case of serious mental illness (SMI) and the Psychiatric Review Team (PRT) will generate an **Individual Recovery Plan (IRP)** within 20 days of determination that the inmate has an SMI. This **IRP** will accompany the inmate to the receiving facility. The inmate shall be offered an opportunity to attend this meeting and the **IRP** will include goals in the inmate's own words, the PRT's unique plan for the inmate addressing his/her goals including sentinel behaviors, e.g. self-injurious behavior (SIB) and interventions utilized to achieve goals. Inmates that are not identified immediately at reception, but demonstrate evidence of mental illness, will be referred to psychiatry via the **DC-97, Mental Health Referral Form (Attachment 1-A)** for non-emergent referrals and this process must occur within 14 days of the referral.

(2)  Other cases: Assessment procedures will not be modified for juveniles adjudicated as adults, for capital cases, or for boot camp cases.

## B. Facility Functions and Procedures

1.  The functions of the psychology staff are to provide diagnostic, therapeutic, mental health, and consultative services. The facility psychology staff shall provide group and individual therapy, as well as supervision and training in counseling and treatment for other staff members who need or request it, serve as a resource and consultant for administrative, custodial and other staff, participate in the development of individualized treatment programs, and participate in various staffings. Social workers may perform duties consistent with their licensure. The facility psychology staff shall evaluate mental health cases for potential commitment to the mental health system, arrange and coordinate mental health commitment hearings, and provide appropriate testimony at such hearings, as required. Psychology staff may serve as the point of contact with the courts and mental health facilities and make appropriate arrangements for the transfer to and/or return of an inmate from a mental health facility. The psychology staff are responsible for advising the Regional Licensed Psychology Manager (RLPM) and the Central Office Chief of Psychology, of any problems, difficulties, or unusual occurrences involving mental health cases and/or the transfer procedures, and for keeping records of every transfer to/from the mental health system. The psychology staff also provides follow-up treatment and monitors every mental health case returned to the facility from one of the Mental Health Units (MHU), State Correctional Institution (SCI) Waymart Forensic Treatment Center (FTC), or a Department of Human Services facility.[2]

---

[2] 4-4368, 4-4369

Issued: 1/30/2017
Effective: 2/6/2017

2. Designated psychology staff members in the facility shall function as Mental Health Coordinators (MHC), coordinating treatment services for particular inmates, arranging mental health commitments, tracing of mental health commitments, and crisis intervention until needed services can be coordinated.[3]

   a. Diagnostic Evaluations for Program Planning

      Counselors and other staff members make frequent referrals to the psychology department for the following reasons:

      (1)   consideration for Community Work Program (CWP);

      (2)   consideration for outside clearance;

      (3)   difficulty adjusting to program and/or facility life;

      (4)   frequent or serious disciplinary infractions;

      (5)   offer of an in-person, out-of-cell assessment, of every active mental health roster inmate involved in the disciplinary process prior to appearing before the decision maker;

      (6)   potential mental health commitments;

      (7)   guilty but mentally ill (GBMI) commitments, including an annual psychological evaluation in PCRA format;

      (8)   parole evaluations in PCRA format for active mental health roster inmates (C and D Roster) or those convicted of violent offenses; and/or

      (9)   psychosocial evaluations for use by local and Central Office Gender Review Committee (GRC).

   b. Procedures

      The counselor or other staff member shall refer cases to the psychology department for comprehensive evaluation and treatment on the **DC-97**. Ideally, such referrals shall be discussed with the referring party. If this is not possible, it may be necessary to proceed on the basis of the written referral only. It may also be necessary for the psychology staff to train other facility staff on the appropriate way to ask referral questions and what types of cases are appropriate for referral. Once the psychology staff receives the referral, he/she shall review the request and determine what procedures are necessary to answer the referral question. A diagnostic interview may be sufficient or additional testing may be necessary. The appropriate procedures necessary to reach responsible conclusions shall be determined by the nature of the

---

[3] 4-4368, 4-4369

request, the information available in the record, and the psychology staff's own skills. Generally, some additional testing shall be necessary, employing objective and/or projective techniques. The psychology staff performing the evaluation shall select the instruments used, except where policy may specify instruments to be used. The evaluation will be completed within 14 days of the referral request date and include the following:[4]

(1)   review of mental health screening and appraisal data to include requesting community treatment data with the **DC-108, Authorization for Release of Information** and the **DC-484, Mental Health Informed Consent Form** signed;

(2)   direct observations of behavior;

(3)   collection and review of additional data from individual diagnostic interviews and tests assessing personality, intellect, and coping abilities;

(4)   compilation of the individual's mental health history; and

(5)   development of an IRP/management plan with appropriate referral to include transfer to a mental health facility for inmates whose psychiatric needs exceed the treatment capability of the facility.

c.   Specialized Evaluations

(1)   Psychology staff frequently are called upon to perform specialized evaluations. These cases, which may be sent to outside agencies, require sophisticated and intensive evaluations. General guidelines for the completion of these reports are presented in the **Guidelines for Department Psychological Evaluations for Parole and Other Assessments Required by Policy or Referral (Attachment 1-B)**.

(2)   The psychologist shall employ appropriate interview procedures and test instruments, which may include objective measures (Minnesota Multiphasic Personality Inventory [MMPI-2], PAI, and PCRA), mental status exam, the Montreal Cognitive Assessment and one or more projective tests, to provide the required information. When possible, these evaluations shall be performed by a licensed psychologist (LP). Only under exceptional circumstances shall the following reports be prepared by anyone at a level less than the Psychological Services Specialist (PSS). Reports prepared by unlicensed staff must be reviewed and signed by a LP. The examiner and/or the reviewer's PA license number and signature shall be affixed to the report.

(a)   Commutation

---

[4] 4-4372

Issued: 1/30/2017
Effective: 2/6/2017

When possible, commutation evaluations shall be performed by a LP. If any commutation reports are prepared by other than a LP, the reports must be reviewed and signed by a LP, preferably the Licensed Psychologist Manager (LPM). The reviewing psychologist shall include his/her license number and signature. For further information on the preparation of commutation psychological evaluations, please refer to **Procedure for Preparation of Commutation Psychological Evaluations (Attachment 1-C)** and to Department policy **11.4.1, "Case Summary."**

(b)  Court Requests for Special Evaluations

Occasionally the committing court requests a special psychological evaluation on an individual. These requests shall be honored as rapidly as possible.

(c)  Parole Board Requests

Psychological evaluations for parole shall include a clinical interview, review of the relevant files, and administration of the **PCRA and Psychological Evaluation for Parole (Attachment 1-D)**. The PCRA is a list of risk factors that research suggests are related to re-offending. Specific directions for administration of the PCRA and format for the PCRA are presented in **Psychological Evaluation and Clinical Risk Assessment (Attachment 1-E)**.

(d)  Evaluations for Mental Health Facility Placement

The psychologist may be requested to perform an evaluation on an inmate being considered for transfer to a Department MHU or state hospital. The psychologist shall choose the appropriate clinical instruments that provide the information needed to assist in such determinations.

(e)  Evaluations Requested by Facility Psychiatrist/PCRNP

The facility Psychiatrist/PCRNP may occasionally refer an inmate for psychological evaluation. When possible, the psychologist shall discuss the referral with the Psychiatrist/PCRNP prior to performing the evaluation. It is also helpful if the findings of the psychological evaluation can be discussed with the referring Psychiatrist/PCRNP.

(f)  Psychological Evaluation of Inmates Confined in a Security Level 5 (SL5) Unit

These units include the Restricted Housing Unit (RHU), Special Management Unit (SMU), and Security Threat Group Management Unit (STGMU).

i.   Psychology staff shall visit the SL5 Unit five times per week.[5] All psychology staff entering the unit shall sign in/out on the **DC-702, SL5 Unit Log Book**.

ii.   Psychology and/or nursing staff will assess every inmate placed in a SL5 Unit for suicide potential and review the **DC-510, Suicide Indicators Checklist (Attachment 1-F)**. These procedures are outlined in **Section 2** of this procedures manual.

iii.   All assessments and written reports of SL5 inmates shall address suitability for continued placement in the SL5 and assess mental deterioration or lack thereof. It is expected that all assessments will also include risk for suicidality and include consideration of protective factors.

iv.   The treating Psychiatrist/PCRNP shall continue to see inmates on the C Roster out-of-cell a minimum of every 90 days or more frequently based on their clinical discretion, and shall make recommendations to the Program Review Committee (PRC) regarding inmates in Administrative Custody (AC)/Disciplinary Custody (DC) status who may be released.

v.   Psychology staff shall personally interview, assess, and make a written report utilizing the **DC-560, Mental Health Contact Note (Attachment 1-G)** to be filed in the medical record for all A and B Roster status inmates monthly. A brief **Inmate Cumulative Adjustment Record (ICAR)** entry indicating the contact occurred shall also be made. Psychology staff shall make recommendations to the PRC regarding inmates in AC/DC status who may be released.

vi.   Psychology staff shall personally interview, assess, and make written reports utilizing the **DC-560** to be filed in the medical record for every C Roster inmate monthly. A brief **ICAR** entry indicating the contact occurred will also be made. Psychology staff shall make recommendations to the PRC regarding inmates in AC/DC status who may be released. C Roster inmates shall be offered out-of-cell contacts with psychology/Psychiatry/PCRNP on the unit at least every 90 days. The refusal and/or acceptance of these offers shall be documented in the **ICAR** and on the **DC-560** in the medical record. These out-of-cell contacts are contingent on behavioral compliance from the inmate. If behavior is demonstrated that would contraindicate out-of-cell contact, this shall be documented in the **DC-17X, Adjustment Record for SL5 Inmates**, **ICAR**, and the **DC-560**. The inmate shall be seen at the next available visit if behavior permits.

---

[5] 4-4258

vii.    Psychology staff shall assess an inmate referred and/or approved for Secure Residential Treatment Unit (SRTU) or Behavioral Management Unit (BMU) programming (whether on transfer waiting list or time-out) at least every seven days and shall make recommendations to the PRC regarding the inmate. These assessments shall be documented as brief **ICAR** entries with a more detailed **DC-560** filed in the medical record. SRTU and BMU approved inmates shall be offered out-of-cell contacts with Psychiatry/PCRNP at least every 30 days on the unit and shall be reviewed by PRT on a monthly basis.

viii.   An inmate continuously confined in a SL5 Unit for a period of one year shall be given, at a minimum, an annual psychological, and if indicated, psychiatric examination during his/her confinement addressing the suitability of continued confinement in the SL5 Unit, regardless of current Mental Health (MH)/ID roster status. It is the responsibility of the psychology staff to see that such an evaluation is conducted. These shall be documented as brief **ICAR** entries with a PCRA evaluation filed in the medical record. If the inmate refuses to submit to assessment, procedures in accordance with Department policy **13.1.1, "Management & Administration of Health Care,"** shall be followed.

ix.    Psychology staff shall make recommendations to the PRC regarding inmates in long-term AC/DC status who may be released or possibly transferred to a SRTU, BMU, SMU, STGMU, or other specialized program.

x.    Unless a specific need exists that the inmate must be removed from the unit, the inmate shall be visited in the unit. This is to restrict traffic and to avoid possible problems during escort or time out of the unit. The Shift Commander/designee must approve any move from the unit for a psychological/psychiatric visit or interview.

xi.    The LPM/MHC will provide the Commissioned Officer-in-Charge of the SL5 Unit weekly with a listing of all inmates on the active mental health roster and those considered to display risk factors for suicidal behavior. This list is to be utilized by security staff to assist in their day-to-day interactions and decision-making processes. These postings should stay in the secured control bubble.

xii.    The Unit Manager/Officer-in-Charge is responsible for coordinating visit/interview dates and times to ensure that security is provided during meetings between inmates and psychology/psychiatric staff. Any requests by mental health staff to interview an inmate out-of-cell shall be accommodated by security staff if possible, as they are to have unrestricted full access to inmates. At the same time, mental health staff should be sensitive to the activities on the unit and

1-7

whenever possible, attempt to coordinate in advance times that are convenient for security for out-of-cell contacts. For example, psychiatry and psychology are permitted to interview the same inmate together.

xiii.   The **RHU C & D Roster Inmate Review Tracking Sheet (Attachment 1-H)** is to be utilized for tracking contacts with C Roster inmates housed in the RHU. It is intended to serve as a mechanism to ensure compliance with the required psychology/psychiatry contacts in accordance with **B.2.c.(2)(f)i.-xiii. above**. The Facility Manager shall designate a staff member to maintain the **RHU C & D Roster Inmate Review Tracking Sheet**. The tracking sheet shall be forwarded to the Facility Manager on a weekly basis and shall be reviewed during the quarterly inspection process.

(g)   Psychological Evaluation of Inmates Housed in Specialized Housing Units

These units include Diversionary Treatment Units (DTUs), SRTUs, and BMUs.

i.   Psychological services provided in the DTUs will be in accordance with **Section 14** of this procedures manual.

ii.   Psychological services provided in the SRTUs will be in accordance with **Section 10** of this procedures manual.

iii.   Psychological services provided in the BMUs will be in accordance with **Section 12** of this procedures manual.

(h)   Gender Dysphoria Evaluation

This psychological evaluation should follow the below guidelines.

A psychological evaluation will be scheduled and completed by a LPM or LP, if available, and recommendations made for treatment or referral (i.e., this psychological evaluation shall not be completed by a psychological services associate [PSA]). A PSS may complete this report if an LPM or LP is not available. The purpose of this assessment is to gather a complete psychosocial and developmental history of this individual and to determine how this individual has adjusted to prison since arriving in the Department. This psychological assessment will include an assessment of the individual's need for psychological and psychiatric treatment. The psychology staff member completing this assessment will attempt to retrieve any existing prior psychological and psychiatric treatment records utilizing the **DC-108, Authorization for Release of Information**. This report will be utilized by Central Office Administrative GRC to make informed recommendations. Further information on the Central Office GRC

1-8

can be found in Department policy **DC-ADM 008, "Prison Rape Elimination Act (PREA)."**

These records may include treatment prior to incarceration (i.e., including hormone therapy, completed or currently in process, surgical interventions, and ongoing counseling).

This comprehensive evaluation will specifically review and address:

i.    the individual's developmental history (especially with reference to gender identity), history and development of gender dysphoric feelings, history of sexual behavior, mental health history, the impact of stigma associated with gender nonconformity on one's mental health history, and family and social support currently available and anticipated upon release, if applicable. Additionally, consideration of diagnoses and treatment of comorbid conditions, such as anxiety disorders, depressive disorders, and autism spectrum disorder should be addressed, as well. If during this assessment, information is gleaned to suggest comorbid conditions not previously identified, appropriate referrals to psychiatry should be made utilizing the **DC-97**;

ii.   institutional adjustment, including a review of sexual behavior in prison (e.g., misconducts for sexual behavior), current relations with inmate peers, level of identification with subpopulations in the correctional environment, any current or anticipated safety concerns in the institution, history of sexual victimization in prison (and otherwise, anywhere else);

iii.  a thorough mental status examination; this examination should focus on the dysphoria currently being reported by the individual. Areas to address should include, but not be limited to, specifics about why the individual is currently dysphoric; what accommodations might improve the individual's dysphoria and why/how; what accommodations have improved the individual's dysphoria (if applicable) and why/how; what current circumstances in the individual's life are causing or leading to the dysphoria; what is the individual's current level of dysphoria; and

iv.   completion of the PAI, with specific attention given to relevant subscales.

Once completed, a licensed professional must sign off this psychological evaluation, if a licensed professional does not conduct the evaluation. In addition to the above information, we would like to have "any and all available psychological and psychiatric records" from the referring SCI. This would include the entire psychology and psychiatry portions of the medical file.

Issued: 1/30/2017
Effective: 2/6/2017

(3)   The LPM shall ensure that a psychology staff member assesses each newly received inmate transferred from another correctional or mental health system (county prison, the Federal Bureau of Prisons, parole supervision, or a State Hospital). The assessment shall be completed within 14 days of admission to the facility. If there is documented evidence of a mental health evaluation within the previous 90 days, a new evaluation is not required, unless the inmate is placed on the MH/ID roster, or the inmate had demonstrated some behavior or made some statement which makes correctional staff believe that further assessment is needed. Mental health assessments shall include, but are not limited to:[6]

   (a)   review of available historical records of inpatient and outpatient psychiatric treatment;

   (b)   review of history of treatment with psychotropic medication;

   (c)   review of history of psychotherapy, psycho-educational groups, and classes or support groups;

   (d)   review of history of drug and alcohol treatment;

   (e)   review of education history;

   (f)   review of sexual abuse-victimization and predatory behavior;

   (g)   assessment of current mental status and condition;

   (h)   assessment of current suicide potential and person specific circumstances that increase suicide potential;

   (i)   assessment of violence potential and person-specific potential circumstances that increase violence potential;

   (j)   assessment of drug and alcohol abuse and addiction;

   (k)   use of additional assessment tools as indicated;

   (l)   referral to treatment as indicated; and

   (m)   development and implementation of a treatment plan, including recommendations concerning housing, job assignment, and program participation.

   **NOTE**: Psychology staff can collect much of this information through participating in the Initial Reception Committee (IRC) and completing the **DC-**

---

[6] 4-4371

**560** and **DC-560A, Initial Reception Mental Health Questionnaire (Attachment 1-I)**.

d.  Reporting and Distribution of Specialized Psychological and Psychiatric Reports and Evaluations

Every evaluation performed in the permanent facility shall be maintained as noted below.

(1)  Psychological Evaluations – The original psychological evaluation shall be filed in the Integrated Medical Record, Psychiatric/Mental section, and copies of the report placed in the **DC-15, Inmate Record**. A notation of the fact that an evaluation was performed, the purpose, and date shall be entered in the **ICAR**. Additionally, the psychology staff responsible for producing the report may maintain a copy of the evaluation in his/her own records. In addition to Health Care and Corrections Counseling staff, access to these evaluations shall be permitted to the Treatment Team, which is generally composed of Unit Management staff (including Unit Manager, Drug and Alcohol Treatment Specialists [DATS], and Corrections Officers), Centralized Services staff, Corrections Classification and Program Manager (CCPM), Deputy Superintendents, and the Facility Manager. Each report shall contain a statement that the contents are confidential and that the document shall not be reviewed by, nor the information shared with, persons who are not members of the Treatment Team.

(2)  Psychology contacts with inmates shall be recorded employing the Subjective Objective Assessment Plan (SOAP) note format and with date and time on the **DC-560**. A notation of the fact that a contact occurred and the date shall be entered in the **ICAR**. It is the responsibility of the treating psychology staff member to ensure that continuity of care is provided and that important information is forwarded to the counselor. Information may be summarized on the **ICAR**, or copies of the **DC-560**.

(3)  Psychiatric Reports

(a)  Notes of specialized, ongoing mental health treatment, including infirmary visits by psychiatry staff, shall be entered in the medical record using the **DC-472** and maintained in the Integrated Medical Record, Psychiatric/Mental Health section. Assessment shall be written in SOAP format.

(b)  Each report shall contain a statement that the contents are confidential and that the document shall not be reviewed by, nor the information shared with, persons who are not members of the Treatment Team.

1-11

e. Psychology Response to PREA Events

(1) Psychology staff are responsible for interviewing all reported victims and alleged inmate perpetrators of sexual abuse within 24 hours of the allegation being made. If the report is made during the timeframe when psychology staff are not on shift, such as a weekend or holiday, then this interview will take place the next business day.

(2) If no mental health staff are on duty at the time a report of abuse is made, security staff first responders shall take preliminary steps to protect the victim as outlined in Department policy **DC-ADM 008.**

(3) Prior to conducting the interview, the psychology staff member will explain that, if indicated for the inmate's protection, information disclosed will be shared only on a need-to-know basis with indicated staff (i.e., Security Office, PREA Compliance Manager [PCM], Unit Manager, Counselor, Sexual Abuse Review Team, Pennsylvania State Police [PSP], etc.). The psychology staff member will then have the inmate sign a **DC-484**.

(4) The purpose of the interview is to evaluate and assess the current level of cognitive, mental, and emotional functioning as well as to determine overall inmate safety (the current risk of self-harm or harm to others or the fear of harm by others). In addition, crisis intervention, education about expected reactions to stressful events, and the normalization of worrisome thoughts and emotions are provided. This interview and the report are neither conducted for the purposes of an investigation nor for the purpose of documenting and illuminating the inmate's account of events and circumstances that allegedly took place as part of the incident.

(5) This interview should be conducted in a private area to ensure confidentiality, with no security staff present during the interview, unless there are documented security concerns.

(6) If indicated, a referral to psychiatry for evaluation and possible treatment shall be initiated.

(7) The facility shall provide alleged victims with mental health services consistent with the community level of care.

(8) The results of this interview shall be documented on the **DC-575, Post Sexual Assault Interview** in accordance with Department policy **DC-ADM 008**.

(9) Contacts with alleged victim and alleged perpetrator should continue after the initial assessment monthly for at least 90 days and may occur more frequently and last longer due to clinical judgment and inmate's roster status.

Issued: 1/30/2017
Effective: 2/6/2017

f.  Monthly Report

The psychology staff shall keep an accurate record of the number of psychological evaluations (testing), number of psychological interviews for information gathering (other than testing), and any group testing sessions conducted. These records shall be submitted to the facility State Corrections Analysis Network (SCAN) Coordinator at the end of each month for inclusion in the facility's monthly SCAN report.

g.  Mental Health Roster Status

(1)  The mental health needs of an inmate shall be rated on a four-point nominal scale system according to the following:

(a)  "A" Roster - inmate has no identified psychiatric/ID needs or history of psychiatric treatment.

(b)  "B" Roster - inmate has identified history of psychiatric treatment, but no current need for psychiatric treatment; inmate is placed on inactive MH/ID roster.

(c)  "C" Roster - inmate is currently receiving psychiatric treatment, but is not currently diagnosed with a SMI or functional impairment, and does not have an ID or is not GBMI.

(d)  "D" Roster – inmate is currently diagnosed with a SMI, ID, credible functional impairment, or is GBMI. The PRT shall generate an IRP for him/her. An IRP for a newly incarcerated inmate shall be developed within 30 days of intake and updated every 120 days, or more frequently if clinically indicated. The Treatment Team shall generate a new IRP annually. The psychology staff shall coordinate with the education department to ensure that any inmate with an ID who is 21 years of age or younger receives an Individual Education Plan (IEP).

(2)  The MHC (or other psychology staff member who enters data into the mainframe system) is required to enter any mental health roster status change within one working day of the change by the PRT.

h.  Reclassification Summary Psychological Report – Prior Commitment-Parole Violation Cases Classification Summaries for Parole Violators (PVs) must be completed as quickly as possible after the inmate returns to the permanent facility. The primary purpose is to identify special risk factors for violence against self or others in order to help the facility make critical decisions about housing and treatment. In addition, facility staff may desire information that would be useful in making employment decisions. In many cases, the psychology staff can gather sufficient data to complete the summary by conducting a clinical interview, administering a Mental Status Exam, and reviewing the inmate's file.

Issued: 1/30/2017
Effective: 2/6/2017

## C. Treatment

Each psychology staff member will engage in both individual and group therapy commensurate with his/her level of skill and training. Social workers will provide services consistent with their licenses. PSA personnel shall seek supervision from a LP or the facility Psychiatrist/PCRNP when conducting therapy, unless they are licensed and/or are able to document specialized supervised training and experience in therapy. Every unlicensed psychology staff member engaged in ongoing psychotherapy must arrange for supervision by a LP. This constraint does not apply to routine counseling, but rather to sustained in-depth, therapeutic endeavors. The psychologist shall, if qualified and if requested to do so, make himself/herself available to serve as a consultant and/or supervisor for Corrections Counselors who are engaged in counseling or leading groups.

1. Procedures

   a. When establishing therapeutic programs, the psychology staff member should take into account facility routines and appropriate custodial needs. However, all therapeutic programs should be driven by inmate need and reflected on individual inmate IRPs. The psychology staff are free to use the standard therapeutic techniques of his/her choice, unless the Department mandates a particular type of treatment model. However, if he/she elects to use some highly unusual or radical therapeutic approach, such plans shall be discussed with his/her supervisor, RLPM, and the Central Office Chief of Psychology prior to implementation.

   b. Psychology staff members shall conduct or co-facilitate a variety of different types of treatment groups. These include, but are not limited to, sex offender treatment, mental health related treatment and support, and standardized program groups. Each psychology staff member shall conduct at least four hours of group treatment per week.

2. Reporting of Therapeutic Contacts and Progress

   Each therapeutic contact and the date of the contact shall be recorded in the **ICAR**. A periodic, brief summary of progress in therapy shall be prepared and placed in the inmate's medical file, psychology section. Periodic conferences and review of progress should be held with the inmate's counselor. Contacts shall be recorded on the **DC-560** using the SOAP format and filed in the psychology section of the medical record.

3. Monthly Reports on Treatment

   The DCC psychology staff shall maintain accurate records of the number of individual psychological interviews, the number of individual psychological evaluations (testing), and the number of individual psychological counseling sessions held each month. The number of inmates seen in each activity shall be recorded. In addition, every group testing session shall be recorded, including the number of inmates and the number of hours involved. Any group counseling session conducted by the psychology staff shall be recorded in a similar manner. The data collected shall be submitted at the end of each

month for inclusion in the Monthly SCAN Report in accordance with Department policy **2.1.1, "Planning, Research, and Statistics."**

## D. Procedure for Preparation of Commutation Psychological Evaluations

The Board of Pardons is charged with making critical decisions on the basis of the information they receive. Refer to the **Procedures for Preparation of Commutation Psychological Evaluations**. The Format for Commutation Psychological Reports is outlined in the **Format for Commutation Psychological Reports (Attachment 1-J)**.

## E. Training, Consultation, and Peer Review

1. The facility psychology staff shall conduct a variety of training, consultation, and other supportive services for other staff members in the facility. For example, the corrections school principal may coordinate a training during break week, conducted by psychology staff after discussing with the LPM/designee at the monthly Deputy Superintendent for Centralized Services (DSCS) department head meeting.

2. ***Psychology staff members and/or other mental health staff members may be required to teach suicide prevention classes to contact staff members in each facility in accordance with Department policy 5.1.1, "Staff Development and Training." The recommended delivery of this program is that it is team taught with security and treatment staff. It is acceptable to teach with just one instructor if the other is unavailable. This is not intended to mean that it is the sole responsibility of psychology/mental health staff to teach every suicide prevention class. Other treatment staff may co-teach with security staff based on the treatment staff member's experience, interest in training, and the administration's belief that they are capable of teaching. Examples of treatment staff include CCPMs, Unit Managers, counselors, DATS, nurses, etc. In addition, psychology staff are frequently asked to conduct training in mental health services and communication skills.***

3. Psychology staff members and other mental health staff may be requested to provide consultation in areas where they possess specialized information or expertise. For example, the psychology staff may consult with the Facility Manager regarding the impact of new programs upon the inmate population. During emergencies and extraordinary occurrences in the facility (riots, hostage takings, or work stoppages), the psychology staff may advise the crisis team. A mental health staff member who has received special training may coordinate the Critical Incident Stress Management (CISM) services in the facility and supervise the delivery of stress defusing and debriefings for any facility employee and/or inmate who has been exposed to traumatic events in accordance with Department policy **6.7.2, "Special Response Teams."**

4. Psychology staff members are frequently asked to perform other professional duties in the facility that may not relate to the inmate population.

Issued: 1/30/2017
Effective: 2/6/2017

a. A LP reviews the personnel packages of Correctional Officer Trainee Candidates, and completes the **Psychological Screening Report Form (Attachment 1-K)** in accordance with the instructions found in the **Role of Psychologist in Personnel Selection of Corrections Officer Trainees (Attachment 1-L)**.

b. A LP is required to evaluate a correctional officer who has worked in a SL5 Unit for longer than 12 months to judge whether he/she is suited to continue working in these units in accordance with Department policy **6.5.1**.

c. Psychology staff members may assist other staff members and make referrals in accordance with Department policy **4.1.1, "Human Resources and Labor Relations."**

d. During facility emergencies, psychology staff may be required to perform unusual non-professional duties. For example, during crises that involve "lock-downs," psychology staff members will support food services in food preparation and delivery of food trays to the blocks, assist in cell searches, and other duties as assigned.

5. Peer reviews for LPMs shall be completed as specified in Department policy **13.1.1,** and may include the below listed types.

a. Scheduled Peer Review – all LPMs shall have a scheduled peer review performed every two years. Scheduled peer reviews may be completed as part of the annual Psychology Office mental health services review.

b. Exceptional Peer Review – may also be initiated in response to patient complaints or patient care issues identified by health service providers, the Psychology Office, Contracted Health Care Provider staff, or non-medical personnel including facility staff.[7]

## F. Central Office Oversight, Quality Improvement, and Quality Assurance Activities

1. Central Office Special Needs Psychiatric Review Team (COSNPRT)

a. This interdisciplinary team meets monthly and is composed of all Regional Deputy Secretaries, Major of Security, Director of the Office of Population Management, Chief Data Analyst from Planning, Research, and Statistics, Chief of Psychiatry, Licensed Psychologist Director (LPD), and the Mental Health Program Manager from the Central Office Psychology Office.

b. Topics for discussion are to centrally track and capture trends and reach back out to the field through action items and the distribution of a report.

(1) Review of waiting lists for specialized programs requiring referrals (Special Assessment Unit [SAU], Intermediate Care Unit [ICU], BMU, SRTU, and SMU).

---

[7] 4-4411

Issued: 1/30/2017
Effective: 2/6/2017

(2)   Trends in regard to facility referrals to include consideration of capacities.

(3)   Use of force and restraint chair trends and totals by region and year-to-date.

(4)   Review of DTU, MHU, SRTU, and BMU populations.

(5)   Appropriate plans for SMI/ID in DTU for greater than 30 days.

(6)   Review of suicides, serious attempts, and SIB for the month and year-to-date.

(7)   Trending in regard to regions considering location, most frequent self-injurers, etc.

(8)   Review of MHU commitments.

(9)   Review of cases due to sentinel events, difficult placements, or referral.

(10)   Distribution of COSNPRT packet to members, Facility Managers, Regional LPMs, and the contract service provider for psychiatric services.

(11)   The Central Office Chief of Psychology will elevate to the Executive Deputy Secretary issues that are significant or cannot be resolved.

2.   RLPM Oversight

a.   RLPMs provide clinical oversight and monitoring of their assigned facilities. They review referral packets and monitor trending in operations through visits and discussion with appropriate staff. Any issues of significance or those that cannot be resolved are elevated to the LPD at Central Office.

b.   At least once per quarter the RLPM will visit their assigned sites and complete a compliance report. These reports shall be submitted to the Secretary, Executive Deputy Secretary, respective Regional Deputy Secretary, and the Chief of Psychology at Central Office. The first report is due by April each year and will be due by the tenth day following the end of each quarter. Reports are due by April 10, July 10, October 10, and January 10. The annual psychology operations audit is an additional visit, unless the annual audit is conducted the same day as a compliance report. These dates do not limit visits if, in the clinical opinion of the RLPM, they need to be on-site more frequently than this schedule.

c.   Quarterly reports will be submitted in a narrative format and cover all measurable areas of the Technical Compliance Consultant Matrix.

Issued: 1/30/2017
Effective: 2/6/2017

## Section 2 – Delivery of Mental Health Services

### A. Identifying Mental Health Needs of Inmates

Good treatment begins with the appropriate identification of the needs of each inmate. Thus, early and appropriate identification of needs for mental health services is the foundation for *providing* appropriate *treatment to* these individuals.

1. Automated Tracking System

   Tracking of an inmate with mental illness is accomplished via the Automated Mental Health/Intellectual Disability (MH/ID) Tracking System. This tracking system is a mechanism through which the Department seeks to ensure that an inmate with mental illness is identified and receives treatment, and that he/she receives continuity of care. The automated MH/ID tracking program is a system that ensures that mental health staff in the Department have access to the most up-to-date information available concerning an inmate. The tracking system is composed of the Active MH/ID Roster and Inactive MH/ID Roster.

   a. Distinctions between the Active and Inactive MH/ID Rosters

      (1) The Active MH/ID Roster includes every inmate who is being tracked by the Psychology Department; many of these individuals may be medically compliant and psychiatrically stable.

      (2) Some of these individuals may earlier have been diagnosed with a "Serious Mental Illness (SMI)" ("A substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or cope with the ordinary demands of life."), but may be in remission and/or displaying adequate adjustment to facility life.

      (3) The Inactive MH/ID Roster includes any inmate who has a history of mental health treatment or was previously followed by the Psychiatric Review Team (PRT) until the team determined that he/she no longer needed mental health monitoring.

      (4) The inmate's status on the MH/ID Roster is communicated to other Department staff by means of the Mental Health Roster in the following manner:

         (a) "A" Roster – inmate has no identified psychiatric/ID needs or history of psychiatric treatment;

         (b) "B" Roster – inmate has identified history of psychiatric treatment *(other than SMI or ID history)*, but no current need for psychiatric treatment *and does not require follow-up/support from Psychology on a regular basis*. Inmate is placed on Inactive MH/ID Roster;

Issued: 8/17/2018
Effective: 8/31/2018

(c)   "C" Roster – inmate is currently receiving ***psychological treatment, but may or may not be receiving (psychotropic medications)*** treatment, ***and*** is not currently diagnosed with an SMI or functional impairment and does not have an ID or is not Guilty But Mentally Ill (GBMI). An Individual Recovery Plan (IRP) for a newly incarcerated C Roster inmate shall be developed within 30 days of intake and updated annually, or more frequently if clinically indicated; and

(d)   "D" Roster – inmate is currently diagnosed with an SMI, ID, credible functional impairment, or is GBMI. The PRT shall generate an IRP for him/her. An IRP for a newly incarcerated inmate shall be developed within 30 days of intake and updated every 120 days. The treatment team shall generate a new IRP annually.[1] The psychologist shall coordinate with the education department to ensure that any inmate with ID who is 21 years of age or younger receives an Individual Education Plan (IEP).

## B. Definition of Serious Mental Illness

1.   Inmates determined by the PRT to have a current diagnosis or a recent significant history of any of the DSM5 diagnoses (using International Classification of Diseases [ICD] 10 codes and letter tags):

a.   Substance-Induced Psychotic Disorder (excluding intoxication and withdrawal)

F10.159, Alcohol-Induced Psychotic Disorder, with mild use disorder,
F10.259, Alcohol-Induced Psychotic Disorder, with moderate-severe use disorder,
F10.959, Alcohol-Induced Psychotic Disorder, without use disorder

Substance-Induced Psychotic Disorders employ the same specifiers (.159; .259; .959)
With cannabis F12; sedative, hypnotic, anxiolytic F13; cocaine F14; amphetamine F15;
other hallucinogen/ phencyclidine F16; inhalant F18;
and other substance/unknown substance F19

b.   Schizophreniform Disorder          F20.81

c.   Schizophrenia                              F20.9

d.   Delusional Disorder                      F22a, Erotomanic type

F22b, Grandiose type
F22c, Jealous type
F22d, Persecutory type
F22e, Somatic type

---

[1] 4-4350

      F22f, Mixed type
      F22g, Unspecified type

e.  Brief Psychotic Disorder         F23

f.  Schizoaffective Disorder         F25.0, BIP type

      F25.1, DEP type

g.  Other Psychotic Disorders

      F06.0, Psychosis due med condition w/delusions
      F06.2, Psychosis due med condition w/hallucinations
      F28 Other specified schizophrenia spectrum and other Psychotic Disorder
      F29 Unspecified schizophrenia spectrum and other Psychotic Disorder

h.  Bipolar I and II

      F31.0,   BIP I, current or most recent episode hypomanic
      F31.11, BIP I, current or most recent episode manic, mild
      F31.12, BIP I, current or most recent episode manic, moderate
      F31.13, BIP I, current or most recent episode manic, severe
      F31.2,   BIP I, current or most recent episode manic, w/psychotic features
      F31.31, BIP I, current or most recent episode depressed, mild
      F31.32, BIP I, current or most recent episode depressed, moderate
      F31.4,   BIP I, current or most recent episode depressed, severe
      F31.5,   BIP I, current or most recent episode depressed, w/psychotic features
      F31.71, BIP I, current or most recent episode hypomanic, in partial remission
      F31.72, BIP I, current or most recent episode hypomanic, in full remission
      F31.73, BIP I, current or most recent episode manic, in partial remission
      F31.74, BIP I, current or most recent episode manic, in full remission
      F31.75, BIP I, current or most recent episode depressed, in partial remission
      F31.76, BIP I, current or most recent episode depressed, in full remission
      F31.81, BIP II disorder
      F31.9a, BIP I, current or most recent depressed, unspecified
      F31.9b, BIP I, current or most recent episode hypomanic, unspecified
      F31.9c, BIP I, current or most recent episode manic, unspecified
      F31.9d, BIP I, current most recent episode unspecified

i.  Major Depressive Disorder

      F32.0,   MDD, single episode, mild
      F32.1,   MDD, single episode, moderate
      F32.2,   MDD, single episode, severe
      F32.3,   MDD, single episode, w/psychotic features
      F32.4,   MDD, single episode, in partial remission
      F32.5,   MDD, single episode, in full remission

F32.9a, MDD, single episode, unspecified
F33.0,   MDD, recurrent, mild
F33.1,   MDD, recurrent, moderate
F33.2,   MDD, recurrent, severe
F33.3,   MDD, recurrent, w/psychotic features
F33.41, MDD, recurrent, in partial remission
F33.42, MDD, recurrent, in full remission
F33.9,   MDD, recurrent, unspecified

**NOTE**: For the purpose of this definition, the term "recent significant history" shall be defined as "currently in existence or within the preceding three months."

2. Inmates diagnosed by PRT with DSM5 disorders that are commonly characterized by breaks with reality, or perceptions of reality, that lead the individual to experience significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

3. Inmates diagnosed by PRT with ID, a dementia, or other cognitive disorders that result in a significant impairment involving acts of self-harm or other behaviors that have seriously adverse effect on life or on mental or physical health.

4. Any inmate sentenced GBMI.

## C. Clinical Guidelines for Functional Impairment

Factors for consideration when assessing significant functional impairment shall include the following:

1. whether the inmate has engaged in self-harm which shall be defined as a "deliberate, intentional, direct injury of body tissue with or without suicidal intent." Such acts include, but are not limited to the following behaviors: hanging, self-strangulation, asphyxiation, cutting, self-mutilation, ingestion of a foreign body, insertion of a foreign body, head banging, drug overdose, jumping, and biting themselves;

2. the inmate has demonstrated significant difficulty in his or her ability to engage in activities of daily living, including eating, grooming and personal hygiene, maintenance of housing area, participation in recreation, and ambulation; and

3. the inmate has demonstrated a pervasive pattern of dysfunctional or disruptive social interactions including withdrawal, bizarre or disruptive behavior.

## D. Intellectual Disability (ID)

Inmates scoring 70 or below on the BETA-III will be administered an individual IQ test (WASI-II or WAIS-IV) at the parent facility. If their WASI-II IQ is 70 or below then a full WAIS-IV will be administered. If this WAIS-IV comes out to 70 or below, a measurement of adaptive behavior including the following will be assessed:

Issued: 8/17/2018
Effective: 8/31/2018

1. conceptual skills – language and literacy; money, time and number concepts; and self-direction;

2. social skills – interpersonal skills, social responsibility, self-esteem, gullibility, naiveté, social problem solving, the ability to follow rules/obey laws and to avoid being victimized; and

3. practical skills – activities of daily living (personal care), occupational skills, healthcare, travel/transportation, schedules/routines, safety, use of money, and use of telephone*.*

   **NOTE**: An assessment to determine if the disability originated during the developmental period should be conducted to establish if the intellectual and adaptive deficits were present during childhood or adolescence. This assessment should include corroborative information obtained from complementary reliable and valid sources, which reflect functioning outside of the prison setting. Additional factors to take into account include the community environment typical of the individual's peers and culture, linguistic diversity, cultural differences in the way people communicate, move, and behave. Assessments must also assume that limitations often coexist with strengths, and that a person's level of life functioning will improve if appropriate personalized supports are provided over a sustained period.

   F70, Intellectual Disability (Intellectual Developmental Disorder) mild = 50/55-70
   F71, IDD, moderate                  =35/40-50/55
   F72, IDD, severe                    =20/25-35/40
   F73, IDD, profound                  =<20/25
   F74, IDD, severity unspecified

   a. Decision rules for placement of inmates on the Active and Inactive MH/ID Rosters

      An asterisk (*) identifies each criterion that requires consideration of placement upon the Active MH/ID Roster. An inmate meeting the non-asterisk criteria may not necessarily be placed on a roster; however, his/her case shall be reviewed.

      (1*)  History of outpatient treatment or inpatient psychiatric hospitalization - Hospitalization in the past year shall be an automatic MH/ID Roster addition; treatment within the last five years shall be reviewed for possible roster addition.

      (2*)  Receiving psychotropic medication - An inmate who receives or is prescribed psychotropic medication shall be placed on the Active MH/ID Roster.

      (3*)  History of serious suicide attempt within the last two years - Recent suicide attempts shall trigger review of roster placement.

      (4*)  An inmate who is on the Active MH/ID Roster and is non-compliant with psychotropic medication for a period of seven days, has a history of violence, and has a current pattern of facility infractions shall be reviewed by the PRT.

Issued: 8/17/2018
Effective: 8/31/2018

The purpose of the PRT review should be to review the inmate's IRP, consider enrollment into a medication compliance group, etc.

b. The PRT shall review the case of an inmate with SMI and/or who is housed on a Residential Treatment Unit (RTU) every 120 days or more frequently if clinically indicated. C Roster MH/ID cases shall be reviewed at least annually. The scheduling of the yearly review may coincide with the inmate's annual unit review so that the Unit Management Team may be as involved as possible in the treatment.

c. The PRT shall meet at least weekly, and the session shall be documented on the appropriate **IRP (Initial – IRP [Attachment 2-A], Change of Status – IRP [Attachment 2-B], or Review – IRP [Attachment 2-C])**. The IRP documentation must show clearly that the inmate was invited to attend PRT and that the unit team, to include Corrections Officers, were present or had input at the meetings, and were actively involved in development and/or review of the recovery plan. The IRP must also show that the inmate was involved in the development of the plan, and the inmate shall be offered the opportunity to sign the IRP. If the inmate opts not to sign the IRP, refusals shall be noted.

d. In order to maintain confidentiality required by patient/client ethical standards and applicable laws, staff approved to make inquiry and maintain records shall be limited. Staff must obtain a User ID through Computer Services and security clearance through the Central Office, Psychology Office.

e. The PRT must approve removal of an inmate from the Active MH/ID Roster. The rationale for the removal and the date shall be recorded in the psychiatric section of the Medical Record. An inmate removed from the Active Rosters shall automatically be placed on the Inactive MH/ID Roster and the change noted on the tracking system.

f. Information which is available in the tracking system and is automatically included on the MH/ID Roster includes:

   (1) name, Department number, offense, and dates of minimum and maximum sentence;

   (2) facility, custody level, block/cell location;

   (3) history of problem areas including inpatient/outpatient hospitalization (Y/N), GBMI (Y/N), "S" score (i.e. Roster status), and program codes ("Z" and "O"); and

   (4) Beta IQ score or appropriate individual intelligence test score.

g. Information which is not available in the system and must be entered by the mental health staff:

   (1) ICD code;

Issued: 8/17/2018
Effective: 8/31/2018

(2)   World Health Organization Disability Assessment Schedule (WHODAS) score; and

(3)   suicide attempt history – means, dates, and severity of attempts.

4.   Reception Officer[2]

The first point of contact with a new reception, whether it is in the Diagnostic and Classification Center (DCC) or in a permanent facility, is the receiving officer. Therefore, every receiving officer shall receive training in the recognition of the signs and symptoms of mental illness and ID. Each facility shall develop an appropriate system for the immediate referral of any new reception identified as potentially mentally ill, suicidal, intellectually disabled, etc., to the appropriate ***Nursing*** staff for close observation and further evaluation.

5.   Diagnostic and Classification Center[3]

a.   Observations or concerns about any inmate reporting or displaying mental health issues shall be relayed to appropriate treatment staff for evaluation and follow-up using the **DC-97, Mental Health Referral Form (refer to Section 1 of this procedures manual),** in non-urgent cases. Under supervision of the Licensed Psychology Manager (LPM), Psychology staff will interview the inmate as soon as possible after receipt of the referral, but no later than one week.[4] This interview will be documented using a **DC-560, Mental Health Contact Note**. The LPM will evaluate the need for immediate psychiatric evaluation and/or Psychiatric Observation Cell (POC) placement. If the LPM/designee determines psychiatric evaluation is warranted but not an emergency, a **DC-560 *with his/her assessment and explanation as to the need for referral*** shall be forwarded to the psychiatry provider the same day. The inmate shall be ***scheduled to be*** seen by the psychiatry provider within two weeks[5] of this referral from Psychology staff or sooner if clinically indicated. In urgent cases, a phone call shall be made to the Psychology Department (or the infirmary if after hours), or the inmate shall be escorted to the infirmary area.

b.   DCC Psychology staff shall be alert and search for indications of previous psychiatric/psychological treatment, current or prior suicidality, use of psychotropic medications, hospitalizations or outpatient treatment and/or evaluations, ID placements, or history of drug or alcohol abuse. Every effort shall be made to obtain prior records of hospitalizations, treatment programs, or specialized placements.

c.   Prior to transfer, when suicidality, assault potential, or other special treatment needs are identified during the classification process, appropriate notification via case conference shall be made by DCC Psychology staff either by email or phone call to

---

[2] 4-4372
[3] 4-4366, 4-4368
[4] 4-4372
[5] 4-4372

Issued: 8/17/2018
Effective: 8/31/2018

the receiving LPM/designee. A corresponding **Inmate Cumulative Adjustment Record (ICAR)** entry shall be made by DCC staff documenting the case conference as previous treatment recommendations, **ICAR** entries, and psychological reports are not sufficient means of communicating about unstable, potentially suicidal, or violent mental health transfers.

6. Permanent Facilities[6]

   a. Receptions[7]

      Every permanent facility shall have procedures for reviewing the records and holding a personal interview with every new reception. In this review of records and interview, staff shall explore with the inmate the possible need for mental health services. When such needs are identified, every appropriate staff shall be alerted to these needs and appropriate referrals made for follow-up by treatment staff. Under supervision of the LPM, the initial record review and interview by Psychology staff shall take place as soon after reception as possible, but no later than one week. Every C and D Roster inmate shall be scheduled for PRT review within two weeks of arrival and a new IRP must be completed by the receiving facility PRT staff and placed in the medical file within four weeks of the inmate's arrival.

   b. General Population

      Since any inmate may report or demonstrate mental health issues whether or not they are currently receiving mental health treatment, all contact staff must be trained and able to recognize signs of potential mental illness, suicidality, or elevated risk of violence. Observations or concerns about any inmate with such issues shall be relayed to the appropriate treatment staff for evaluation and follow-up using the **DC-97 to Psychology**. In urgent cases, a phone call shall be made to the Psychology Department (or the infirmary if after hours) or the inmate shall be escorted to the infirmary area. Under supervision of the LPM, Psychology staff will interview the inmate as soon as possible after receipt of the referral, but no later than one week.[8] This interview will be documented on a **DC-560**. The LPM will evaluate the need for immediate psychiatric evaluation and/or POC placement. If the LPM/designee determines psychiatric evaluation is warranted but not an emergency, a **DC-560 *with his/her assessment and explanation as to the need for referral*** shall be forwarded to psychiatry the same day. The inmate shall be ***scheduled to be*** seen by the psychiatry provider within two weeks of receipt of this referral from Psychology staff or sooner if clinically indicated.

---

[6] 4-4372
[7] 4-4368
[8] 4-4372

Issued: 8/17/2018
Effective: 8/31/2018

**E. Processing**

Each facility shall provide mental health services needed by an inmate in its population.

1. Mental Health Services

    a. Psychiatric Services – Each facility in the Department shall have psychiatric services available through contracted services.

    (1) The treating psychiatrist/Certified Registered Nurse Practitioner-Psychiatric Services (PCRNP) shall see the inmate ***who is*** on the C ***Roster and currently being prescribed psychotropic medications by psychiatry provider at a minimum of once every 120 days, and all*** D Roster ***inmates at*** a minimum of once every 90 days. The psychiatrist/PCRNP is encouraged to see the inmate more frequently if clinically indicated. However, frequency of contacts is driven by clinician discretion, clinical presentation, and acuity of illness. Frequency of psychiatry and psychology contacts shall be noted in the inmate's IRP. ***For C Roster patients, the psychiatry provider shall refer to PRT for roster discussion, if and when the psychiatry provider initiates psychotropic medications for an inmate, or discontinues all psychotropic medications (inmates whose psychotropic medications are discontinued shall at least have one scheduled follow up psychiatric appointment within two to four weeks after the discontinuation of psychotropic medications to assess the stability), and/or no longer requires the individual to be followed by the psychiatry provider. For D Roster patients, the team shall follow D Roster downgrade protocol.***

    (2) If an inmate diagnosed with an SMI is placed in a Diversionary Treatment Unit (DTU), the treating psychiatrist/PCRNP must see the inmate out of cell once every 30 days.

    b. Psychological Services - Each facility shall provide sufficient psychological staff to provide evaluation, monitoring, and treatment to those inmates in need of such services.

    **NOTE**: The treating psychologist (LPM/Psychological Services Specialist [PSS]/Psychological Services Associate [PSA]/Mental Health Coordinator [MHC]) shall see inmates on the Active MH/ID Roster a minimum of once every 30 days. The psychologist has the discretion to see the inmate more frequently, if clinically indicated. These contacts can be completed in group settings. All mental health contacts will be recorded on a **DC-560** and a corresponding ICAR entry. If these contacts occur in a group setting, each inmate is required to speak and be spoken to by the mental health staff.

    c. Counselors - Each facility shall have available Corrections Counselors trained to work with an inmate who is in need of mental health services. Counselors working with an inmate in need of residential mental health services (i.e. RTUs, Secure Residential

Treatment Units [SRTUs], Behavior Management Units [BMUs], DTUs, etc.) shall meet with him/her at least monthly. The frequency of such contacts shall be determined by the severity of the need and the personnel available.

d. MHC - Every facility shall have a MHC on the Psychology staff and shall make appropriate use of the coordinator to assist an inmate in receiving each of the mental health services he/she is scheduled to receive.

2. Internal Mental Health Facilities[9]

   a. Short term inpatient Regional Mental Health Units (MHU) are available at State Correctional Institution (SCI) *Camp Hill*, Rockview, and Muncy to provide mental health care for an inmate who needs the service.

   b. The Forensic Treatment Center (FTC) at Waymart is available to provide long-term inpatient care for those individuals who need the service. Procedures for referring inmates to the FTC and MHUs are presented in **Section 4** of this procedures manual.

   c. SRTUs are available at SCI Muncy, Rockview, Smithfield, *Phoenix*, and *Greene*. Procedures for referring an inmate to the SRTU are contained in **Section 10** of this procedures manual.

   d. BMUs are located at SCI Muncy *for females* and SCI Frackville, *Smithfield, and Retreat for male inmate populations*. Procedures for referring an inmate to the BMU are contained in **Section 12** of this procedures manual.

3. Information Flow

   a. Each facility shall provide for the flow of information and observations of behavior from all levels of staff (particularly from Corrections Officers and trades instructors) to appropriate treatment personnel concerning an inmate in need of mental health services. The treatment staff member receiving it shall acknowledge receipt of this information and, when possible, feedback shall be provided to the originator of the information. The **DC-97** shall be used to refer mental health related matters to the counselor and *psychologist*.

   b. Treatment staff shall share with Corrections Officers, trades instructors, and other staff the goals and direction of recovery plans developed for inmates in need of mental health services.

4. Recovery Plans

   a. The PRT shall develop IRPs for inmates on the Active MH/ID Roster, and the inmates shall be given the opportunity to provide input, review, and sign the plan. IRPs for inmates on the D Roster shall be updated a minimum of every 120 days and IRPs for

---

[9] 4-4368

inmates on the C Roster shall be updated at least annually. The psychiatrist/PCRNP shall participate and approve the development, modification, and discontinuance of each treatment plan.[10]

b. Recovery plans shall include the goals the team and inmate intends to achieve, including symptom stabilization and elimination, and recommendations regarding how staff shall interact in dealing with the inmate. The inmate shall be involved in the development of his/her recovery plan, shall be given the opportunity to sign-off on the completed plan, and shall receive a copy of the IRP. These procedures are more fully described under **Subsection G. below**.[11]

c. A **DC-551, Continuity of Care and Transfer Individual Treatment Plan (Attachment 2-D)** shall be generated. Items indicated by an asterisk must be completed for an inmate who is being petitioned for transfer to another facility.

## F. Mental Health Commitments

1. General

   a. An inmate who becomes mentally ill and in need of mental health treatment beyond interim, community type care is to be considered for commitment to an approved mental health facility.[12] Every such commitment shall be governed by the Mental Health Procedures Acts 143 of 1976 and 324 of 1978, and it is expected that all staff dealing with mental health commitments shall be thoroughly familiar with these acts. When it is determined that an inmate is in need of a mental health commitment, the facility shall move as expeditiously as possible to obtain such a commitment.[13]

   b. In general, §201 voluntary admissions and §302 and §303 involuntary emergency commitments governed by the Mental Health Procedures Act, Acts 143 of 1976 and 324 of 1978, shall be treated in the MHUs. Longer-term §304 involuntary commitments shall be placed in the FTC at Waymart or a Department of Human Services (DHS) Forensic Unit. A female inmate requiring a longer-term §304 involuntary commitment shall be placed in a DHS Forensic Unit.[14] Appropriate forms for each type of commitment are:

      (1) **Application for Involuntary Emergency Examination and Treatment, MH 783 (Attachment 2-E)**;

      (2) explanation of **Patient's Bill of Rights, MH 783-A (Attachment 2-F)**;

      (3) **Application for Extended Involuntary Treatment, MH 784 (Attachment 2-G)**;

---

[10] 4-4372
[11] 4-4372
[12] 4-4372
[13] 4-4374
[14] 4-4374

Issued: 8/17/2018
Effective: 8/31/2018

(4) **Voluntary Application for Mental Health Treatment (Section 201) (Attachment 2-H)**;

(5) **Explanation of Voluntary Admission Rights, MH 781-Z (Attachment 2-I)**; and

(6) **Initial Evaluation, MH 781-A (Attachment 2-J)**.

c. Facilities are encouraged to use the certified MHUs for emergency and acute care commitments that are acceptable within the criteria of the specific unit. Commitments to the MHU are governed by the Mental Health Procedures Act and completion of appropriate petitions is required. Consent for Voluntary Inpatient Treatment, 201 petition, is acceptable and preferred for admission to a Department in-house MHU.

d. Only psychiatrists or other facility physicians can be the examining physicians for the purposes of a mental health commitment documentation. A PCRNP cannot take the role of an examining physician.

2. Non-Emergency Commitment to a Mental Health Facility

a. When an inmate is observed behaving in a way that is dangerous to himself/herself or to others, is suicidal or self-mutilating, or so disturbed that he/she is unable to care for himself/herself without assistance, a psychiatric evaluation for possible 304 Mental Health Commitment shall be requested.[15]

b. Upon referral for evaluation for possible commitment, the inmate shall be seen by the psychiatrist as soon as possible, but no later than the next working day.[16]

c. The psychiatrist shall evaluate the inmate in accordance with the criteria for commitment contained in the Mental Health Procedures Act.[17]

d. If upon evaluation by the psychiatrist, the inmate is found committable, the designated facility staff member shall prepare the petitions **(Application for Involuntary Emergency Examination and Treatment, MH 783)**, obtain the necessary signatures, see that the inmate is advised of the forthcoming hearing, and read the inmate's rights to him/her **(Patient's Bill of Rights, MH 783-A)**.

e. The designated staff member shall submit copies of the petition to the committing court and notify the county MH/ID Administrator of the committing county and the county MH/ID Administrator of the inmate's home county, if the home county is known and is different than the committing county. Local county mental health services shall be contacted, when appropriate, for their involvement since they may require a delegate to be involved in the involuntary commitment process.

---

[15] 4-4374
[16] 4-4374
[17] 4-4374

Issued: 8/17/2018
Effective: 8/31/2018

f.  When approval has been obtained from the committing county, the local mental health reviewing officer or local court shall be contacted and a hearing date established. If the committing county wishes to conduct the hearing, appropriate arrangements shall be made.

g.  When possible, mental health commitment hearings will be conducted in the facility.

h.  If the hearing is to be held outside the facility, appropriate arrangements for custody and transportation shall be made as far in advance as practical. A day or two before the hearing, a follow-up check shall be made to be certain all transportation and security plans are ready. Necessary staff shall also be advised of the date, time, and place of the hearing so he/she may be available to testify if needed.

i.  When a commitment hearing has been completed, the designated staff member shall make appropriate arrangements for transportation of the inmate to the mental health facility. The procedures for a male inmate are fully described in **Section 4** of this procedures manual. Such transfer shall occur as expeditiously as possible.

j.  Following transfer of an inmate to a mental health facility for treatment, either the MHC or another designated staff member shall routinely contact the mental health facility every 90 days to determine the status of the inmate. Such contacts shall be logged on the **ICAR** and forwarded to the counselor for filing or recorded on the **DC-472, Progress Notes** and copies forwarded for filing in the Psychiatric Section of the medical record.

3.  Emergency Commitments to a Mental Health Facility[18]

a.  In accordance with Acts 143 of 1976 and 324 of 1978, §302 emergency commitment is available, but shall only be used in genuine emergency situations. When properly handled, emergency commitments can be effected in less than eight hours and rarely take more than 12 hours. Psychology staff at each facility shall make certain that §302 emergency commitment forms are available and staff shall familiarize themselves with the process.[19]

b.  In most cases, the MHC shall initiate the §302 emergency commitments and serve as the petitioner. The consulting psychiatrist shall serve as the examining physician. However, in some facilities, a staff member who has been appointed as a delegate by the local county mental health administrator may initiate the §302 petition. In a few facilities, either the ranking officer on duty or the staff member who observed the behavior may sign the §302 petition or emergency commitment.

c.  Any staff member who has observed the behavior on which the petition is based shall be prepared to testify to and document his/her observations in accordance with the

---

[18] 4-4351
[19] 4-4351

Mental Health Act and the requirements of the county administrator conducting the extension §303 hearing.

d.  If a DHS mental health facility accepts the inmate on an emergency commitment, the MHC or other designated staff member shall maintain contact with the mental health facility to determine if the mental health facility will proceed with a §303 commitment at the end of the five day emergency commitment or whether the mental health facility plans to discharge the inmate at the end of the five days.

e.  In a Department MHU, the MHU staff are responsible to notify the sending facility of changes in the inmate's treatment status. If the inmate is to be discharged, appropriate arrangements shall be made for the inmate's return to the facility from which he/she was committed.

4.  Information Provided to the Treating Mental Health Facility

The complete medical record shall accompany the inmate as well as the documents listed in **Application for Involuntary Emergency Examination and Treatment, MH 783** and **Patient's Bill of Rights, MH 783-A**.

5.  Voluntary Commitment to a Department MHU

a.  An inmate who believes he/she is experiencing symptoms of a mental illness, is a danger to himself/herself or others, or is suicidal or self-mutilating may request a psychiatric evaluation and voluntary commitment to the MHU.[20]

b.  If upon evaluation by the psychiatrist, the inmate is found in need of treatment, the designated facility or MHU staff member shall prepare the petition, obtain the necessary signatures, see that the inmate is advised of his/her rights and forthcoming hearing, if applicable (**Patient's Bill of Rights, MH 783-A**). A psychiatrist or physician shall complete a **Voluntary Application for Mental Health Treatment** petition.

c.  The designated staff member shall submit the original copy of the petition and history of the inmate, including treatment program, and any special needs to the MHU staff.

d.  An inmate who is a §201 voluntary admission, who wishes to sign out prior to discharge, but presents a threat to self/others or is debilitated, shall be processed as an emergency commitment, 302 petition, by MHU staff.[21] If deemed necessary, the MHU staff shall process extension of emergency commitment, 303 petition, and involuntary treatment, 304 petition.

e.  Upon discharge of the inmate from the MHU or FTC, the treatment unit staff shall provide the referring facility staff with a discharge summary including treatment

---

[20] 4-4351
[21] 4-4351

Issued: 8/17/2018
Effective: 8/31/2018

recommendations. The discharge conferencing and treatment recommendations procedures are discussed more thoroughly in **Subsection G. 4. below**.

## G. Continuity of Care Procedures for Inmates with Mental Illness Being Transferred

Continuity of care between State Correctional Facilities, DHS State Hospital Regional Forensic Centers, and the Department's MHUs shall be as follows:

1. General

   a. The Department provides a continuum of mental health services for every inmate in the system; this continuum ranges from outpatient services offered to an inmate in the general population, to temporary crisis beds, short term psychiatric treatment in a Department MHU, or long term hospitalization at the FTC at Waymart, or at a DHS Regional Forensic Center. It is the policy of the Department to provide continuity of care for an inmate with mental illness who is transferred from:

      (1) one facility to another;

      (2) between the facilities and the FTC;

      (3) between the facilities and the Department MHUs; and

      (4) from the facilities into mental health services in the community (continuity of care procedures for inmates being discharged into the community are described in **Subsection H. below**).

   b. The mechanisms which have been developed to ensure this continuity of care include the MH/ID Automated Tracking System, enhanced teleconferencing between mental health staff who work with these inmates, and the sharing of treatment plans between service providers in the interfacing facilities, hospitals, and agencies.

2. Tracking of an Inmate with Mental Illness Moving from One Facility to Another

   a. The automated tracking system shall ensure that an inmate with mental illness who was being tracked in the sending facility shall appear on the MH/ID Roster of the receiving facility immediately after his/her arrival. Mental health and medical staff in every facility shall review the automated MH/ID Roster daily to see if any new cases have been entered into the facility's population.

   b. When a facility requests to transfer an inmate with mental illness to another facility, the mental health staff of the sending facility shall generate an IRP to guide the inmate's treatment in the receiving facility. These procedures shall be in accordance with Department policy **11.2.1, "Reception and Classification."**

Issued: 8/17/2018
Effective: 8/31/2018

c. The LPM/designee at the sending facility shall initiate a teleconference or email correspondence with the mental health staff at the receiving facility to discuss the inmate and his/her special needs.

d. Any additional critical clinical information shall be forwarded to the receiving facility as soon as possible via facility courier in an envelope marked confidential and placed in the medical file.

3. Tracking of Inmates Returning from the FTC, Department Regional MHUs, and DHS Regional Forensic Centers returning to other Department facilities

a. Shortly before the inmate is to be discharged from the FTC, Department Regional MHU, or DHS Regional Forensic Center, the treatment team at the unit and the PRT at the sending facility shall conduct a videoconference or a teleconference to discuss the patient's progress and develop an IRP to guide his/her reintegration into the facility population.

   (1) At a minimum, the multi-disciplinary treatment team at the facility shall consist of the following members:

      (a) LPM/MHC;

      (b) Psychiatrist/PCRNP;

      (c) Corrections Health Care Administrator (CHCA) and/or psychiatric nurse;

      (d) Corrections Counselor, Drug and Alcohol Treatment Specialist (DATS), and/or Unit Manager; and

      (e) Lieutenant from the area.

   (2) During the videoconference or teleconference, the FTC, DHS Regional Forensic Center, or MHU team shall summarize the inmate's response to treatment at the forensic facility and offer any insights he/she might have concerning the inmate's treatment needs and potential readjustment problems upon return to the facility.

   (3) The MHU and FTC treatment teams shall document their discharge treatment recommendations on the **DC-551**, and the facility team shall document the teleconference on the **DC-97** to ensure that the inmate is evaluated by mental health staff immediately upon return to the facility. The treatment facility shall fax the completed **DC-551** to the LPM/MHC at the receiving facility immediately following the videoconference or teleconference so that the updated treatment plan can be attached to the **DC-97**.

Issued: 8/17/2018
Effective: 8/31/2018

(4) It is likely that the DHS Regional Forensic Centers may use different forms to document videoconference or teleconference treatment recommendations. DHS, FTC, and MHU teams may attach additional information on the **DC-551**.

(5) The treatment teams in the FTC, DHS Regional Forensic Center, and MHU shall make recommendations for the inmate's facility placement. This is a key component of the videoconference or teleconference.

b. Upon return to the facility, the inmate shall be placed in an infirmary observation cell or other appropriate setting until he/she can be evaluated by the facility psychiatrist/PCRNP or licensed psychologist who shall make placement recommendations within the facility, based on the evaluation results and the recommendations in the **DC-551**. An inmate returning from the FTC, MHU, or DHS unit who is on Administrative Custody (AC) or Disciplinary Custody (DC) status shall not be placed in the Restricted Housing Unit (RHU) until his/her case has been reviewed by the PRT. The Program Review Committee (PRC) shall be notified immediately of the inmate's return so that the committee can review the inmate's AC/DC status. Insofar as possible, an inmate with an SMI shall be diverted from RHU placement to DTU, if appropriate.

c. The FTC, DHS Regional Forensic Center, MHU, and facility treatment teams shall schedule the inmate's return to the facility to ensure that he/she will receive a mental health evaluation immediately following his/her return. The PRC shall be informed immediately of the return of any Capital Case inmate from the FTC, DHS Regional Forensic Center, SRTU, or MHU.

d. The PRT shall review the inmate's case monthly for four months to monitor the success of the IRP to reintegrate the inmate into prison life.

e. Several weeks after the inmate's return to the facility from the FTC, DHS Regional Forensic Center, or MHU treatment staff from those units may request information concerning the inmate's readjustment in the facility. This data shall be useful for FTC/DHS/MHU program development.

f. The FTC, DHS Regional Forensic Center, or MHU shall send a discharge summary to the facility within 30 days following the inmate's discharge.

4. Tracking of Inmates Following Placement in an MHU Housed on the Grounds of the Same Facility

a. If the MHU is housed on the grounds of the same facility, the general procedures described in **Subsection G.3. above** shall apply.

b. In these cases, it is likely the PRC will be more involved in the placement of the inmate in the facility.

Issued: 8/17/2018
Effective: 8/31/2018

   c. The PRT should work closely with the MHU staff and PRC to ensure appropriate placement in the facility.

## H. Continuity of Care Procedures for an Inmate with Mental Illness Being Discharged

These procedures provide direction to staff in developing continuity of care services for an inmate with mental illness following his/her release from incarceration into the community following Sentence Complete or parole.

1. Sentence Complete Inmates on the MH/ID Roster[22]

   a. The Psychology Department shall maintain automated procedures for Active MH/ID Roster inmates. Lists of the names and Department numbers of each roster inmate shall be updated monthly and sent to the unit staff so that the RHU Lieutenant, Unit Manager, Corrections Counselor, and/or DATS can be aware of inmates with mental illness who are housed on his/her unit.

   b. The LPM shall schedule special PRT reviews for an inmate on the MH/ID Roster 12 months prior and again six months prior to the Sentence Complete to update the inmate's IRP on the **DC-551**. The updated IRP shall address continuity of care service needs and actions required to transition the inmate into the community.

      (1) Participants in the meeting shall include, but are not limited to, the LPM, MHC, psychiatrist/PCRNP, CHCA, DATS, and Corrections Counselor or Unit Manager. It is desirable that the inmate attend the meeting.

      (2) The IRP shall address the inmate's anticipated community needs including mental health, medical treatment, substance abuse and/or sex offender specific treatment, ***aging services, intellectual disability services,*** Medical Assistance (MA), Supplemental Security Income (SSI), Social Security Disability Insurance (SSDI), and housing. If additional assessments are necessary, this shall be addressed in the IRP.

      (3) If the inmate did not attend the PRT meeting, this will be documented on the **DC-551**, and the staff shall meet with the inmate to discuss the planning process. Staff shall determine where the inmate plans/wishes to reside, ascertain his/her view of treatment and benefit needs, and secure the inmate's participation in the planning process.

      (4) Staff shall request that the inmate sign the **DC-108, Authorization for Release of Information**, in accordance with Department policy **DC-ADM-003, "Release of Information,"** so that the Department staff can share treatment information including the inmate's Social Security number, physical/medical health diagnoses, and psychiatric diagnosis, with outside agencies.[23] Staff shall advise

---

[22] 4-4347
[23] 4-4347

Issued: 8/17/2018
Effective: 8/31/2018

the inmate that the **DC-108** will expire in 30 days for physical/mental health information and 90 days for non-physical/non-mental health information, and it may be necessary to sign several releases of information.

c.  The Central Office Psychology Office shall monitor the MH/ID Roster to identify each roster inmate who is within 12 months of Sentence Complete. The Central Office Psychology Office shall forward this information quarterly to the DHS Office of Mental Health and Substance Abuse Services (OMHSAS) Forensic Liaison so that the OMHSAS can be aware of each inmate with mental illness who will be returning to the community in the upcoming year, dates he/she is leaving, the facility from which he/she is being discharged, and the county to which he/she will be returning. The OMHSAS will forward this information to the appropriate county MH/ID administrators.

d.  The LPM/MHC shall contact the MH/ID Administrator in the inmate's county of origin to advise the county staff of the inmate's impending Sentence Complete and obtain assistance locating community resources. A list of MH/ID administrators can be obtained from the OMHSAS Forensic Liaison or Central Office Psychology Office.

(1)  The LPM/MHC shall document all contact with the MH/ID Administrator in the medical record on the **DC-472**, and shall follow-up this contact with a collaborating letter to the MH/ID administrator, copied to the correspondence section of the medical record and the OMHSAS Forensic Liaison.

(2)  If the inmate has signed the **DC-108**, the LPM/MHC shall provide the county MH/ID agency with the inmate's Social Security number, current ICD diagnosis, WHODAS score, treatment being provided, and other pertinent data. The information shall be included ***with*** the **DC-551**.

(3)  If the inmate refused to sign the **DC-108**, the LPM/MHC shall provide the MH/ID agency with information regarding the inmate's date of release and number of MHU/FTC commitments while incarcerated. If the inmate refused to sign the **DC-108**, the LPM/MHC will not provide to the OMHSAS the inmate's current ICD diagnosis, WHODAS score, level of treatment being provided, and other pertinent data. This confidential information shall not be included ***with*** the **DC-551** until the inmate has signed a **DC-484, Mental Health *Confidentiality Disclosure Statement* (Attachment 2-K).**

(4)  The LPM/MHC shall invite the County MH/ID staff to visit the correctional facility and/or participate in the PRT meetings. The county MH/ID staff and/or OMHSAS may request to attend the PRT meetings.

(5)  The Department has made special continuity of care arrangements with Philadelphia County and the four surrounding counties (Bucks, Chester, Delaware, and Montgomery), and Allegheny County, which identify specific MH/ID staff members to contact to arrange continuity of care services for an inmate returning to those jurisdictions. The LPM/MHC is encouraged to contact

Issued: 8/17/2018
Effective: 8/31/2018

the Central Office Psychology Office with any questions regarding these arrangements.

(6) If the County MH/ID Administrator is non-responsive to the contact described above, the LPM shall contact the Regional Office of the OMHSAS or the OMHSAS Forensic Liaison and the Chief Psychologist in the Bureau of Health Care Services (BHCS).

(7) Staff should also consider contacting the inmate's family for assistance with aftercare planning, if the inmate has agreed and signed the **DC-108**.

e. If the inmate is psychiatrically stable, the LPM/MHC shall arrange a community intake/evaluation appointment for the inmate. This includes the date and time of the appointment, location of the interview, and contact person. This information shall be provided to the inmate both verbally and in writing. The information shall also be documented in the medical record on the **DC-472** via a Subjective, Objective, Assessment, Plan (SOAP) note and in the correspondence section, and it will be shared with the county MH/ID contacts or the OMHSAS Liaison.

f. If the Department treatment team believes that the inmate meets involuntary mental health civil commitment criteria outlined in the Mental Health Procedures Act, the MHC/psychologist shall advise the inmate's home county MH/ID Administrator/designee and/or OMHSAS Forensic Liaison/designee that the Department plans to file a 304 petition with the local court requesting involuntary inpatient mental health treatment. Prior to the commitment hearing, the MHC/psychologist shall provide documentation of the inmate's treatment history and current treatment needs to the County MH/ID Administrator of the county to which the inmate shall be released, and shall request that the county MH/ID Administrator designate a community hospital to which the inmate can be committed for the needed inpatient services.

g. If the Department treatment team believes that the inmate meets involuntary mental health civil commitment criteria and the county MH/ID Administrator recommends direct admission to a state hospital, or is unavailable to make the designation of a community placement, the MHC/psychologist will provide documentation of the inmate's treatment history and current treatment needs to the OMHSAS Forensic Liaison/designee for review and determination of the most appropriate hospital to which the inmate can be committed for the needed inpatient services. Once reviewed and accepted for admission to a state psychiatric hospital, planned civil admissions can occur on any day of the week. There will be no admission of an inmate completing sentence to a state hospital Regional Forensic Center.

h. If the inmate meets involuntary mental health commitment criteria and there is sufficient time prior to Sentence Complete, the LPM/MHC shall initiate an involuntary commitment to the FTC/MHU that can be "rolled over" into the civil commitment on the date of Sentence Complete. If this procedure is employed, staff shall request that

Issued: 8/17/2018
Effective: 8/31/2018

the court order allows placement in both a Department MHU and a community hospital.

i.   If the inmate's condition is such that he/she is in need of immediate treatment, but is not committable under the Mental Health Act, the LPM/MHC shall contact the MH/ID agency to discuss treatment options including intervention by the county crisis services upon release.

j.   If the inmate refuses to accept processing for community aftercare or is non-responsive to recommendations for community aftercare processing, and the staff believes that the inmate's state of mental health is such that he/she poses a clear and present danger to himself/herself or others in the future following release from supervision (but the inmate does not meet inpatient commitment criteria), then the BHCS shall be contacted, and in consultation with the Chief Psychologist and the Office of Chief Counsel, the following options shall be considered:

   (1)   the mobile crisis or Intensive Case Management (ICM) units of the County MH/ID Program can be alerted and may be able to make community contact even though unsolicited by the inmate;

   (2)   notify local law enforcement authorities of the pending release and the inmate's condition (seriously mentally ill and non-cooperative);

   (3)   the psychologist is not able to contact the individual, the local law enforcement authority shall be notified; and

   (4)   the identity of those individuals who were contacted and the substance of the communication shall be documented in the medical record, with copies to the **ICAR, DC-15, Inmate Records Jacket,** and the Facility Manager.

k.   The Medical Department shall provide the inmate with a 60-day supply of prescribed medication, in accordance with Department policy **13.2.1, "Access to Health Care"** to prevent disruption of treatment until the inmate can be seen by a psychiatrist/PCRNP. A supply of fewer days may be provided if an overdose potential exists and/or an appointment with a psychiatrist/PCRNP can be secured sooner. Information concerning medication shall be conveyed to the community treatment provider.

l.   In cases where an inmate is not able to travel on his/her own due to mental health status and has no other option, the facility shall provide transportation prior to the Sentence Complete. If an inmate, who will require transportation, is approaching Sentence Complete, but the facility cannot provide this service due to distance, then the unit management team may initiate a transfer petition. In this manner, the inmate may be moved to a facility closer to his/her home. In these cases the LPM/MHC in the referring facility shall be responsible for continuity of care planning, and these activities should be documented on the **DC-551**.

m. In situations in which the inmate is seriously mentally ill and will need benefits immediately upon Sentence Complete, the staff may complete the Commonwealth of Pennsylvania Application for Social Services (COMPASS) on-line applications to help the inmate access Medicaid and other health care services that he/she shall need in the community. COMPASS interfaces with the Pennsylvania DHS, Insurance Department, medical providers, community-based organizations, advocates, and others.

   (1) COMPASS requires internet access, and staff shall use the computer in the CHCA's office to complete the on-line application.

   (2) COMPASS can be reached directly at http://www.compass.state.pa.us.

   (3) Staff shall submit monthly lists of the number of on-line COMPASS applications completed to the CHCA/***designee***.

n. Continuity planning activities need to be documented via the **DC-551**, entries in the **DC-472**, and the correspondence section of the medical record, with information copied to the Corrections Counselor for placement in the **ICAR**.

2. Procedures for a Hard to Place Inmate on the MH/ID Roster Being Paroled/Re-Paroled

   Whenever possible, an inmate with a mental illness should be returned to the community via parole, rather than Sentence Complete, so that he/she can be mandated to receive the community treatment and management services.

a. Procedures for a Hard to Place inmate will be in accordance with Department policy **7.3.1, "Reentry and Transition."** In addition:

   (1) the facility LPM shall attend the parole staffing at the facility for all cases identified as "Hard to Place," and which are also placed on the MH/ID Roster; and

   (2) the LPM shall coordinate the activities of the "Hard to Place" meetings and PRT meetings for an inmate receiving mental health treatment.

b. The LPM/MHC shall monitor the MH/ID Roster to identify any inmate approaching one year to his/her parole date and schedule a PRT meeting to update the inmate's IRP on the **DC-551** to ensure that the IRP includes objectives that are related to community reentry. The PRT shall supplement the "Hard to Place" procedures outlined above.

   (1) The IRP shall be recorded on the **DC-551** and shall address mental health and medical treatment needs, co-occurring disorder treatment needs, housing needs and family integration, educational/vocational needs, and community management and support issues. The PRT shall develop relevant, specific plans

2-22

to complete entitlement applications such as MA, Veterans Administration (VA) benefits, SSI, SSDI, and Income Maintenance.

(2) Participants at the PRT meeting shall include the LPM, consulting psychiatrist/PCRNP, CHCA, MHC, DATS, Corrections Counselor, Unit Manager, and facility parole representative. The county MH/ID liaison should be invited to the meeting.

    (a) Department policy **7.2.1, "Counseling Services,"** mandates that the Facility Parole Representative shall attend the PRT meeting for any MH/ID inmate who is likely to receive facility support for parole so that the PBPP can participate in aftercare planning.

    (b) School staff may attend the meeting if vocational/educational issues are being considered.

(3) The PRT shall review every inmate on the MH/ID Roster to determine if he/she meets the referral criteria for placement in one of the Department's Community Corrections Centers (CCCs) for parolees who suffer from mental illness and/or co-occurring substance abuse disorders.

(4) The LPM, MHC, Corrections Counselor, and/or DATS shall meet with the inmate to determine where he/she plans/wishes to live, ascertain his/her view of his/her treatment and benefit needs, and review reentry plans. These discussions may occur during the PRT review meeting, facility release, or parole staffing.

(5) The psychologist shall conduct a psychological evaluation for parole, employing the PA Clinical Risk Assessment (P-CRA), to identify community risk management and treatment needs and make community treatment recommendations. The psychological report shall be submitted at least six months prior to the inmate's minimum date. ***The report shall include an updated ICD diagnosis and WHODAS score***.

(6) The LPM and/or MHC shall be available to the PBPP to respond to any questions regarding the inmate's mental health assessment or response to treatment in the facility. The LPM shall visit the facility parole office regularly to discuss referrals.

3. Procedures for a Non-Hard to Place Inmate on the MH/ID Roster Being Paroled/Re-Paroled

    a. The Psychology Department, Unit Manager, and the Corrections Counselors and/or DATS shall monitor the MH/ID Roster to identify an inmate approaching his/her parole date.

    b. The LPM/MHC shall monitor the MH/ID Roster to identify any inmate approaching one year to his/her parole date and schedule a PRT meeting to update the inmate's

Issued: 8/17/2018
Effective: 8/31/2018

IRP on the **DC-551** to ensure that the IRP includes objectives that are related to community reentry.

(1)   The IRP shall be recorded on the **DC-551** and shall address mental health and medical treatment needs, co-occurring disorder treatment needs, housing needs and family integration, educational/vocational needs, and community management and support issues. The PRT shall develop relevant, specific plans to complete entitlement applications such as MA, VA benefits, SSI, SSDI, and Income Maintenance.

(2)   Participants at the PRT meeting shall include the LPM, consulting psychiatrist/PCRNP, CHCA, MHC, DATS, Corrections Counselor, Unit Manager, and facility parole representative. The county MH/ID liaison should be invited to the meeting.

(3)   School staff may attend the meeting if vocational/educational issues are being considered.

c.   The PRT shall review every inmate on the Active MH/ID Roster to determine if he/she meets the referral criteria for placement in one of the Department's CCCs for parolees who are diagnosed with mental illness and/or substance abuse. Flow charts outlining the Mental Health CCC Referral Procedures are contained in the **Referral Procedure for Cromisa Project (Attachment 2-L)**.

d.   The psychologist shall conduct a psychological evaluation for parole employing the P-CRA to identify community risk management and treatment needs and make community treatment recommendations. The psychological report shall be submitted at least six months prior to the inmate's minimum date. ***The report shall include an updated ICD diagnosis and WHODAS score.***

e.   The Corrections Counselor or DATS and the MHC or LPM shall arrange for a meeting with the inmate to discuss and review aftercare treatment needs. Psychology staff shall be careful not to usurp the casework prerogatives of the counseling staff. These discussions may occur during the PRT review meeting or parole staffing. The counselor shall advise the facility parole agent of those aftercare needs at least six months prior to the inmate's parole eligibility date.

f.   The Corrections Counselor shall coordinate with the PBPP to provide whatever documentation or updated evaluations are necessary for aftercare placement.

I.   *Limits of* **Confidentiality**

1.   ***All inmates will be offered the opportunity to sign one DC-484 for Psychology upon admission to the DCC of the Pennsylvania Department of Corrections (DOC) to indicate that they have been informed that these conditions have been explained. If the individual refuses to sign the DC-484, he or she shall be informed that this refusal does not change or alter the conditions explained, and will apply***

*throughout the individual's time with the Pennsylvania DOC. Additionally, if the individual is released from DOC custody and is returned, (e.g. parole violator), Psychology shall complete a new DC-484. The DC-484 shall be completed once at the time of the Initial Psychiatric Assessment or Brief Psychiatric Assessment by the psychiatrist/PCRNP.*[24]

2. Unless the staff can be reasonably certain that the *individual* can read and understand the *DC-484, the DC-484* shall be read aloud to the inmate; the clinician shall provide him/her with the opportunity to ask questions, and the inmate shall be asked to sign the *DC-484*.

3. *The individual shall be provided with a copy of the DC-484, if requested*.

4. *When the inmate is seen for psychological evaluation or treatment, he/she shall be reminded of the conditions of confidentiality that were originally explained in the DC-484 completed during the classification process*.

5. *If the individual refuses the offered evaluation or treatment, he/she will be cautioned that assessments by recipients of the report (staffing committees and PBPP) might be affected by the lack of information resulting from the refusal*.

6. The *individual* shall be advised that he/she may later agree to sign the *DC-484, if initially refused*.

7. It shall be stressed that *DC-484* describes conditions under which information may be disclosed. This is not *a* consent to assessment and treatment form. Nothing in the document or these directions shall discourage staff members from providing health/mental health sustaining services to the *individuals*.

## J. Guilty But Mentally Ill (GBMI) Inmates

The purpose of these procedures is to aid staff in processing GBMI commitments. It is incumbent upon every reception and DCC staff, as well as all treatment staff in the permanent facility, to become familiar with the GBMI Act (Act 286-82).

1. Reception

   a. The GBMI statute is **Act 286-82 (18 Pa.C.S.A. §§314 - 315 and 42 Pa.C.S.A. §9727)**. Since not every GBMI commitment may be clearly identified as such, the Records Specialist shall carefully review every court commitment order for any indication suggesting a GBMI commitment. If any mention of mental illness is noted in the commitment order, a check shall be made to determine if this commitment was intended to be a GBMI commitment.

---

[24] 4-4368

Issued: 8/17/2018
Effective: 8/31/2018

b. GBMI commitments fall into two categories. Once a commitment has been identified as a GBMI commitment, the Records Specialist shall determine which of the following categories a particular commitment falls under.

   (1)   Category I consists of those GBMI commitments for whom:

      (a)   the court held a hearing at the time of sentencing and found the defendant to be seriously mentally disabled and in need of treatment pursuant to the provisions of the Mental Health Procedures Act at the time of sentencing;

      (b)   the defendant was represented by counsel at this hearing; and/or

      (c)   not more than 90 days has elapsed since the date of the court order finding the defendant to be seriously mentally disabled and in need of treatment.

   (2)   Category II consists of those GBMI commitments for whom:

      (a)   the court held a hearing at the time of sentencing and found that the defendant was <u>NOT</u> seriously mentally disabled and in need of treatment pursuant to the provisions of the Mental Health Procedures Act at the time of sentencing;

      (b)   more than 90 days have elapsed since the date of the court order finding the defendant to be seriously mentally disabled and in need of treatment; and/or

      (c)   the defendant was not represented by counsel at the court hearing to determine if he/she was presently seriously mentally disabled and in need of treatment.

c. Upon determination of the above information, the Records Specialist shall immediately contact the Corrections Classification Program Manager (CCPM) and advise of the reception of a GBMI commitment and of the category under which the commitment is determined to fall.

d. A GBMI commitment who is identified as a Category I commitment shall be housed in the infirmary or other appropriate mental health setting if space, facilities, and security considerations permit.

e. While awaiting transfer to a mental health facility, the severely mentally disabled (Category I) inmate shall receive such care as available resources permit.

f. A GBMI commitment who is identified as a Category II commitment will complete the normal reception procedures and will, after appropriate staff have been notified, be placed in regular DCC housing unless contraindications to such placement are noted during the reception process.

Issued: 8/17/2018
Effective: 8/31/2018

g. A Category I GBMI inmate shall not be double celled in a DCC until reviewed by the treatment team. This review shall be completed as soon as operations permit, but no later than 72 hours. If the ***treatment*** team find the inmate to be neither seriously mentally ill, a serious threat to others, nor disruptive, double celling may be considered if approved by the ***treatment*** team. A Category II GBMI inmate who exhibits no serious mental illness, is not a threat to others, and is not disruptive may be double celled if approved for double celling by the reviewing ***treatment*** team.

2. Staff Contacts and Procedures

   a. Upon notification from the Records Specialist that a GBMI inmate has been received, the DCC Director/designee or CCPM/designee shall:

      (1) immediately review the case and its category designation; and/or

      (2) immediately notify the appropriate counselor and the MHC of the reception of a GBMI commitment; and

      (3) immediately ensure the inmate is scheduled for review by PRT within 72 hours or as soon as operations permit.

   b. The counselor assigned to the case shall see the GBMI inmate as soon after reception as possible, but no later than one week after reception.

   c. Counselor contacts shall be continued on at least a weekly basis, or more frequently if necessary, throughout the classification period.

   d. The classification profile shall be developed as soon as possible after reception, but no later than one week after reception.

   e. The MHC shall visit the GBMI inmate as soon after reception as possible, but no later than one working day after reception.

   f. The MHC shall contact other relevant staff to determine what mental health needs have been identified for the GBMI inmate and shall assist in coordinating these needs.

   g. Within one working day after reception, the DCC Psychologist or PSS shall see the GBMI inmate for an initial evaluation.

3. Psychiatric Evaluation

   a. ***All GBMI inmates shall be placed in D Roster upon arrival to the DOC.***

   b. ***All GBMI inmates shall have an initial psychiatric evaluation and psychological assessment upon arrival to the DCC.***

2-27

c. ***All GBMI inmates shall have treatment follow ups on regular intervals by Psychiatry and Psychology as per the current policy.***

d. ***All GBMI inmates shall receive a PRT review at least once every four months, more if clinically indicated.***

e. A GBMI commitment who was found by the court to be severely mentally disabled and in need of treatment at the time of sentencing (a Category I commitment) does not require a psychiatric reevaluation prior to transfer to a mental health facility; however, he/she shall be seen and evaluated by the psychiatrist/PCRNP as soon after reception as possible, but by the next working day. Appropriate treatment shall be prescribed and implemented until the inmate is transferred to a mental health facility.

f. If the GBMI commitment is a Category II commitment, a psychiatric evaluation shall be arranged as soon after reception as possible and in no case longer than five days after admission for those facilities with psychiatric services routinely available. If psychiatric services are not available, a psychological evaluation may be substituted.

g. If it is determined that a Category II commitment is in need of commitment to a mental health facility, Mental Health Procedures Act commitment procedures shall be followed and a current psychiatric evaluation shall be obtained.

4. Transfer to a Mental Health Facility

If a Category II commitment is subsequently found to be severely mentally disabled and in need of treatment, normal commitment procedures as required by the Mental Health Procedures Act shall be followed.

5. Return from a Mental Health Facility

a. When the treating mental health facility determines that a GBMI inmate sent to them from the Department is ready to return to the correctional system, the mental health facility shall contact the receiving facility and work out a return date.

b. The receiving facility shall arrange to pick up the returning GBMI inmate.

6. Mentally Disabled GBMI Commitments

If a GBMI commitment is found to be so mentally impaired as to suggest the likelihood of being intellectually disabled, a psychological and psychiatric evaluation of his/her intellectual and functioning level shall be made by the DCC staff.

7. Transfer to a Intellectual Disability Program

If a GBMI commitment is found to be so cognitively impaired as to be unable to function in a correctional setting, a petition for commitment to an Intellectual Disability facility shall

Issued: 8/17/2018
Effective: 8/31/2018

be initiated. Submission of this petition shall be guided by the procedures found in the Mental Health Procedures Act.

8. Transfer to a Department Permanent Facility

   a. Upon completion of the classification process for a GBMI inmate, a transfer petition shall be submitted to Central Office in the same manner as every other DCC case, except the case shall be clearly identified as a GBMI case.

   b. Once the transfer petition has been approved, the Director of the DCC shall, via memo, inform the Facility Manager of the permanent facility that a GBMI inmate is being transferred to that facility.

   c. The memo to the Facility Manager shall include appropriate identifying data, a statement of the essential DCC findings in the case, and any treatment recommendations for needed follow-up treatment. The memo shall include the anticipated date of transfer. The Facility Manager of the receiving facility shall distribute copies of the memo to appropriate staff.

   d. When any GBMI inmate is being transferred from a DCC to a permanent facility, it is the responsibility of the DCC LPM to contact the LPM in the receiving permanent facility and review with him/her the mental status of the GBMI inmate being transferred. The DCC LPM shall provide the permanent facility LPM with the name and number of the GBMI inmate, the essential psychiatric/psychological findings of the DCC staff, any treatment recommendations for needed follow-up treatment, and the anticipated date of transfer.

9. Programming GBMI Inmates at Permanent Facilities

   a. Reception

      (1) Upon reception of a GBMI inmate, his/her case shall be reviewed by appropriate intake staff. This staff shall make the proper housing assignment and shall refer the inmate to the mental health review team or counselor, as the case warrants.

      (2) Based on a review of the case and the recommendations of the DCC staff, the intake staff of the permanent facility shall develop an appropriate program for the inmate. If follow-up psychiatric/psychological treatment is needed, arrangements shall be made, subject to available resources, to provide needed treatment.

   b. Programming

      (1) For the first month after reception, the counselor assigned to the case shall see the inmate on a weekly basis. The facility Psychologist shall see the GBMI inmate at least once during the first month, more frequently if necessary.

Issued: 8/17/2018
Effective: 8/31/2018

(2)   After the first month, the counselor in conjunction with his/her supervisor and the facility Psychologist shall determine the continued frequency of counselor contacts. However, the counselor contacts shall be no less than once a month for the first year. If the inmate's behavior remains stable for that period of time (a year), the counselor and his/her supervisor will determine frequency of contact thereafter. The decision shall be documented on the **DC-14, Counselor File** and copied to the Medical Record.

(3)   Any GBMI inmate, who decompensates to the point where inpatient care is required, shall be considered for commitment to a mental health facility via the Mental Health Procedures Act and usual commitment procedures shall be followed.

## K. Dealing with a Potentially Suicidal Inmate and an Inmate who Attempts Suicide

Suicide and self-injurious acts are serious dangers in any correctional setting. Therefore, early identification, appropriate housing and monitoring, and proper treatment of a potentially self-destructive inmate is critically important, both for the individual in need of service and for the facility charged with his/her care.

1.   Assessment of Suicide Risk

Suicide potential can be evaluated by using the criteria listed below. These criteria are intended to help staff formulate a plan of prevention and treatment.

a.   Suicidal Plan

The potential for suicide is greater when there is a well-organized and detailed plan developed by the inmate. The potential also increases when the means of the suicide identified in the plan is readily available to the inmate and can be lethal.

b.   Prior Suicidal Behavior

The potential for suicide is greater if the individual has experienced one or more prior attempts of a lethal nature or has a history of repeated threats and depression. In addition, individuals involved in many episodes of self-injurious behavior (SIB) are at increased risk to complete suicide.

c.   Stress

The potential for suicide is greater if the individual is subject to stress from increased pressures such as, but not limited to:

(1)   difficulties in coping with legal problems;

(2)   the loss of a loved one through death or divorce;

2-30

(3)   the loss of valued employment (high paying position in Correctional Industries [CI]);

(4)   anniversary of incarceration date or offense;

(5)   serious illnesses or diagnosis of terminal illness;

(6)   threats or perceived threats from peers;

(7)   sexual victimization, particularly after the first submission;

(8)   placement in RHU/Special Management Unit (SMU);

(9)   unexpected punishment (misconducts or additional sentence or parole denial);

(10)  cell restriction;

(11)  recent transfer from another state or county facility;

(12)  recently returned to prison due to a parole violation;

(13)  any movement to and from Level 5 Housing Unit (watch closely for several hours);

(14)  long sentence coupled with poor external supports (family or volunteers) and/or minimal involvement in facility supports (education, treatment, activities, and employment);

(15)  somatic complaints of a vague nature that do not respond to treatment;

(16)  history of violence toward others;

(17)  low IQ;

(18)  requesting protective custody;

(19)  deemed to be a "high profile" case;

(20)  long sentence, including life;

(21)  history of alcohol and/or drug abuse; and/or

(22)  transition periods within a correctional institution (i.e. release from a POC, placement into an RHU, removal from general population).

Issued: 8/17/2018
Effective: 8/31/2018

d. Prior Suicidal Behavior of Significant Other

The potential for suicide is greater if a parent, spouse, or other close relative has attempted or **completed** suicide.

e. **Signs and** Symptoms

The potential for suicide is greater if the individual manifests **signs/**symptoms such as:

(1) auditory and/or visual hallucinations, particularly command hallucinations ordering the person to harm himself/herself;

(2) delusions;

(3) any change from the individual's sleep pattern (this may be manifested by either a decrease or increase in sleep);

(4) any change from the individual's ordinary eating pattern. (This may be manifested by either a decrease or an increase in the individual's appetite with an accompanied decrease or increase in weight);

(5) social withdrawal;

(6) apathy;

(7) despondency;

(8) severe feelings of hopelessness and helplessness;

(9) general attitude of physical and emotional exhaustion;

(10) agitation through such symptoms as tension, guilt, shame, poor impulse control or feelings of rage, anger, hostility, or revenge;

(11) giving away personal property;

(12) removal of every visitor from the visiting list;

(13) changing next of kin notifications;

(14) expressions of death or finality (i.e. "it will all be better tomorrow" or "the world is better off without me");

(15) frequent engagements in self-injurious behaviors and/or serious suicide attempts;

Issued: 8/17/2018
Effective: 8/31/2018

(16)   sudden elevated mood ("everything's OK attitude"); and/or

(17)   psychic or somatic anxiety.

f.   Personal Resources

The potential for suicide is greater if the person has no family or friends, or his/her family and friends are unwilling to help. Potential is greater if a significant other evidences a defensive, rejecting, punishing attitude, or denies that the individual needs help.

g.   Acute vs. Chronic Aspects

The potential for suicide is greater when there is a sudden onset of specific symptoms. An individual who has recently learned that he/she has a serious disorder is at greater risk than a person who has been coping with the problem for years. The acute risk is higher if the person appears anxious.

h.   Medical Status

The potential for suicide is greater when there is a chronic, debilitating illness, especially when it involves an alteration of body image or life style.

i.   A person considering suicide does not demonstrate all of these signals. Generally, the more characteristics the individual has, the greater the potential for self-destruction. Every suicide attempt, including gestures, shall be taken seriously.

2.  Screening/Assessment

a.   Every contact employee will receive training in suicide prevention in accordance with Department policy **5.1.1, "Staff Development and Training."** If a staff member observes suicidal behavior, the Unit Manager shall be notified, and a referral shall be made to the LPM/designee. In the absence of the Unit Manager, the staff person shall contact the Shift Commander. The Unit Manager or Shift Commander shall immediately contact the LPM/designee and brief him/her on the situation.

b.   The LPM/designee shall assess the inmate's suicidal potential in the most appropriate location depending on the inmate's level of agitation and security needs (inmate's cell, psychologist's office, or observation area).

c.   A suicidal inmate shall **be under continuous observation.**[25]

d.   Based on the screening, a referral to the psychiatrist/PCRNP for further evaluation and treatment may be necessary. If the psychiatrist/PCRNP determines the inmate is

---

[25] 4-4257

Issued: 8/17/2018
Effective: 8/31/2018

a danger to self and/or others, he/she shall order a watch. The watch may only be reduced or terminated by a physician or psychiatrist/PCRNP.[26]

e.  In the absence of the psychiatrist/PCRNP, and with the authorization of the senior ranking official in the facility, the LPM/designee, or the Nurse Supervisor can order that the inmate be moved to the POC to be placed on constant watch.[27] Procedures for monitoring the watches in the POC are described in **Subsection K.3. below**.

f.  Every inmate placed in Level 5 Housing Units shall be assessed on the **DC-510, Suicide Risk Indicators Checklist (refer to Section 1 of this procedures manual)**. The checklist shall also be used for every returned parole violator.[28] Every inmate placed in a Level 5 housing unit shall also be provided with the "Living Through It" brochure.

(1)  The ranking Corrections Officer present in the unit shall ensure that the checklist is completed immediately when an inmate is brought to the Level 5 Housing Unit/Intake Unit.

(2)  The escorting officer shall note any special physical/behavioral characteristics (crying, poor hygiene, and cuts and/or bruises); he/she shall be asked:[29]

(a)  why the inmate is being brought to the Level 5 Housing Unit/Intake Unit;

(b)  if the inmate is expressing suicidal thoughts/making threats to harm himself/herself;

(c)  whether the inmate shows signs of depression (crying, withdrawn, passive);

(d)  is the inmate acting/talking in a strange manner (hearing/seeing things that aren't there?);

(e)  whether the inmate appears to be under the influence of drugs/alcohol;

(f)  whether there is any information that the inmate may be self-destructive; and

(g)  whether the inmate is requesting protective custody.

(3)  The inmate shall be asked:

---

[26] 4-4257
[27] 4-4257
[28] 4-4347
[29] 4-4373

Issued: 8/17/2018
Effective: 8/31/2018

    (a)    whether he/she has experienced a recent family change (i.e. death of child/spouse/parent or "Dear John letter");

    (b)    if there has been a recent legal status change (i.e. parole violation or new detainer);

    (c)    if this is his/her first placement in Level 5 Housing (if applicable);

    (d)    if he/she has any special problems or needs the staff shall be made aware;

    (e)    whether he/she has been assaulted (physically or sexually) by another inmate; and/or

    (f)    if he/she is on any psychotropic medication.

(4)    Staff shall note whether the inmate:

    (a)    shows anger, hostility, and threats;

    (b)    appears anxious, afraid (pacing, wringing hands);

    (c)    displays signs of self-neglect or abuse (i.e. poor hygiene or cuts); and/or

    (d)    states that he/she is taking psychiatric medication.

(5)    If any of the items in **Subsection K.2.f. above** are present the Unit Officer shall immediately phone the following staff:

    (a)    between 8:00 AM and 4:30 PM, nursing and LPM or MHC. A psychologist will immediately visit the unit to review the checklist, assess the inmate, and discuss the case with unit staff prior to the inmate being placed in cell. The time and results of the assessment will be recorded in the "Clinical Staff Action" section including a plan; or

    (b)    after hours, or on weekends, the Shift Commander shall notify nursing staff and nursing staff shall immediately review the checklist, assess the inmate, and discuss the case with unit staff prior to inmate being placed in cell. The time and results of the assessment will be recorded in the "Clinical Staff Action" section. Psychology staff will review the checklist, assess the inmate, and discuss the case with unit staff upon the next available working day.

(6)    Even if no items are present the nurse and/or psychologist will assess the inmate within 24 hours and note the date, time, and the results of the assessment in the "Clinical Staff Action" section. The completed form will remain in the **ICAR** until reviewed by PRC.

Issued: 8/17/2018
Effective: 8/31/2018

    (7)   Any time an inmate appears in immediate danger of harming himself/herself or someone else, the unit staff shall contact the Shift Commander, nursing staff, and LPM or MHC to request an immediate assessment.

3.  Levels of Observation and Housing in POCs, Infirmary Settings, and Other Areas

    a.  This subsection addresses observation and housing in all areas, except for MHUs. For MHUs, the administrative and clinical staff of the MHU have governing authority and provide watches and all other operational requirements over inmates committed to the MHU. All watches will occur in accordance with Department policy **DC-ADM 008, "Prison Rape Elimination Act (PREA)."**

    b.  Each facility shall provide an observation area to monitor suicidal inmates. Such an area requires well lit, adequately ventilated and heated cells that allow for quiet and necessary communication with appropriate treatment and custody staff. The area shall be as nearly suicide-proof as possible, without protrusions of any kind that would enable the inmate to hang himself/herself. Observations shall be conducted in infirmary areas or other areas. At a facility without an infirmary, the POCs shall be located close to the medical area to allow for frequent observation and rapid response.

    c.  ***If a RHU or DTU cell is temporarily utilized as a POC for a psychiatric admission, it must be a camera cell. Additionally, if an RHU or DTU cell is temporarily utilized as a POC, it is mandatory that all provisions of implementing all safeguards, levels of watch, documentation, and operational procedures as directed by Subsection K.3. above and Section 3 of this procedures manual, as well as other policies directing other disciplines' operations for this setting are followed. It is imperative that all disciplines and members of multidisciplinary teams, including security, are informed of the individual's needs and the expectations of this temporary housing placement***.

    d.  Staff safety is a critical consideration in deciding where to conduct the observation. Custody and supervisory staff shall not enter a cell until sufficient staff are available to handle the inmate.

    e.  An individual placed in these settings shall be provided with basic items needed for personal hygiene, as well as items such as eyeglasses, writing materials, and reading materials consistent with his/her custody level. If mental health staff judges there is imminent danger that an inmate will destroy an item or use it to induce self-injury, the inmate may be deprived of the item; however, every effort shall be made to provide a substitute for the item or allow the inmate to use the item under the supervision staff. Watches and precautions should not be punitive. For example, except in extreme circumstances where contraindicated due to active suicidality or otherwise, inmates should be permitted reading materials without staples, mattresses, etc.

    f.  The different levels of observation require different types of restrictions. In every case, the least restrictive measures shall be determined by the psychiatrist/PCRNP,

LPM/designee, and the senior ranking official (in consultation with the facility nursing supervisor or charge nurse) based on the inmate's security needs. However, every inmate shall initially be evaluated for constant watch. If the inmate is behind a locked door, the observing staff shall be able to open the cell door immediately.[30]

g. The levels of observation are described below. Post orders for the observation shall specify the officer's duties in providing for custody and control and the treatment staff responsibility in providing clinical services.[31]

   (1)   Constant Watch[32]

   Constant watch is the most restrictive watch and requires constant visual contact with recording of observations on an irregular schedule that does not develop a pattern but occurs at
   least once every ten minutes for a total of at least seven entries per hour.[33] The **DC-483, Psychiatric Observation Monitoring Form** shall not be made out in advance with times entered in advance i.e. 0810, 0820, 0830, 840, and 0850. All personal clothing shall be removed from the inmate and an anti-suicide smock and blanket shall be provided.[34] The psychiatrist/PCRNP will determine what items are permitted in the cell based on security needs and the inmate's current behavior. Any items not permitted need an explanation on the **DC-447, Psychiatric Observation Cell Orders**. *Psychiatry provider shall assess if* a mental health commitment *is necessary and shall provide recommendations and document accordingly* as soon as possible.

   An officer shall be assigned to provide constant watch. ***The assigned officers are scheduled to rotate every two hours. The officer is required to have visual contact of the inmate at all times. This may also be accomplished if the inmate is located in a camera cell and has full view of the inmate at all times. If the camera is covered, then the necessary actions must take place in order to remove the objects covering the camera. If this is not possible, then the officer shall be assigned to the cell door and must have full view of the inmate at all times. If the inmate is continuously covering the view into the cell, all necessary actions need to take place in removing the objects that are being used to cover the view of the inmate, this does not require orders from Psychiatry. This must be documented in the DC-483. Any planned use of force shall be documented in accordance with Department policy 6.3.1, "Facility Security."***

   If more than one inmate is on constant watch at the same time, they may be placed in adjacent POCs so that one officer may watch more than one

---

[30] 4-4191
[31] 4-4257
[32] 4-4257
[33] 4-4373
[34] 4-4416

Issued: 8/17/2018
Effective: 8/31/2018

inmate. Constant watch may not be assigned to one officer who cannot observe both inmates simultaneously.

(2)   Close Watch[35]

This is less restrictive than constant watch; however, there is still potential danger for self-injurious behavior. Visual checks shall be made in such a fashion that the inmate is not aware of a pattern developing, but at least once in every ten-minute period for a total of seven entries per hour. ***The assigned officers are scheduled to rotate every two hours***. The type of clothing and cell items permitted is based on the clinical judgment of the psychiatric provider based on the inmate's security needs and current behavior. [36] Any items not permitted require an explanation on the **DC-447**. A log is kept of the visual checks, and a record is maintained for the approved clothing and related items employing the **DC-483**.

(3)   Regular Watch

This is the least restrictive level of observation and is usually the last step prior to release from observation. Visual checks shall be made in such a fashion that the inmate is not aware of a pattern developing, but at least within a 30-minute period ***(random – three entries in an hour)***. This level of observation does not require the assignment of a dedicated officer. Periodic checks are to be made by the officer regularly assigned to the area. A log is kept of the visual checks, and a record is maintained for the approved clothing and related items employing the **DC-483**.

(4)   A Recovery Plan shall be designed by the PRT with goals to reduce the level of observation as soon as possible and eventually discharge the inmate from the observation area to a follow-up plan. Double celling should be considered, particularly for inmates under regular or close watch. PRT entries shall be made on the **DC-472** and in the psychiatric section of the Medical Record.

4.   Governing Authority over the Watches

a.   A psychiatrist/PCRNP shall order an admission to the POC and specify the type of suicide watch and any items permitted in the cell (i.e. clothing, reading materials, etc.). However, in an emergency, the Facility Manager/designee and/or Shift Commander, LPM/designee, or Nurse Supervisor/Charge Nurse can order an admission. The psychiatrist/PCRNP or physician shall order discharges from the watch and Infirmary.

b.   Administration and clinical staff of the MHU govern operation of a watch in the MHU.

---

[35] 4-4373

[36] 4-4416

c. Confinement outside of the infirmary area is governed by Department policies **DC-ADM 801, "Inmate Discipline"** and **DC-ADM 802, "Administrative Custody Procedures."** Each inmate shall be allowed privileges and personal property, encouraged to exercise, and provided personal property consistent with his/her level of custody and within the guidelines established by Department policy.

    (1) Every inmate placed on suicide observation, both inside and outside the infirmary, shall be given written notice of the reasons for Administrative Custody using a **DC-141, Part 1, Other Report Form**. For an inmate placed in observation outside of the infirmary, a hearing is scheduled according to the provisions of Department policy **DC-ADM 802**.

    (2) An inmate placed in observation status outside the infirmary shall be given a review whereby he/she is presented with the reasons for AC and given the opportunity to discuss the situation with PRC.

    (3) The PRC controls the level of observation outside of the infirmary area and based on the recommendations made by members of the PRT. Privileges are recommended by the mental health staff and authorized by the PRC.

d. Each facility shall develop local procedures to ensure close collaboration between the health care, treatment, and custody departments, and compliance with the National Commission Correctional Health Care (NCCHC) and American Correctional Association (ACA) standards, DHS regulations for MHUs/FTCs, and Department policies and directives.

5. Use of Psychiatric Restraints[37]

    Psychiatric restraints shall be used to protect a mentally disabled inmate from harming himself/herself or others in accordance with Department policy **6.3.1, Section 32** and **Section 33**.

6. Mental Health Commitment

    If the inmate remains a high suicidal risk, the facility mental health staff shall initiate a mental health commitment to a licensed inpatient facility using established local procedures for processing the necessary commitment.

a. Emergency Involuntary (302) Commitments may be initiated to one of the MHUs in the Department or to the FTC at SCI Waymart.

b. Long Term Involuntary (304) Commitments may be initiated to the FTC at Waymart, or to a DHS Forensic State Hospital if the inmate is a female. Although the FTC and Forensic State Hospital are the preferred sites for long-term commitments, 304s may also be conducted in the MHUs.

---

[37] 4-4191

Issued: 8/17/2018
Effective: 8/31/2018

   c.  Voluntary (201) Commitments may be placed in a Department MHU, or in the FTC at SCI Waymart.

7.  Discharge of an Inmate from a POC

   a.  The staff shall be aware of the increased risk of suicide for an inmate released from a POC and shall be conservative in discharging him/her.

   b.  If the inmate who has been housed in an infirmary observation cell is returning to general population, the following precautions shall be ensured by the discharging authority:

     (1)  the inmate shall be closely monitored by staff;

     (2)  Psychology staff will interview the inmate in the POC on the day of discharge. Additionally, the inmate will be interviewed by Psychology on the day of discharge on the unit they are discharged to, the following day, and as clinically indicated until PRT convenes (i.e. within seven days);

     (3)  arrangements shall be made to discuss the case with staff assigned to the unit to which he/she shall be released;

     (4)  PRT develops an aftercare plan for the inmate; and

     (5)  the inmate will be scheduled for PRT within seven days of discharge.

   c.  Release of an inmate from POC to housing units that are not general population *(RHU, SRTU, SMU, DTU, etc.)*:

     (1)  PRT will create an aftercare plan, to include an updated **Change of Status IRP**. Arrangements should be made to discuss the aftercare plan with staff on the housing unit receiving the inmate;

     (2)  placement of the inmate in a cell within close observation of Corrections Officers;

     (3)  15-minute close observation and/or continuous video monitoring is initiated and maintained;

     (4)  the Psychology staff, in conjunction with the inmate's counselor, shall maintain daily contact with the inmate and review the corrections staff logs, incident reports, and any classification materials;

     (5)  ***the inmate shall be scheduled for a psychiatry appointment as per the recommendations indicated in the POC discharge progress note***; and

Issued: 8/17/2018
Effective: 8/31/2018

(6)   the inmate shall be scheduled to be reviewed by PRT within seven days of discharge. PRT shall continue to review the inmate until the team determines that close observation is no longer needed. PRT will also review roster status upon discharge and assess for credible evidence of functional impairment.

8.   Treatment Planning and Responsibilities

   a.   PRT

   The PRT members shall meet within three working days of the inmate's placement in observation to discuss present and future interventions. The PRT shall develop an aftercare plan based on the inmate's therapeutic needs. The PRT shall monitor the inmate's progress for at least 30 days after his/her release from observation. Monitoring may be extended, based on the inmate's risk level, if determined by team members.

   b.   Continuity of Care[38]

   An aftercare plan is developed by the PRT based on the inmate's therapeutic and custodial needs. Recommendations for RTU placement (if one is available in the facility), monitoring via the regular facility tracking system, and/or weekly counselor or psychologist contacts are possible components of a plan. The PRT monitors the inmate's progress for at least 30 days after his/her release from observation. Monitoring may be extended, based on the inmate's risk level, if determined by team members.

   c.   Unit Psychologist and Counselor/DATS

   Based upon the recommendation of the PRT, both the Unit Psychologist and counselor/DATS, as part of the PRT, shall visit the inmate daily while he/she is on a constant or close watch. Afterward, follow-up is determined by the PRT.

   d.   Psychiatrist/PCRNP

   These visits are determined by the psychiatrist/PCRNP's availability during a one-week period. If the inmate is on constant or close watch, the treating psychiatrist/PCRNP shall visit the inmate every day he/she is in the facility.

   e.   Physician

   The facility physician shall visit the inmate daily.

---

[38] 4-4347

Issued: 8/17/2018
Effective: 8/31/2018

f.  Licensed Psychologist Manager (LPM)

The LPM/designee shall arrange for timely mental status examinations and monitor the daily adjustment of every inmate in the observation area. The LPM shall chair the PRT meetings and ensure that recommendations are provided to the PRC when the inmate is released from the POC.

g.  Unit Manager

The Unit Manager shall provide information regarding the inmate's current situation, and assist in the implementation of the aftercare plan after the inmate's release from observation.

h.  Nursing Staff

The nursing staff shall open a psychiatric inpatient record upon admission. The registered nurse shall be the contact person for the psychiatrist/PCRNP. Nursing staff shall visit each inmate in a POC every two hours in accordance with Department policy **13.2.1**

i.  Training Coordinator

The Training Coordinator shall ensure that all contact staff receive training in suicide prevention, in accordance with Department policy **5.1.1**. The training sessions shall be team-taught by a member of the treatment staff and a custody staff member.

## L.  Suicide Prevention Committee

1.  The Suicide Prevention Committee at each facility is a multi-disciplinary, multi-level committee with a designated chairperson who is expected to remain current on research and scholarship about correctional suicide prevention. The composition of this committee is the same as the clinical review team referenced in Department policy **13.1.1, "Management and Administration of Health Care," Section 9** although the Facility Manager/designee has the discretion in adding members as deemed clinically and professionally necessary. This committee meets monthly and reviews completed suicides, serious suicide attempts and recommends changes for the future. The purpose of the Suicide Prevention Committee is to review ACA standards pertaining to suicide prevention and evaluate local facility processes and procedures as they relate to suicide prevention with the intent of improving and developing best practices. Additionally, each month the Suicide Prevention Committee will review the most recent and available Central Office Special Needs Psychiatric Review Team (COSNPRT) packet for the specific purpose of completing all outstanding **DC-516, Evaluation of Inmate Self-Injury** and clinical reviews. A specific plan of action will be included in the Suicide Prevention Committee meeting minutes to resolve the outstanding **DC-516s** and clinical reviews identified by COSNPRT. Furthermore, operational recommendations regarding systemic and institutional suicide prevention should be considered and proposed from the data provided by COSNPRT. A copy of the most recent and available COSNPRT

packet will be provided for all Suicide Prevention Committee members at the time of this meeting or earlier, if possible, for planning purposes.

2. Examples of what this committee should review shall include, but not be limited to the following:

   a. ACA standards in regard to all contact staff receiving annual refresher training in suicide prevention also in concert with Department policy **5.1.1**;

   b. the process by which all inmates received at the facility receive a suicide prevention orientation within 30 days of their reception at the facility;

   c. methods for distributing the "Living Through It" brochure;

   d. POC procedures;

   e. developing and updating a video to be aired on the inmate dedicated channel introducing mental health staff and services offered by Psychology;

   f. developing wallet or pocket cards for dealing with inmates suffering from mental illness or intellectual disability and potentially suicidal inmates;

   g. ensuring proper submission and review of all **DC-516s**;

   h. quarterly suicide drills for response time from medical, custody, and other appropriate staff, which are to be submitted to the institutional Critical Incident Manager to ensure that the Critical Incident Stress Management (CISM) Team is activated afterward; and

   i. ***post POC PRTs that are required to occur***.

## M. Mental Health Services Review Committee (MHSRC)

The Mental Health Services Review Committee (MHSRC) at each facility shall annually review this procedures manual and make recommendations for changes or improvements believed to be helpful. Recommendations for changes or additions to the procedures manual shall be submitted to the Chief of Psychiatry, Chief of Psychological Services, and the respective Regional LPM for review and coordination. In addition, the MHSRC shall review the facility's written procedures for screening, treating, tracking, and follow-up of inmates in need of mental health services and recommend changes and updating as necessary. All staff participating in the MHSRC (i.e. to include all Psychology staff members) shall sign a training roster reflecting that they have received training on this procedures manual. The MHSRC report is due the month preceding the SCI's annual audit month.

Issued: 8/17/2018
Effective: 8/31/2018



| BULLETIN |
| Commonwealth of Pennsylvania • Department of Corrections |

| Policy Subject: | | |
| **Access to Mental Health Care Procedures Manual**<br>**Section 3 – Delivery of Psychiatric Services** | | |
| Policy Number: | | |
| **13.08.01, Section 03-01** | | |
| Original Issue Date: | | |
| **August 17, 2018** | | |
| Date of Issue:<br><br>**December 10, 2018** | Authority:<br><br>**Signature on File**<br><br>**John E. Wetzel** | Effective Date:<br><br>**December 17, 2018** |

The purpose of this bulletin is to revise **Section 3 – Delivery of Psychiatric Services** of Department policy **13.8.1, "Access to Mental Health Care Procedures Manual."** Changes below are noted in bold and italics.

**Subsection D. Guidelines for Psychiatric Observation Cells (POC) 4.j.** shall now read:

j.   complete an on-site or via Tele psychiatry (where feasible*)* evaluation within two hours after the application of any psychiatric restraints in the POC (psychiatrist only). ***During times of extreme weather conditions, it is expected that the psychiatrist shall communicate with site, complete the assessment over the phone, and complete the documentation in Sapphire accordingly. The psychiatrist will assess the patient face to face as soon as the extreme conditions abate and it is safe to drive to the site.***

**Section 3 – Delivery of Psychiatric Services**

**A. Documentation of Psychiatry Services**

This section establishes procedures for the delivery of psychiatric services. All psychiatric reports, assessments (practitioner/nursing), exams, progress notes, etc. shall be filed under the psychiatric divider in the inmate medical record.

1. **DC-472C, Outpatient Psychiatry Progress Notes (Attachment 3-A)**

   a. A **DC-472C** shall **only** be used by a psychiatrist or **Psychiatry** Certified Registered Nurse Practitioner (PCRNP) to document **psychiatric** patient care **provided at all locations within the Department of Corrections (DOC). Psychiatry providers at a Mental Health Unit (MHU)/Forensic Treatment Center (FTC) shall utilize DC-472E, Inpatient Progress Note**. The Subjective Objective Assessment Plan (SOAP) format includes:

      (1) military time and date;

      (2) S (Subjective) – The inmate's described interval (since last visit) and current psychiatric and medical symptoms, pertinent interval history, pertinent pharmacology or medication concerns, etc;

      (3) O (Objective/Observations) – The clinician's mental status examination (MSE), Abnormal Involuntary Movement Scale (AIMS) score, other test or observation results (including cognitive screening examinations), and significant laboratory test results which the work up and/or treatment will be based upon. Additional components of an MSE can be described in the line spaces provided. Behaviors observed by other staff and reported to the clinician can be described here;

      (4) A (Assessment) – Diagnosis/rationale – need for treatments, medications/medication adjustments/change in medications/**medication compliance**; and

      (5) P (Plan) – The clinician's treatment plan, including a diagnostic component and a therapeutic component, could include:

         (a) psychotropic medications (new or modify pre-existing) with rationales;

         (b) laboratory test including blood levels, electrocardiogram (EKG), X-Rays, etc.;

         (c) **referrals to other disciplines such as Medical and Psychology** (psychotherapy, psycho education, etc.);

         (d) request/review of medical records from outside sources;

   (e)   administrative/security concerns to be addressed;

   (f)   Program Review Team (PRT) *regarding changes to C and D* Roster *status*;

   (g)   next appointment (routine and/or brief follow-up); and

   (h)   statement of discussion with the inmate.

b.  All outpatient psychiatry progress notes shall be signed by the psychiatric provider, above a block stamp of the name and professional degree-certifications.

2.  Psychiatric Reports/Examinations

a.  The following are examples of psychiatric examinations:

   (1)   psychiatric *assessments*;

   (2)    *second opinions*;

   (3)   commutation;

   (4)   pardon;

   (5)   guilty but mentally ill (GBMI);

   (6)   specialized housing units; and

   (7)    other reports as requested.

b.  Each report shall be dictated and signed. The exam evaluation shall cover:

   (1)   demographic information;

   (2)   current psychiatry history;

   (3)   past psychiatric history;

   (4)   substance abuse/dependence history;

   (5)   current psychotropic medications and compliance;

   (6)   mental status examination;

   (7)   diagnostic impression;

   (8)   recommendations including ongoing and routine treatment; and

Issued: 8/17/2018
Effective: 8/31/2018

(9)   any other relevant information.

3.  Informed Consent for Psychotropic Medication

  a.  The **DC-452D, Informed Consent for Psychotropic Medication (Attachment 3-B)** shall be completed by a psychiatrist/PCRNP when a new medication is ordered. The purpose of the form is to ensure the inmate is aware of possible side effects, and verbalizes an understanding of the medications. A Spanish version of the **DC-452D** is available **(Attachment 3-C)**.

  b.  The inmate shall be *asked* to document whether he/she wants, or does not want, to take the medication.

  c.  Upon form completion, the inmate shall be *asked* to date/time and sign the document.

  d.  When an inmate refuses to sign the form, the psychiatrist/PCRNP shall document the inmate refusal on the **DC-452D**. If the inmate needs the medication, and wants to continue taking it, refusing to sign the form does not mean the medication shall be stopped; this shall be documented in the progress notes.

  e.  The psychiatrist/PCRNP shall be required to date/time and sign the form. ***Patient facilitator can complete this form during the Telepsychiatry session. Telepsychiatry provider shall document the medication consent process accordingly in the progress note***.

## B. Provisions of Psychiatric Services by a PCRNP

1.  Terms of Practice

  a.  A PCRNP is subject to the terms of agreement for credentialing and privileging established by the Bureau of Health Care Services (BHCS) (refer to Department policy **13.1.1, "Management and Administration of Health Care Services," Section 1**) and the contract services provider providing psychiatric services. The individual PCRNP's practice is also subject to the terms specified in the Collaborative Agreement for Prescriptive Authority ("Collaborative Agreement") between a collaborating psychiatrist and the PCRNP, as stipulated by the Pennsylvania State Board of Nursing.

  b.  The Collaborative Agreement is signed by the PCRNP, the collaborating psychiatrist, and a substitute psychiatrist who can provide collaboration for up to 30 days if the collaborating psychiatrist is unavailable. The collaborating psychiatrist may designate another psychiatrist to be contacted in urgent situations where he/she and the substitute psychiatrist are both not immediately available. The Collaborative Agreement also describes the PCRNP's ability to prescribe psychotropic medications and limitations in prescribing controlled substances. A copy of the signed Collaborative Agreement shall be kept on file at the contract service provider's regional office and by the Correctional Health Care Administrator (CHCA) at the

Issued: 8/17/2018
Effective: 8/31/2018

PCRNP's facility of clinical practice. More than one Collaborative Agreement may be necessary, if the PCRNP practices at two or more facilities with different psychiatrist(s). At a minimum, the PCRNP and his/her collaborating psychiatrist/substitute psychiatrist shall meet, or talk by telephone, *at a minimum once a month and, if needed,* weekly to discuss cases, *prescription practices*, or other *clinical* practice issues. *Any changes in clinical care, plan, or treatment because of the collaboration discussion shall be documented in patient's record by the PCRNP*.

2. Scope of Psychiatric Practice

   a. The scope of PCRNP practice is the same as that for a contract service provider psychiatrist working in the Department, except for the following limitations in accordance with Commonwealth statutes:

      (1) may not provide the required first or second psychiatric opinion in cases where the involuntary administration of psychotropic medication is being considered, in accordance with **Subsection E.2.g. below**;

      (2) may not assume the role of examining physician for the purposes of any voluntary or involuntary mental health commitment, in accordance with **Section 2** of this procedures manual;

      (3) may not be assigned as, or assume the role of, a Clinical Director of an MHU or of a Psychiatric Director of a unit in the FTC of the State Correctional Institution (SCI) Waymart;

      (4) may not order the initiation, renewal/continuation, reduction, or discontinuation of psychiatric restraints for an inmate; and

      (5) shall prescribe controlled substances in accordance with Pennsylvania Code:

          (a) schedule I: cannot prescribe;

          (b) schedule II: 30 day maximum prescription order;

          (c) schedule III and IV: 90 day maximum prescription order; and

          (d) schedule V: cannot prescribe, as these are not part of the Collaborative Agreement.

   b. Can function as the sole outpatient psychiatric provider at a facility.

   c. May provide psychiatric services at all Department facilities, including:

      (1) any of the outpatient housing units;

(2)   Diagnostic and Classification Centers (DCCs);

(3)   admission to, and discharge from, a Psychiatric Observation Cell (POC);

(4)   admission assessments, discharge, and routine care of patients in the FTC *(inpatient) including psychiatric restraints with the approval from the Department of Human Services (DHS)*; and

(5)   after hours on call for a facility, as contracted by the contract services provider.

## C. Psychiatric Therapeutic Restraints

1.   Psychiatric therapeutic restraints are designed to control acute, or episodic, aggressive behaviors of inmates, only when less restrictive measures and techniques have proven to be less effective.

2.   Therapeutic restraints shall only be used when an inmate is acting in a manner as to be a clear and present danger to himself, to other inmates, or employees due to psychiatric, or organic medical, causes or conditions.

3.   Psychiatric therapeutic restraints shall be used in accordance with Department policy **6.3.1, "Facility Security," Section 33**.[1]

## D. Guidelines for Psychiatric Observation Cells (POC)

1.   General Procedures

   a.   The Registered Nurse Supervisor/designee shall notify the Shift Commander of every POC admission and discharge.

   b.   Every inmate placed in a POC shall be within sight or sound observation of the medical and/or operations staff at all times. A facility with an infirmary shall locate the POC close to the medical area *where feasible*.

   c.   *If a Restricted Housing Unit (RHU) or Diversionary Treatment Unit (DTU) cell is temporarily utilized as a POC for a psychiatric admission, it must be a camera cell and the individual must initially be placed on a constant watch unless the psychiatry provider decides to change it based on his/her assessment. This initial constant watch will remain in place until a face-to-face assessment is completed by the psychiatric provider. Additionally, if an RHU or DTU cell is temporarily utilized as a POC, it is mandatory that all provisions of implementing all safeguards, levels of watch, documentation, and operational procedures as directed by this Section and Section 2, Subsection K.3. of this procedures manual, as well as other policies directing other disciplines' operations for this setting are followed. It is imperative that all disciplines and*

---

[1] 4-4405

Issued: 8/17/2018
Effective: 8/31/2018

*members of multidisciplinary teams, including security, are informed of the individual's needs and the expectations of this temporary housing placement.*

d. The Department discourages *prolonged psychiatric admission/stay in POC*, unless the inmate is *being provided/receiving appropriate treatment,* steadily improving, and/*or* awaiting discharge to an appropriate housing unit, MHU, or FTC.

e. In accordance with Department policy **6.3.1**, a **DC-141, Part 1, Other Report,** must be prepared by the facility staff witnessing the event; completed reports shall be submitted to the Shift Commander. The Shift Commander/designee shall distribute copies of the **DC-141** to the Program Review Committee (PRC), Facility Manager, psychiatrist, PCRNPs, Mental Health Coordinator (MHC), Control, CHCA, Unit Manager, counselor and/or Drug and Alcohol Treatment Specialist (DATS), and Inmate Records.

f. An inmate shall only be discharged from a POC upon being assessed face-to-face *or via Telepsychiatry* by the psychiatrist/PCRNP with a documented *DC-472C and* **DC-474A, POC Discharge Summary Form (Attachment 3-D)**, and only upon a written order by the psychiatrist/PCRNP. Verbal or telephone orders for discharge are not acceptable.

g. The Registered Nurse Supervisor/designee shall ensure that the PRC is notified of planned POC discharges so that PRC may arrange for appropriate housing.

2. Notification of Facility Psychiatrist/PCRNP or MHC for Psychiatric Emergencies by Facility Staff

a. During regular working hours, the MHC/*Registered Nurse (RN)/*designee shall call the facility psychiatrist/PCRNP. The psychiatrist/PCRNP shall evaluate the inmate for a POC admission. If a psychiatric emergency exists, *psychiatry provider shall* instruct the nursing staff to admit the inmate to a POC *for psychiatric reasons*. The psychiatrist/PCRNP shall complete a **DC-447, Psychiatric Observation Cell Order (Attachment 3-E)** *and document the reasons/findings in the DC-472C*.

(1) *If a psychiatric emergency exists and a psychiatric provider orders a POC admission, but all current POCs at the current facility are currently occupied or otherwise unavailable, collaboration of members of PRT and PRC must consider the following:*

(a) *whether any of the current patients in the POC can be moved to a less restrictive setting with provisions of safeguards and watches, as appropriate, and ordered and supported by the psychiatric provider;*

(b) *if the above is not possible, an RHU or DTU cell may be temporarily utilized as a POC for a psychiatric admission. This cell must be a camera cell and the individual must initially be placed on a constant watch unless the psychiatry provider decides to change the watch*

3-6

based on his/her assessment. This initial constant watch will remain in place until a face-to-face assessment is completed by the psychiatric provider. Additionally, if an RHU or DTU cell is temporarily utilized as a POC, it is mandatory that all provisions of implementing all safeguards, levels of watch, documentation, and operational procedures as directed by this Section and Section 2, Subsection K.3. of this procedures manual, as well as other policies directing other disciplines' operations for this setting are followed. It is imperative that all disciplines and members of multidisciplinary teams, including security, are informed of the individual's needs and the expectations of this temporary housing placement; and

 (c) *transfers to another facility for this purpose are strongly discouraged.*

(2) *If a psychiatric admission to POC is not warranted, MHC/RN/designee shall inform the Captain/Shift Commander of the clinical decision. The psychiatry provider shall document the findings in the DC-472C with plan and recommendations.*

 (a) *If concern still exists regarding keeping the inmate safe from himself or herself that is not due to psychiatric etiology (e.g., the inmate expresses/making threatening suicidal gestures or inflicts self-harm, but the psychiatric provider has deemed the ideations or actions to not be the result of psychiatric impairment), collaboration between members of PRT and PRC should consider alternative housing in a DTU or RHU, with provisions of implementing enhanced security measures and restrictions (e.g. Intermediate Restraint System, Restraint Chair, etc.) as appropriate and outlined in Department policies 6.3.1 and 6.5.1, "Administration of Security Level 5 Housing Units," to provide a housing setting commensurate with the individual's current needs. Once an alternative location at the current facility has been identified, it is imperative that all disciplines and members of multidisciplinary teams, including security, are informed of the individual's needs and the expectations of this placement.*

 (b) *Unit psychology staff/counselor/designee shall provide support, assess for suicidality, and monitor the inmate regularly until it is no longer deemed necessary during working days.*

 (c) *Unit Certified Peer Specialist (CPS) shall also provide peer support daily as needed.*

 (d) *The inmate will be scheduled for follow-up with psychiatry within one to three days, if deemed necessary.*

b. During non-regular working hours, the Shift Commander may ***bring the*** inmate into a POC. The Registered Nurse Supervisor/designee shall evaluate the inmate using a

Issued: 8/17/2018
Effective: 8/31/2018

**DC-586NN, Nursing Evaluation Tool: General Psychiatric Concern** and contact the on-call psychiatrist/PCRNP to report the inmate's condition and behavior.

(1) If a psychiatric emergency exists, the psychiatrist/PCRNP shall order a POC admission **for psychiatric reasons**, which shall include the level of observation required and the items permitted to be in his or her possession; the nurse receiving the verbal/telephone orders shall initiate/complete a **DC-447**, and other **documentations** as outlined **in this procedures manual**.

(2) *If a psychiatric emergency exists and a psychiatric provider orders a POC admission, but all current POCs at the current facility are currently occupied or otherwise unavailable, members of PRC and/or Shift Commander must consider the following:*

    (a) *utilizing an RHU or DTU cell temporarily as a POC for a psychiatric admission. This cell must be a camera cell and the individual must initially be placed on a constant watch unless the psychiatry provider decides to change the watch based on his/her assessment. This initial constant watch will remain in place until a face-to-face assessment is completed by the psychiatric provider. Additionally, if an RHU or DTU cell is temporarily utilized as a POC, it is mandatory that all provisions of implementing all safeguards, levels of watch, documentation, and operational procedures as directed by this Section and Section 2, Subsection K.3. of this procedures manual, as well as other policies directing other disciplines' operations for this setting are followed. It is imperative that all disciplines and members of multidisciplinary teams, including security, are informed of the individual's needs and the expectations of this temporary housing placement; and*

    (b) *transfers to another facility for this purpose are strongly discouraged.*

(3) *If a psychiatric admission to POC is not warranted (after the review by the psychiatry provider), nurse/designee shall inform the Captain/Shift Commander of the clinical decision.*

    (a) *If concern still exists regarding keeping the inmate safe from himself or herself that is not due to psychiatric etiology (e.g. the inmate expresses/making threatening suicidal gestures or inflicts self-harm, but the psychiatric provider has deemed the ideations or actions to not be the result of psychiatric impairment), collaboration between members of PRC and/or Shift Commander should consider alternative housing in a DTU or RHU, with provisions of implementing enhanced security measures and restrictions (e.g. Intermediate Restraint System, Restraint Chair, etc.) as appropriate and outlined in Department policies 6.3.1 and 6.5.1 to provide a housing setting commensurate with the individual's current needs. Once an alternative location at the current facility has been identified, it is*

Issued: 8/17/2018
Effective: 8/31/2018

               **imperative that all disciplines and members of multidisciplinary teams, including security, are informed of the individual's needs and the expectations of this placement.**

    (b)   **Unit psychology staff/counselor/designee shall follow-up the next working day.**

    (c)   **Unit CPS shall also provide peer support daily as needed.**

    (d)   **The inmate will be scheduled for follow-up with psychiatry within one to three working days.**

3. Nurses shall be required to perform/ensure the following.

   a. The RN shall perform an initial nursing assessment; and document the findings in a progress note. The note must include:

     (1)   chief complaint;

     (2)   vital signs;

     (3)   reason for admission (to include admission date and time);

     (4)   nursing assessment; and

     (5)   plan of care.[2]

   b. The RN shall contact the psychiatric practitioner to report the inmate's condition, and to obtain physician orders; if receiving verbal orders, initiate the **DC-447 *and a copy of DC-447 shall be provided to the officer in charge of POC to follow through all the restrictions as ordered by the psychiatry provider. Any changes to these restrictions requires a new DC-447, and the RN shall communicate with the officer in charge of the changes by providing a copy of the new DC-447.***

   c. Initiate and maintain the **Inpatient Area Admission/Discharge Log** (see Department policy **13.2.1, "Access to Health Care," Section 7**) which shall be used daily for updating the automated infirmary tracking log.

   d. Initiate and maintain the inpatient medical record in accordance with Department policy **13.1.1, "Management and Administration of Health Care," Section 10**.

   e. The RN shall initiate a **DC-478, Inpatient Unit Nursing Care Plan** (see Department policy **13.2.1, Section 7**). The **DC-478** shall include active psychiatric or medical

---

[2] 4-4350

Issued: 8/17/2018
Effective: 8/31/2018

**13.8.1, Access to Mental Health Procedures Manual**
*Section 3 – Delivery of Psychiatric Services*

problems, interventions, and expected outcomes. The **DC-478** shall be updated according to change of patient status.[3]

f.  Ensure the outpatient record is available in the inpatient unit nurse's station.

g.  Inform the Corrections Officer regarding the level of watch for the inmate, and the items permitted to be in his or her possession.

h.  Transcribe and initial all verbal and written practitioner orders. The practitioner must sign-off on all verbal orders within two hours on regular working days, and within 72 hours/next working day during off hour, weekends, and holidays.

i.  Verbal orders for medications shall be entered in the electronic Medication Administration Record (e-MAR).

j.  Procedures for psychiatric therapeutic restraints shall be followed in accordance with Department policy **6.3.1, Section 33**.

k.  The RN shall observe *inmate behaviors, interact with the inmate to assess the stability, and provide therapeutic support at least every two hours during the shift,* and document (using the SOAP [IER] format) *the findings, observations, and* behaviors in the inpatient progress notes, at a minimum of *twice* (every *four* hours) *per shift*, unless otherwise ordered by the psychiatric/medical practitioner.

l.  The RN shall report significant changes in the inmate's behavior or mental status to the psychiatric *provider*.

m.  Give a verbal and written shift-to-shift report to the incoming infirmary nurse. The Inpatient Daily Shift to Shift Report must be completed by each infirmary nurse at the end of each shift.

4.  The facility psychiatrist/PCRNP shall accomplish the following duties related to the POC:

a.  *psychiatrist/PCRNP shall assess the inmate for the need of POC admission and document all clinical findings with respect to the need for the POC admission in the progress note, along with recommendations in relation to his/her treatment while the inmate is in the POC, and also complete the DC-447;*

b.  *POC admitted inmates shall be assessed daily during working hours on regular working days. Document the assessed clinical findings/progress/ recommendations in the progress note;*

c.  *when appropriate, the psychiatric provider or psychology staff member may request an out-of-cell contact for those individuals psychiatrically admitted to the POC;*

---

[3] 4-4350

Issued: 8/17/2018
Effective: 8/31/2018

d. *team review of the restrictions must be done on a daily basis on working days, same shall be documented and if any changes to the restrictions are considered, a new DC-447 shall be completed with all the new restrictions or lesser restrictions. This form must be completed in its entirety at all times;*

e. *all POC discharge decisions shall be made during the team review. The MHC/RN/designee shall inform PRC of POC discharges;*

f. *where feasible, Telepsychiatry may be utilized for POC admits/rounds/ discharges, 302 commitments, and psychiatric restraints assessments;*

g. enter medication orders in the ***Electronic Health Record (EHR)*** eMAR;

h. ***review and*** co-sign every verbal psychiatric order given to nursing staff upon admission within two hours on regular working days. ***All on-call psychiatry provider's verbal orders shall be signed off by the same provider within 12 hours after reviewing the DC-447 completed by the RN in the EHR***;

i. complete the **DC-474A** within ***24*** hours of discharge ***or by the end of the next working day with follow-up recommendations.***[4] ***All patients who are being discharged from POC shall be referred to PRT; and***

j. complete an on-site ***or via Telepsychiatry (where feasible)*** evaluation within two hours after the application of any psychiatric restraints in the POC (psychiatrist only).[5]

5. The Facility Physician shall be required to ensure the following.

   a. Review the annual or bi-annual physical examination.

   b. Perform an initial examination including:

      (1)   review of the medical problem list;

      (2)   review of the medical record including recent progress notes and orders;

      (3)   physical examination focused on current and newly developed medical problems, such as recent trauma and abnormal findings listed on the **DC-440, Physical Examination Form**;

      (4)   assessment with updated medical problem list; and

      (5)   medical treatment plan and orders to address current problems.[6]

---

[4] 4-4413
[5] 4-4405
[6] 4-4350

Issued: 8/17/2018
Effective: 8/31/2018

c.  Examine the inmate daily.

d.  Document daily in the progress notes via the SOAP format.

e.  Call the emergency on-call psychiatrist/PCRNP to obtain treatment recommendations regarding difficult to manage clinical cases. This may include recommendations for commitment to an MHU.

6.  The psychologist shall be required to ensure the following:

a.  Provide counseling and support during regular working hours (Monday – Friday). The psychology staff shall evaluate the inmate Monday – Friday with the psychiatric provider.

b.  Update the Individual Recovery Plan (IRP) addressing behavior warranting POC admission on the day of admission, or as soon as normal institution operations permit.[7]

c.  Verbally communicate concerns about the inmate's condition to the nursing staff and inmate's counselor and/or DATS.

d.  Document results of daily contacts in the progress notes.

e.  Assign each inmate placed in a POC to the PRT list for discussion at the first PRT meeting after the POC admission date.

f.  Facilitate, through the MHC, referrals and mental health commitments to MHUs or the FTC.[8]

g.  Complete the following monitoring when an inmate transfers from the POC to general population or a Residential Treatment Unit (RTU):

(1)  the inmate shall be seen in the POC on the discharge day, or when normal institution operations permit;

(2)  the inmate shall be seen on the housing block, or when normal institution operations permit;

(3)  the inmate shall be seen the day after discharge from the POC; and

(4)  the inmate shall be seen as clinically indicated until the PRT convenes. PRT shall meet within seven days of the discharge.

---

[7] 4-4350
[8] 4-4374

Issued: 8/17/2018
Effective: 8/31/2018

7. The Shift Commander shall be required to ensure the following.

   a. During non-working hours, order the POC placement and contact the Registered Nurse Supervisor/designee to evaluate the inmate.

   b. Ensure Correctional Officers are documenting observation of behavior, as ordered.

8. The Correctional Officer assigned to the POC shall.

   a. Document observation of behavior on the **DC-483, Psychiatric Observation Monitoring Form (Attachment 3-F)** as ordered by the physician. For constant and close watches, ***as defined in Section 2, Subsection K.3. of this procedures manual. All*** recording of observations is made on an irregular schedule that does not develop a pattern, but occurs at least once every ten minutes, for a total of at least seven entries per hour. The **DC-483** shall not be completed with times entered in advance e.g. 0800, 0810, 0820, 0830, and 0840. Upon completion, the **DC-483** shall be forwarded to the medical records department to be placed in the inpatient record.

   b. Notify the nursing staff immediately of any unusual behavior.

   c. CPSs can be used to provide support during watches conducted by Correctional Officers; the Correctional Officer must always be present during these watches.[9] Under no circumstances do CPSs replace staff; they increase supportive services. CPS supervisors should be aware, and explore any issues in regard to providing services in POCs during monthly supervision contacts. If issues arise requiring supervision sooner than the monthly interval, they shall occur.

   d. The supervisors of the CPSs, due to the sensitive nature of these assignments, will take considerable care in ensuring CPSs are mature, reliable, have credibility with both staff and inmates, are able to protect the suicidal inmate's privacy from other inmates, and can perform duties with minimal need for supervision.

   e. Each CPS will receive a job orientation, and sign the **Inmate Job Orientation Form** (see Department policy **DC-ADM 816, "Inmate Compensation," Section 1**) maintained by the CPS supervisor that such occurred. This orientation, and ongoing training, will cover:

      (1) location of suicide watch area (POCs);

      (2) summoning of staff;

      (3) recognizing behavioral signs of stress or agitation;

      (4) two hours of on-the-job training; and

---

[9] 4-4393

Issued: 8/17/2018
Effective: 8/31/2018

(5)   guidance on refraining from counseling or advising the inmate on watch.

f.   ***CPS supervisor will ensure all CPSs receive suicide prevention training. If this training is needed, CPS supervisor will coordinate the training.***

## E.   Involuntary Administration of Psychotropic Medications[10]

1.   Guidelines

Involuntary administration of psychotropic medication shall be given to an inmate only if:

a.   The inmate suffers from a mental disorder and/or an organic, mental, or emotional impairment that has a substantial adverse impairment on the inmate's cognitive/volitional function.

b.   The inmate is an imminent threat of danger to self or others.

c.   The inmate is either currently:

(1)   under an involuntary commitment in an MHU or the FTC;

(2)   under a voluntary commitment in an MHU or the FTC, but an involuntary commitment will now be initiated; and/***or***

(3)   is housed in a POC or infirmary, and **shall be assessed for** an involuntary commitment **by a psychiatrist and if needed, it** will now be initiated.

2.   Procedures for Treating Acutely Mentally Ill and Unstable Inmates

a.   An inmate showing signs of significant, impairing mental disorganization, including significant inability to care for self, and/or who possess a danger of hurting himself/herself or others, shall be immediately placed in a POC by security staff.

b.   The inmate shall be assessed for danger of physical harm to himself/herself or others by POC security staff, and nursing staff will be contacted.

c.   If the inmate is deemed dangerous to himself/herself or others, or cannot care for self, the Registered Nurse Supervisor/designee shall call the on-site psychiatrist/PCRNP during normal business hours. The on-site psychiatrist/PCRNP shall examine the inmate and assess the need for **POC admission or** psychotropic medication, and/or other interventions. After conducting an assessment of the inmate, the on-site psychiatrist/PCRNP shall document his/her findings in the progress notes **with recommendations**.

---

[10] 4-4401

Issued: 8/17/2018
Effective: 8/31/2018

*13.8.1, Access to Mental Health Procedures Manual*
*Section 3 – Delivery of Psychiatric Services*

d.  After normal business hours, or if there is no psychiatrist/PCRNP currently available during normal business hours, the on-call psychiatrist/PCRNP shall be contacted. The Registered Nurse Supervisor/designee shall discuss the inmate's condition with the on-call psychiatrist/PCRNP, and document this discussion, and any psychiatric recommendations and verbal orders, in the progress notes and the Physician's Order Sheet.

e.  After determining that the inmate requires psychotropic medication, the inmate shall be offered the opportunity to voluntarily accept the prescribed psychotropic medication. The inmate's response(s) shall be recorded in the progress notes and filed in the psychiatric section of the inmate's medical record.

f.  If the inmate refuses to voluntarily accept the prescribed psychotropic medication, the on-site/on-call psychiatrist/PCRNP shall be contacted for further instructions on how to treat the inmate.

g.  The on-site/on-call psychiatrist may then consider ordering the involuntary administration of psychotropic medication *for the purpose of patient's standing doses of medication treatment*; however, the facility psychiatrist must obtain a second opinion from another psychiatrist on-site or elsewhere (a PCRNP cannot provide the initial or second opinion) in order to proceed with this plan of care.

h.  If this consulting psychiatrist does not concur, then a third consulting psychiatrist's concurring opinion must be obtained, prior to ordering this medication. In these cases, it is preferable that the Psychiatry Contract Service Provider's State Medical Director provides this opinion. If disagreement continues over the need for the involuntary administration of this psychotropic medication, then the Bureau Chief of Psychiatry shall be consulted.

i.  If a final decision is made by the Chief of Psychiatry to not involuntarily administer the psychotropic medication, the medication shall not be given. The reasons for final decision will be recorded by the attending psychiatrist/PCRNP in the progress notes section of the inmate's medical record, and an alternative treatment plan shall be developed in order to stabilize and ensure the health and safety of the inmate.

j.  In the case of extreme emergency

The on-site/on-call psychiatrist determines that there is no less invasive means for preventing the inmate from causing harm to himself/herself or others, *the psychiatrist/PCRNP may order STAT psychotropic medication over patient's objection and shall assess the need for a* mental health commitment *as soon as possible*.

The *psychiatry provider (on-site or on call)* shall document the rationale and need for the involuntary administration of psychotropic medication in the *progress note*. This documentation must include the immediate threat posed to the inmate or others, all the efforts to have the inmate accept the medications voluntarily, every previous

3-15

unsuccessful treatment effort, and every emergency treatment that was needed to stabilize the dangerous behavior exhibited by the inmate.[11]

3. Process for the Administration of Involuntary Psychotropic Medication[12]

   a. Upon approval of order, the nurse shall administer the involuntary psychotropic medication with the assistance of the security staff. Every measure shall be taken to ensure the safety of the inmate and staff, including the use of restraints as deemed necessary by security staff, and with consultation, as needed, from the psychiatrist; the ordering of psychiatric restraints can only be accomplished by a psychiatrist, not security staff.

   b. After the administration of medication, vital signs shall be monitored by the RN every 30 minutes at a minimum, or until otherwise directed by the psychiatrist/PCRNP. Medication efficacy and side effects shall be monitored by the RN *and documented in the progress note*. In addition, hydration status, food intake, changes in mental status, etc. shall also be routinely assessed and documented accordingly by the RN.[13]

   c. *The RN shall contact and inform the psychiatry provider* if the medication *did not* produce the desired results *and get further recommendations with respect to the* need for further medication.[14] *The same shall be documented in the progress note.* The verbal nursing order(s) for the first dose of medication, and any subsequent doses, shall be cosigned by the *psychiatry provider* as soon as possible.

   d. The psychiatrist *(not PCRNP)* shall perform an evaluation *face-to-face or via Telepsychiatry* as necessitated by reported concerns of inadequate response to one or more doses of the medication, deterioration of the inmate's overall condition, worsening risk of harm to self or others, or at the specific request of the *site Facility Manager/Deputy/CHCA/designee at any time*.

   e. *Recommended plan* shall be documented in the *progress note* by the psychiatrist.[15]

   f. The treatment team shall begin emergency commitment procedures if indicated. The transfer to the FTC or MHU shall be completed at the earliest possible date.[16] The inmate shall be placed on the PRT roster for review at the next meeting.

   g. This PRT review shall address the following:

      (1) the reason for use of involuntary psychotropic medication;

      (2) the inmate's current status;

---

[11] 4-4401
[12] 4-4401
[13] 4-4401
[14] 4-4401
[15] 4-4350, 4-4401
[16] 4-4374, 4-4404

Issued: 8/17/2018
Effective: 8/31/2018

(3)   a review of proposed or completed commitments to an MHU or FTC; and

(4)   notification of the actions taken; all recommendations/comments must be forwarded to the Facility Manager through the CHCA and Deputy Superintendent for Centralized Services (DSCS). The CHCA shall notify the BHCS of this event in the next monthly CHCA report.

## F.  Sleep Medications

Department practice specifically prohibits the use of sleep medications, as well as other soporific medication for sleep disorder alone (in the absence of psychopathology). If the inmate does not have a documented/diagnosed sleep disorder, the following shall occur:

1.   the psychiatrist/PCRNP shall refer the inmate to psychology for the Sleep Hygiene Enhancement Program by initiating/completing a **DC-97**;

2.   sleep medications and minor tranquilizers are to be used only when other techniques, such as relaxation and support groups, have been found to be ineffective;

3.   minor tranquilizers, and sleep medications, shall only be prescribed when the need for such medication has been clearly documented by the psychiatrist/PCRNP;

4.   minor tranquilizers and sleep medications shall only be ordered for the shortest time period needed to achieve the therapeutic or diagnostic goal, and not to exceed 30 days, unless re-evaluated by a psychiatrist/PCRNP;

5.   the psychiatrist/PCRNP may renew the prescription only upon a face-to-face re-evaluation of the inmate. The psychiatrist/PCRNP shall document the rationale for continuing/renewing the prescription in the inmate's medical record; and

6.   the PRT must develop a treatment plan to address the sleep issues, and the discontinuation of the medication, as soon as therapeutically possible.

## G.  Benzodiazepines

1.   Department practice specifically prohibits the use of benzodiazepines, as well as other soporific medications.

2.   Use of benzodiazepine medication is discouraged because of the high potential for abuse through malingering and/or diversion, and because of the high potential for psychological and physiological dependence.

3.   Benzodiazepines are not to be used when there is a history of abuse, dependence on drugs or alcohol, or if the inmate has been detected to have utilized illegal drugs on a prison urinalysis drug test.

Issued: 8/17/2018
Effective: 8/31/2018

4. When the use of benzodiazepines is deemed necessary, rationale for the same shall be documented in the progress notes; it is recommended that use be in accordance with guidelines limiting continued utilization for a maximum of two months.

5. The psychiatrist/PCRNP may **renew** the prescription **if they are expiring prior to the scheduled appointment with the psychiatry provider for up to ten days, so as not to have abrupt withdrawals, and the inmate must be scheduled to have** a face-to-face re-evaluation **within seven days**. The psychiatrist/PCRNP shall document the rationale for continuing/renewing the prescription in the progress notes.

6. The PRT shall develop a treatment plan to address the issues, and the discontinuation of the medication, as soon as therapeutically possible.

7. In those instances in which benzodiazepines are being withheld, it is recommended that withdrawal is managed by a gradual reduction of the benzodiazepines, or by switching to a longer-acting cross tolerant drug with which to begin the taper. Schedules may vary from tapering by 25% every five to seven days, which may produce some symptoms that are not severe, and still mitigates against seizures to a gradual reduction over six to eight weeks. If there is mixed alcohol and benzodiazepine dependence, use of a longer acting benzodiazepine with graded reduction is recommended. If there is polydrug abuse with benzodiazepine dependence, substitution of Phenobarbital for benzodiazepines with a slow tapering is sometimes recommended.

8. In those cases where benzodiazepines are prescribed in association with other psychotropic medications and benzodiazepines are being discontinued, care shall be taken, as the psychotropic medications have the potential for lowering seizure threshold.

## H. Psychiatric Medication Monitoring

The Department provides clinical management of psychiatric illness and medication management through chronic care clinics. Medications specifically reviewed and monitored include Antipsychotics, Mood Stabilizers, and Tricyclic Antidepressants (TCA). Minimum guidelines shall be followed in order to monitor and evaluate for possible side effects of antipsychotic medications, mood stabilizers, and TCAs.

1. Antipsychotic Medication**

   a. Initial Work Up – Fasting Serum Glucose, Fasting Lipid Panel, Complete Blood Count (CBC), **Complete Metabolic Panel (CMP)**, Prolactin level*, Weight plus Body Mass Index (BMI), Blood Pressure, Electrocardiogram (EKG), Abnormal Involuntary Movement Scale (AIMS).

   b. Every Six Months – Fasting Serum Glucose, Cholesterol Panel, **CMP**, CBC, Blood Pressure, Weight plus BMI, AIMS.

   c. Every 12 Months – EKG

Issued: 8/17/2018
Effective: 8/31/2018

\*Prolactin level initially, at six month mark and 12 month mark, <u>then only if clinically indicated</u>.

\*\*Pregnancy test if applicable.

d.  Documentation

    (1)  **DC-468C, Antipsychotic Medication Flow Sheet (Attachment *3-G*)**

        (a)  A Psychiatric Provider/RN/Licensed Practical Nurse (LPN)/designee can complete the **DC-468C**. The psychiatrist/PCRNP shall review and sign the form and document any clinically significant findings in a progress note **(DC-472C** or **DC-472, Progress Notes)**.

    (2)  Practitioner orders

        (a)  Psychiatrist/PCRNP shall order required labs, EKG, AIMS, etc. and document any clinically significant findings in the progress note.

        (b)  Any labs/EKG done within 30 days of the due date are acceptable. The provider shall review the lab results/EKG. Provider shall order new labs/EKG if they are clinically indicated, and shall document the same in the progress note.

    (3)  **DC-470, Abnormal Involuntary Movement Scale (AIMS)**

        (a)  The AIMS shall be completed in accordance with Department policy **13.2.1, "Access to Health Care," Section 3.**

2.  Mood Stabilizer Medication\*

  a.  <u>Lithium:</u>

    (1)  ***CMP***, CBC with Platelets, Thyroid Stimulating Hormone (TSH) done: Initially, at three months, at six months, then every six months thereafter.

    (2)  Lithium level weekly x two at initiation or dose change, then at three months. Once stable, every six months.

  b.  <u>Depakote:</u>

    (1)  ***CMP***, CBC with Platelets: Initially, at three months, at six months, then every six months thereafter.

    (2)  Depakote level weekly x two at initiation or dose change, then at three months. Once stable, every six months.

Issued: 8/17/2018
Effective: 8/31/2018

c. Trileptal:

**CMP**, CBC with Platelets: Initially, at three months, at six months, then every six months thereafter.

d. Tegretol:

(1) **CMP**, CBC with Platelets: Initially, at three months, at six months, then every six months thereafter.

(2) Tegretol level weekly x two at initiation or dose change, then at three months. Once stable, every six months.

*Pregnancy test if applicable.

e. Documentation

(1) **DC-468B, Lithium, Depakote, Trileptal, Tegretol Flow Sheet (Attachment *3-H*)**

A Psychiatric Provider/RN/LPN/designee can complete the **DC-468B**. The Psychiatrist/PCRNP shall review and sign the form and document any clinically significant findings on a progress note.

(2) Practitioner Orders

(a) Psychiatrist/PCRNP shall order required labs and document any clinically significant findings on a progress note.

(b) Any labs done within 30 days of the due date are acceptable. The provider shall review the lab results. The provider shall order new labs if they are clinically indicated, and shall document the same in the progress note.

3. Tricyclic Antidepressants (TCA)*

a. TCA: Laboratory tests (**CMP**, and CBC), EKGs will be ordered as clinically indicated based on patient's Cardiac History (i.e. Cardio Vascular Disease, Coronary Artery Disease, history of A-fib, etc.) and/or knowledge of any adverse reactions.

*Pregnancy test if applicable.

b. Documentation

(1) Practitioner Orders

(a) Psychiatrist/PCRNP shall order required labs/EKG and document any clinically significant findings on a progress note.

Issued: 8/17/2018
Effective: 8/31/2018

    (b)    Any labs/EKG done within 30 days of the due date are acceptable. The provider shall review the lab results/EKG. The provider shall order new labs/EKG if they are clinically indicated, and shall document the same in the progress note.

4.   Other Special Labs

    Any special lab orders (Haldol levels/TCA levels/Clozaril levels etc.) shall require Mental Health Contract Statewide Psychiatric Director Approval.

3-21

## Section 4 - Temporary Transfer of Mental Health Commitments

### A. General Considerations

1. If a state correctional facility has a Mental Health Unit (MHU) located on site, then the local MHU shall be used for voluntary (201) and involuntary (302), emergency commitments, extended involuntary emergency commitment (303), and interim placement for a patient with court ordered involuntary commitment (304c) awaiting transfer for extended care at the Forensic Treatment Center (FTC) at Waymart. If the facility does not have a MHU on site, then a Department Regional MHU shall be considered first for 201, 302 applications, and 303 commitments. An inmate requiring 304 commitments shall be referred to the FTC at Waymart through the Bureau of Health Care Services (BHCS).

2. Intra-facility transfers shall apply to Voluntary Commitments (201), and Involuntary Commitments for Evaluation and Treatment (302 and 304) as established by the Mental Health Procedures Act.

3. If there is no bed available at a Department Regional MHU or alternate MHU, the inmate shall be referred to the FTC at Waymart for the 302 application and 303 commitment.

4. If a MHU bed is available, but transportation considerations are prohibitive (due to distance and/or weather), a referral to the FTC may be approved by the BHCS.

5. When the Department Regional Mental Health Unit determines that the inmate is to be discharged due to improved condition or transferred to the FTC at Waymart for extended care or a Department of Public Welfare (DPW) Forensic MHU, the MHU shall advise the mental health staff at the sending facility. The treatment staff from the two facilities shall conduct a discharge planning conference phone call, and the sending facility shall pick up the inmate within 72 hours of the date of the discharge from the MHU or in conjunction with the new admission to the FTC at Waymart or a DPW forensic unit.

6. Each state correctional facility shall develop local procedures, assigning specific duties to appropriate staff, and develope special post orders for corrections officers conducting the transports.

7. Every facility is encouraged to use Psychiatric Observation Cells (POCs) to control problem behaviors such as self-inflicted injury or uncontrolled agitation toward others. These cells can be used for two to three days to further assess suicide ideation or threats until a treatment plan can be developed such as transfer to a MHU or return to general population when stable. The use of these cells for longer than three days is discouraged, unless the purpose is to wait for a 304c hearing, which can take five to seven days.

### B. Eligibility Criteria for Intra-Facility Transfer

1. The identification, evaluation, and petition for voluntary commitment via 201 application and involuntary commitment via 302 and 304 petition shall be conducted in accordance

Case 1:18-cv-00176-CCC-KM   Document 46-2   Filed 11/18/19   Page 143 of 297

*13.8.1, Access to Mental Health Care Procedures Manual*
*Section 4 - Temporary Transfer of Mental Health Commitments*                    **Revised 8/2010**

with the Mental Health Procedures Act[1] and **Section 2, Delivery of Mental Health Services** of this procedures manual.

2. Every facility referral to be considered for transfer to a Department Regional MHU shall meet the following criteria:

   a. voluntary commitments shall have a **Voluntary Application For Mental Health Treatment Form** (refer to **Section 2, Attachment 2-F** of this procedures manual) completed by the sending unit and accepted by the receiving Department Regional MHU, as well as request for temporary transfer;

   b. 302 and 304 commitments shall have appropriate forms completed, as well as a **Request for Temporary Transfer to a Mental Health Unit (Attachment 4-A)**;

   c. the custody level of the inmate being transferred shall be suspended for the course of that inmate's time at the MHU or FTC;

   d. males shall be housed in a men's MHU and females housed in a women's MHU;

   e. the sending facility must guarantee a bed for the inmate when he/she is discharged from the Department Regional MHU or FTC;

   f. the appropriate Department temporary transfer petition shall be completed; and

   g. transportation to and from the Department Regional MHU or FTC shall be provided by the sending facility.

## C. Department MHU Commitment Process

1. At the Facility Manager's request, the facility mental health staff shall identify individuals who may be in need of inpatient psychiatric evaluation and treatment.

2. The facility Mental Health Coordinator (MHC) or designated psychology staff shall determine if the inmate meets the criteria for a mental health examination and commitment.

3. If a mental health examination and emergency involuntary commitment is deemed appropriate and the facility does not have a MHU on site, then the MHC or designated psychology staff shall pursue a placement at a Department Regional Mental Health Unit. If a male inmate meets the criteria for non-emergency involuntary commitment status, the staff shall refer the inmate to the FTC at Waymart if he is determined to be chronically mentally ill and unable to care for himself in the facility. A female inmate who meets this criteria shall be referred to the forensic units at either Mayview or Norristown State Hospitals.

---

[1] 4-4404

Case 1:18-cv-00176-CCC-KM   Document 46-2   Filed 11/18/19   Page 144 of 297

**13.8.1, Access to Mental Health Care Procedures Manual**
*Section 4 - Temporary Transfer of Mental Health Commitments*                    ***Revised 8/2010***

4.  The MHC or designated psychology staff shall contact the Department Regional MHU Director to discuss the case and obtain approval for MHU admission. The MHC or designated psychology staff shall also contact their facility CHCA or designee and provide the name and Department number of the inmate and the mental health facility to which the inmate will be transferred. The sending facility CHCA/designee shall review the medical file and contact the CHCA/designee of the designated receiving mental health facility and provide any additional medical information/status to ensure no lapse in medical treatment. The MHC shall fax a **Request for Temporary Transfer to a Mental Health Unit** to the MHU Director and the office of the Chief of Psychological Services that shall include the date of transfer. The sending facility shall telephone the Transportation Division at 717-731-7072 or email the transportation group at CR-DOC Inmate Transportation.

5.  The sending facility shall telephone the Bureau of Treatment Services (BTS), Diagnostic and Classification Coordinator, who handles transport to advise of the impending transfer and provide the information from the **Request for Temporary Transfer to a Mental Health Unit**.

6.  The facility mental health staff requesting commitment shall process the 201, 302, or 304 petition in accordance with the Mental Health Procedures Act. The preferred procedure for completing the 302 and 304c petition shall be for the physician examination sections to be completed by a psychiatrist or ***physician*** in the sending facility, not the receiving MHU or Waymart.

7.  The MHC of the sending facility shall arrange vehicle transportation for the patient to the Department Regional MHU.

8.  The MHC shall prepare the transfer package consisting of at least the following documents, which must accompany the inmate:

    a.  original 201 application, 302 or 304 petition;

    b.  complete **DC-15, Inmate Record** file;

    c.  complete medical/dental and psychiatric files;

    d.  a copy of the **DC-17, Conduct Record**; and

    e.  a copy of the **Inmate Cumulative Adjustment Record** for the past 90 days.

9.  Staff shall ensure the inmate is sent with the minimum approved inmate property required for transfer in accordance with Department policy **6.3.1, "Facility Security"** (see **Approved Inmate Property for Transfer to a Mental Health Unit, Attachment 4-B**).

10. Upon arrival at the designated MHU, the transporting officer shall deliver the inmate and records to the Department Regional MHU staff through appropriate reception channels or procedures developed by the MHU staff. The complete medical/dental and psychiatric files shall be delivered to the facility's medical records department.

## D. Department Regional MHU Responsibilities

1. The Department Regional MHU Director/designee shall immediately review any cases submitted for consideration for commitment. The Director may request any additional information he/she believes is necessary and may also request a telephone conference call with referring staff to discuss the case. The MHU Director/designee shall notify the facility CHCA/designee when such a conference is scheduled.

2. The MHU Director shall consult with the MHC to schedule the date and time for transfer and request any additional information.

3. If the patient is ready for discharge at or before the treatment limits, the Department Regional MHU or FTC shall notify the MHC of the sending facility of the impending discharge. Treatment staff from the MHU or FTC and sending facility shall conduct a discharge treatment planning conference call. The facility shall arrange to pick up the inmate within 72 hours following the discharge date. Both parties shall document the date of the conference call, the participants, and a summary of the plans that were agreed upon.

4. If an inmate needs care beyond the limits of the Regional MHU, the Regional MHU staff shall initiate a transfer to the FTC at Waymart or DPW Forensic MHU (females only). The referring facility shall be responsible for transportation of any transfer cases from the Department Regional MHU to the Forensic Psychiatric Unit at Waymart or a DPW Mental Health Unit.

5. If the Department Regional MHU is transferring the inmate to the FTC at Waymart or to a DPW Forensic MHU, the MHU staff shall follow procedures in **Section 2** of this procedures manual, including conference call, copy of 304 petition, Classification Summary, Mental Health Commitment - Medical Summary, and advising security and records office.

6. The MHU staff shall advise the Corrections Classification Program Manager (CCPM) of the receiving facility of the inmate's presence in the MHU.

## Section 5 – Residential Treatment Units (RTUs)

### A. Program Mission

1. The Residential Treatment Unit (RTU) is designed to provide structure, consistency, and support to inmates who have been diagnosed with a serious psychiatric disorder and/or a serious impairment with psychological functioning. The RTU will implement treatment strategies that rely on the Recovery Model, which is based on recovery principles that facilitate individual growth, hope, self-determination, overcoming obstacles, coping skills, and re-connection to support systems. The Recovery Model is an evidence-based practice. The RTU is intended to provide opportunities for inmates and staff to establish a therapeutic alliance which is of the utmost importance for the recovery of the RTU inmate. The ultimate goal of the RTU is to maximize functioning within the Department and to facilitate a successful community reentry for relevant inmates.

2. All "D" Roster facilities shall operate a RTU in accordance with this section. Each facility with a RTU is responsible for developing post orders, a unit operations manual, and local procedures consistent with this procedures manual. The manual, local procedures, and any revisions shall be reviewed and approved by the respective Regional Deputy Secretary. An annual review of every procedure and post order governing the RTU operation is to be conducted by unit staff and reviewed by the Facility Manager. Every revision, approval, and yearly review is to be maintained in the operations manual.

### B. Admission Criteria and Process for Transfer

1. The RTU is a unit designated for inmates with current, significant psychiatric and impaired psychological functioning. These inmates may be experiencing or may be predicted to have difficulty adapting to general population housing in the Department. Inmates currently in the RTU will not meet commitment criteria according to the Pennsylvania Mental Health Procedures Act.

   a. Only inmates on the active Mental Health Tracking Roster (Mental Health Rosters "C" and "D") are eligible for placement on the RTU. Intellectual limitations may be taken into account, but only in the case of inmates with current, significant mental health issues. Inmates who carry a stability rating of C or D and who are receiving psychiatric services may be considered for placement in the RTU even if he/she could be safely housed in general population. An inmate should not be considered for RTU placement without a current significant mental health issue(s)/diagnosis. Inmates of every age group, custody level (except custody level 5), program code, and sentence structure are eligible for RTU placement, if they are identified as "active" on the Mental Health Roster.

   **NOTE**: The ultimate goal for RTU inmates is to be housed at the most independent/least restrictive level of care. This is especially important after Individual Recovery Plan (IRP) goals have been met.

b. An inmate who may have physical limitations, sensory impairments, is elderly, or who appears vulnerable, or who has other "special" needs that may inhibit positive adjustment to general population, but who does not have any current, significant mental health issues should be housed in another appropriate area of the facility.

2. Referrals from within the facility may be made by the Unit Management Team, Medical Department, Psychology staff, Program Review Committee (PRC), or any other staff member who perceives an inmate as having adjustment difficulties due to a limitation.[1] The referral shall be made to the Psychiatric Review Team (PRT), who shall screen and evaluate the referred inmate.[2] The inmate will attend this meeting and will have input into his/her potential placement in the RTU. If he/she declines to attend that meeting, this will be documented in the IRP and an **Inmate Cumulative Adjustment Record (ICAR)** entry shall be entered. Following the evaluation, the Unit Team shall prepare a **DC-46, Vote Sheet** concerning RTU admission. The recommendation shall be forwarded for administrative staff review and action through the Corrections Classification and Program Manager (CCPM), the Deputy Superintendent for Centralized Services (DSCS), and the Deputy Superintendent for Facilities Management (DSFM). The Facility Manager must review any split votes regarding RTU program admission or rejection.

3. Facility staff who identifies an urgent need for RTU placement may request admission approval directly from the Facility Manager/designee.

4. A referral from a facility where there is no RTU (such as a Security Level 2 facility), from a facility that has an inmate whose mental health needs it cannot accommodate, or where a separation is required, may be considered. Transfer requests shall be made via the transfer petition process as outlined in Department policy **11.1.1, "Population Management."**

5. Every attempt shall be made to place any inmate who needs RTU housing into a suitable unit within 30 days of the initial evaluation.

6. In cases where an inmate has been approved for RTU placement and space is not available, the PRT shall prioritize placement in the program. The following criteria shall be used:

a. ability to function within general population;

b. alternative placement availability;

c. length of time inmate is likely to be in RTU;

d. programming offered in the RTU; and

e. objectives of the inmate's IRP.

---

[1] 4-4305
[2] 4-4399

Issued: 5/21/2018
Effective: 5/28/2018

7.  In order to generate additional RTU bed space, the PRT shall consider the following:

    a.  double-celling an inmate; or

    b.  discharge of a higher functioning inmate to alternative housing (if available, step down unit or appropriate general population housing).

8.  In those cases where an inmate is seriously disruptive within the unit, the RTU Management Team shall consider alternative but appropriate housing.[3]

## C. RTU Cell Assignment

1.  Ideally, RTU inmates are compatibly double-celled.

2.  The Unit Management Team will make every effort to facilitate a double-celling agreement between compatible RTU inmates.

3.  ***Individualized determinations shall be made to ensure the safety of each inmate. (28 C.F.R. §115.42[b])*** Inmates may be double-celled as long as there are no compatibility contraindications present including, but not limited to, age differences, disparate physical size, ***history of sexual perpetration or sexual victimization,*** Security Threat Group (STG) affiliation, security needs, PRAT scores, medical issues, geographic/regional differences, and/or a documented history of ethnic/religious violence.

4.  ***Inmates who have engaged in sexual abuse in a confinement setting shall not be doubled-celled.***

5.  Involuntary double-celling of a RTU inmate should only occur under the direct oversight and supervision of the Unit Manager.

6.  The **Involuntary Double-Celling Checklist (Attachment 5-A)** shall be used prior to double-celling a RTU inmate. Any "yes" response in the Staff Review Section stops the process, pending review by the Unit Manager.

7.  Involuntary RTU double-celling after normal working hours is prohibited except in the event of extenuating circumstances, and should only occur with the authorization of the Shift Commander.

8.  RTU inmates will only be placed in a single cell if they meet the criteria for single-cell/Z-code status as outlined in Department policy **11.2.1, "Reception and Classification."**

## D. Individual Recovery Plans (IRPs) and Psychiatric Review Team (PRT)

1.  An inmate on the Mental Health Tracking Roster requires an **Initial IRP, Parts 1-3 (Attachment 5-B)**. Within 14 days of admission, the RTU staff, in conjunction with PRT,

---

[3] 4-4399

Psychology staff, and the inmate shall complete an **Initial IRP** (if the inmate does not already have one) or a **Change of Status IRP (Attachment 5-C)**.

2. All inmates on RTUs shall have their recovery plan updated every 120 days. This shall be accomplished using the **Review-IRP (Attachment 5-D)**.

   a. IRPs should be specific to the inmate's needs and should include obtainable goals that the inmate has helped create. The IRP should be recovery-based keeping recovery principles as the focus. The inmate's input concerning his/her IRP should be taken into account by the PRT.

   b. The **IRP Guidelines (Attachment 5-E)** provide additional guidelines for writing IRPs as well as which type of IRP is appropriate for the inmate such as an Initial, Review, and/or Change of Status IRP.

   c. At SCI Muncy, the Daily Adult Interactive Learning Experience (DAILE) staff will work in conjunction with the RTU staff and the inmate to complete their IRPs. The inmate's IRP will encompass both on-unit and DAILE goals. This will ensure that treatment is cohesive between both programs and not confuse the inmate with two separate treatment plans.

3. PRT will be held on the RTU or another appropriate location. RTU inmates will be permitted and encouraged to attend PRT meetings related to their treatment. If an inmate declines to attend the PRT meeting, this shall be noted in the IRP and an entry in the **ICAR** should be noted. RTU staff and/or PRT shall review the IRP every 120 days as stated above and make appropriate revisions.

## E. Treatment Team Meetings

1. Treatment Team Meetings shall be conducted weekly if possible, bi-weekly at a minimum. Meetings shall include all disciplines of the RTU (Corrections Officer [CO], Counselor, Psychology, Unit Manager, Psychiatry, Alcohol and Other Drugs [AOD], Education, Medical, and Activities, as appropriate). Meetings shall be utilized to review IRP progress, review goals for inmates, review incentive programs, discuss inmate behavior, and evaluate inmates and recovery-oriented programming. Attendance of the Treatment Team meeting should be recorded and kept on file.

2. At SCI Muncy, DAILE staff will be included in the RTU PRT meetings. This allows opportunity for pertinent information to be shared between the two programs.

## F. Treatment Programming

1. The RTU staff offer at least 35 hours of programming per week; including two hours each day of unstructured recreational activity. Participation in religious services, employment, or educational programs can be included in the required 35 hours. However, these areas cannot account for more than ten hours and the **DC-43, Integrated Correctional Plan (ICP)** programs cannot account for more than eight hours. Remaining programs must be

equally distributed through the provision of recreation, treatment specific, community, and therapeutic support.

**NOTE**: At SCI Muncy, the DAILE program's hours can be included in the required 35 hours per week.

2. Programming shall be voluntary, but highly encouraged, with assigned inmate participation in activities that should help the inmate meet his/her goals from their IRP.

3. Programming shall be designed to stabilize and stimulate the recovery needs of the inmate with the ultimate goal, where appropriate, of re-integration into a general population housing unit.

4. An inmate in RTU housing will be permitted to participate in group activities and other programs with general population inmates.

5. The required 35 hours of RTU programming should include programs on and off the unit to meet the needs of both higher and lower functioning inmates. Programming should focus on meeting IRP objectives to include influencing inmates to have frequent opportunities for social interaction and to be actively involved with recovery oriented activities.

**NOTE**: Trained Peer Assistants and/or Certified Peer Support Specialists can be utilized to assist staff in providing support programs and activities in compliance with Department policy **7.3.1, "Inmate Reentry and Transition."** At no time will a peer assistant or a peer support specialist be responsible for supervision of the RTU inmates. Peer Assistants and/or Certified Peer Specialists may be housed on the RTU even if they are not on the "C" or "D" Roster, as long as doing so does not take a bed away from an inmate who requires that level of care.

6. A suggested menu of required and optional therapeutic groups is as follows:

   a. Group Therapy

      (1) *goals group;

      (2) *coping skills;

      (3) anger management;

      (4) self-esteem;

      (5) *medication adherence;

      (6) hygiene group;

      (7) alcohol and other drugs;

Issued: 5/21/2018
Effective: 5/28/2018

    (8)   life management skills;

    (9)   *support based groups;

  (10)  daily living skills;

  (11)  inter-personal relations;

  (12)  communication skills;

  (13)  stress management;

  (14)  healthy relationships;

  (15)  healthy living;

  (16)  human sexuality;

  (17)  relapse prevention;

  (18)  mental health THU workshop;

  (19)  **WRAP© (Wellness Recovery Action Plan)**; and

  (20)  social skills.

b.  Recreation

    (1)   aerobics;

    (2)   special exercise class;

    (3)   recreational therapy;

    (4)   art therapy;

    (5)   music therapy;

    (6)   specially designed tournaments;

    (7)   bingo;

    (8)   structured card and board games;

    (9)   yard-out activities;

  (10)  sports activities; and

Issued: 5/21/2018
Effective: 5/28/2018

    (11)   game systems (Xbox, Wii).

c.   Insight Oriented Therapeutic Groups

    (1)   dialectical behavior therapy informed groups;

    (2)   depression-anxiety groups;

    (3)   adjustment groups; and

    (4)   prison adjustment.

d.   Standardized Psycho-Educational Groups

    (1)   Start Now;

    (2)   Seeking Safety;

    (3)   Taking a Chance at Change; and

    (4)   Medlin Sex Offender Treatment.

*Required in every RTU due to the special recovery needs of the mentally ill individual. The Medication Adherence groups will be facilitated by a Psychological Services Specialist (PSS)/Psychological Services Associate (PSA), and may be co-facilitated by nursing, Psychiatry, or other appropriate staff members.

e.   The **Group Therapy Resources for RTU Inmates (Attachment 5-F)** references resources that have shown to be helpful with inmates who have participated in the DAILE program at SCI Muncy and the ***Residential Treatment Unit (RTU)*** at SCI Camp Hill. These resources should be considered for use during the required and optional group therapy sessions.

f.   WRAPs© can help reduce troubling feelings and behaviors, help individuals feel more control over their mental illness, and have the potential to improve quality of life. ***WRAPs© may be developed and used by any individual who chooses to create a WRAP©. If an individual chooses to develop a WRAP© he/she may do so; however, staff or CPSs who have completed WRAP© Seminar I may assist an individual in developing a WRAP©. WRAP© groups may be facilitated by a CPS or staff who have completed WRAP© Seminar II. WRAP© may be utilized to support any individual housed in any housing unit within the Department of Corrections.***

    (1)   Religion

        (a)   religious studies;

      (b)   regular services;

      (c)   musical group or choir; and/or

      (d)   literacy.

   (2)  Education

      (a)   Adult Basic Education (ABE);

      (b)   General Education Diploma (GED); and/or

      (c)   life skills.

   (3)  Employment

      (a)   regular facility inmate details;

      (b)   specially designed details for mentally ill inmates;

      (c)   block workers; and/or

      (d)   janitors.

7.  Programming should enlist a variety of facility staff or community volunteers who are essential in the development of appropriate programs.

8.  A schedule for RTU programming must be posted in conspicuous areas in the RTU. A copy of the **RTU Program Schedule (Attachment 5-*G*)** shall be given to each RTU inmate by his/her counselor upon admission to the unit and reviewed with the inmate prior to the initial RTU IRP (within 14 days). RTU program schedule shall be posted by the Unit Manager/designee when updates/changes are made.

## G. Milieu/Unit Atmosphere

1.  The RTU shall display posters that include motivational quotes and/or goal oriented language. Daily and/or weekly quotes are encouraged to be displayed throughout the unit. Decorative bulletin boards should be used to display inmate artwork, RTU program schedules, and the name of the selected "resident" of the week. Selecting a resident of the week has the potential to enhance motivation among the RTU inmates and can help facilitate a sense of pride. A resident of the week should be chosen using the following consideration:

   a.  an inmate who participates in unit activities;

   b.  an inmate who has demonstrated improved behavior;

Issued: 5/21/2018
Effective: 5/28/2018

c. an inmate who has achieved identified IRP goal(s); and/or

d. an inmate who is helpful to others.

2. Rewards

   a. The following are "rewards" that should be considered for the resident of the week:

     (1)  chips;

     (2)  candy;

     (3)  pretzels;

     (4)  crackers;

     (5)  popcorn; and/or

     (6)  other small snack items.

   b. The Unit Manager, in cooperation with the Business Office, will purchase a supply of the above listed items. The resident of the week will be allowed to choose any two items from that supply.

   c. Other rewards that could be considered instead of or in addition to the above items are:

     (1)  TV privileges;

     (2)  first release to meals;

     (3)  photo on the bulletin board; and/or

     (4)  other privileges as allowed by policy.

3. Community Meetings are encouraged on the RTU and should be facilitated by the Counselor, Unit Manager, and/or CO at least twice per month. Psychology staff are highly encouraged to attend. These meetings shall allow for inmate input regarding the happenings on the unit as well as to help facilitate a sense of ownership and connectedness with other inmates and staff.

4. The RTU is encouraged to have at least one "game" night a week which will provide structured opportunities for the inmate to socialize. Prizes should be considered as an option for participation/"winning" the game.

Issued: 5/21/2018
Effective: 5/28/2018

## H. Treatment Team Responsibilities

Staffing needs for each RTU shall vary based upon the unit size, physical structure, type of inmate services, etc. All staff directly assigned to the RTU will receive an annual review of their continued assignment to the unit in conjunction with their routine EPR. Re-assignment will be made based on approval through the Unit Manager, the staff member's supervisor, and appropriate chain of command. The Unit Manager, Psychologist, Counselor, and COs shall have designated and trained staff to cover the unit in their absence to the greatest extent possible.

1. Unit Manager

   The Unit Manager is responsible for supervision of all Unit Management members of the Treatment Team, as well as the delivery of security and program services for the RTU. The Unit Manager shall work in conjunction with other supervisors/Department Heads in providing staff and services for the unit. If space does not permit a permanent office on the unit, the Unit Manager shall attend PRT unit meetings and visit the unit on a daily basis (Monday through Friday). Unit visits will consist of meaningful interaction with staff and residents during activity/programs and through the use of cell tours, office hours, etc., with a minimum of three hours spent on the unit daily.

2. Counselor

   The Counselor will perform case management duties to the RTU inmates, as assigned by the RTU Unit Manager. Such duties may include (but are not limited to) attending Commissary meetings, co-facilitating therapeutic groups, individual inmate contacts, and supervising inmate out-of-cell time. The Counselor shall manage the casework duties for every inmate assigned to the unit. He/she shall complete every necessary report, staffing, assist in the development of IRPs, and provide individual and group counseling. If space does not permit a permanent office on the unit, Counselors shall attend every unit meeting and visit the unit on a daily basis (Monday through Friday).

3. Corrections Officers (CO)

   A CO must be selected to work in the RTU by a committee consisting of at least the Unit Manager, Major, Shift Commander, and/or Zone Lieutenant. Licensed Psychologist Manager (LPM) involvement in this decision is highly encouraged. The committee shall select officers who have demonstrated ongoing interest in and effective management skills working with mentally ill inmates. COs shall be assigned to the unit on a regular basis to foster investment in the program, as well as to maintain continuity of care. When possible, regular alternate COs should be selected to replace primary COs during off days, vacation, or illness. The alternate can also be used to replace the primary CO when he/she is rotated or otherwise leaves the unit. Due to required training and specialized selection process, assignment to this unit will not utilize a bid post process.

   a. The CO staffing complement for the RTU should be in accordance with the facility's staffing survey.

Issued: 5/21/2018
Effective: 5/28/2018

b. COs shall make three security patrols per hour on the RTU.

4. Psychology Services Specialist/Associate (PSS/PSA)

A member of the Psychology staff shall be responsible for providing ongoing monitoring, individual and group therapy, developing IRPs with the inmates, as well as required assessments and reports. If space does not permit a permanent office on the unit, the PSS shall attend PRT, unit meetings, and visit the unit on a daily basis (Monday through Friday). Unit visits will consist of meaningful interaction with staff and residents during activity/programs and through the use of cell tours, office hours, etc. with a minimum of one hour spent on the unit daily participating in these services; this hour does not include programs/workshops facilitated on the unit. Psychology staff is required to provide a total of 20 hours of Mental Health services on the RTU a week per 75 RTU inmates.

5. Licensed Psychologist Manager (LPM)

The LPM will not be dedicated solely to the RTU but he/she will also supervise and administer psychological services in other areas of the facility. The LPM will provide administrative and clinical supervision of all Psychology staff, including Psychology staff in the RTU. The LPM will also provide clinical oversight and guidance to the entire RTU team and should consult with the RTU Unit Manager on a regular basis.

6. Psychiatry Staff

The Psychiatrist/Psychiatric Certified Registered Nurse Practitioner (PCRNP) will meet with RTU inmates as often as deemed clinically necessary, but no less than once every 90 days. The Psychiatrist/PCRNP will also attend the PRT meetings held on the unit. The Psychiatrist/PCRNP will consult with the RTU staff on an as-needed and emergency basis and will attend RTU Treatment Team meetings as possible.

7. Medical Staff

Nursing or other medical staff assigned to the unit shall monitor the medical needs of the inmates on the unit, medication compliance, assist with psychiatric referrals, and provide health and hygiene education where staffing levels permit. Medications may be delivered by Nursing/Medical staff to the RTU and will be administered on that unit according to policy. RTU inmates may also participate in going to the infirmary for medication. Each facility will decide which method of delivery works better.

8. Centralized Services Staff

Staff from other departments may be assigned to the unit to provide specific services. When possible, services shall be provided by the same persons to foster investment in the program and maintain continuity of care. When possible, services should be provided on the unit. The remaining list (**Subsections H.9.-13. below**) of service providers is not mandatory nor is it all-inclusive.

5-11

9. Activities Staff

   Corrections activities staff shall provide structured recreational programming, plan and facilitate special events, and coordinate the scheduling of space, supplies, and equipment. Requests for funding for supplies and equipment may be submitted to the Inmate General Welfare Fund (IGWF) through the Activities Department. Activities should be available to RTU inmates on the RTU. If RTU inmates are participating in a recreational activity in another area of the facility, they should be able to do so at a time that other inmates are not permitted in that area (e.g., RTU only gym time).

10. Education Staff

    Education programs shall be developed in accordance with the needs of each inmate being serviced in the unit.

11. Alcohol and Other Drugs (AOD) Specialists

    AOD staff, in conjunction with Psychology staff, shall develop and implement programs for dually diagnosed individuals and others with alcohol and other drug problems.

12. Contracted Services

    A facility which has specific services provided by contracted vendors shall review the agreements and in conjunction with the director of the service, provide services for each inmate in need. Services such as art, music, recreational or occupational therapy may be obtained using the inmate IGWF as the funding source in accordance with Department policy **3.1.1, "Fiscal Administration."**

    **NOTE**: At SCI Muncy, MHM Correctional Services currently operates the DAILE program. This program will be available for the majority of the RTU inmates. However, for those that do not attend, they will be encouraged to participate in the on-unit programming as outlined in the RTU policy. The RTU Team and DAILE Team will work together to determine which inmates will benefit from the DAILE program or the on-unit RTU programming.

13. Volunteer/Student Interns

    When possible and appropriate, community volunteers or groups shall be used to provide support services. Facilities with student intern programs may assign students from appropriate fields of work in the unit.

**I.  Medications**

For inmates housed in the RTU, medications shall be either delivered to the unit or an independent medication line movement shall be established. Medication compliance shall be monitored in accordance with Department policy **13.2.1, "Access to Health Care," Section 12.**

## J. Razors

RTU inmates are permitted to retain issued razors, razor blades, and mirrors in their cell. Unit Officers shall thoroughly inspect each razor upon an inmate's admission to the unit to ensure the item has not been altered. The RTU staff member conducting the inventory of the inmate's property will ensure the inmate only has one razor in his/her possession. RTU staff require PRT approval to restrict razor possession or shaving privileges of any RTU inmate. Restriction of shaving privileges or razor possession shall only occur when legitimate security, psychiatric, or other concerns exist. Examples of concerns include, but are not limited to, assaulting/threatening other with razor, inflicting/threatening self-injurious behavior with razor, or any physical modification to a razor. In the event an inmate is placed on razor restriction, this will constitute a status change. Accordingly, the inmate's IRP will be updated to address this status change and to outline the specific goals, objectives, and time frame necessary for razor restriction removal. RTU staff require PRT approval to remove any RTU PRT's decision to approve the removal of any RTU inmate from razor restriction is contingent on the inmate's performance with his/her updated IRP.

## K. Staff Training and Development

Each contact staff member shall receive Crisis Intervention Training (CIT), Mental Health First Aid (MHFA), and Suicide Prevention in accordance with Department policy **5.1.1, "Staff Development and Training."** In addition, all RTU staff shall receive training on recovery model concepts, behavior modification, conflict intervention, and managing the intellectually impaired, etc. Newly assigned staff shall receive RTU Training within six months of their assignment to that unit. When this is not feasible, staff will be scheduled as soon as possible to meet with the Unit Manager and LPM. This meeting will provide a RTU briefing based on the approved RTU training material. RTU staff will also be scheduled to attend CIT prior to or soon after their assignment to that unit.

## L. Behavioral Adjustment Cell (BAC)

The Behavioral Adjustment Cell (BAC) is an option when an inmate is experiencing behavioral decomposition that could potentially lead to the issuing of a misconduct. In this case the BAC is used as a behavioral management tool. The BAC is an option when the inmate is becoming disruptive due to inappropriate language and/or non-compliance, etc. The BAC is not appropriate for inmates who are threatening to harm themselves or others. The BAC is viewed as a therapeutic intervention. The goal of the BAC is to facilitate the positive adjustment of the inmate. Placement in a BAC must be made by the Unit Team and/or Shift Commander on off hours. The decision to use a BAC will be a Unit Team decision. The BAC shall be located in close proximity to the officer's station. Ideally, two cells near the officer's station should be reserved for use as BAC cells.

1. The BAC should be considered by the Unit Team after all recovery oriented and established behavioral modification interventions have been exhausted.

2. The Unit Team will use the **BAC Tracking Sheet (Attachment 5-*H*)** to outline the behaviors for BAC placement. The **BAC Tracking Sheet** will document initial time of

placement and anticipated release, permitted in-cell contents, if regular inmate movement is permitted, goals for BAC discharge, and involved Unit Team members. Note that the time of anticipated release can change at the Unit Teams discretion but cannot exceed 48 hours.

3. COs should make three security patrols per hour of the BAC. Documentation of this observation should be made in the Housing Unit Log Book.

4. Inmates who are placed in the BAC shall be re-evaluated by the Unit Team/Shift Commander every 24 hours and as indicated below.

5. There should be clearly defined goals for behavioral improvement prior to discharging an inmate from a BAC. These goals should be immediately documented on the **Change of Status IRP** upon placement and included on the **BAC Tracking Sheet**. The Unit Team shall make an effort to work collaboratively with the inmate in the establishment of these goals and to encourage the inmate to achieve his/her recovery goals.

6. The PSS assigned to the RTU shall be contacted immediately upon inmate placement in the BAC during normal business hours. If an inmate is placed in the BAC outside of normal business hours, nursing staff shall be contacted immediately for an initial assessment. If the nursing staff (during off hours) makes initial contact, he/she will assess the inmate and determine if the BAC is appropriate and/or if the Psychiatric Observation Cell (POC) is warranted. The PSS should also be available for PRN contact with the inmate during his/her placement in the BAC.

7. If the PSS/designee makes initial contact with the inmate housed in the BAC, he/she will help the inmate to identify the origins of the problematic behavior and to encourage the inmate to achieve his/her recovery goals. The PSS shall also determine if the BAC is appropriate and/or if the POC is warranted. The PSS should also be available for PRN contact with the inmate during their placement in the BAC.

8. If no behavioral improvement is noted while the inmate is housed in the BAC, the Unit Team and/or Shift Commander will reassess placement. Confinement in the BAC should not exceed 48 hours.

9. If the inmate significantly decompensates in the BAC at any time, the Unit Team/Shift Commander will reassess the inmate's behavioral state and make alternate recommendations, which may include POC placement or Mental Health Unit (MHU) referral.

## M. Discharge and Transfer Procedures

1. An inmate shall be considered for discharge by the RTU Management Team when he/she no longer needs the security, structure, and/or programming provided by the unit. This process is also to be used when alternate housing may be appropriate for a seriously disruptive inmate or for an inmate who refuses to participate in stipulated IRP

activity, programs, and taking prescribed medication. Removal will be made only when it does not endanger his/her welfare and stability.

2. Prior to discharging an inmate from the RTU, the PRT will meet to consider such discharge. The PRT will be held on the RTU and the inmate will be offered the opportunity to attend that meeting and give his/her input and feedback related to potential discharge from the unit. If he/she declines to attend that meeting or provide input that will be documented in the IRP and an **ICAR** entry shall be made.

   **NOTE**: At SCI Muncy, the DAILE program staff will participate in the development of the discharge summary and process to include recommendations for continued care. Inmates may continue to participate in the DAILE program even though they are discharged from the RTU.

3. The recommendation for discharge of the inmate to general population or to other housing shall be done via **DC-46** by the RTU Management Team. Included in the body of the **DC-46** shall be a discharge summary that documents the inmate's progress, reasons for discharge and recommendations for follow-up monitoring, future programming and continuing care. The **DC-46** shall be sent, at a minimum, through the CCPM and DSFM for final action. The Facility Manager/designee must review every split vote.

   **NOTE**: In those cases where the inmate is to be returned to another facility, a transfer petition shall be submitted in accordance with Department policy **11.1.1**. Inmates on the active Mental Health/Intellectual Disability (MH/ID) Roster ("C" or "D" Roster) must have an IRP attached to the petition.

Issued: 5/21/2018
Effective: 5/28/2018

Case 1:18-cv-00176-CCC-KM   Document 46-2   Filed 11/18/19   Page 161 of 297

*13.8.1, Access to Mental Health Care Procedures Manual*
*Section 6 – Post Traumatic Stress Disorder Treatment Program*                    ***Revised 8/2010***

## Section 6 – Post Traumatic Stress Disorder Treatment Program

The Post Traumatic Stress Disorder (PTSD) Treatment program is for inmates who are combat veterans.

This section describes an abbreviated version of the earlier treatment program and is being retained in the policy to provide counseling and psychology staff members with general guidelines to conduct treatment with the inmate if sufficient resources are available in his/her facility. If not available, it may be necessary to initiate a transfer petition to another facility.

Although the PTSD program was developed for a combat veteran of the Viet Nam War, it is likely that components of the model may be relevant for an inmate combat veteran of other military conflicts.

### A.  Awareness and Education Phase

The PTSD victim tends to be guarded, suspicious, and non-trusting of authority figures. Therefore, preplanning, structure, and communication are essential elements to the presentation and implementation of the program.

1.  An inmate veteran who is interested in participating in the program shall be advised of the documents he/she needs to obtain in order to validate his/her combat service and to be evaluated for admission to the program.

2.  An interested inmate veteran shall also complete the **DC-553, Military Veterans Scale (Attachment 6-A)** and the **DC-552, Military Experience Scale (Attachment 6-B)** at this meeting. The original of these forms shall be filed in the inmate's medical record and a copy shall be filed in the **DC-14, Inmate Cumulative Adjustment Record**.

3.  Staff may choose to hold three or four "decision group" sessions with an interested inmate veteran to give him/her an opportunity to learn what the program is like and for treatment staff to get to know and evaluate him/her before proceeding with diagnostic evaluations.

### B.  Evaluation

The evaluation phase shall be conducted to select candidates for the PTSD program.

1.  Before being accepted for evaluation, the inmate veteran shall obtain and present documentation that he/she served in combat or a similar stressful position. The primary verification document shall be the Department of Defense form **DD-214, Report of Separation from Active Duty**. Staff shall provide the inmate with addresses of Veterans Administration (VA) Offices to request appropriate application forms. If the inmate has already been evaluated by the VA, other agencies, or individuals for PTSD or other similarly related disability claims, copies of the release of information for said reports shall be secured.

Case 1:18-cv-00176-CCC-KM   Document 46-2   Filed 11/18/19   Page 162 of 297

*13.8.1, Access to Mental Health Care Procedures Manual*
*Section 6 – Post Traumatic Stress Disorder Treatment Program*        *Revised 8/2010*

2.  The PTSD treatment staff member shall conduct the intake interview. The in-depth interview shall develop a personal history including the veteran inmate's social, educational, criminal justice, vocational, and military experiences. A thorough background history prior to his/her military experience and prior to offense is essential to establish behavioral and personality characteristics and changes in line with criteria described in the DSM-IV.

3.  The psychologist shall administer and interpret the Minnesota Multiphasic Personality Inventory (MMPI-2) or the Personality Assessment Inventory (PAI). If the inmate's reading level prohibits the use of the MMPI-2 or the PAI, an alternative battery of at least two projective techniques may be employed. A report shall be prepared that presents the standard scores and a narrative summary.

4.  The licensed psychologist or psychiatrist/***Certified Registered Nurse Practitioner – Psychiatric Services(PCRNP)*** shall make a diagnosis of PTSD based upon the criteria in the DSM-IV.

5.  The PTSD treatment staff shall develop an Individual Treatment Plan (ITP), which shall be reviewed every 120 days. The ITP shall be filed in the **DC-14** if the inmate is not placed on the Mental Health/Mental Retardation (MH/MR) Roster. If the inmate is placed on the MH/MR Roster, the plan shall be filed in the psychiatric section of the medical record with a copy placed in the **DC-14**.

## C. Treatment Program

1.  Group Counseling

    Group counseling shall be the primary treatment approach. The group may be led by an individual staff member or by co-leaders, if sufficient personnel are available. Emphasis shall be placed upon understanding the military experience, as well as related personal adjustment problems. Guidance shall be given to bring out feelings and develop emotional awareness. Attempts of the inmate to skirt the main issues and/or discuss prison concerns/complaints shall be kept to a minimum.

2.  Group Size and Frequency

    Groups shall be run on a variable schedule as needed and as staff resources permit, but generally shall run for one to one and one-half hours, three times a week. Group size shall generally be limited to five to 10 participants.

3.  Individual Counseling

    In rare cases, an inmate veteran may be assigned to individual counseling in conjunction with or instead of group counseling when needed. The program staff, at the time of initial evaluation, shall determine the inmate veteran who is in need of individual counseling. The staff member providing individual counseling shall determine the number of the counseling sessions based on the client's needs and resources available.

Case 1:18-cv-00176-CCC-KM   Document 46-2   Filed 11/18/19   Page 163 of 297

**13.8.1, Access to Mental Health Care Procedures Manual**
**Section 6 – Post Traumatic Stress Disorder Treatment Program**          **Revised 8/2010**

4. Personal Journal

   Each inmate shall be required to maintain a personal, daily journal and/or complete readings of materials recommended by the program staff, counselor, and VA consultants. The personal journal shall be a confidential document to be used in the treatment process with the treatment staff, in group and individual counseling, and in peer interactions when deemed appropriate. The journal shall include, but not be limited to, the inmate's daily interactions, feelings, attitudes, and reflections. The journal shall not become a part of the inmate file.

5. Veterans Administration Services

   Whenever possible, the treatment staff shall encourage VA representatives to provide services to each inmate veteran. VA representatives may be willing to visit the facilities to conduct groups and provide other supportive services.

6. Ancillary Services

   In the evaluation phase and treatment plan development, the staff shall address ancillary services needs. Such areas as Alcoholics Anonymous/Narcotics Anonymous groups, drug/alcohol counseling, educational/vocational, and leisure time needs shall be considered. Consultation with, and participation of, staff from the Veterans Outreach Centers shall be encouraged.

7. Confidentiality

   It is likely that program staff shall enter into a relationship with the inmate in which the client shares personal, sometimes sensitive, information. The position of the Department is consistent with the "Code of Ethics" for the treatment profession.

   (1) The confidential nature of the relationship between the inmate and the staff member is respected in most situations. However, when information is revealed to the staff person, which indicates clear and imminent danger to the inmate, other individuals, the security of the facility, or to society, the staff person is legally and ethically obligated to disclose such information to appropriate officials or supervisors.

   (2) The staff person shall enter the relationship with the client by indicating the limits of confidentiality. It is suggested that the conditions be stated during the treatment plan development phase and in initial group settings.

   (3) Each inmate shall be required to sign the **DC-484, Mental Health Informed Consent Form.**

   (4) Individual progress notes shall be documented on the **DC-14**.

**D. Training**

It shall be the responsibility of the Department to provide, when resources permit, training to selected PTSD program staff. The training shall include the recognition of PTSD signs and symptoms, diagnosis, and treatment.

**E. Program Discharge**

Upon completion of PTSD treatment, a narrative discharge summary indicating the inmate's initial treatment goals, progress, follow-up goals and recommendations shall be prepared. The report shall be filed in the **DC-14**. If the inmate is placed on the MH-MR roster, the report shall be copied to the psychiatric section of the medical record.

## Section 7 – Special Assessment Unit (SAU)

### A. Mission/Purpose

The intended purpose and overriding mission of the SAU is to conduct an in-depth and time-limited clinical assessment under the ultimate supervision of a licensed psychologist. Out-of-cell activities are encouraged and expected but solely for evaluation purposes as opposed to in-depth treatment efforts. The SAU enlists clinical assessments for the following reasons:

1. to determine the presence or absence of a serious mental illness;

2. to provide diagnostic clarification;

3. to determine the need for referral to a specialized program and housing status;

4. other treatment and housing recommendations; and

5. to determine reason(s) for Secure Residential Treatment Unit (SRTU) removal and proper subsequent placement.

### B. Time Frame

Assessments are short term and focused with the expectation that they be completed within 45 calendar days; the vast majority being able to be completed in 30 calendar days. If an assessment remains incomplete after 45 days, the Licensed Psychology Manager (LPM) at SCI Camp Hill or the Licensed Psychologist Director (LPD) at SCI Waymart will notify the LPD at Central Office.

### C. Location

The SAU is located within the State Correctional Facilities at Waymart and Camp Hill. SCI Waymart has five beds and SCI Camp Hill has seven beds. The units at both facilities have closed-circuit television monitoring for each SAU cell. Every inmate shall be single celled.

### D. Admission Criteria

Admission criteria includes, but is not limited to, the following:

1. uncertainty and lack of diagnostic clarification, or the case requires differential diagnosis for program placement. The information the referring facility requires for their decision making process should be clearly articulated in the referral question to guide the assessment;

2. may have lengthy or multiple admissions to the Restricted Housing Unit (RHU), Administrative Custody/Disciplinary Custody (AC/DC) (refer to Department policy **6.5.1, "Administration of Security Level 5 Housing Units"**);

Issued: 1/6/2015
Effective: 1/13/2015

3. severe mental illness or a history of mental illness and not currently a danger to self or others and does not fulfill commitment criteria for an in-patient Mental Health Unit (MHU);

4. Special Management Unit (SMU) or long term RHU inmate four to six months prior to sentence completion may be referred;

5. medically cleared of acute medical problems by the referring facility's medical department;

6. a mental health inmate in the Diagnostic and Classification Center (DCC) who has accumulated a significant amount of DC time or a mental health inmate in the DCC who has unsuccessfully adjusted to the DCC Special Needs Unit with multiple admissions to the Psychiatric Observation Cell (POC), the Special Observation Unit (SOU) and/or the RHU; and/or

7. an inmate currently housed in a SMU or SRTU and who has been approved for program failure and an evaluation is requested to determine alternative program recommendations.

## E. Process for Transfer to SAU

1. The Mental Health Coordinator (MHC) at any State Correctional Facility referring an inmate to a SAU program shall submit the following information to the Office of Population Management (OPM). The referral packet shall include the following:

   a. a completed **Special Program Referral Approval/Rejection Form**, in accordance with Department policy **11.1.1, "Population Management," Section 2 – Transfer Petition System, Attachment 2-C,** requesting SAU and Program/Unit Admission;

   b. **DC-14, Cumulative Adjustment Record** (past three months, unless significant details predate the cutoff);

   c. **DC-46, Vote Sheet**;

   d. **DC-186, Separation File**;

   e. Pre-Sentence Investigation (PSI) (if available);

   f. a current Individual Treatment Plan (ITP);

   g. **DC-487, Transfer Health Information Form** (including Medication Compliance Records);

   h. request for **Temporary Transfer to a Mental Health Unit Form**; and

   i. a copy of the Mental Health Section of the medical record.

Issued: 1/6/2015
Effective: 1/13/2015

2. Once the SAU referral packet is completed at the facility, it will be forwarded simultaneously to the OPM mailbox dedicated to the Special Programs Referral and the respective Regional LPM. This mailbox is located at: CR, CEN OPM Special Program REFERRALS. This packet must only be forwarded electronically. OPM will log and track the referral packet as it moves through the approval/rejection process.

3. The Regional LPM will review the SAU referral packet and schedule a face-to-face (on-site or via video conference) interview with the referred inmate. The purpose of this interview is to facilitate an appropriate referral to the SAU. This interview provides a focused independent assessment, upon which the Regional LPM can make further recommendations, then if needed, to the facility regarding the referral process. Additionally, this focused interview process will provide guidance to the Bureau of Health Care Services (BHCS) Chief Psychologist and Chief of Psychiatry in their approval process of this packet. The Regional LPM will notify OPM when the referral packet is ready to be forwarded to the Chief Psychologist and Chief of Psychiatry. The findings and recommendations of the Regional LPM will be communicated to the Chief Psychologist and OPM electronically, with a copy to the referring facility's LPM.

4. The Chief Psychologist, Chief of Psychiatry, and Regional Deputy Secretaries for the sending and receiving region will vote on the SAU referral. If the recommendations are not unanimous, the Executive Deputy Secretary will make the final recommendation.

5. Referrals for other specialized programs like the SMU or SRTU may be changed to SAU referrals by the Chief Psychologist, Chief Psychiatrist, Regional Deputy Secretaries or Executive Deputy Secretary if specialized assessment for diagnosis and program appropriateness is deemed relevant for clarity.

6. When an inmate is approved or disapproved for admission to the SAU, OPM notifies the referring facility via email with copies to the Chief of Psychology, BHCS, and Diagnostic and Classification Coordinator, Bureau of Treatment Services (BTS). This email includes the reasons for rejections and recommendations.

7. Once OPM has notified the referring facility that an inmate has been approved for SAU admission and the inmate is placed on the SAU waiting list, the referring facility will immediately implement the following protocol for Enhanced Mental Health Services which has been established for inmates on the SAU waiting list:

   a. weekly out-of-cell psychology contact, at minimum, will be conducted, with the **Inmate Cumulative Adjustment Record (ICAR)** and the **DC-560, Mental Health Contact Note** documentation copies to the medical report;

   b. additional psychological contacts, if requested by the inmate or a staff member, will be provided by the assigned psychologist during his/her scheduled daily psychology rounds;

   c. monthly out-of-cell psychiatrist/Certified Registered Nurse Practitioner – Psychiatric Services contacts;

7-3

d.  weekly review by the Psychiatric Review Team (PRT);

e.  monthly Program Review Committee (PRC) review; and

f.  continued weekly Correctional Counselor visits.

8.  If the referring facility cannot fully provide the above protocol for enhanced mental health services, the facility should contact OPM as soon as possible so that OPM can expedite transfer to the nearest facility which is able to provide this protocol.

9.  Once an inmate is approved for the SAU and is receiving enhanced mental health services, an interim mental health commitment should not preclude subsequent SAU placement, unless decided otherwise by Central Office.

## F.  Transportation

Every inmate received into the SAU at SCI-Camp Hill or SCI-Waymart shall be a temporary transfer. Transfer procedures for the SAU shall be in accordance with Department policy **6.3.1, "Facility Security."** Additional restrictions and/or requirements are listed below.

1.  Every admission to the SAU shall be received no later than 2:00 p.m. Monday, Tuesday, and Wednesday of each week so that the inmate can be observed. Staff shall be available to conduct initial assessments and provide for a period of stabilization. The inmate can only bring personal property items permitted in accordance with **Section 4 – Temporary Transfer of Mental Health Commitments, Attachment 4-B** of this procedures manual.

2.  An initial phone conference will be initiated by SAU staff and be held with the PRT at the referring facility to clarify the inmate's behavior, psychiatric history, staff observations, what treatment interventions have worked and which have not, and general clarification of the referral questions and what the assessments should accomplish.

3.  Transportation is the responsibility of the referring facility. The inmate will be transported alone without other inmates. The transport date will be coordinated between the SAU team, the referring facility, and the OPM.

4.  Transfers out of this unit shall take place no later than five days after a final discharge decision has been made. Discharge transport can be via regular bus transport based on support of discharge summary and/or risk assessment. The SAU team shall determine the method and time of discharge in coordination with the referring facility.

5.  When an inmate is discharged from the SAU, the inmate is permitted to return to the parent facility with only personal property items permitted in accordance with Department policy **6.5.1, "Administration of Security Level 5 Housing Units"** and **Section 4, Attachment 4-B** of this procedures manual.

Issued: 1/6/2015
Effective: 1/13/2015

## G. Orientation

The inmate shall be received in the Property Room and processed for the SAU. Once in the SAU, staff shall orient the inmate to the rules and regulations of the housing unit.

## H. Admission Process

Upon admission, the inmate shall meet with the SAU Team who shall:

1. review referral packet;

2. screen for suicide and/or assaultive potential; and

3. create a planned assessment battery under the direction of the LPM to answer the referral question.

## I. Assessment Process

1. Members of the Multidisciplinary Team shall conduct an intensive clinical assessment to determine the presence or absence of a serious mental illness, for diagnostic clarification or the need for referral to a specialized program and/or other treatment or housing recommendations.

2. The LPM shall supervise and provide oversight of all clinical assessments to determine the presence or absence of a serious mental illness, for diagnostic clarification or the need for clarification or the need for referral to a specialized program and/or treatment or housing recommendations. Additional out-of-cell testing and interviewing is expected to address the referral question. For example, the Million Clinical Multiaxial Inventory-3 (MCMI) may be given to clarify psychopathology and augment Personality Assessment Inventory results. Tests to address organicity, intellectual deficiency, and clarify diagnosis shall be utilized to address the referral question. Due to the specialized clinical nature of these assessments, licensed psychology staff should conduct them or supervise staff conducting SAU assessments.

3. Daily rounds will be conducted in concert by psychiatry and licensed psychology staff. Other members of the SAU team may include staff from nursing, counseling, and will provide important information/observations regarding the inmate's behaviors, actions, and verbalizations.

4. When the assessment is completed, the SAU shall hold a teleconference with members of the PRT from the inmate's parent facility. During the teleconference, the SAU Team shall provide a report to the PRT that shall include the assessment findings, an evaluation of the inmate's level of functioning while in the SAU, and recommendations for further programming.

5. If appropriate, the SAU Team shall initiate commitment proceedings to the Forensic Treatment Center (FTC) at SCI-Waymart. While in the FTC, the inmate is monitored

periodically by a member of the SAU Team. Discharge planning shall include members of the Multidisciplinary Team with the PRT from the inmate's designated facility.

6. In those cases where continued DC time could result in further de-compensation of the inmate's mental status, the SAU Team shall make recommendations to the referring facility's Program Review Committee (PRC) to modify or systematically reduce that DC time per Department policy **DC-ADM 801, "Inmate Discipline."**

## J. Discharge Process

1. The SAU Team will create a Discharge Summary which will address the following:

   a. any previous mental health diagnosis(es);

   b. the presence or absence of significant mental illness;

   c. the need for referral to a specialized program;

   d. any specialized housing considerations;

   e. any treatment recommendations; and/or

   f. transportation requirements, i.e., sedan or via regular bus transport.

2. The SAU will fax the Final Discharge Summary to the referring facility, with a copy being placed in the Medical Record. If questions arise after the inmate has returned to the referring facility, the SAU Team will make itself available for consultation with the referring facility's PRT.

3. ***In the event that the SAU staff recommends a specialized housing unit placement (e.g., SRTU, Behavior Management Unit [BMU], Intermediate Care Unit [ICU], SMU, etc.) they will contact the OPM who in turn will contact the Licensed Psychologist Director at Central Office for direction on placement. Arrangements shall be made for direct placement from the SAU to the recommended program. The inmate will not need to be returned to the referring facility prior to placement in the specialized housing unit.***

Issued: 1/6/2015
Effective: 1/13/2015

## Section 8 - Intermediate Care Unit (ICU)

### A. Admission Criteria and Custody Level Overrides

1. When an inmate is transferred to the Intermediate Care Unit (ICU), his/her custody level is suspended for the course of his/her time in the ICU. While security is always a concern, the primary purpose of the transfer is for the intensive mental health treatment of the inmate. The ICU has secure space for this population. Once the inmate is released from the ICU, the inmate's custody level shall be reinstated.

2. An inmate shall have the ability to learn, adapt, and participate in his/her Individual Treatment Plan (ITP), as developed by the ICU Treatment Team. Admission to the ICU shall be based on the following general criteria:

   a. multiple admissions to the Forensic Treatment Center (FTC) and/or other specialized units due to mental illness;

   b. patterns of inability to cope with general population or Special Needs Unit (SNU) stressors which are a result of mental illness; and

   c. noted intermittent non-compliance with medication that results in decompensation of the inmate's overall mental health.

### B. Process for Transfer

1. The Mental Health Coordinator (MHC) at any facility referring an inmate to an ICU Program shall submit the following information for review to the Bureau of *Treatment* Services (BTS):

   a. **DC-1, Classification Summary**;

   b. **DC-13, Reclassification Summary** (if applicable);

   c. **DC-14, Cumulative Adjustment Record** (past three months unless significant details predate the cutoff);

   d. **DC-46, Staff Vote Sheet**;

   e. **DC-2, A&B** (photo copies);

   f. **DC-186, Separation File**;

   g. initial or reclassification Pennsylvania Additive Classification Tool (PACT) form;

   h. Pre-Sentence Investigation (if available);

   i. a current ITP;

8-1

    j.   **DC-487, Transfer Health Information form** (Including Medication Compliance Record);

    k.   request for **Temporary Transfer to a Mental Health Unit** form; and

    l.   **DC-3C, Transfer Petition *for the purpose of "ICU Admission"*** indicating "***Permanent* Transfer to the ICU,"** typed in the remarks section.

2.   The packet containing all of the above information shall be sent by the BTS to the ICU Referral Coordinator for review by the ICU Admission Review Committee. This committee shall review the entire packet and respond to the BTS within 10 working days.

## C.  *Transfers and* Transportation

Every inmate received into the SCI-Waymart ICU shall be a ***permanent* transfer *for the duration of the program***. Transfer procedures for the ICU shall be in accordance with Department policy **6.3.1, "Facility Security."** Additional restrictions and/or requirements are as follows:

1.   every admission to the ICU shall be received no later than 2:00 p.m. Monday, Tuesday, and Wednesday of each week so that the inmate can be observed. Staff shall be available to conduct initial assessments and provide for a period of stabilization;

2.   transfers shall be via sedan and are the responsibility of the ***referring*** facility;

3.   transfers out of this unit shall take place after a final discharge decision has been made. The ICU team shall determine the method and time of discharge in coordination with the ***original*** referring facility, ***or facility designated for transfer by the Office of Population Management (OPM)***; and

4.   ***Upon discharge from the ICU Program, the following options will be available for transfer:***

    a.   ***a Permanent Transfer Petition for the purpose of "ICU Discharge" will be entered by ICU and will specify the return of the inmate to his previously assigned/referring Permanent Facility;***

    b.   ***a Permanent Transfer Petition for the purpose of "ICU Discharge" will be entered by ICU with the selected facility remaining open for OPM to evaluate and determine the most appropriate Permanent Facility based on ICU recommendations. ICU recommendations will be contained in the comment section of petition; or***

    c.   ***inmates may be approved for Department bus transportation by the ICU Treatment Team upon discharge. If sedan transportation is required and the inmate is returning directly to the referring facility, that facility will provide pick***

*up and return transportation. All other sedan transportation requirements will be provided by ICU.*

## D. Bureau of Health Care Services (BHCS) Responsibilities

1. The ICU Admission Review Committee shall make the final decision for admission.

2. Every transfer to the ICU shall follow established Department procedures through the Diagnostic and Classification Coordinator at Central Office.

3. When the transfer is approved, the ICU Referral Coordinator shall coordinate the transfer procedures, bed availability, waiting lists, etc. If bed space is not currently available, the ICU Admission Review Committee shall prioritize each inmate scheduled for placement.

4. The FTC Treatment Team shall process referrals from the FTC to the ICU *between the FTC and ICU Treatment Teams.* This shall be formalized through local procedures.

## E. Orientation for an ICU Inmate

The orientation procedures listed below shall be used upon admission to the ICU.

1. The Unit Registered Nurse shall meet with the inmate on the day of his/her admission to perform an assessment of his/her physical/mental needs.

2. Members of the ICU Treatment Team shall conduct an initial assessment within three working days of admission. At that time, a preliminary plan shall be developed based on a review of the inmate's current ITP, information available at the time of transfer, and observation of the inmate since his/her admission.

3. The Unit Treatment Team shall meet with the inmate following a variety of assessments to develop an ITP within 14 days of admission. These Treatment Plans shall be reviewed every 60 days or sooner, if needed.

4. Every inmate admitted to an ICU shall carry an "O" code.

5. An inmate processed for admission to an ICU is permitted to bring *all* personal property *as a permanent transfer*.

## F. Treatment Programs/Levels of Treatment

1. Treatment program components in the ICU include Group Therapy, Mental Health Rehabilitation, Therapeutic Activities, and Self-Help.

2. Participation in treatment programs shall be based on a level system. The treatment level system uses progressive steps to increase inmate privileges. Movement to a higher treatment level is based on appropriate inmate behavior and compliance with the treatment plan. The initial treatment level shall be determined by the inmate's present

level of functioning, recent historical information, and mental status. Within the ICU, the treatment team shall assign the treatment level. The unit team shall monitor the behavior of every ICU inmate and may grant specific privileges according to the level system. The Unit Team reserves the right to govern and/or terminate all levels and privileges at any time. Levels may be dropped and programs may be restricted due to inmate behavior (non-compliance with treatment plan, incurred misconducts, etc.). Treatment levels are listed below.

a.  Level A

Intensive treatment shall continue in this level. Reintegration with general population programs and activities may be used. The inmate is prepared for discharge to a general population or SNU.

b.  Level B

This is a more intense treatment level. Off-unit programs and more intense group therapy programs may be used.

c.  Level C

This is the introductory level for on-unit group therapy. An inmate at this level shall begin to develop a basic understanding of his/her mental health problems.

d.  Level D

This is the basic treatment level for most inmates admitted to the ICU. Every program shall be conducted on-unit.

## G. Discharge Procedures

1.  While there are no definite periods which would determine the length of program involvement, discharge of an inmate from an ICU shall be considered when:

a.  the treatment plan goals have been satisfied;

b.  the unit staff feels the inmate has achieved maximum benefit from treatment;

c.  the ICU Treatment Team concludes that the inmate remains resistant to participation in the ITP that was developed for him/her;

d.  the inmate is found guilty of a serious misconduct unrelated to his/her mental illness. In this case, the inmate *may* be returned to his/her *referring* facility *or the designated new facility determined by OPM* to serve Disciplinary Custody (DC) time; and/or

8-4

e. commitment to the FTC may be appropriate for behavior directly related to the inmate's mental health diagnosis.

2. When an inmate is to be discharged from the ICU, the ICU treatment team shall conduct a conference phone call with the unit team of the ***referring*** facility or facility designated for transfer, to discuss the inmate's response to treatment. Both teams shall document the date, participants, and issues discussed in the conference call. At a minimum, the following issues shall be addressed:

a. the inmate's progress toward meeting the goals of his/her ITP;

b. the extent to which he/she has achieved maximum benefits from treatment available at the ICU;

c. any on-going resistance to program participation;

d. any serious misconducts and whether these were related to his/her mental illness; and

e. any treatment needs that shall be addressed when the inmate returns to his/her home or designated facility.

Issued: 12/13/2017
Effective: 12/20/2017

Case 1:18-cv-00176-CCC-KM   Document 46-2   Filed 11/18/19   Page 176 of 297

*13.8.1, Access to Mental Health Care Procedures Manual*
*Section 9 – Staffing and Security of Mental Health Units*          **Revised 8/2010**

## Section 9 – Staffing and Security of Mental Health Units

### A. Responsibilities

1. Regional Deputy Secretary

   Act as a point of contact along with the Chief of Clinical Services and/or the Chief of Psychological Services at the Bureau of **Treatment Services (BTS)** regarding the transportation, admission, programming, and discharge of capital case inmates requiring Mental Health Unit (MHU) treatment.

2. Bureau of Health Care Services (BHCS)[1]

   The BHCS shall act as a central resource for the facilities MHU Directors and shall assist in the coordination of mental health treatment and services provided to an inmate and the annual training of staff members assigned to provide mental health services and treatment to an inmate housed within the Department.

3. Bureau of **Treatment Services**

   Assist in coordinating the transportation and/or placement of every inmate being admitted or discharged from the MHUs in accordance with Department policies **11.5.1, "Records Office Operations,"** and **11.2.1, "Reception and Classification."**

4. Central Office Security Division

   a. Assist in coordinating and transportation of every capital case admitted or discharged from the MHUs in accordance with Department policies **6.3.1, "Facility Security,"** and **6.5.8, "Capital Case Administration."**

   b. Act as a point of contact regarding the transportation of a non-capital case inmate being admitted or discharged from a MHU.

5. Facility Manager

   The Facility Manager shall ensure that the procedures set forth in this policy/ procedures manual are implemented. The Facility Manager shall also ensure that   any local procedures drafted and enacted to address issues not covered by this procedures manual, or that are unique to the facility, are reviewed and/or updated on an annual basis to ensure compliance with Department policy/procedures and to verify the continued need for the local procedures manual.

6. Deputy Superintendent for Facilities Management (DSFM)

   The DSFM shall ensure:

---

[1] 2-CO-1A-15, 2-CO-4E-01

Case 1:18-cv-00176-CCC-KM   Document 46-2   Filed 11/18/19   Page 177 of 297

*13.8.1, Access to Mental Health Care Procedures Manual*
*Section 9 – Staffing and Security of Mental Health Units*                    ***Revised 8/2010***

a. that an adequate number of corrections officers are assigned to the MHUs in accordance with Department policy **6.3.1, Section 15, Corrections Officer Staffing** and that the officers have been appropriately screened and approved according to the post orders for the MHUs and the staffing procedures and criteria contained in this procedure manual;

b. that every officer assigned to the MHU has received training regarding the procedures contained in **Section 2, Delivery of Mental Health Services** of this procedures manual; and

c. that every post order regarding the operation of the MHU is created according to Department policy **6.3.1, Section 5, Post Orders**, reviewed on an annual basis and rewritten, if necessary, to reflect any changes in the method and manner in which mental health services are provided to an inmate.

7. Deputy Superintendent for Centralized Services (DSCS)

   The DSCS/designee shall be responsible for coordinating efforts between the facility and the medical department regarding access to medical/mental health treatments and other related medical programs. As the Facility Manager's representative, he/she shall have joint responsibility along with the Corrections Health Care Administrator (CHCA) and the BHCS to address those issues outlined in this procedures manual.

8. Director of the MHU

   The Director of the MHU shall ensure:

   a. each MHU/Forensic Treatment Center (FTC)/Intermediate Care Unit (ICU) develops local seclusion and restraint procedures, consistent with Office of Mental Health and Substance Abuse Services (OMHSAS) regulations and Department policies and administrative directives, **Section 3** of this procedures manual and Department policy **6.3.1, Section 32**. Video recording of cell extractions in the MHU shall not be necessary if the recording might cause delay in providing necessary treatment and security. If the incident is video recorded, the recording of the incident shall be stopped once the inmate has been secured and the officer in charge has finished his/her debriefing of the extraction team and the incident;

   b. administer the program in compliance with the regulations promulgated by OMHSAS and every policy and procedure mandated by the Department;

   c. maintain liaison and optimal working relations between the contract health care provider, host facility, and the Department, including the BHCS and the Director of the FTC at Waymart;

   d. report to the DSCS either directly or through the CHCA or Chief Psychologist, as appropriate;

Case 1:18-cv-00176-CCC-KM   Document 46-2   Filed 11/18/19   Page 178 of 297

*13.8.1, Access to Mental Health Care Procedures Manual*
*Section 9 – Staffing and Security of Mental Health Units*                    **Revised 8/2010**

e.  meet with the CHCA, Licensed Psychologist Manager (LPM), and Major of the Guard (CO5) at least quarterly and otherwise as needed, to coordinate activities. The Director, at his/her discretion, may appoint an MHU Advisory Board composed of key facility staff members to review policies, procedures, and address local problems;

f.  provide monthly reports to the BHCS regarding census and other issues;

g.  advise the BHCS, via fax, of every temporary mental health transfer between the MHUs and facilities;

h.  coordinate with the Training Coordinator and Training Lieutenant to ensure that Corrections Officers (COs) working in the MHU are familiar with and aware of MHU duties and responsibilities (post orders);

i.  coordinate with the facility LPM, CHCA, and Training Coordinator to ensure that training for MHU staff is conducted in accordance with Department policy **5.1.1, "Staff Development and Training."** Training shall include, but not be limited to:

   (1)  suicide prevention;

   (2)  crisis intervention;

   (3)  access to health care;

   (4)  access to emergency care;

   (5)  security issues; and/or

   (6)  care, custody, and control of an inmate, which shall be provided to every CO in the facility, since every custody staff member is likely to rotate through the MHU.

j.  have the responsibility for being the liaison between the MHU and outside agencies including OMHSAS, the courts, and county mental health/social service agencies;

k.  compliance with the Mental Health Procedures Act for every necessary hearing for the involuntary commitment of an inmate patient to the MHU; and

l.  arrange with the OMHSAS to schedule annual mental health audits.

**B. Corrections Officer Staffing Levels and Inmate Custody Levels in the MHUs**

1.  Corrections Officer Assignments to MHUs

   a.  The MHU officer shall be required to perform a variety of complex tasks in the MHUs.

   b.  Although an inmate's custody level is suspended while in the MHU, an inmate may still pose a significant danger to himself/herself and/or others. Enriched custody staffing levels are needed in the units to provide protection to staff and inmates and

Case 1:18-cv-00176-CCC-KM   Document 46-2   Filed 11/18/19   Page 179 of 297

**13.8.1, Access to Mental Health Care Procedures Manual**
**Section 9 – Staffing and Security of Mental Health Units**            **Revised 8/2010**

ensure that mental health programming can be provided. The DSFM shall ensure that CO coverage is maintained to allow the unit to conduct out-of-cell mental health programming, protect persons and property on the unit, and escort an inmate in and out of cells. The DSFM shall meet regularly with the MHU Director to discuss custody-staffing needs.

c.  The CO assigned to the unit shall provide input into MHU treatment decisions through regular contact with the treatment staff. It is expected that the CO shall report on his/her observations of every inmate activity, as well as any interaction that he/she may have had with a client.

d.  CO staff shall be provided with training on an annual basis regarding the confidentiality of Department and medical records.

2.  Determination and Maintaining of Staffing Levels for the MHUs

a.  The DSFM and the Major(s)/designee shall be responsible for selecting and assigning Corrections Officer Staff to Mental Health Units. The MHU Director shall have input into this selection; however, the final determination shall be made by the DSFM.

b.  MHU assignments shall be made from COs who have submitted a written request to the Major(s)/designee to be considered for placement in a MHU position.

c.  Volunteers for these assignments must exhibit the following characteristics prior to placement in MHU positions:

    (1)  willingness to work in a non-traditional corrections environment;

    (2)  the ability and willingness to become an integral part of the MHU Treatment Team;

    (3)  the ability and willingness to perform non-professional counseling and crisis intervention with MHU inmates;

    (4)  good communications skills;

    (5)  the ability to react appropriately to crisis situations;

    (6)  good emotional stability;

    (7)  interest in mental health issues; and/or

    (8)  any other attributes considered important, but not listed above.

d.  A CO assigned to MHUs shall be reviewed for rotation out of the MHU at least annually by the DSFM and Major(s)/designee.

Case 1:18-cv-00176-CCC-KM   Document 46-2   Filed 11/18/19   Page 180 of 297

*13.8.1, Access to Mental Health Care Procedures Manual*
*Section 9 – Staffing and Security of Mental Health Units*                    **Revised 8/2010**

e.  Removal from the MHU position may occur at any time if it is determined that the CO is inappropriate for his/her assignment or detrimental to the operation of the MHU. This determination shall be made by the DSFM with input from the Major, Shift Commander, and/or MHU Director and shall be based on written documented incidents.

f.  An Officer assigned to a MHU beyond one year shall be interviewed by a facility psychologist to determine his/her fitness for the MHU assignment. Reports shall be confidential and shared only with appropriate personnel.

3.  Custody Status of Inmates Transferred to the Mental Health Units

a.  A capital case shall be managed under Department policy **6.5.8, "Capital Case Administration,"** and shall be segregated from other inmates. Any exceptions to this procedure must be approved through the Regional Deputy Secretary in consultation with the Chief of Clinical Services and/or Chief of Psychological Services in the BHCS.

b.  Custody levels of non-capital cases shall be suspended while the inmate is placed in the MHU so that they can participate in treatment to the maximum extent possible.

c.  Every MHU reception shall be initially placed in "hard cell" observation cells until the inter-disciplinary treatment team can review his/her case to determine if special security and/or clinical precautions are required to protect staff and/or other inmates. Issues to be considered include, but are not limited to:

(1)  separation from other inmates or staff members, or transfer of the patient to another MHU for treatment;

(2)  reason for any disciplinary time (assaults, verbal abuse, possession of contraband); and/or

(3)  clinical conditions that require special treatment such as extreme agitation, lability, acute suicide threats, or other detrimental behavior.

d.  The MHU clinical staff shall determine when the patient can leave the hard cell to enter the therapeutic environment, using consultation from the custody staff.

e.  In some situations, the psychiatrist/***Certified Registered Nurse Practitioner – Psychiatric Services (PCRNP)***, psychologist, or Director may have already evaluated the inmate, before the patient arrived on the unit, and recommendations made at that time concerning cell placement may be followed. This placement shall be reviewed at the next meeting of the treatment team, or earlier if required.

Case 1:18-cv-00176-CCC-KM   Document 46-2   Filed 11/18/19   Page 181 of 297

*13.8.1, Access to Mental Health Care Procedures Manual*
*Section 9 – Staffing and Security of Mental Health Units*                    **Revised 8/2010**

## C. Tracking System Access

Vendor and Department staff members working in specialized units shall have reading and inquiry access to the MH/MR tracking system, and reading access to Inmate Classification, Inmate Records, Separations, Medical Tracking, and Misconduct information that is maintained on the Department mainframe.

1. Staff members shall be able to review the clinical information contained in the PRT and Mental Health/Mental Retardation (MH/MR) rosters (entering new International Classification of Diseases (ICD codes) and Global Assessment Functioning (GAF) scores.

2. The treatment unit staff shall monitor the mainframe system to note any changes in the inmate's status (impending max date).

3. The BHCS Chief Psychologist shall ensure that training is provided to vendor staff in the use of the mainframe data system.

## D. Discharge Procedures

1. Pre-discharge Procedures

   a. Every patient scheduled for discharge from the MHU must be approved, both medically and in terms of security, for transport back to his/her parent facility according to Department policy **6.3.1**.

   b. Before the patient is discharged from the MHU, the MHU treatment team shall conduct a teleconference with the treatment team in the patient's home facility.

   c. The MHU treatment staff shall provide a summary of the patient's response to treatment and recommendations for aftercare in the facility. This summation shall be based upon the inmate's treatment and his/her Individual Treatment Plan (ITP).

   d. The MHU team shall also make recommendations to the treatment team and the Program Review Committee (PRC) regarding adjustments or forgiveness of the inmate's Disciplinary Custody (DC) time, consistent with policy **6.5.1, "Administration of Security Level 5 Housing Units,"** and **DC-ADM 801, "Inmate Discipline."**

   e. If the treatment team and PRC in the sending facility have reservations regarding the MHU recommendations for treatment and adjustment of DC time, a teleconference via phone or telemedicine consultation shall be the forum for the discussion of these concerns.

   f. If the PRC elects to disregard the MHU's recommendations regarding disciplinary time, the Facility Manager of the facility shall submit a memorandum to the Regional Deputy Secretary, copied to the BHCS, outlining the rationale for PRCs disagreement.

Case 1:18-cv-00176-CCC-KM   Document 46-2   Filed 11/18/19   Page 182 of 297

**13.8.1, Access to Mental Health Care Procedures Manual**
**Section 9 – Staffing and Security of Mental Health Units**                    **Revised 8/2010**

2.  Continuity of Care Planning for Parole and Final Discharge Maximum Expiration (FDME) Inmates

    a.  Mental health staff members from the sending facility and a MHU/FTC/ICU staff member shall share joint responsibility for an inmate nearing parole or FDME.

    b.  For an inmate who is within one year of parole or FDME when he/she is referred to the MHU/ICU/FTC, the staff in the sending facility shall advise the treatment unit staff of every continuity care activity that has been initiated.

    c.  For an inmate who is within one year of parole or FDME while he/she is placed in the MHU/FTC/ICU, staff members in the sending facility and the treatment unit shall conduct teleconferences to coordinate continuity of care activities.

3.  Transferring Inmates to a Second Facility Following Completion of Treatment at the MHU/FTC/ICU

    a.  In some cases (due to classification to another facility, separations, or special treatment needs), it may not be appropriate to return an inmate to the sending facility.

    b.  In these cases, the sending facility staff shall initiate transfer petitions through the classification section of the *BTS*. The BHCS mental health staff shall approve the transfer petitions when completed by *BTS* before the inmate is transferred.

    c.  The MHU/FTC/ICU staff shall be responsible for initiating a teleconference with the treatment team staff in the third (receiving) facility to:

        (1)  ensure that appropriate bed space is available for the inmate (in the Special Needs Unit); and

        (2)  advise the team of the inmate's needs.

    d.  The sending facility shall be responsible for picking up the inmate and his/her property and transporting the inmate from the MHU/ICU/FTC to the new facility.

## Section 10 – Secure Residential Treatment Unit (SRTU)

### A. Program Mission[1]

1. The Secure Residential Treatment Unit (SRTU) is designed to provide management, programming, and treatment for an inmate who exhibits Serious Mental Illness (SMI), chronic disciplinary issues, and demonstrates an inability to adapt to a general population setting. This is a secure diversionary unit for mentally ill inmates who do not currently meet commitment criteria according to the Pennsylvania Mental Health Procedures Act and require a secure setting due to their demonstrated problematic behavior in less secure environments. The unit is intended to provide focused staff interaction, programming, and treatment for this select inmate population. The focus of the SRTU is to convey sufficient skills in behavioral control, coping, and compliance with recommended treatment.

2. Each inmate in the SRTU will be scheduled and offered a minimum of 20 hours out-of-cell activity per week; 10 hours of structured activity and 10 hours unstructured activity. This intensive specialized treatment program will assist an inmate in progressing to the least restrictive environment for managing his/her demonstrated behavior. The least restrictive environment will vary among inmates and may include eventual return to a general population, continued placement within the SRTU, and even fulfillment of the inmate's reentry plan upon Sentence Complete. An inmate's custody level will be suspended while in the SRTU but their Disciplinary Custody (DC) sanctions, if they have any, will run concurrent to their time in the SRTU until the sanction expires or until placed in Phase 1 of the program. This occurs so the inmate may still participate in and benefit from treatment to the maximum extent possible and be returned to the least restrictive setting as soon as possible. An inmate who is unable to transition from the SRTU, complete the SRTU program, or requires a therapeutically recommended transfer to another SRTU, will be processed for alternative placement by review of the Central Office Special Needs/Psychiatric Review Team (COSN/PRT).

3. ***At any point during the program, the Program Review Committee (PRC) can recommend that an inmate be removed from the Restricted Release List (RRL) and initiate this process.***

   a. ***An inmate may not be released to general population, i.e. Phase 1 probationary status, until he/she has been officially removed from the RRL.***

   b. ***On Phase 2, when staff have discretion in bringing an inmate out unrestrained, if the inmate still is maintained on the RRL list, this phase can be modified so he/she receives Phase 2 privileges, but still comes to out-of-cell activity in restraints.***

---

[1] 5-6A-4368

Issued: 12/11/2018
Effective: 12/18/2018

c. ***In the event that an RRL inmate makes it to Phase 2, is still on the RRL list, and goes on an escorted trip to a destination in general population, arrangements shall be made to appropriately restrain or conduct the escorted trip during count to maintain security of those still active on RRL.***

## B. Location

SRTUs will be located at various facilities within the Department as outlined on the **Institutions with SRTUs Listing (Attachment 10-A)**.

## C. Staffing[2]

1. SRTU Treatment Team

   a. Comprised of the Licensed Psychologist Manager (LPM), Unit Manager, Unit Counselor, Psychiatrist/Certified Registered Nurse Practitioner (CRNP), full-time Psychology staff (Psychological Services Specialist [PSS] and/or Psychological Services Associate [PSA]), Activities, and SRTU Correctional Officers (COs). The SRTU Treatment Team will meet with and review all SRTU inmates at least every 30 days. Inmates placed on Accountability Status in accordance with **Subsection M. below** will be reviewed daily. This team follows the inmate in all phases, including at least three months of probationary status in a general population Residential Treatment Unit (RTU) or other population housing unit deemed appropriate by the Treatment Team; this probation can be extended for an additional three months if indicated. However, the duration of Phase 1 must not exceed six months' time, irrespective of any off unit placements. Other staff and teams involved in the daily operation of the SRTU include, but are not limited to: the PRC, staff members from Alcohol and Other Drug (AOD) treatment, Education, Social Worker, Therapeutic Activities Services (TAS) Worker, Medical - Nursing, Chaplaincy, and Certified Peer Specialists (CPS). Staff contacts with inmates participating in the SRTU will be noted on the **SRTU Accepted/Refused Structured Out-of-Cell Program Log (Attachment 10-B)** and the **SRTU Accepted/Refused Unstructured Out-of-Cell Program Log (Attachment 10-C)**. In addition, the SRTU Treatment Team will meet at least twice each week to discuss the general operation of the unit and review the recovery plans of each inmate. These meetings will be facilitated by the Unit Manager and the LPM and should generally be held at the change of shift in order to maximize Officer involvement.

   b. Responsibilities and Ratios[3]

      (1) SRTU Unit Manager

---

[2] 5-6A-4368
[3] 5-6A-4368

Issued: 12/11/2018
Effective: 12/18/2018

The Unit Manager will provide manager-level direction with the assistance of the Lieutenants. The Unit Manager will provide the team with daily leadership and will review and direct the treatment and activity of the inmates in his/her care. If not permanently assigned to the SRTU, the Unit Manager will visit the unit daily and sign the log book.

(2) LPM

The LPM is not solely assigned to the SRTU, but also oversees all psychological services in the institution. The LPM functions as the administrative and clinical supervisor of all psychological staff on the SRTU. The LPM also provides clinical oversight, via the Treatment Team and the Individual Recovery Plan (IRP), to the entire SRTU Treatment Team. The LPM is responsible for chairing any treatment team meetings held on the SRTU. However, in all aspects of the program, the LPM will closely collaborate with Psychiatry and the Unit Manager.

(3) Psychiatrist/Psychiatric Certified Registered Nurse Practitioner (PCRNP)

***The Psychiatrist/PCRNP will meet with SRTU inmates as often as deemed clinically necessary, but no less than once every 30 days.*** In addition, they will coordinate medication monitoring. Psychiatric coverage will include 30 minutes per inmate. All Psychiatric contacts are to be out-of-cell unless the inmate refuses or security issues prohibit out-of-cell contact at that time. This includes those SRTU inmates who may be on Accountability Status. The Psychiatrist/PCRNP will also be required to participate in all scheduled Treatment Team meetings.

(4) PSS/PSA

For SRTUs that have more than one full-time equivalent PSS/PSA assigned, a portion of those additional hours will be assigned to a 12-8 work shift. The PSS/PSAs assigned to the SRTU will be responsible for developing IRPs with their assigned inmate caseload. These IRPs will specifically identify goals and objectives designed to restore the inmate to a stable and healthy level of functioning. The goals on the IRP, established collaboratively with the SRTU Treatment Team and the inmate shall drive the clinically structured out-of-cell offerings on the unit. The PSS/PSA will work closely with custody staff and all disciplines assigned to the SRTU. The PSS/PSA will be responsible for delivering individual and group therapy directed at addressing the issues outlined in the IRP. All contacts will be noted on the **SRTU Accepted/Refused Structured Out-of-Cell Program Log**, at a minimum weekly **Inmate Cumulative Adjustment Record (ICAR)**, and **DC-560, Mental Health Contact Note** entries are required. The PSS/PSA will also offer all inmates on Accountability Status daily AM and PM 30-minute out-of-cell contacts for the duration of Accountability Status. At the discretion of the LPM, the PSS/PSAs assigned to the SRTU may have other assigned facility duties.

Issued: 12/11/2018
Effective: 12/18/2018

(5)   Corrections Counselor (CC)

The CCs will provide professional counseling and case management activities to an inmate caseload assigned by the Unit Manager. This will include treatment groups, individual contacts, and supervising inmate unstructured out-of-cell time. All contacts will be noted on the **SRTU Accepted/Refused Structured Out-of-Cell Program Log** and **SRTU Accepted/Refused Unstructured Out-of-Cell Program Log**, and at a minimum weekly **ICAR** entries will also be made to document the inmate's status. The CCs will work with the SRTU Staff to assure that proper documentation is kept by maintaining the tracking forms for all out-of-cell structured and unstructured activity. In addition, the CCs will ensure that all incentive tracking charts are up-to-date on a weekly basis with results reported as an **ICAR** entry. Thus, charting the progress each inmate is making in preparation for his/her possible graduation from the program and possible reentry into the general population.

(6)   TAS Worker

The TAS Worker will develop and deliver activities during the days, evenings, and on the weekends. The TAS Worker will implement, monitor, and evaluate the therapeutic recreational segments of IRPs including instructing, directing, and providing support in a variety of activities relating to therapeutic recreation, occupational therapy, and vocational adjustment services. The activities would be directed at engaging self-isolated or reclusive inmates and providing structured and unstructured recreational time for SRTU inmates. The increased activity and out-of-cell time will be assisting with improving the inmate's emotional control. All contacts will be noted on the **SRTU Accepted/Refused Structured Out-of-Cell Program Log** and the **SRTU Accepted/Refused Unstructured Out-of-Cell Program Log**. This employee may also be assigned to work with inmates on the General Population RTU as supervised by the Activities Manager and in collaboration with the Unit Manager.

(7)   Custody Staff

(a)   The Facility Manager/designee shall establish local procedures outlining the appropriate security staffing levels and security measures to be followed for inmate movement, showers, meals, activities, etc. Unit staffing and security measures may be reduced by the Unit Team and the PRC for an SRTU inmate in Phases 3, 2, and 1 but, should always remain at a level to provide escort coverage for daily out-of-cell contacts.

(b)   COs assigned to the unit will provide daily input for the SRTU Treatment Team decisions through regular contact with treatment staff and via documentation utilizing the **SRTU Shift Pass Down Form (Attachment 10-D)**. This form is utilized in order to ensure accurate communication between shifts and the Treatment Team. In addition, it is important for custody staff's observations to be included in the Treatment Team's review of the inmate's

10-4

progress with their treatment objectives. COs are expected to communicate their observations of an inmate's activity and any interactions they may have had with the inmate. In addition, custody staff will participate in all Treatment Team meetings, comment on, and sign the IRP.

(c) Because the potential exists that an inmate may become a significant danger to himself/herself and/or others, enriched custody staffing levels are required in the units to provide protection to staff and inmates. This modification ensures that out-of-cell mental health programming can be provided as well. The Deputy Superintendent for Facilities Management (DSFM) shall ensure that CO coverage is maintained and sufficient to permit the unit to conduct out-of-cell structured and unstructured activities, protect persons and property on the unit, and escort inmates in and out of cells throughout the day, even during count time. The DSFM shall meet regularly with the Major of the Guard and Unit Manager to discuss custody staffing needs.

2. Other Staff Involved on the SRTU

   a. PRC

   This committee is generally comprised of the DSFM, the Deputy Superintendent for Centralized Services (DSCS), and the Corrections Classification Program Manager (CCPM). The PRC will review all SRTU inmates monthly or as necessary as indicated by submissions of **SRTU Program Review Sheet (Attachment 10-E)** by the SRTU IRP. Inmates in the SRTU on Accountability Status will be reviewed by the PRC at least weekly.

   b. AOD

   Drug and Alcohol Treatment Specialists (DATS) will provide group and/or individual structured out-of-cell contacts for SRTU inmates with identified AOD treatment needs. The goals/objectives of such treatment will be reflected on the inmate's IRP. All contacts will be noted on the **SRTU Accepted/Refused Structured Out-of-Cell Program Log**.

   c. Education/Adult Basic Education (ABE) Teacher

   This staff member will address the educational needs of the inmates participating in the SRTU. He/she would provide educational opportunities for those who are mandated to participate in education to meet guidelines and also those who wish to volunteer. The goal would be to have inmates prepare for reentry to general population classes or reentry into society. All out-of-cell contacts will be noted on the **SRTU Accepted/Refused Structured Out-of-Cell Program Log**. This team member will be supervised by the School Principal in collaboration with the Unit Manager.

Issued: 12/11/2018
Effective: 12/18/2018

d.  Social Worker (Master of Social Work [MSW])

This employee will develop, implement, and provide social work, counseling, and case management services to SRTU inmates to enhance their social functioning and to help them attain a more satisfactory social, economic, emotional, or physical adjustment within a Department facility. All out-of-cell contacts will be noted on the **SRTU Accepted/Refused Structured Out-of-Cell Program Log**. This employee will be interacting with inmates, inmate family members, inmate guardians, and community agency staff to plan, provide, or coordinate needed social work services upon release to the community. This employee will work primarily within the SRTU, however, at the direction of the LPM; the Social Worker will also assist the general population Mental Health Coordinator (MHC) with reentry services to general population inmates.

e.  Medical-Nursing

Any medication concerns identified will be forwarded to the Psychiatrist/CRNP, the assigned PSS/PSA, and recorded in the inmate's medical file. All out-of-cell contacts will be noted on the **SRTU Accepted/Refused Structured Out-of-Cell Program Log**.

f.  Chaplaincy

The Facility Chaplaincy Program Director (FCPD) will provide structured individual and group religious services to inmates in the SRTU. Structured group contact will be available at least weekly. All out-of-cell contacts will be noted on the **SRTU Accepted/Refused Structured Out-of-Cell Program Log**.

g.  CPS

CPSs will be available on the unit to provide support for participants in the program. Duties may include individual out-of-cell contacts with inmates, educational group programming, recreational activities, and assistance with daily living skills. CPSs will function under the direct supervision of the Unit Manager. Contacts will be noted by supervising staff on the **SRTU Accepted/Refused Unstructured Out-of-Cell Program Log**.

## D. Determination and Maintenance of Staffing Levels for the SRTUs[4]

1.  The DSFM and the Major(s)/designee shall be responsible for selecting and assigning CO Staff to SRTUs. The Unit Manager and LPM shall have input into this selection; however, the final determination shall be made by the DSFM.

---

[4] 5-4A-4258

Issued: 12/11/2018
Effective: 12/18/2018

2. SRTU assignments shall be made from COs who have submitted a written request to the Major(s)/designee to be considered for placement in an SRTU position.

3. Volunteers for these assignments must exhibit the following characteristics prior to placement in SRTU positions:

   a. willingness to work in a non-traditional corrections environment;

   b. the ability and willingness to become an integral part of the SRTU Treatment Team;

   c. the ability and willingness to perform non-professional counseling and crisis intervention with SRTU inmates;

   d. good communications skills;

   e. good emotional stability;

   f. interest in mental health issues;

   g. Crisis Intervention Team (CIT) and Mental Health First Aid (MHFA) trained or willing to obtain the training; and/or

   h. any other attributes considered important, but not listed above.

4. A CO assigned to the SRTU shall be reviewed for rotation out of the SRTU at least annually by the DSFM and Major(s)/designee.

5. A CO assigned to an SRTU beyond one year shall be interviewed by the facility LPM/designee to determine his/her fitness for the SRTU assignment. Reports shall be confidential and shared only with appropriate personnel.

6. Removal from the SRTU position may occur at any time if it is determined that the CO is inappropriate for his/her assignment or detrimental to the operation of the SRTU. This determination shall be made by the DSFM with input from the Major, Shift Commander, and/or SRTU Unit Manager. In addition to custody staff, any staff member, recommended by the Unit Manager and the LPM, may be removed from being assigned to the SRTU if that staff is deemed inappropriate for assignment to the SRTU.

## E. Chain of Command

1. The Unit Manager shall provide daily guidance/direction for all officers assigned to the SRTU. The Unit Manager and Shift Commander are responsible for monitoring and evaluation of staff performance.

2. The Shift Commander is in charge of use of force situations and assumes responsibility for operation of the unit in the absence of the Unit Manager.

Issued: 12/11/2018
Effective: 12/18/2018

3. The Unit Manager shall have the discretion to make essential administrative, program, and operational decisions regarding unit security and inmate management. Clinical decision will be made via the SRTU Treatment Team as directed by the LPM.

## F. Staff Training

All staff selected or assigned to the SRTU to provide programming and supervision will be required to complete certain Department training. Within six months of placement into the unit, staff will be required to have completed the Department's Crisis Intervention Team Training (CITT) and the Department's MHFA Training. If it is necessary to assign a staff member to the SRTU who has not completed this training, the facility shall, within two weeks, advise the CITT Program Coordinator of the need. The facility's Training Coordinator shall also communicate such training needs to the CITT Program Coordinator to ensure that sufficient training is conducted to meet the needs of the facility. CO Trainees (COTs) will not be assigned to the SRTU.

## G. Admission Criteria[5]

Admission criteria shall include the following:

1. a diagnosis of SMI as defined in the **Definition of a SMI Outline (Attachment 10-F)** of this policy.

2. history of multiple admissions to a Restricted Housing Unit (RHU), either AC or DC status, *a Diversionary Treatment Unit (DTU)*, a Mental Health Unit (MHU), and/or the Forensic Treatment Center (FTC);

3. presenting problems may include significant difficulties such as self-injury, overtly aggressive behavior, and/or impulse control disorder;

4. a Special Assessment Unit (SAU) evaluation may be required;

5. C stability code inmates may be considered for placement in an SRTU;

6. he/she is cleared of acute medical problems by the referring facility's medical department; and

7. *an inmate that meets SRTU program criteria who is also currently maintained on the RRL, as a step-down process, upon PRC recommendation*.

## H. Process for Transfers

1. When an inmate is being recommended by the PRT, Unit Management Team, or Psychology staff, for placement in an SRTU, the PRC shall review the recommendation

---

[5] 5-6A-4368

Issued: 12/11/2018
Effective: 12/18/2018

with the inmate and inform him/her of the reason(s) for the transfer recommendation. The recommendation shall be documented on the **DC-141, Part 4, Facility Manager's Review**, with a copy to the inmate. The inmate will be given the opportunity to respond to the rationale given and object to his/her placement in an SRTU, if he/she so desires. The inmate may appeal the recommendation for transfer to the Facility Manager/designee and Central Office, as outlined in Department policy **DC-ADM 802, "Administrative Custody"** and **DC-ADM 801, "Inmate Discipline."**

2. The MHC/designee at the referring facility shall submit a completed Referral Packet to the Office of Population Management (OPM) mailbox **(CR, CEN OPM Special Program REFERRALS)** dedicated to the Special Programs Referral. OPM is responsible for tracking the SRTU Referral Packet through the approval/rejection process. This packet must only be forwarded electronically.

   a. *If needed,* the Regional LPM *may be consulted to* review the SRTU Referral Packet and schedule a face to face (on site or via videoconference) interview with the referred inmate *prior to the referring facility submitting the packet to OPM*. The purpose of this interview is to facilitate an appropriate referral to the SRTU *or any other specialized placement*. This interview provides a focused independent assessment, upon which the Regional LPM can make further recommendations to the facility regarding the referral process, if needed. Additionally, this focused interview process will provide guidance to the *Director of Psychology* and Chief of Psychiatry in their approval process of this packet.

   b. The SRTU referral may be changed to an SAU referral by the Regional LPM if a specialized assessment for diagnosis and program appropriateness is deemed necessary.

3. The OPM will then electronically forward the SRTU Referral Packet to the Chief Psychologist, Chief of Psychiatry, and the *Executive Deputy Secretary for Institutional Operations (EDSI)*/Regional Deputy Secretary for the sending and receiving region who will vote on the SRTU referral. If the recommendations are not unanimous, the Executive Deputy Secretary will make the final recommendation.

4. The approved and/or rejected SRTU Referral Packet will then be sent to the OPM. The OPM will record the disposition of the Referral Packet in the Transfer Petition System. OPM notifies, via email, the referring facility with copies to the Chief of Psychological Services, BHCS, and Diagnostic and Classification Coordinator, Bureau of Treatment Services (BTS). This email will include the rationale for the rejection and recommendations.

5. The OPM will return any disapproved Referral Packets to the referring facility's LPM/designee.

6. Following final approval, BHCS will coordinate, with the sending and receiving facilities and the OPM, the inmate's transfer to the designated SRTU. If space is not available, the OPM and BHCS shall retain the inmate's name on a waiting list.

Issued: 12/11/2018
Effective: 12/18/2018

7. Prior to an inmate's transfer, the transferring facility's PRT shall conduct a videoconference or teleconference call, with the SRTU Treatment Team at the receiving facility. The sending facility shall document the date, names of participants, and issues discussed in the conference call in the **ICAR/DC-14** and on the **DC-472, Progress Note**.

8. Once BHCS has notified the referring facility that an inmate has been approved for SRTU placement, and the inmate is placed on the SRTU waiting list, the referring facility will immediately implement the following Protocol for Enhanced Mental Health Services which has been established for inmates on the SRTU waiting list. The protocol is as follows:

   a. a weekly out-of-cell psychology contact, at minimum, will be conducted, with **ICAR** and **DC-560** documentation copied to the medical record;

   b. additional psychological contacts, if requested by the inmate or a staff member, will be provided by the assigned psychologist during his/her scheduled daily psychology RHU rounds;

   c. monthly out-of-cell Psychiatrist/CRNP contacts;

   d. weekly review by the PRC;

   e. monthly PRT review; and

   f. continued weekly Correctional Counselor visits.

9. If the referring facility cannot fully provide the above protocol for enhanced mental health services, the facility should contact OPM as soon as possible so that OPM can expedite transfer to the nearest facility which is able to provide this protocol.

10. An inmate who is on the waiting list for the SRTU can be transferred to an MHU/FTC if necessary. This does not affect his/her SRTU waiting list status, unless decided otherwise by Central Office.

**I. Transportation**

An inmate received into the SRTU will be sent as a permanent transfer. Transport procedures for the SRTU shall be in accordance with Department policy **6.3.1, "Facility Security."** Additional restrictions and/or requirements are as follows:

1. all of the inmate's property will be transported with him/her to the SRTU;

2. an inmate transferred to the SRTU shall be received no later than 2:00 PM Monday, Tuesday, or Wednesday. This schedule allows staff to be available to conduct an initial assessment and provides for a period of stabilization; and

3. the inmate shall be transported via sedan; this is the responsibility of the referring facility.

Issued: 12/11/2018
Effective: 12/18/2018

## J. Admission and Orientation

1. All inmates will receive a standardized "SRTU Inmate Handbook." This handbook will be distributed to all inmates upon arrival and admission to the SRTU. The inmate handbook will address and include at a minimum the following:

   a. general program description and purpose of the unit;

   b. SRTU rules and regulations;

   c. the process of treatment planning and the inmate's involvement in that process;

   d. overview of the Levels of Treatment/Phase System and the role of the Treatment Team;

   e. what an inmate needs to do to advance through the Phases/Levels of Treatment;

   f. earning and utilizing incentive points;

   g. property and privileges;

   h. description of groups and treatment milieu;

   i. discipline and "Accountability Status;" and

   j. discharge and transition from the SRTU.

2. Once admitted to the SRTU, the inmate shall receive the SRTU Inmate Handbook and staff will orient the inmate to the rules and regulations of the unit, within 48 hours of arrival. The inmate will be asked to sign the **SRTU Inmate Handbook Receipt Form (Attachment 10-G)**.

3. Staff shall complete the **DC-510, Suicide Risk Indicators Checklist** in accordance with **Section 1** of this procedures manual.

4. Inmates housed in an SRTU, will be issued royal blue hobby jeans and a royal blue shirt with DOC printed in large white block letters on the back.

5. SRTU Cell Assignments

   a. An inmate shall be housed in a single cell for Phases 5, 4, and 3 of the SRTU program. Suitability for double celling will be considered in Phases 2 and 1 and will be contingent upon the inmate's program code in accordance with Department policies **11.2.1, "Reception and Classification,"** *and DC-ADM 008, "Prison Rape Elimination Act (PREA)."*

Issued: 12/11/2018
Effective: 12/18/2018

b. When considering double celling Phase 2 inmates on the unit, the SRTU Treatment Team should make every effort to facilitate voluntary double celling agreements between SRTU inmates.

c. If no compatibility contraindications are present (these include, but are not limited to: age differences, disparate physical size, gang affiliations, security needs, custody level, medical issues, geographic/regional differences, ***PREA Risk Assessment Tool [PRAT] designations***, and a documented history of ethnic/religious violence, or propensity for such) the SRTU Treatment Team may consider voluntary double celling.

d. SRTU double celling after normal working hours is prohibited, except in extenuating circumstances, and only with authorization from the Shift Commander. The double celling assignment will be reviewed by the SRTU Treatment Team the next working day.

6. Medical staff shall conduct the medical screening in accordance with Department policy **13.2.1, "Access to Health Care."**

7. Upon admission, Psychology staff will interview/assess the inmate and:

a. review the Referral Packet; and

b. screen for any acute mental health symptoms including potential suicide risk.

8. Within 48 hours, the unit Psychology staff will review the **SRTU Initial Annual Recovery Treatment Plan (Attachment 10-H)** with the inmate and outline specific targeted goals and objectives. Documentation that the IRP was completed with the inmate will be made in the **ICAR**.

9. The SRTU Treatment Team shall conduct an initial review of the inmate's IRP within three working days.

10. Within seven working days, a Psychiatric admission summary note with treatment recommendations will be completed. Summary of the SRTU admission shall include at a minimum, but not *be* limited to the following information:

a. history of present illness/reasons for SRTU admission;

b. past psychiatric treatment history in the community/Department;

c. mental status examination;

d. diagnosis;

e. risk assessment; and

10-12

f.   treatment recommendations and any needed referrals.

## K.  Transfers of Inmates in the SRTU System

1.  An inmate who is participating in the SRTU program may be permanently transferred between SRTUs, only when the SRTU Treatment Team believes it would be of therapeutic benefit and then only with the approval of both the receiving and sending facility's **EDSI**/Regional Deputy Secretary with input from the Chief of Psychological Services. These transfers will be coordinated through the BHCS and OPM. Any permanent transfer of an SRTU inmate to a non-SRTU location will require written approval by the Executive Deputy Secretary.

    **NOTE**: Transfers between SRTUs will be coordinated with an exchange of transfer packets, a **DC-46,** including a transfer rationale and a copy of the most recent Psychiatric Assessment.

2.  At times it may be necessary to temporarily transfer an inmate from an SRTU to a non-SRTU facility. In these cases, the SRTU inmate will be housed in a Psychiatric Observation Cell (POC), unless written approval has been granted by the Executive Deputy Secretary for placement in another setting such as a DTU or RHU. The Chief of Psychological Services, BHCS, must be notified within 24 hours of any temporary transfer of an SRTU inmate.

3.  Prior to an SRTU inmate's temporary or permanent transfer, a member of the transferring facility's SRTU Treatment Team shall communicate, with a member of the SRTU Treatment Team or PRT at the receiving facility. The sending facility shall document the date, names of participants, and issues discussed in the conference call in the **ICAR** and on the **DC-472**.

4.  If an inmate is committed to a Department MHU or the FTC, that inmate's SRTU bed will be held open for a reasonable period of time, pending the inmate's return from the MHU or FTC.

## L.  Treatment Programs/Levels of Treatment[6]

1.  The program components in the SRTU include a multi-disciplinary treatment environment.

2.  All inmates in the SRTU will have an IRP. These IRPs **shall** be created using the "Recovery Model" of treatment. The recovery model has the goal of enhancing the individual's quality of life. It supposes that the treatment delivered be tailored to the

---

[6] 5-4B-0032, 5-6A-4368

Issued: 12/11/2018
Effective: 12/18/2018

individual's strengths, needs, and directions; and treatment decisions are made in partnership with the individual. In adopting the recovery model, we understand that the focus is on a path of recovery, not just goals. We also understand that recovery is an ongoing process and does not mean there is an absence of symptoms. Overall, this person-centered approach can reduce therapeutic disruption, noncompliance, decompensation, violence, and self-harm.

   a. The first step in developing a "Recovery Model" IRP is to identify the "person-centered" goal. Listening to the individual with empathy, acceptance, and validation will allow the goal to be expressed. Second, identify the individual's strengths. This will tell us what is already working that can be amplified, supported, and used as a resource to facilitate change. Third, identify obstacles that prevent the individual from reaching their goal. Fourth, identify treatment objectives. These treatment objectives need to be measurable, concrete, and clear. It is important that the treatment objectives are relevant to the individual's stated recovery goal and to the obstacles that are hindering the inmate from reaching their goal. Fifth is to identify treatment interventions. Treatment interventions will be chosen that are likely to increase the individual's strengths.

   b. Treatment planning may also include variations to the standard phases, treatment goals, and length of time in a phase, privileges, and management of problematic behavior. Modifications to the inmate's level of security related to restraints and escort will also be noted on the IRP. These security modifications will also be clearly noted in the Unit control booth. An overview of property and privileges associated with each Phase of treatment is found in the **SRTU Property, Privileges, and Services Chart (Attachment 10-I)**.

   c. In conjunction with the SRTU Treatment Team, the Psychology staff will update the Initial/Annual IRP, using the **SRTU Recovery Treatment Plan Review (Attachment 10-J)**, every 30 days while the inmate is in Phases 5 through 1. The IRP shall be reviewed out-of-cell with the SRTU inmate at a minimum of every 30 days. The inmate must have input into the goals rather than all of them being generated by the SRTU Treatment Team in a standardized fashion. All inmates will be invited to personally attend and participate in all SRTU Treatment Team meetings. Treatment plan reviews will be documented in the **ICAR**.

   d. The goals on the IRP, established collaboratively with the SRTU Treatment Team and the inmate, drive the clinically structured out-of-cell offerings on the SRTU.

3. Participation in treatment programs is based on a phase system. Movement to a lower treatment phase is based on appropriate inmate behavior and compliance with the IRP. The initial treatment phase shall be determined by the inmate's present level of functioning, recent historical information, and mental status. The SRTU Treatment Team shall recommend all treatment phase changes. Ultimately the PRC, with input from the SRTU Treatment Team, has the final decision on awarding or terminating privileges and granting phase changes.

Issued: 12/11/2018
Effective: 12/18/2018

4. The SRTU treatment program includes a progressive phase system that may include, but is not limited to, Phases 5 through 1, plus Accountability Status, and Post-SRTU aftercare. The length of time spent in each phase is dependent on the inmate's demonstrated level of adjustment. The specific time parameters for each phase movement will be defined in the inmate's IRP.

5. Changes in status from phase to phase shall be accomplished through staff action by the SRTU Treatment Team and documented by circulating an **SRTU Program Review Sheet**, with final approval by the Facility Manager. All status changes will be documented in the **ICAR** by the Unit Counselor. A **DC-46** is not required for phase change following placement on Accountability Status. A **DC-46** will be required to be circulated for all Phase 1 approvals.

6. The SRTU is designed to support inmates with mental health problems in achieving the highest level of functioning within a safe environment. The phase system is designed to provide incentives for inmates who are able to remain free of self-injury, aggression, and other problematic behaviors as well as for attendance and participation in programming. Incentives will be earned when inmates engage in appropriate behavior. Incentives may be purchased weekly via the points system and points are deducted at the time they are redeemed.

7. The SRTU Treatment Team is aware that from time to time participation in programming may be difficult for some individuals. They may exhibit a lack of meaningful participation in the milieu offered. It is the goal of the SRTU that all participants receive the maximum benefit from treatment. Therefore, the SRTU Treatment Team will closely monitor program participation. Each month, every participant's IRP and out-of-cell participation will be reviewed by the Treatment Team. Should an individual's participation in out-of-cell offerings fall below 60% of the minimum 20 hours programming, the institution's LPM will lead the Treatment Team in collaborating with the individual to discuss goals/objectives/barriers to out-of-cell participation. Part of that review will include a discussion of the programming offered in order to ensure that it addresses the individual's expressed needs. ***The Treatment Team will also assess whether a higher level of care is indicated***. The institution's LPM ***may*** coordinate a videoconference/ ***teleconference consultation*** with their Treatment Team, their respective Regional LPM, and the Mental Health Advocate at Central Office, to discuss and review the Recovery Plan changes recommended by the institution's LPM and their Treatment Team.

8. Consequences for engaging in self-injurious, aggressive, or other problematic behavior will be immediate with the inmate being placed on Accountability Status where the capacity to earn incentives is limited.

9. Phase advancement will be recommended by the SRTU Treatment Team, which includes mental health staff, security staff, and unit team staff. Phase advancement shall be based on behavior and attendance as well as participation in programming. The SRTU is an incentive-based program, meaning that as behavioral stability is demonstrated, more privileges are earned. Inmates who engage in problematic behavior will not be afforded these privileges until they demonstrate they are able to function more independently.

10-15

Overriding goals include no disciplinary reports, treatment compliance, and active program participation.

10. Criteria for consideration of cutting set-aside-disciplinary sanctions and for advancement from phase to phase include:

    a. remain free of misconducts and problematic behavior reports;

    b. remain free of self-injury;

    c. attend at least 60% of the minimum 20 hours out-of-cell structured and unstructured programming;

    d. attend at least 90% of individual sessions; and

    e. other individualized recommendations on the IRP made by the SRTU Treatment Team.

11. Phase System

    a. Phase 5 (seven days)

        (1) This is the starting point for new admission to the program. The inmate is eligible to advance to Phase 4 programming after seven days with no problematic behavior demonstrated and active participation in out-of-cell programming. This phase includes:

            (a) the initial assessment of the inmate;

            (b) works with staff to develop an IRP to identify behavioral and clinical needs and goals;

            (c) attend initial SRTU Treatment Team session and orientation to the unit;

            (d) introduction to incentive plan;

            (e) rules of the unit;

            (f) behavioral expectations;

            (g) overview of the phase system;

            (h) group descriptions; and

            (i) unit schedule of activities and programs.

10-16

(2)   Phase 5 privileges and restrictions include the following:

(a)   as outlined in the **SRTU Property, Privileges, and Services Chart**;

(b)   may earn up to 50 incentive points per week. Incentive points may be used on Phase 5 for items approved on the **SRTU Incentive Order Form (Attachment 10-K)**; and

(c)   escorted in restraints to all out-of-cell activities. Restrained inmates will not be in mixed out-of-cell groups/activities with unrestrained inmates.

b.   Phase 4 (60 days or longer based on clinical recommendation)

(1)   After seven consecutive days on the Phase 5/Stabilization Phase without problematic behavior, the inmate is eligible for transition to Phase 4. Advancing through phases depends on active participation in programming. After 60 days on Phase 4, the inmate is eligible to move to Phase 3.

(2)   Phase 4 privileges and restrictions include the following:

(a)   as outlined in the **SRTU Property, Privileges, and Services Chart**;

(b)   may earn up to 50 incentive points per week;

(c)   15 incentive points may be used for food items;

(d)   30 additional earned points may be used for Phase 4 incentive point menu items; and

(e)   escorted in restraints to and from all activities. Restrained inmates will not be in mixed out-of-cell groups/activities with unrestrained inmates.

c.   Phase 3 (60 days or longer based on clinical recommendation)

(1)   An inmate may be considered appropriate for transition from Phase 3 to Phase 2 when the following is evident:

(a)   demonstrates the ability to maintain safe behavior for at least 60 days;

(b)   compliant with institutional regulations for at least 60 days;

(c)   demonstrates an overall level of functioning that is consistent with general population; and

(d)   compliant with treatment objectives as outlined in the inmate's IRP.

Issued: 12/11/2018
Effective: 12/18/2018

(2)   Phase 3 privileges and restrictions include the following:

    (a)   as outlined in the **SRTU Property, Privileges, and Services Chart**;

    (b)   may earn up to 50 incentive points per week;

    (c)   30 incentive points may be used for food items;

    (d)   any incentive point value may be used for incentive point menu items other than food items up to a total of 70 points per week;

    (e)   in Phase 3 the inmate can be considered for on-unit employment based on team approval and job-availability. The Phase 3 inmate may be permitted to eat meals out-of-cell. Phase 3 inmates will be paid General Labor Pool (GLP) for five days per week; and

    (f)   restraints - Upon placement on Phase 3 the Treatment Team may approve reduced restraints during escort to and from therapeutic modules for groups, recreation, and showers. However, Phase 3 inmates are generally unrestrained for regular movement within the unit unless out with another inmate who requires restraints.

d.   Phase 2 (30 days or longer based on clinical recommendation)

Phase 2 privileges and restrictions include the following:

(1)   as outlined in the **SRTU Property, Privileges, and Services Chart**;

(2)   may earn up to 50 incentive points per week;

(3)   any incentive point value may be used for any incentive point menu item including food up to a total of 70 points per week;

(4)   may generally move unrestrained out-of-cell unless out with another inmate who requires restraints;

(5)   in Phase 2 the inmate can be considered for on-unit employment based on team approval and job-availability and may be permitted to consume meals out-of-cell. Phase 2 inmates will be paid GLP for five days per week; and

(6)   may exercise in a group with up to six other unrestrained inmates.

e. Phase 1 (90 days or longer)

(1) An inmate attaining this phase is considered ready to begin reintegrating into a general population RTU or other housing unit deemed appropriate by the Treatment Team at the current treating facility or another SRTU facility. This probationary phase will be 90 days in length; with an option to extend probation for another 90 days through the Vote Sheet process. However, the maximum amount of time this phase will last is 180 days. Should the inmate be away from the facility for any reason, such as Authorized Temporary Absence (ATA) or a Mental Health Commitment, Phase 1 time will be suspended until such time as the inmate returns to the facility.

(2) While on Phase 1, the SRTU Treatment Team will continue to review the individual's IRP every 30 days. Incentive points will not be earned nor can they be used while an inmate is on Phase 1. The focus of this Phase *shall* be to continue to address treatment goals while adjusting to the general population setting. Thus, acclimating and blending into the general population routine is vital. Incentive points should be used prior to earning Phase 1. Once promoted to Phase 1, any unused points will be lost.

(3) When an inmate successfully completes the probationary status after 90 to 180 days without any significant incidents of behavioral or mental health regression, the SRTU Treatment Team will staff him/her for discharge/graduation from the program. Graduation from the SRTU will be completed by Vote Sheet with final approval from the Facility Manager. Since the inmate has completed/graduated the program, the Treatment Team may consider transferring him/her to another facility, or permit him/her to remain at the current facility. After completing the probationary period, the release of any Phase 1 inmate to general population requires facility approval via the *EDSI*/Regional Deputy Secretary.

## M. Accountability Status

Accountability Status is a temporary placement within the unit or off of the unit for SRTU inmates whose behavior is acutely dangerous to self or others or whose behavior is threatening and disruptive to programming and the operational functioning of the unit. The inmate on Accountability Status *shall* be evaluated daily with a plan for his/her timely return to the program.

1. Purpose of Accountability Status

a. It is the goal of the SRTU to provide quality out-of-cell programming to inmates who can benefit from treatment, but who, because of their behavior, have been restricted to units where intensive therapy is difficult to provide. An essential part of all Behavior Management programs is the provision for an immediate consequence for serious negative behavior. Therefore, Accountability Status may be instituted to temporarily address an acutely aggressive, threatening, disruptive inmate participating in SRTU

programming. This ensures the education of the inmate; safety of staff and other inmates; and the smooth continuation of the program for treatment compliant inmates.

b. The SRTU inmate may be held on Accountability Status no longer than 24 hours. Additional placement on Accountability Status may be approved by the Facility Manager in 24-hour increments up to an additional 72 hours if the individual's status has not stabilized after the first 72 hours, the Psychiatrist will be consulted to determine the need for POC or inpatient placement. In addition, upon reaching the initial 72-hour time frame, the institution's LPM will forward the SRTU Change of Status IRP to the institution's Regional LPM and the Chief of Psychology for review. Also, the SRTU Treatment Team will schedule and conduct a videoconference with the Department's Mental Health Advocate. Recommendations for case management will be made in conjunction with Central Office.

2. Indicators for Accountability Status Process

   a. SRTU inmates who are exhibiting acutely aggressive and/or threatening behavior toward themselves or others or are exhibiting extremely disruptive behavior that interferes with the safe and orderly functioning of the program will immediately be placed on Accountability Status. These behaviors may be reported and documented by utilizing the:

      (1) **DC-141, Misconduct or Other report**; or

      (2) **DC-121, Part 3, Employee Report of Incident**.

   b. Once a staff member observes a harmful, potentially harmful, or disruptive behavior, they will inform the Area Lieutenant, Unit Manager, and the LPM/designee. They will also complete one of the above noted documents. The Area Lieutenant will notify the Shift Commander of the noted behavior and the recommendation to place the inmate on Accountability Status. The Lieutenant, Unit Manager, or LPM will complete the **SRTU Accountability Status Restriction Form (Attachment 10-L)**. Recommended property and privilege restrictions must relate to the behavior which prompted the inmate's placement on Accountability Status. All documentation *shall* be completed immediately and forwarded to the Shift Commander for initial disposition.

   c. In general, cells utilized for Accountability Status should be away from the routine activity of the SRTU program. However, cells should be outfitted to ensure the maximum ability to observe and ensure the safety of the inmate.

   d. Prior to placing the inmate into Accountability Status, he/she *shall* be strip searched and given property and privileges as indicated on the **SRTU Accountability Status Restriction Form**. Once placed on Accountability Status, the inmate *shall* be seen by his/her assigned Psychology staff member. Together they *shall* complete the **SRTU Accountability Status – Individual Recovery Plan (Attachment 10-M).** This recovery plan *shall* specifically address the inmate's goals related to why he/she is on Accountability Status and his/her return to regular programming. Placement in

Accountability Status and subsequent treatment planning *shall* be documented in the **ICAR**. After being reviewed by the institution's LPM, the **SRTU Accountability Status – Individual Recovery Plan** will then be scanned to the institution's Regional LPM for review. They *shall* then be scheduled for the next Treatment Team meeting. All staff contacts *shall* occur as described in the Accountability Status Monitoring Protocol as follows:

(1)  the assigned Psychology staff member *shall* offer daily 30-minute AM and PM out-of-cell contacts for the duration of the Accountability Status placement. Contacts will be documented in the **ICAR** and **DC-560** documentation copied to the medical record;

(2)  additional psychological contacts, if requested by the inmate or a staff member, will be provided by the assigned psychologist during his/her scheduled daily psychology unit rounds;

(3)  one 30-minute daily out-of-cell Therapeutic Recreation Specialist contact;

(4)  one 30-minute daily out-of-cell Social Worker contact;

(5)  one 30-minute daily out-of-cell CPS contact;

(6)  one hour of yard daily;

(7)  PRC review during the Accountability Status placement;

(8)  SRTU Treatment Team review at the initiation of the Accountability Status placement, including review of treatment compliance, and property and privileges permitted with recommendations forwarded to PRC on a new **SRTU Accountability Status Restriction Form**; and

(9)  continued 30-minute daily out-of-cell Correctional Counselor visits.

e.  While on Accountability Status, the Treatment Team will make the final decision as to when and whether the inmate may have more property privileges or programming, or qualify for ending Accountability Status. While on Accountability Status inmates may earn one incentive point for each day without exhibiting acute aggressive and/or threatening behavior toward themselves or others or are exhibiting extremely disruptive behavior to the safe and orderly functioning of the program.

f.  To be removed from Accountability Status an inmate must be treatment compliant, (including out-of-cell participation of at least 50%), in behavioral control, and misconduct free to finish Accountability Status. The Treatment Team *shall* decide when an inmate has successfully completed Accountability Status. The inmate will then be returned to the program Phase deemed appropriate by the SRTU Treatment Team.

Issued: 12/11/2018
Effective: 12/18/2018

## N. Structured Versus Unstructured Programming

1. All structured and unstructured programming will take place in therapeutic modules and Restart Chairs upon determination by the Treatment Team. Each facilitator of structured and unstructured programming *shall* document their group contact with each individual on the **SRTU Group Participation Form (Attachment 10-N)**. Each facilitator *shall* keep the **SRTU Group Participation Form** in their possession. At the end of each 30 days, the **SRTU Group Participation Form** *shall* be forwarded to the medical record for filing. At the same time, the facilitator *shall* place a brief monthly summary in the **ICAR**.

2. Structured activities are those that are lead/facilitated by a Department or contracted staff member, or a Volunteer. These may include: Morning Meetings, Mental Health groups, the HELPING: Multimodal Self-Change Approach, Carey Guides, Relapse Prevention Plan, AOD, chaplaincy, Thinking for a Change groups, Violence Prevention, Taking a Chance on Change groups, Start Now program, groups run by activities staff, education, Reentry groups and modules on accepting mental illness, activities for challenged inmates, body basics, staying healthy on your medications, exploring the United States, handle anger better, personal hygiene, planning for a better life, self-esteem, social skills for challenged inmates, and substance abuse treatment introduction and other treatment interventions. Staff may also choose to use the "Traffic Light" Tool in order to illustrate targeted goals and objectives for each inmate. This visual representation of their immediate objectives can be placed where the inmate may view and have immediate feedback concerning appropriate and inappropriate behavior. This intervention will be utilized in a way that protects the confidentiality of the inmate. These resources and activities may be acquired from the LPM assigned to your region.

3. Unstructured activities are defined as activities occurring outside the cell but not conducted by Department staff members. For example: law library, recreation, visits, viewing movies, eating in small groups, and reading out-of-cell. They do not include activities of daily living like showers; however, eating meals in a small group would be considered unstructured.

4. At a minimum, ten structured and ten unstructured out-of-cell hours of programming will be offered to all inmates housed in the SRTU. The number of structured out-of-cell hours or portions of an hour of programming the inmate participates in will be logged by the staff member who provides the structured out-of-cell contact. The staff member will log the completed time on the **SRTU Accepted/Refused Structured Out-of-Cell Program Log**. The number of unstructured out-of-cell hours or portions of an hour of programming the inmate participates in will be logged by a CO assigned to the unit. The CO will log the completed time on the **SRTU Accepted/Refused Unstructured Out-of-Cell Program Log**.

5. Weekly, the SRTU Counselor will compile the total hours of programming for each inmate, document the total in the **ICAR** and report the data on the **Weekly Structured/Unstructured Out-of-Cell Program Report (Attachment 10-O)**. Completed logs will be forwarded to the SRTU Unit Manager for filing. The **Weekly**

**Structured/Unstructured Out-of-Cell Program Report** will be forwarded to the Chief of Psychological Services.

## O. Phase Modification

The SRTU treatment program will tailor individualized phase modifications/alternatives when necessary. The modifications will be documented on the IRP with the rationale and goals for the modification and the steps to be taken to reach those goals. These alternatives include, but are not limited to:

1. Accountability Status for an SRTU inmate who is celled in an area apart from the SRTU (if available) due to his/her behavior, psychiatric symptoms, and/or facility need. The inmate may be committed to a MHU, or other appropriate housing unit;

2. temporary phase change and/or phase demotion;

3. phase freeze (a hold in one phase for various reasons, where privileges may be modified); and

4. modified phase (e.g., an inmate with previous assaults on female staff will lock up when female staff are on the unit, or a Phase 4 inmate may be permitted uncuffed out-of-cell time when other inmates are all in their cells).

## P. Incentive Program

1. The Incentive Program is designed to allow inmates in the SRTU the opportunity to earn incentive points that may be redeemed for items on a regularly scheduled basis. Incentive points are earned based on individual performance and for positive and pro-social behaviors.

2. Incentives are a proven method for increasing pro-social behavior and reducing problematic (target) behaviors. Once the target behaviors and goals are identified with the inmate, incentives are used as a reward for achieving identified goals. Within the Incentive Program design is also life skill opportunities such as basic math and reading, learning to save and plan, and facilitating positive social communication.

3. Program Design

   a. Inmates who follow facility rules and regulations evidenced by not receiving a misconduct report or demonstrating any problematic behavior will earn a point for the day. A notation in the **ICAR** will be written as supporting documentation for an inmate who does not earn his/her point for the day. This will be noted by the Unit Counselor.

   b. Treatment points are earned based on treatment attendance and participation without problematic disruptive behavior. Inmates earn two points for each hour of structured activity and one point for each hour of unstructured activity they attend. Structured and unstructured programming will occur daily. Inmates are assigned to specific

groups based on individual needs. Inmates who do not have an excused absence, who ask to leave group before it is finished, or who are escorted out due to disruptive behavior do not earn points for that group.

c.  Inmates' points are aggregated each week. Inmates are informed, weekly, both verbally and in writing of all points earned. Inmates then may order items or purchase privileges using their points. Items are given point values from 5 to 50 points. Unused points may be carried over from week to week and month to month, but an inmate may not use more than the total stated for each phase in a given week. Once a point or privilege is earned, it cannot be taken away. Points and privileges will be held in abeyance should the inmate be placed in Accountability Status.

d.  The following is an overview of the incentive points that may be earned in each week:

(1)  seven daily points for no disciplinary reports or information reports (Maximum to be earned is seven);

(2)  seven daily points for Good/Fair ratings for Cell Cleanliness and Hygiene (Maximum to be earned is seven);

(3)  two points for each hour of attendance and participation in structured programming (Maximum to be earned is 20);

(4)  one point for each hour of attendance and participation in unstructured programming (Maximum to be earned is ten);

(5)  six bonus points for attending and participating in all groups and meeting recovery plan requirements for one week; and

(6)  seven daily points for no disciplinary reports or ***negative*** information reports while under Accountability Status (Maximum to be earned is seven).

e.  At the end of each week, the SRTU Counselor will tabulate each inmate's incentive point total for the previous week using the **SRTU Weekly Point Summary (Attachment 10-P)**. The total points will be transposed to the **SRTU Monthly Point Summary (Attachment 10-Q)** in order to track the total incentive points earned and redeemed over time. After tabulating the weekly point totals, the SRTU Counselor will then distribute the **SRTU Incentive Order Form** to each inmate. They will then complete and return the forms by the end of the day. Incentives earned will then begin to be distributed no later than the week following when they were redeemed.

Issued: 12/11/2018
Effective: 12/18/2018

## Q. Misconducts

1. The alleged commission of a Class 1 Misconduct charge 1 to 14 will result in formal disciplinary action if found guilty and Accountability Status for no more than three days.

2. The alleged commission of a Class 1 Misconduct charge 15 to 25 may result in formal disciplinary action if found guilty and placement in Accountability Status for no more than three days.

3. An inmate will not be issued misconducts for self-mutilation, however, a **DC-121, Part 3** will be generated. This may result in the inmate's placement in the POC or on Accountability Status.

4. The assigned Psychology staff will provide input to the Hearing Examiner for all formal hearings in regard to whether the infraction was due to the inmate's mental illness or volitional. The Hearing Examiner will use this input for sanctions or modifying sanctions.

5. An inmate on probationary status in Phase 1 in a general population RTU does not automatically need to be returned to the SRTU. This decision will be made by the PRC with input from the SRTU Treatment Team.

## R. Changes in Status

1. Inmates may be transferred to the SRTU in either Administrative Custody (AC) or DC status. DC sanctions should not be cut by the sending facility. The major goal of the SRTU program is to stabilize the inmate's behavior so he/she can progress to placement in the least restrictive environment, based on his/her demonstrated behavior. Any remaining DC time will be addressed by the PRC at the SRTU facility.

2. While in the SRTU, DC status is set aside. As stated above, the DC sanction time continues to expire while the inmate is in the SRTU. An inmate can earn further reductions in his/her DC sanctions for appropriate behavior.

3. An inmate who exhibits misconduct-related behavior while in the SRTU will generally serve a period of suspension on Accountability Status with a phase change (reduction in privilege level) based on the recommendation of the SRTU Treatment Team and approval of PRC.

4. All changes in status in regard to Phase progression will be completed via the **SRTU Program Review Sheet**. Once the unit team makes a recommendation to PRC to advance a phase, and PRC approves, an **ICAR** entry will be made by the counselor indicating such.

Issued: 12/11/2018
Effective: 12/18/2018

## S. Release of SRTU Inmates

1. Phase 1 constitutes the release of the inmate to a general population housing unit generally within the treating facility. The release of any Phase 1 inmate from the SRTU to a general population RTU or appropriate housing unit requires approval of the **EDSI**/Regional Deputy Secretary.

2. An inmate who is being considered for release to general population as a result of placement on Phase 1 must have completed all requirements of his/her IRP for Phase 2.

3. Approval to move to Phase 1 and release to a general population RTU shall be requested via memo to the office of the **EDSI**/Regional Deputy Secretary. Documentation should include the SRTU Treatment Team's approval, PRC action, Facility Manager's approval, and submission of appropriate rationale concerning the inmate's progress in the SRTU program. The release is usually to the general population RTU of the treatment facility.

4. If approval is granted for transition to Phase 1 and ultimate discharge to the designated facility, the Unit Manager/designee shall verify the status and move date.

5. The Unit Manager shall ensure that the following are completed:

   a. the inmate is readied for transition on the approved date;

   b. the inmate packs his/her property and cleans the cell;

   c. the inmate's property is inventoried by unit staff;

   d. all SRTU property, clothing, etc., is returned to the SRTU inventory;

   e. the inmate's property is released to the inmate and/or the Department transportation crew;

   f. if the inmate is being released to the SRTU facility's general population, request appropriate staff to escort the inmate to the newly assigned housing unit;

   g. review all documentation to ensure proper log entries, forms, location boards, and SRTU paperwork is completed accurately and in a timely manner;

   h. notify the facility's Control Center to ensure inmate movement forms for count procedures are completed; and

   i. in a case where the inmate is being discharged to an RTU placement at another facility with an SRTU, the SRTU Treatment Team shall conduct a videoconference or teleconference call, with the Unit Management Team of the receiving facility to discuss the inmate's response to treatment. The referring facility shall document in the **ICAR** and on the **DC-560** the date, names of participants, and issues discussed in the

conference call. At a minimum, the following issues shall be addressed:

(1)   the inmate's progress toward meeting the goals of his/her IRP;

(2)   the extent to which he/she has achieved maximum benefit from treatment available at the SRTU;

(3)   any ongoing resistance to program participation; and/or

(4)   any treatment needs to be addressed when the inmate arrives at his/her designated facility.

6.   An inmate being transferred to another facility as a Phase 1 SRTU inmate on probationary status will be afforded the same privileges and services as defined in the SRTU Privileges and Services Chart (Phase 1) and placed in general population.

7.   In the event that an inmate's behavior deteriorates, during his/her Phase 1 probationary period, the inmate may be returned to the SRTU. If the inmate's behavior deteriorates, after he/she has completed Phase 1, return to the SRTU is an option, but is not mandated. If a decision has been made to place the inmate back into SRTU programming, a new Referral Packet will be generated and the packet submitted for review as stated in this policy. Depending on the nature of the deterioration, the inmate may require a short time stay in the RHU and/or a mental health inpatient setting. If there are questions regarding the preferred option, cases in this status can be reviewed with the COSN/PRT and the Regional LPM.

## T.  Discharge Procedures

1.   Discharge/Graduation of an inmate from SRTU programming after successful completion of the Phase 1 probationary period shall be considered when:

a.   the IRP goals have been satisfied with successful reintegration into a general population RTU or step-down unit for three to six months in a permanent facility;

b.   it is necessary to place an SRTU graduate in the RHU, he/she will be managed according to his/her Stability Rating and Department policy **DC-ADM 801**; or

c.   an inmate successfully completing Phase 1 probationary period and graduating from SRTU programming may be eligible for transfer to a facility in his/her home region by submission of a permanent transfer petition utilizing the purpose, Other and Comments: SRTU Graduate.

2.   Discharge of an inmate from the SRTU for other than successful program completion shall be considered when:

a.   the SRTU Treatment Team concludes that the inmate remains resistant to participation in the IRP that was developed for him/her; and/or the inmate engages in

Issued: 12/11/2018
Effective: 12/18/2018

repeated negative behavior which is contrary to the mission of the SRTU, and undermines the treatment of other SRTU participants;

b. all inmates being considered for discharge from the SRTU for reasons other than successful completion shall be automatically referred to the SAU for review and recommendation for subsequent placement. The SAU recommendations will then be included in the Referral Packet; and

c. the following criteria should be met when an inmate is being considered for removal from overall SRTU programming:

   (1) clinician and custody consensus that the inmate's presentation is intentional and volitional and is not driven by SMI; and

   (2) evidence of both disruptive actions and deleterious impact on valid SRTU inmates' progress.

3. The facility recommending an inmate for removal from SRTU programming should send a Referral Packet to the OPM for review at COSN/PRT. The Referral Packet should include the following information:

   a. a completed **Special Program Referral Approval/Rejection Form**, which will serve as the face sheet. In the Requested Action Section, the Program/Unit Removal box should be checked;

   b. **DC-46** circulated through the SRTU Treatment Team and the referring facility's administrative staff;

   c. rationale for the inmate's removal from SRTU programming to include listing of disruptive behaviors, misconducts, and actions of self-injury;

   d. the review and recommendations as prepared by the SAU; and

   e. documented evidence of behaviors to include, but not limited to Misconduct Report(s), **DC-121s**, **ICAR** entries from SRTU Treatment Team, and PRT notes.

4. If the COSN/PRT determines that removal from the SRTU programming is not appropriate, all options will be reviewed and a decision as to the disposition of the inmate's case will be generated.

5. If the final recommended disposition by COSN/PRT does not include placement in another SRTU, the Executive Deputy Secretary will conduct the final review.

6. If removal from SRTU Programming is approved by the COSN/PRT and the Executive Deputy Secretary, then a Transfer Petition will be completed by the OPM. COSN/PRT will determine where the inmate should be placed and the OPM will assign a facility accordingly.

Issued: 12/11/2018
Effective: 12/18/2018

7. The receiving facility can submit the inmate for consideration by COSN/PRT for reentry into the SRTU programming, if the inmate displays behaviors consistent with SRTU admission criteria.

8. Prior to discharge or transfer to another SRTU or other placement, documentation from the Psychiatric provider shall include at a minimum, but not limited to the following information:

   a. overall progress, any symptoms which have not responded to treatment;

   b. summary of response to medication trials, reasons/need to continue any polypharmacy, and any significant events while in the SRTU;

   c. SRTU discharge treatment recommendations; and

   d. any inmate who's Psychiatric Evaluation is over *five* years old, shall have an updated Summary Psychiatric Assessment at the time of his/her discharge from the SRTU which shall include the above information.

## U. Release via Sentence Complete (Formerly Final Discharge Maximum Expiration [FDME])

1. If an inmate is scheduled for release via Sentence Complete before completion of the SRTU program, the inmate shall be referred to the facility Psychology Department 12 months prior to release for continuity of care/release planning, in accordance with **Section 2** of this procedures manual.

2. ***The inmate may be referred to the SAU in accordance with this procedures manual for an evaluation. The inmate may be placed on the Hard to Place Offender List in accordance with Department policy 7.3.1, "Reentry and Transition."***

3. Any release of a highly assaultive inmate due to sentence completion shall follow procedures set forth in Department policy **6.5.1, "Administration of Security Level 5 Housing Units," Section 1**. *Reentry services shall be offered in accordance with Department policies 6.5.1 and 7.3.1.*

## V. Unit Operation Evaluation

1. Monday of each week, the SRTU Unit Manager/designee will provide, via email, the Licensed Psychologist Director at Central Office with an updated roster to include SRTU inmates on Mental Health (MH) commitment, WRIT, etc. This roster shall include phases, effective date of current phase, and date admitted to the SRTU.

2. Also, on Monday of each week, the SRTU Unit Manager/designee will submit via email, to the Licensed Psychologist Director at Central Office, the log sheet of out-of-cell hours on the **SRTU Accepted/Refused Structured Out-of-Cell Program Log** and the **SRTU Accepted/Refused Unstructured Out-of-Cell Program Log**.

3.  In conjunction with this review, the SRTU Unit Manager/designee will submit a list of SRTU individuals who participated in out-of-cell programming at less than a 60% average for the previous month. This list will be reviewed by the institution's LPM who will ensure that all listed individual's IRPs have recovery plan goals/objectives related to program participation and overcoming obstacles to treatment. This list will be forwarded to the institution's Regional LPM and the Chief of Psychology. The type and content of programming offered will be evaluated as to its efficacy in engaging the individuals in the therapeutic process. Upon Central Office review, consultations with the institution may occur with recommendations to modify the programming delivered to the SRTU.

4.  The SRTU Unit Manager/designee shall provide, via email, a summary of the monthly Treatment Team meeting to the Licensed Psychologist Director (LPD) on the first of each month.

5.  In order to evaluate the operation of the SRTU, each Facility Manager/designee shall ensure that an **SRTU Semi-Annual Report (Attachment 10-R)** is completed and submitted to the Executive Deputy Secretary, the LPD, and the Regional LPM by July 31 (reporting period 1/1 to 6/30) and January 31 (reporting period 7/1 to 12/31) of each calendar year. This report shall include, but not be limited to, the following:

    a.  the number of inmate receptions by month;

    b.  a list of facilities transferring inmates to the unit;

    c.  the name and Department number of every inmate transferred to the unit;

    d.  the name and Department number of every inmate promoted to Phase 1;

    e.  the average length of an inmate's stay in all Phases (5, 4, 3, 2, and 1);

    f.  the name and Department number of every inmate released from the unit and the location where he/she was transferred;

    g.  the name and Department number of every inmate with Sentence Complete expiring while in the unit;

    h.  the name and Department number of every inmate moved to Accountability Status and Post SRTU;

    i.  the number of grievances filed by inmates in the unit;

    j.  the number of misconducts issued to inmates in the unit;

    k.  the number of SRTU inmates at the beginning and end of the reporting period;

    l.  any recommendations to facilitate the operation of the unit; and

m. any concerns regarding the operation of the unit.

Issued: 12/11/2018
Effective: 12/18/2018

## Section 11 - Sex Offender Treatment (SOT)

**A. Standards, Guidelines, and Theoretical Orientation for the Assessment and Treatment of Adult Sex Offenders**

1. Standards and Guidelines

   The Department's **Standards and Guidelines for the Assessment, Evaluation, and Treatment of Sex Offenders** are found in **Attachment 11-A**. Every provider of sex offender-specific treatment shall thoroughly familiarize himself/herself with these prior to facilitating treatment.

2. Theoretical Orientation

   The *overarching* theoretical orientation of the Department is derived from the *modern research* in the field of Sex Offender Treatment (SOT). All program components and therapeutic strategies are evidence-based on a cognitive behavioral model *of treatment*.

**B. Risk/Need Assessment**

1. Assessment Strategy

   a. An **Adjusted Actuarial Approach** shall be employed in evaluating sexual offenders. This strategy, involving first the use of a validated sex offender risk instrument that measures static or unchangeable risk factors shall be adjusted based on a *comprehensive* analysis of the inmate's dynamic risk factors.

   b. The risk assessment should be updated *if* an inmate's dynamic risk factors change, *even* minimally post-treatment and (if different) at time of parole review.

   c. When the inmate's reentry into the community is being considered, reports to the Pennsylvania Board of Probation and Parole (PBPP) should specify the offender's dynamic risk factors that are more acute in nature, *particularly* those that have a stronger *correlation* with re-offending and/or those that may change rapidly, such as *affective regulation or substance use disorder, etc.*, as these may be more amenable to observation by supervising officers and service providers. *These issues* may indicate that risk has increased such that offending is *potentially* more imminent than it was previously.

2. Facility Responsibilities

   a. Permanent facilities *will assign a sex offender coordinator/designee who will be* responsible for identifying, *initial* tracking, and assessing all sexual offenders received. All facilities shall use the automated Unit Management System for recommending *an* SOT Program and maintain waiting lists. A trained SOT provider shall conduct specialized assessments of a sexual offender within *three* months of

his/her arrival at the facility, and subsequent to the assessment, ensure the appropriate program is placed on the offender's **DC-43, Correctional** Plan (**C**P).

b. Participation in sex offender-specific treatment shall be "minimum sentence-driven," with an offender closest to his/her minimum date taking priority over those further from his/her minimum sentence date. However, this is not to say that lifers and/or offenders with very long sentences shall not be afforded treatment. Whenever possible (when it would not take a slot needed for an offender two years within his/her minimum date), these offenders shall be considered for placement in treatment.

3. Informed Consent

   Prior to initiating an interview for the purpose of initial risk assessment, the evaluator shall explain the nature, scope, and purpose of the interview to the inmate, emphasizing its importance in determining treatment needs. The **DC-484, Mental Health Informed Consent** form shall be completed in accordance with **Section 2** of this procedures manual.

4. Assessment protocol for an inmate offender with a current sex offense

   a. Every offender currently incarcerated for a sex offense shall be assessed for level of risk within **three** months of arrival at the permanent facility.

   b. For every male sexual offender, assessment shall include, but not be limited to, a case file review, and completion of the Static-99R. ***For an explanation of how to score the Static-99R refer to* Static-99*R* Coding Rules, Revised 2016 (Attachment 11-*B*). *Relative risk tables related to the Static-99R* can be found online at [www.Static99.org](www.Static99.org)).**

   ***The Static-99R will be scored electronically in DOCInfo under the Assessments tab. Refer to the Coding Form Preamble (Attachment 11-C) for a paper copy of the Static-99R.***

   c. Unless the convicted sexual offender refuses ***or exigent circumstances exist***, an individual interview shall also be part of the assessment process. During the interview, ***the assessor may use*** the **DC-577, Sex Offender Data Collection Instrument (Attachment 11-D)**. **NOTE**: ***The use of the DC-577 may assist the assessor in structuring the interview.*** Much of the information required for completion of the **DC-577** can be gleaned through the case file review, but can be verified and/or clarified in the individual interview. The same assessment process shall occur with every convicted female ***or juvenile*** sexual offender, excluding the completion of the Static-99***R*** as this risk assessment tool has not been cross-validated with this population.

   d. ***Any inmate who refuses*** to be interviewed for purposes of ***sex offender*** risk assessment shall ***have documentation placed*** in the **Inmate Cumulative Adjustment Record (ICAR)**. Upon refusal, the inmate shall be counseled as to the possible consequences of failure to participate in treatment, including the possibility of

being denied parole and of increasing his/her chances of re-offending upon return to the community. In cases where the inmate is appealing his/her case based upon claim of innocence and/or is in total denial of the crime(s) and refusing treatment, this shall also be documented using the **ICAR *and the DC-578, Sex Offender Program Evaluation (Attachment 11-E)*.**

e. Once the Static-99***R has*** been completed, the treatment provider shall determine if the risk level gleaned from the Static-99***R*** is to be adjusted based upon the following static and dynamic risk factors that have been empirically ***validated*** to increased risk of sexual recidivism:

   (1)   indication that the offender is at high risk for general recidivism based on Level of Services Inventory - Revised (LSI-R) scores (if available);

   (2)   indication that the offender maintains attitudes that support sexual offending (articulates belief that ***individuals under the age of 18*** are not harmed by sexual activity with adults);

   (3)   indication that the offender has a primary sexual attraction to ***individuals under the age of 18*** and/or becomes sexually aroused by violence;

   (4)   indication that the inmate has engaged in a high degree of deviant sexual behavior ***or known paraphilia*** rather than appropriate sexual behavior;

   (5)   indication based on historical data or behavioral observations that the inmate has serious emotion management/impulsivity problems;

   (6)   indication that the inmate has significant history of conflict-ridden intimate relationships; and/or

   (7)   documented evidence of early onset sexual offending behavior.

f. In the case of the female ***or juvenile*** sexual offender, the treatment provider shall determine the level of risk based upon the case file review, the individual interview, and the presence (or absence) of ***any of*** the above-cited dynamic risk variables.

g. In making decisions to adjust the risk level obtained from the Static-99***R*** based upon identification of the above-cited static and dynamic risk factors, the following guidelines apply:

   (1)   Static-99***R*** scores translated into Low and Low-Moderate risk categories shall be adjusted upward (Moderate/High Risk) in cases where the presence of the dynamic risk factor deviant arousal is confidently identified. There should be documented evidence of a pattern of deviant behavior as evidenced by multiple offenses and/or victims over an extended period of time;

11-3

    (2)    **a primary attraction to individuals under the age of 18 and/or sexually aroused by violence**; or

    (3)    Static-99**R** scores translated into Low and Low-Moderate risk categories shall be adjusted upward (Moderate/High Risk) in cases where four or more of the risk factors (1) through (7) are confidently identified.

h.    In the event that the inmate does not self-refer (via written or verbal request) to treatment within a period of one year, the Corrections Counselor shall ensure that he/she is again counseled regarding the possible consequences of failure to participate in treatment at the time of his/her annual review. In the event that an inmate does self-refer for treatment, a risk assessment shall then be completed.

i.    The results of the sex offender assessment shall be summarized using the **DC-578**, which provides two levels of risk (Low **and** Moderate/High). A male offender assessed to be low risk shall be prescribed Low Intensity SOT Programming, while an offender assessed to be moderate or high risk shall be prescribed Moderate/High Intensity SOT Programming. **Prior to the individual's enrollment in group, the group facilitator will also complete the Program Enrollment Notification form. The original form will be forwarded to the inmate's counselor with a copy being given to the inmate and a copy will be placed in the individual's SOT file.** Assessment results (including copies of the completed Static-99**R** and the **DC-578**) **can be found on DOCNet**.

5.    Assessment Protocol for a Technical Parole Violator

When a male inmate **previously** convicted of a sexual offense (previously a successful completer of **Department of Corrections (DOC)** sex offender-specific treatment) fails on conditional release and is returned to prison as a **technical** parole violator, decisions about what level to return him to treatment shall be based in the following assessment protocol.

a.    **These cases shall be designated as Act 122 TPVs and will have an automatic release date. Designated staff will administer a Treatment Placement Screening (TPS). At the present time, all levels of risk as assessed on the TPS will be recommended for Parole Violator-Sex Offender Programming (PV-SOP). Programmatic recommendations shall be entered into the Transfer Petition using the Act 122 template provided by the Office of Population Management (OPM). All placement decisions (i.e. State Correctional Institution [SCI] or Contract County Jail [CCJ], and exact location) will be noted by OPM in the approved Transfer Petition.**

b.    **Upon reception, the receiving placement site will administer the PV-SOP program to these individuals.**

6. Assessment of a Convicted Parole Violator

   a. A Convicted Parole Violator, re-incarcerated due to a sexual ***offense conviction*** shall be evaluated as described in **Subsection B.4. above**, using the most recent sex offense as the index offense. Results of the evaluation, along with the programming recommendation, shall be summarized using the **DC-578**.

   b. Convicted Parole Violators, re-incarcerated due to ***a*** non-sexual ***offense conviction*** shall be evaluated ***accordingly:***

   (1) *if the offender has lived sex offense free in the community for ten or more years from the date of his/her most recent release, then there will be a "No Evaluation or Treatment" recommendation;*

   (2) *if the offender has lived sex offense free in the community for less than ten years from the date of his/her most recent release and he/she has previously completed the PA DOC Sex Offender program, then there will be a "No Evaluation or Treatment" recommendation; and*

   (3) *if the offender has lived sex offense free in the community for less than ten years from the date of his/her most recent release and he/she has not completed the PA DOC Sex Offender program, then he/she will be recommended for a "Treatment Evaluation" as described in Subsection B.4. above (using the prior sex offense as the index offense, scoring the Static-99R retrospectively if not available in prior records, and adjusting, if indicated, as described in Subsection B.4. above) and subject to programming recommendations.*

7. Assessment of a male inmate referred for evaluation by the Corrections Counselor and/or the PBPP due to a prior sex offense ***conviction*** who was not on parole at the time of the current, ***instant*** offense.

   a. An inmate who was not on parole at the time he ***was convicted of his instant offense, will be evaluated accordingly:***

   (1) *if the offender has lived sex offense free in the community for a total of ten or more years from the date of his most recent release, then there will be a "No Evaluation or Treatment" recommendation;*

   (2) *if the offender has previously completed the PA DOC Sex Offender program, then there will be a "No Evaluation or Treatment" recommendation; and*

   (3) *if the offender has lived sex offense free in the community for less than ten years from the date of his most recent release and he has not completed the PA DOC Sex Offender program, then he will be recommended for a "Treatment Evaluation" as described in Subsection B.4. above (using the*

*prior sex offense as the index offense, scoring the Static-99R retrospectively if not available in prior records, and adjusting, if indicated, as described in Subsection B.4. above) and subject to programming recommendations.*

## C. Sex Offender Treatment (SOT) Programming

1. Standardized Treatment Model

   a. A program of sex offender-specific treatment is made available to every inmate convicted of a sexual offense, and in cases where specialized assessment indicates, treatment shall also be made available to an inmate who has a history of prior sexual *convictions*.

   b. Every facility that offers sex offender-specific treatment shall use the *"Responsible Living: A Sex Offender Treatment Program."* The program shall be implemented as using the "Group Only" format and the *designated* "Point System." *The process is described in Creating and Managing Groups in the Unit Management System (Attachment 11-F).*

   c. Initially, a denier shall be accepted into the program, but he/she shall be re-evaluated at intervals specified by the program, and ultimately terminated if satisfactory progress is not evidenced. *Use of the 60-day notice is required before termination/discharge from programming.*

   d. The order of presentation of the seven treatment phases *should follow the order as outlined in the program manual. Programming thus should begin with Module One, Responsibility Taking*. Programming shall be *delivered in a* standardized *fashion* with respect to content and, to a lesser extent, process. Any/all refinement and/or modification of programming must initially be approved through *Central Office Psychology*. If approved, any changes shall be incorporated into written procedure before implementation in the field.

   e. Point System - Program participants must accrue 85% of the total possible points in order to "graduate" from the program. (**NOTE**: The total number of possible points may vary as a function of several factors, including group size and the speed at which the facilitator(s) are able to work through the material.)

      (1) Using the "Group Only" format, each participant shall be able to accrue a total of six points per session, two for attendance, two for participation in the group session, and two for completion of the week's homework assignment.

      (2) A participant may be given a score of one rather than a score of two for participation and/or homework completion, if the group facilitator finds either or both marginal rather than satisfactory.

      (3) A participant can accrue ten points upon completion of the "Major Project"

Issued: 11/19/2018
Effective: 11/26/2018

associated with each phase of the program. In order to accrue all ten points, the quality of the participant's work shall be excellent. Nine points are awarded for good work, and eight for satisfactory work. If the facilitator does not find the participant's Major Project worthy of at least an "eight," the work shall not be accepted and the offender shall be advised of the reasons for rejection and performance expectations, and asked to resubmit the project after revisions have been completed.

(4) A program participant shall be issued a completed Points Update form (located on page 96 of the "*Getting Started*" facilitator's manual) at the completion of each treatment phase. The treatment provider shall complete Points Updates along with the Therapist's Ratings on Treatment Goals form (located at the end of the facilitator's manual for each phase), which also shall be given to the program participant.

(5) At this time, **the treatment provider may have the** program participant complete the Self Rating on Treatment Goals and Review of Progress on Treatment Goals forms (located at the end of the facilitator's manual for each phase), and shall submit these to the treatment provider. This exchange of assessments shall permit the program participant, as well as the therapist, opportunity to check the extent to which the program participant's ratings agree with the treatment provider's. The treatment provider shall ensure that copies of Points Update, Therapist's Ratings on Treatment Goals, Self Rating on Treatment Goals, and Review of Progress on Treatment Goals forms are maintained in the sex offender-specific treatment record.

f. Modifications For Correctional Setting - Use of Phallometry and Polygraphy as outlined in *Responsible Living* shall be omitted due to unavailability of equipment and trained personnel. Aversive therapy techniques requiring use of ammonia shall also be omitted, and a written script shall be required instead of audiotapes for the Major Project (Covert Sensitization) in the Behavioral Techniques phase.

g. Procedure for implementing completion of the Major Project for the Victim Empathy Phase of *Responsible Living: Victim Scrapbook* - completing this project requires that the inmate create a series of collages depicting victim impact. **Procedure for Implementing Victim Scrapbook Process (Attachment 11-*G*)** outlines a procedure for managing the materials necessary to complete the collage**.**

h. A Moderate-High and High Risk offender, as assessed by the assessment protocol outlined in **Subsection B. above** shall receive all seven phases of *Responsible Living: A Sex Offender Treatment Program.*

i. A Low and Low-Moderate Risk offender, as assessed by the assessment protocol outlined in **Subsection B. above** shall receive *Responsibility Taking, Sex Education and Relapse Prevention* phases.

j. Special Populations - *Responsible Living: A Sex Offender Treatment Program* was

*originally* designed for the male sexual offender and, therefore, programs for female sexual offenders may be modified *to address gender differences*. Treatment for a Special Needs inmate includes *Intellectual*/Developmental Disability, *Serious* Mental Illness, and/or physical disability. A *non-English speaking* sexual offender may also be modified accordingly, with modifications based upon field research and findings pertaining to best practices for these populations. *The institution is responsible for acquiring translation services in order to provide programming to non-English speaking individuals.* These programs shall be reviewed and approved through *Central Office Psychology*.

2. Treatment Variables

   Group therapy with sex offenders is viewed as the treatment modality of choice. Given skilled clinicians, the group therapy experience can be very *effective*.

   a. Group size - Group size shall be limited to not more than 15 participants.

   b. Group composition – *Group composition is primarily determined by minimum date. Groups are heterogeneous in make-up in regard to offense conviction, etc. Depending on institutional need, group composition may also be dictated by specialized populations as identified above.*

   c. Group process - Any ongoing group is in a continuous process of development. There have been several models outlining group development. A 4-stage model of group development summarizing the work of Corey (1995) can be found in *Four-Stage Model of Group Development* (Attachment 11-*H*).

   d. Getting Started - Documents explaining the **DC-580, Limits of Confidentiality (Attachment 11-*I*)** and **Conditions of Participation (Attachment 11-*J*)** should be thoroughly reviewed, signed by the inmate, and witnessed *by staff* prior to the inmate's involvement in programming.

   e. Levels of Treatment and Adding Group Participants

      (1) *Responsible Living: A Sex Offender Treatment Program*, as it is implemented for a sexual offender whose level of risk and need fall into moderate and high categories, consists of seven treatment phases. Once a treatment phase has been initiated, the group composition is "set" and no new group members shall be added. At the discretion of the treatment team, new members may be added when a new treatment phase is initiated. However, such decisions should be carefully considered and based upon the treatment team's assessment of the impact of these variables on the group and each participant. Close and accurate record keeping shall be very important in managing changes in group composition, as well as variations in the sequential ordering of individual participant's progression through the seven treatment modules.

      (2) *Responsible Living: A Sex Offender Treatment Program,* as it is implemented for

Issued: 11/19/2018
Effective: 11/26/2018

low risk offenders, shall generally be a "closed" group. That is, once the group composition is decided upon and the program is initiated, no new group members shall be added. The only exception to this shall be the case in which attrition has resulted in a Low Intensity group consisting of fewer than five program participants. In such case, this group may be joined with another Low Intensity group at the onset of a new treatment phase, provided the resulting larger group could ultimately complete the entire Low Intensity Program concurrently.

f.   Frequency/Duration – ***It is recommended that*** group sessions be conducted ***once*** weekly for two consecutive hours. ***This allows time between groups for the individual to process the information discussed in group and will allow time for them to complete assigned homework.*** The total target time to complete the program as it is implemented for moderate and high risk/need level participants ***shall be no less than 18 months and no more than 24 months.*** The overall number of sessions required shall be determined by the rate of the group's progress through the required components. The total target time to complete the program as it is implemented for low risk offenders ***shall be no less than*** eight months ***and no more than 12 months;*** however, this also shall be a function of the group's rate of progress through the program material.

g.   Facilitation - Groups may be co-facilitated depending upon availability of staff resources. Given availability of adequate resources, co-facilitation by male-female pairs is optimal and recommended.

**D.  *Support Groups***

***Individuals who have successfully completed treatment (i.e. either low intensity or moderate/high intensity) are eligible to also participate in voluntary support groups for sex offenders supervised by the DOC Psychology Staff. The support group will not be entered on the Correctional Plan and cumulative attendance will not be tracked. Participation in the support group will be strictly voluntary. This group should review SOP concepts and can be used to help individuals prepare for their parole interview. This group shall be offered to the inmate population at least one time per month. This SOP support group is also available to those individuals who have been evaluated and are awaiting participation in sex offender treatment. They will have the opportunity to familiarize themselves with the issues to be addressed in treatment. This will also afford them the opportunity to understand they are not alone in this difficult treatment process. Participation for this group will also be voluntary. Negative participation in the support group will be reviewed and documented by the SOP Coordinator, if needed, and result in the individual being removed from this support group.***

**E.  Delivery of Sex Offender Booster**

1.   ***All individuals who have successfully completed the SOT Program (i.e. either low intensity or moderate/high intensity) will be recommended to also complete the***

*Sex Offender Treatment Booster (Attachment 11-K). This program recommendation should occur approximately four to six months prior to the individual seeing the parole board. The Sex Offender Treatment Booster is recommended for the individual regardless of whether it is mandated in the individual's paroling action or not.*

2. *It is expected that the Sex Offender Treatment Booster will be completed in four to six weeks, preferably in a group setting or with one on one treatment as needed. The expectation is that two sessions per week will be conducted to allow the individual ample opportunity to appropriately complete homework assignments and readdress issues related to offending. Individuals who completed Low Intensity Sex Offender program must complete the corresponding Booster segments (1, 2, 11, and 12) and individuals who completed the moderate/high intensity Sex Offender Program must complete all Booster segments. Individuals will need to pass the Booster with a score of 80% or better and will be required to attend all scheduled sessions. Further questions are addressed in Sex Offender Booster Frequently Asked Questions (Attachment 11-L).*

3. *Upon completion of the SOT Booster, the group facilitator will complete the Unit Management Program Evaluation Document. He/she will evaluate the individual via the Sex Offender Booster Assessment (Attachment 11-M) and include that score into the Unit Management program evaluation. Completion will also be documented in the ICAR.*

4. *SOT Booster failures will be managed according to the instructions found in the Sex Offender Booster Frequently Asked Questions.*

**F.  Staff Qualifications and Minimum Training**

Qualifications *for facilitating the DOC standardized SOT Program*.

1.  Credentialing and Supervision

    a.  Staff who possess a graduate degree in the behavioral health, or social sciences.

    b.  *All group facilitators must have completed the DOC Fundamentals of Sex Offender Treatment (FSOT) prior to delivering this program*.

    c.  *Upon completing the DOC FSOT training, it is recommended that the newly trained staff co-facilitate at least one complete moderate/high treatment group*.

    d.  *They must hold the job classification of Psychological Services Specialist (PSS), Psychological Services Associate (PSA), or Social Worker*.

    e.  *Individuals with other levels of education experience and/or holding other job classifications may be approved individually by Central Office Psychology*.

11-10

2. Training

    a. Education, experience, and training are the critical qualifications associated with the provision of SOT.

    b. Every provider **must** obtain at least **six** hours annually of continuing education in the field of **sex offender assessment and treatment**. Continuing education includes courses, conferences, workshops, and other training experiences including self-directed literature review. A provider may request out-service trainings through his/her facility administrators. A provider may also take advantage of trainings made available by the Sexual Offender Assessment Board (SOAB). These six-hour trainings are typically offered quarterly and free of charge.

3. Consultation and Professional Affiliations

    a. Providers, regardless of degree and years of experience in the field of sexual abuse, should supplement their education and professional experience with informal consultation with other providers of SOT in the Department.

    b. Providers should consider affiliations with other professional organizations, agencies, or groups involved in the assessment, treatment, and management of sexual abusers **such as: Association for the Treatment of Sexual Abusers (ATSA), Midatlantic Association for the Treatment of Sexual Abusers (MARATSA – a chapter of ATSA), Massachusetts Society for a World Free of Sexual Abuse by Youth (MASOC), and Massachusetts Association for the Treatment of Sexual Abuser**.

    c. Every provider should make a good faith effort to remain informed of all applicable statutory and regulatory requirements to warn, report, and notify the appropriate persons or entities of information learned during the course of providing clinical services. **Central Office Psychology** shall periodically provide information as it becomes available.

## G. Multidisciplinary Treatment and Management of the Sex Offender

The Department supports a multidisciplinary approach to the treatment and management of sex offenders. A variety of professionals including, but not limited to, Corrections Counselors, Psychologists, Psychiatrists, Certified Registered Nurse Practitioners – Psychiatric Services (PCRNPs), Unit Managers, and Corrections Officers **may** be involved in the treatment and**/or** management of sex offenders.

Every staff member involved in the treatment and management of sex offenders will become familiar with the cognitive distortions or "thinking errors" commonly used by sex offenders, as this may assist in therapeutic confrontations and/or monitoring the extent to which the offender is internalizing and practicing pro-social attitudes and behaviors addressed in the group treatment setting.

Issued: 11/19/2018
Effective: 11/26/2018

1. Counselors

   The Corrections Counselor shall be the primary case manager for the sexual offender, ensuring he/she has been identified, has completed his/her risk/needs assessment, and has either been placed in programming subsequent to this assessment, or, if necessary, been placed on a waiting list for future involvement in programming. ***The*** Corrections Counselors ***will also monitor the "Green Sheet" to determine if the Parole Board has made any modifications for SOT Program recommendations. These changes will be communicated to the institution's Sex Offender Coordinator via email***.

2. Psychologists

   The Licensed Psychology Manager (LPM)/***SOT Program Coordinator*** shall coordinate and oversee the SOT in each facility. For sex offenders who are also placed on the Mental Health/***Intellectual Disability*** (MH/***ID***) tracking roster(s), the psychology staff shall ensure that the inmate's Individual ***Recovery*** Plan (I***R***P) addresses sex offender assessment and treatment needs ***that may fall beyond the scope of the standardized SOT Program.***

3. Psychiatrists/PCRNPs

   A Psychiatrist/PCRNP shall treat those sex offenders with co-existing Mental Health problems.

4. Unit Managers

   When managing a Residential Sex Offender Unit for sex offenders, the Unit Manager ***may*** become involved in the monitoring and, in some cases, tracking of progress of offenders on his/her housing unit.

5. Corrections Officers

   Particularly when posted on a Residential Sex Offender Unit for sex offenders, Corrections Officers can become involved in the tracking and monitoring of the offender's progress in treatment. Because an Officer tends to observe the inmates more than the treatment providers in settings outside of groups, he/she can be an invaluable source of information with regard to gauging the extent to which there is "transfer of learning" outside the group setting.

## H.  Record Keeping

Record keeping is essential to maintaining documentation of offense-related data, risk assessments, program participation, progress in treatment, relapse prevention plans, and successful program completion. Good record keeping assists the provider in remaining organized and provides a handy resource for those working with large numbers of program participants. ***All documentation must be completed by the individual who actually provided the services.***

1. A file shall be developed for all inmate program participants. This file shall be a separate file developed and securely maintained by the treatment provider solely for maintenance of documents associated with sex offender-specific treatment. ***This file shall contain the record of the individual's group attendance and their points updates. Other SOT specific documents are maintained electronically in DOCNet. There is no need to reproduce and maintain these in a hard copy file. All completed homework assignments and completed major projects will be retained by the group leader for review and scoring. They will then be returned as soon as possible to the group participant.***

2. ***As stated above, the majority of record keeping is done electronically within DOCNet. An overview of those documents includes:***

   a. ***DC-577 – this may be utilized by the assessor or treatment provider to assist in an initial structured interview;***

   b. ***DC-578;***

      (1) ***completed in conjunction with the Static-99R within 90 days of the individual's arrival at the programming institution;***

      (2) ***evaluation is memorialized with a note in the ICAR. Documentation will note that the program evaluation was completed. The individual's attitude toward treatment will also be reflected;***

      (3) ***the evaluator will modify the DC-43 by removing "Evaluation" and assigning a level of treatment; and***

      (4) ***if the individual is refusing treatment, that will also be noted on the plan.***

   c. ***Static-99R – will be completed in conjunction with the Sex Offender Program Evaluation within 90 days of the individual's arrival at the programming institution; and***

   d. ***DC-579, Summary of Progress in Sex Offender Treatment (Attachment 11-N) – this document is to be completed on the following occasions and memorialized with a note in the ICAR. This ICAR note should briefly summarize the individual's progress in treatment. The group leader will also complete a Unit Management Program evaluation reflecting this same information.***

      (1) ***At the successful completion of the group.***

      (2) ***Prior to the individual's parole staffing with his/her unit team for inclusion in the parole staffing packet.***

      (3) ***If the Parole Board would request an update at the time of his/her board hearing.***

11-13

    (4) ***When the individual transfers to another institution prior to completion and at the time, an individual is terminated/discharged from the program.***

    (5) ***Upon successful completion, discharge, or failure.***

3. Upon the offender's release on parole or completion of the maximum sentence, any remaining documents in the file shall be destroyed.

## I. Assistor/Peer Programs

Peers can be ***an asset*** in assisting other inmates who may be struggling with any number of programmatic/***treatment related*** issues. Guidelines for selecting ***peer assistors are as follows:***

1. Selection - The ***SOT Program Coordinator*** shall initially ***identify and interview*** potential assistors/peer group facilitator for inclusion in the program. Every ***candidate for sex offender*** assistor/peer ***should*** be entering the program on a voluntary basis, must have successfully completed the ***appropriate*** treatment program, ***must*** be misconduct-free for at least one year, and should be ***recommended by a*** consensus among ***SOT providers***.

2. At facilities where there is a Residential Unit for sex offenders, the Unit Manager, ***in conjunction with the*** treatment provider, shall delineate assignments, times, and places where an assistor and peer groups can meet with ***their*** assigned inmate(s). The Unit Manager or treatment provider shall determine the number of assignments a particular assistor or peer group facilitator can manage, as well as the duration of his/her sessions. All mentoring sessions shall take place in a day room or conference room, which shall be intermittently monitored by correctional staff. The Unit Manager or treatment provider shall also be responsible for the management of inmate movement in those cases where the assistor is no longer housed in the Residential Sex Offender Unit or ***in an institution where there is no Residential Unit***.

3. Treatment providers shall meet with the assistors and/or peer group leaders at least once monthly to process any concerns or problems, as well as any positive feelings associated with the mentoring process.

## J. Managing Program Participants who *are Found Guilty of* Misconduct(s)

1. When the misconduct results in three consecutive missed sessions, the offender shall be terminated from his/her current program. In a case where imposed sanctions ***may*** allow ***program participation, i.e. cell restriction,*** the offender may ***continue his/her participation*** with his/her group.

2. ***If terminated from programming, this will be documented using the Unit Management Program Evaluation form and the ICAR.***

**K. Managing Inmates without a Sexual Conviction who Sexually Assault during Incarceration.**

1. *If this sexual assault results in a formal legal charge and criminal conviction in a Pennsylvania court of law, this individual will then be referred for assessment according to this policy.*

2. *Consistent with the Prison Rape Elimination Act (PREA), all prisons shall attempt to conduct a mental health evaluation of all known inmate-on-inmate abusers within 60 days of learning of such abuse history and offer treatment when deemed appropriate by mental health practitioners. (28 C.F.R. §115.83[h]) If the facility offers SOT, the facility shall consider whether to require the offending inmate to participate in such interventions as a condition of access to programming or other benefits. (28 C.F.R. §115.78[d]) Inmates who have been found to have engaged in sexual abuse without an accompanying criminal conviction, shall be evaluated for SOT and, if deemed appropriate, offered the opportunity to participate voluntarily in SOT.*

**L. Collaborating with the Sexual Offender Assessment Board (SOAB)**

Collaboration requires agencies to share resources and work together to enhance capacity toward attainment of a common goal. Because of the importance of collaboration in attaining goals of reduced recidivism and increased public safety, staff involved in the treatment and management of sexual offenders shall routinely exchange available pertinent information with the SOAB. Treatment staff shall apprise themselves of available SOAB evaluations, and shall be receptive to arranging times to answer the SOAB evaluators' questions upon request. Responses to questions may be communicated verbally or via available written reports and/or email. The SOAB will make their assessment reports available to treatment staff.

Issued: 11/19/2018
Effective: 11/26/2018

## Section 12 – Behavior Management Unit (BMU)

### A. Program Mission

1. The Behavior Management Unit (BMU) is designed to provide management, programming, and treatment for an inmate who exhibits severe Personality Disorder with functional impairment, chronic disciplinary issues, and demonstrates an inability to adapt to a general population setting. This is a secure diversionary unit for mentally ill inmates who are not acutely mentally ill and do require a secure setting due to their demonstrated problematic behavior in less secure environments. The unit is intended to provide focused staff interaction, programming, and behavior management for this select inmate population. The focus of the BMU is to convey sufficient skills in behavioral control, coping, and compliance with recommended interventions.

2. Each inmate in the BMU will be scheduled and offered a minimum of 20 hours out-of-cell activity per week; ten hours of structured activity and ten hours of unstructured activity. This intensive specialized treatment program will assist an inmate in progressing to the least restrictive environment for managing his/her demonstrated behavior. The least restrictive environment will vary among inmates and may include eventual return to general population, continued placement within the BMU, and even fulfillment of the inmate's reentry plan upon Sentence Complete. An inmate's custody level will be suspended while in the BMU but their Disciplinary Custody (DC) sanctions, if they have any, will run concurrent to their time in the BMU until the sanction expires or until placed in Phase 1 of the program. This occurs so the inmate may still participate in and benefit from treatment to the maximum extent possible and be returned to the least restrictive setting as soon as possible. An inmate who is unable to transition from the BMU, complete the BMU program, or requires a therapeutically recommended transfer to another BMU, will be processed for alternative placement by review of the Central Office Special Needs/Psychiatric Review Team (COSN/PRT).

3. ***At any point during the program, the Program Review Committee (PRC) can recommend that an inmate be removed from the Restricted Release List (RRL) and initiate this process.***

   a. ***An inmate may not be released to general population, i.e. Phase 1 probationary status, until he/she has been officially removed from the RRL.***

   b. ***On Phase 2, when staff have discretion in bringing an inmate out unrestrained, if the inmate still is maintained on the RRL list, this phase can be modified so he/she receives Phase 2 privileges, but still comes to out-of-cell activity in restraints.***

   c. ***In the event that an RRL inmate makes it to Phase 2, is still on the RRL list, and goes on an escorted trip to a destination in general population, arrangements shall be made to appropriately restrain or visit during count to maintain security of those still active on RRL.***

Issued: 12/11/2018
Effective: 12/18/2018

## B. Location

BMUs will be located at various facilities within the Department.

## C. Staffing

1. BMU Treatment Team

   a. Comprised of the Licensed Psychology Manager (LPM), Unit Manager, Unit Counselor, Psychiatrist/Certified Registered Nurse Practitioner (CRNP), full-time Psychology staff (Psychological Services Specialist [PSS] and/or Psychological Services Associate [PSA]), Activities, and BMU Correctional Officers. The BMU Treatment Team will meet with and review all BMU inmates at least every 30 days. Inmates placed on Accountability Status will be reviewed daily. This team follows the inmate in all phases, including at least three months of probationary status in a general population Residential Treatment Unit (RTU) or other population housing unit deemed appropriate by the Treatment Team; this probation can be extended for an additional three months if indicated. However, the duration of Phase 1 must not exceed six months' time, irrespective of any off unit placements. Other staff and teams involved in the daily operation of the BMU include, but are not limited to: the Program Review Committee (PRC), staff members from Alcohol and Other Drug (AOD) treatment, Education, Social Worker, Therapeutic Activities Services (TAS) Worker, Medical – Nursing, Chaplaincy, and Certified Peer Specialists (CPS). Staff contacts with inmates participating in the BMU will be noted on the **BMU Accepted/Refused Structured Out-of-Cell Program Log (Attachment 12-A)** and the **BMU Accepted/Refused Unstructured Out-of-Cell Program Log (Attachment 12-B)**.

   b. In addition, the BMU Treatment Team will meet at least twice each week to discuss the general operation of the unit and review the recovery plans of each inmate. These meetings will be facilitated by the Unit Manager and the LPM and should generally be held at the change of shift in order to maximize Officer involvement.

   c. Responsibilities and Ratios

      (1) BMU Unit Manager

          The Unit Manager will provide manager-level direction with the assistance of the lieutenants. The Unit Manager will provide the team with daily leadership and will review and direct the treatment and activity of the inmates in his/her care. If not permanently assigned to the BMU, the Unit Manager will visit the unit daily and sign the log book.

      (2) LPM

          The LPM is not solely assigned to the BMU, but also oversees all psychological services in the facility. The LPM functions as the administrative and clinical

supervisor of all psychological staff on the BMU. The LPM also provides clinical oversight, via the Treatment Team and the Individual Recovery Plan (IRP), to the entire BMU Treatment Team. The LPM is responsible for chairing any Treatment Team meetings held on the BMU. However, in all aspects of the program, the LPM will closely collaborate with Psychiatry and the Unit Manager.

(3)  Psychiatric provider

The Psychiatric provider will be responsible for interviewing all BMU cases weekly. Psychiatric coverage will include 30 minutes per inmate ***biweekly***. All Psychiatric contacts are to be out-of-cell unless the inmate refuses or security issues prohibit out-of-cell contact at that time. ***The Psychiatrist/PCRNP will meet with BMU inmates as often as deemed clinically necessary, but no less than once every 14 days.*** This includes those BMU inmates who may be on Accountability Status. The Psychiatric provider will also be required to participate in all scheduled Treatment Team meetings.

(4)  PSS/PSA

For BMUs that have more than one full-time equivalent PSS/PSA assigned, a portion of those additional hours will be assigned to a 12-8 work shift. The PSS/PSAs assigned to the BMU will be responsible for developing IRPs with their assigned inmate caseload. These IRPs will specifically identify goals and objectives designed to restore the inmate to a stable and healthy level of functioning. The goals on the IRP established collaboratively with the BMU Treatment Team and the inmate shall drive the clinically structured out-of-cell offerings on the unit. The PSS/PSA will work closely with custody staff and all disciplines assigned to the BMU. The PSS/PSA will be responsible for delivering individual and group therapy directed at addressing the issues outlined in the IRP. All contacts will be noted on the **BMU Accepted/Refused Structured Out-of-Cell Program Log**, at a minimum weekly **Inmate Cumulative Adjustment Record (ICAR)**, and **DC-560, Mental Health Contact Note** entries are required. The PSS/PSA will offer daily AM and PM out-of-cell contacts for the duration of the Accountability Status placement. At the discretion of the LPM, the PSS/PSAs assigned to the BMU may have other assigned facility duties.

(5)  Corrections Counselor (CC)

The CCs will provide professional counseling and case management activities to an inmate caseload assigned by the Unit Manager. This will include treatment groups, individual contacts, and supervising inmate unstructured out-of-cell time. All contacts will be noted on the **BMU Accepted/Refused Structured Out-of-Cell Program Log** and **BMU Accepted/Refused Unstructured Out-of-Cell Program Log**, and at a minimum weekly **ICAR** entries will also be made to document the inmate's status. The CCs will work with the BMU staff to ensure that proper documentation is kept by maintaining the tracking forms for all out-of-cell structured and unstructured activity. In addition, the CCs will ensure that all

incentive tracking charts are up to date on a weekly basis with results reported as an **ICAR** entry. Thus, charting the progress each inmate is making in preparation for his/her possible graduation from the program and possible reentry into the general population.

(6)   TAS Worker

The TAS Worker will develop and deliver therapeutic activities during the days, evenings, and on the weekends. The TAS Worker will implement, monitor, and evaluate the therapeutic recreational segments of IRPs including instructing, directing, and providing support in a variety of activities relating to therapeutic recreation, occupational therapy, and vocational adjustment services. The activities would be directed at engaging self-isolated or reclusive inmates and providing structured and unstructured recreational time for BMU inmates. The increased activity and out-of-cell time will be assisting with improving the inmate's emotional control. All contacts will be noted on the **BMU Accepted/ Refused Structured Out-of-Cell Program Log** and the **BMU Accepted/ Refused Unstructured Out-of-Cell Program Log**. This employee may also be assigned to work with inmates on the general population RTU as supervised by the Unit Manager on the BMU/RTU.

(7)   Custody Staff

(a)   Appropriate security staffing levels and security measures for inmate movement, showers, meals, activities, etc., shall be conducted in accordance with Department policy **6.5.1, "Administration of Security Level 5 Housing Units," Section 1**. Unit staffing and security measures may be reduced by the Unit Team and PRC for a BMU inmate in Phases 3, 2, and 1, but should always remain at a level to provide escort coverage for daily out-of-cell contacts.

(b)   Corrections Officers (COs) assigned to the unit will provide daily input for the BMU Treatment Team decisions through regular contact with treatment staff and via documentation utilizing the **BMU Shift Pass Down Form (Attachment 12-C)**. This form is utilized in order to ensure accurate communication between shifts and the Treatment Team. In addition, it is important for custody staff's observations to be included in the Treatment Team's review of the inmate's progress with their treatment objectives. COs are expected to communicate their observations of an inmate's activity and any interactions they may have had with the inmate. In addition, custody staff will participate in all Treatment Team meetings, comment on, and sign the Treatment Plan.

(c)   Because the potential exists that an inmate may become a significant danger to himself/herself and/or others, enriched custody staffing levels are required in the units to provide protection to staff and inmates. This modification ensures that out-of-cell mental health programming can be

provided as well. The Deputy Superintendent for Facilities Management (DSFM) shall ensure that CO coverage is maintained and sufficient to permit the unit to conduct out-of-cell structured and unstructured activities, protect persons and property on the unit, and escort inmates in and out of cells throughout the day, even during count time. The DSFM shall meet regularly with the Major of the Guard and Unit Manager to discuss custody staffing needs.

2.  Other Staff Involved on the BMU

    a.  PRC

        This committee is generally comprised of the DSFM, the Deputy Superintendent for Centralized Services (DSCS), and the Corrections Classification Program Manager (CCPM). The PRC will review all BMU inmates monthly or as necessary as indicated by submissions of the **BMU Program Review Sheet (Attachment 12-D)** by the BMU Treatment Team. Inmates in the BMU on Accountability Status will be reviewed by the PRC at least weekly.

    b.  AOD

        Drug and Alcohol Treatment Specialists (DATS) will provide group and/or individual structured out-of-cell contacts for BMU inmates with identified AOD treatment needs. The goals/objectives of such treatment will be reflected on the inmate's Treatment Plan. All contacts will be noted on the **BMU Accepted/Refused Structured Out-of-Cell Program Log**.

    c.  Education/Adult Basic Education (ABE) Teacher

        This staff member will address the educational needs of the inmates participating in the BMU. He/she would provide educational opportunities for those who are mandated to participate in education to meet guidelines and also those who wish to volunteer. The goal would be to have inmates prepare for reentry to general population classes or reentry into society. All out-of-cell contacts will be noted on the **BMU Accepted/Refused Structured Out-of-Cell Program Log**. This team member will be supervised by the School Principal in collaboration with the Unit Manager.

    d.  Social Worker

        This employee will develop, implement, and provide social work, counseling, and case management services to BMU inmates to enhance their social functioning and to help them attain a more satisfactory social, economic, emotional, or physical adjustment with a Department facility. All out-of-cell contacts will be noted on the **BMU Accepted/Refused Structured Out-of-Cell Program Log**. This employee will be interacting with inmates, inmate family members, inmate guardians, and community agency staff to plan, provide, or coordinate needed social work services upon release to the community. This employee will work primarily within the BMU, however, at the

direction of the LPM; the Social Worker will also assist the general population Mental Health Coordinator (MHC) with reentry services to general population inmates.

e. Medical-Nursing

Any medication concerns identified will be forwarded to the Psychiatrist/CRNP, the assigned PSS/PSA, and recorded in the inmate's medical file. All out-of-cell contacts will be noted on the **BMU Accepted/Refused Structured Out-of-Cell Program Log**.

f. Chaplaincy

The Facility Chaplaincy Program Director (FCPD) will provide structured individual and group religious services to inmates in the BMU. Structured group contact will be available at least weekly. All out-of-cell contacts will be noted on the **BMU Accepted/Refused Structured Out-of-Cell Program Log**.

g. CPS

CPSs will be available on the unit to provide support for participants in the program. Duties may include individual out-of-cell contacts with inmates, educational group programming, recreational activities, and assistance with daily living skills. CPSs will function under the direct supervision of the Unit Manager. CPSs will not facilitate a group on their own and will not supervise inmates. Contacts will be noted by supervising staff on the **BMU Accepted/Refused Unstructured Out-of-Cell Program Log**.

**D. Determination and Maintenance of Staffing Levels for the BMUs**[1]

1. The DSFM and the Major(s)/designee shall be responsible for selecting and assigning CO staff to BMUs. The Unit Manager and LPM shall have input into this selection; however, the final determination shall be made by the DSFM.

2. BMU assignments shall be made from COs who have submitted a written request to the Major(s)/designee to be considered for placement in a BMU position.

3. Volunteers for these assignments must exhibit the following characteristics prior to placement in BMU positions:

   a. willingness to work in a non-traditional corrections environment;

   b. the ability and willingness to become an integral part of the BMU Treatment Team;

   c. the ability and willingness to perform non-professional counseling and crisis intervention with BMU inmates;

---

[1] 5-4A-4258

Issued: 12/11/2018
Effective: 12/18/2018

d.  good communication skills;

e.  good emotional stability;

f.  interest in mental health issues;

g.  Crisis Intervention Team and Mental Health First Aid (MHFA) trained or willing to obtain the training; and

h.  any other attributes considered important, but not listed above (e.g., willingness and interest to work with inmates exhibiting chronic disciplinary issues, self-injurious behaviors, and/or the inability to adapt to a general population setting).

4.  A CO assigned to the BMU shall be reviewed for rotation out of the BMU at least annually by the DSFM and Major(s)/designee.

5.  A CO assigned to a BMU beyond one year shall be interviewed by the facility LPM/designee to determine his/her fitness for the BMU assignment. Reports shall be confidential and shared only with appropriate personnel.

6.  Removal from the BMU position may occur at any time if it is determined that the CO is inappropriate for his/her assignment, ineffective, or detrimental to the operation of the BMU. This determination shall be made by the DSFM with input from the Major, Shift Commander, and/or BMU Unit Manager. In addition to custody staff, any staff member, recommended by the Unit Manager and the LPM may be reassigned from the BMU if that staff is deemed inappropriate for assignment to the BMU.

**E.  Chain of Command**

1.  The Unit Manager shall provide daily guidance/direction for all COs assigned to the BMU. The Unit Manager and Shift Commander are responsible for monitoring and evaluation of staff performance.

2.  The Shift Commander is in charge of use of force situations and assumes responsibility for operation of the unit in the absence of the Unit Manager.

3.  The Unit Manager shall have the discretion to make essential administrative, program, and operational decisions regarding unit security and inmate management. Clinical decision will be made via the BMU Treatment Team as directed by the LPM.

**F.  Staff Training**

All staff selected or assigned to the BMU to provide programming and supervision will be required to complete certain Department training. Within six months of placement into the unit, staff will be required to have completed the Department's Crisis Intervention Training (CIT) and the Department's MHFA Training. If it is necessary to assign a staff member to the BMU who has not completed this training, the facility shall, within two weeks, advise the CIT

Training Program Coordinator of the need. The facility's Training Coordinator shall also communicate such training needs to the CIT Training Program Coordinator to ensure that sufficient training is conducted to meet the needs of the facility. CO Trainees (COTs) will not be assigned to the BMU.

## G. Admission Criteria

Admission criteria shall include the following:

1. a determination of functional impairment not a result of serious mental illness as defined in **Definition of a Serious Mental Illness (SMI) Outline** (refer to **Section 10** of this procedures manual);

2. history of multiple admissions to a Restricted Housing Unit (RHU) either Administrative Custody (AC) or DC status, a Mental Health Unit (MHU), and/or the Forensic Treatment Center (FTC);

3. presenting behaviors that may include significant difficulties such as self-injury, overtly aggressive behavior, and/or impulse control disorder;

4. a Special Assessment Unit (SAU) evaluation may be required;

5. an inmate who exhibits severe Personality Disorder with functional impairment, chronic disciplinary issues, and demonstrates an inability to adapt to a general population setting;

6. he/she is cleared of acute medical problems by the referring facility's medical department; and

7. ***an inmate that meets BMU program criteria who is also currently maintained on the RRL, as a step-down process, upon PRC recommendation.***

## H. Process for Transfers

1. When an inmate is being recommended by the PRT, Unit Management Team, or Psychology staff for placement in a BMU, the PRC shall review the recommendation with the inmate and inform him/her of the reason(s) for the transfer recommendation. The recommendation shall be documented on the **DC-141, Part 4, Facility Manager's Review**, with a copy to the inmate. The inmate will be given the opportunity to respond to the rationale given and object to his/her placement in a BMU, if he/she so desires. The inmate may appeal the recommendation for transfer to the Facility Manager/designee and Central Office, as outlined in Department policy **DC-ADM 802, "Administrative Custody"** and **DC-ADM 801, "Inmate Discipline."**

2. The MHC/designee at the referring facility shall simultaneously submit a completed Referral Packet to the Office of Population Management (OPM) mailbox **(CR, CEN OPM Special Program REFERRALS)** dedicated to the Special Programs Referral and to the respective Regional LPM. OPM is responsible for tracking the BMU Referral Packet

through the approval/rejection process. This packet must only be forwarded electronically.

    a. ***If needed,*** the Regional LPM ***may be consulted to*** review the BMU Referral Packet and schedule a face-to-face (on site or via videoconference) interview with the referred inmate ***prior to the referring facility submitting the packet to OPM***. The purpose of this interview is to facilitate an appropriate referral to the BMU. This interview provides a focused independent assessment, upon which the Regional LPM can make further recommendations to the facility regarding the referral process, if needed. Additionally, this focused interview process will provide guidance to the ***Director of Psychology*** and Chief of Psychiatry in their approval process of this packet.

    b. The BMU referral may be changed to an SAU referral by the Regional LPM if a specialized assessment for diagnosis and programs appropriateness is deemed necessary.

3. The OPM will then electronically forward the BMU Referral Packet to the Chief Psychologist, Chief of Psychiatry, and the Executive Deputy Secretary for ***Institutional Operations (EDSI)***/Regional Deputy Secretary for the sending and receiving region who will vote on the BMU referral. If the recommendations are not unanimous, the Executive Deputy Secretary will make the final recommendation.

4. The approved and/or rejected BMU Referral Packet will then be sent to the OPM. The OPM will record the disposition of the Referral Packet in the Transfer Petition System. OPM notifies, via email, the referring facility with copies to the Chief of Psychological Services, Bureau of Health Care Services (BHCS), and Diagnostic and Classification Coordinator, Bureau of Treatment Services (BTS). This email will include the rationale for the rejection and recommendations.

5. The OPM will return any disapproved Referral Packets to the referring facility's LPM/designee.

6. Following final approval, the BHCS will coordinate, with the sending and receiving facilities and the OPM, the inmate's transfer to the designated BMU. If space is not available, the OPM and BHCS shall retain the inmate's name on a waiting list.

7. Prior to an inmate's transfer, the transferring facility's PRT shall conduct a videoconference or teleconference call, with the BMU Treatment Team at the receiving facility. The sending facility shall document the date, names of participants, and issues discussed in the conference call in the **ICAR/DC-14** and on the **DC-472, Progress Notes**.

8. Once BHCS has notified the referring facility that an inmate has been approved for BMU placement, and the inmate is placed on the BMU waiting list, the referring facility will immediately implement the following Protocol for Enhanced Mental Health Services

which has been established for inmates on the BMU waiting list. The protocol is as follows:

    a. a weekly out-of-cell psychology contact, at a minimum, will be conducted, with **ICAR** and **DC-560** documentation copied to the medical record;

    b. additional psychological contacts, if requested by the inmate or a staff member, will be provided by the assigned psychologist during his/her scheduled daily psychology RHU rounds;

    c. monthly out-of-cell Psychiatrist/CRNP contacts;

    d. weekly review by the PRC;

    e. monthly PRT review; and

    f. continued weekly CC visits.

9. If the referring facility cannot fully provide the above protocol for enhanced mental health services, the facility should contact OPM as soon as possible so that OPM can expedite transfer to the nearest facility which is able to provide this protocol.

10. An inmate who is on the waiting list for the BMU can be transferred to an MHU/FTC if necessary. This does not affect his/her BMU waiting list status, unless decided otherwise by Central Office.

11. If an inmate is not being followed for mental health concerns, the Enhanced Protocol does not have to be implemented. Contacts shall be in accordance with Department policy **6.5.1**.

**I.  Transportation**

An inmate received into the BMU will be sent as a permanent transfer. Transport procedures for the BMU shall be in accordance with Department policy **6.3.1, "Facility Security."** Additional restrictions and/or requirements are as follows:

1. all of the inmate's property will be transported with him/her to the BMU;

2. an inmate transferred to the BMU shall be received no later than 2:00 PM Monday, Tuesday, or Wednesday. This schedule allows staff to be available to conduct an initial assessment and provides for a stabilization period; and

3. the inmate shall be transported via sedan; this is the responsibility of the referring facility.

Issued: 12/11/2018
Effective: 12/18/2018

## J. Admission and Orientation

1. All inmates will receive a standardized "BMU Inmate Handbook." This handbook will be distributed to all inmates upon arrival and admission to the BMU. This handbook will address and include at a minimum the following:

    a. general program description and purpose of the unit;

    b. BMU rules and regulations;

    c. the process of behavior management planning and the inmate's involvement in that process;

    d. Overview of the Levels of Treatment/Phase System and the role of the Treatment Team;

    e. what an inmate needs to do to advance through the Phases/Levels of Treatment;

    f. earning and utilizing Incentive Points;

    g. property and privileges;

    h. description of groups and treatment milieu;

    i. discipline and "Accountability Status;"

    j. discharge and transition from the BMU; and

    k. Prison Rape Elimination Act (PREA) contacts and reporting information.

2. Once admitted to the BMU, the inmate shall receive the BMU Inmate Handbook and staff will orient the inmate to the rules and regulations of the unit within 48 hours of arrival. The inmate will be asked to sign the **BMU Inmate Orientation Handbook Receipt Form (Attachment 12-E)**.

3. Staff shall complete the **DC-510, Suicide Risk Indicators Checklist** (refer to **Section 1** of this procedures manual).

4. Inmates housed in a BMU will be issued royal blue hobby jeans and a royal blue shirt with DOC printed in large white block letters on the back.

5. BMU Cell Assignments

    a. An inmate shall be housed in a single cell for Phases 5, 4, and 3 of the BMU program. Suitability for double celling will be considered in Phases 2 and 1 and will be contingent upon the inmate's program code in accordance with Department policy **11.2.1, "Reception and Classification."**

12-11

b. When considering double celling Phase 2 inmates on the unit, the BMU Treatment Team should make every effort to facilitate voluntary double celling agreements between BMU inmates.

c. If no compatibility contraindications are present (these include, but are not limited to: age differences, disparate physical size, gang affiliations, security needs, custody level, medical issues, geographical/regional differences, and a documented history of ethnic/religious violence, or propensity for such) the BMU Treatment Team may consider voluntary double celling.

d. BMU double celling after normal working hours is prohibited, except in extenuating circumstances, and only with authorization from the Shift Commander. The double celling assignment will be reviewed by the BMU Treatment Team the next working day.

6. Medical staff shall conduct the medical screening in accordance with Department policy **13.2.1, "Access to Health Care."**

7. Upon admission, Psychology staff will interview/assess the inmate and:

   a. review the Referral Packet; and

   b. screen for any acute mental health symptoms including potential suicide risk.

8. Within 48 hours, the unit Psychology staff will review the **BMU Initial Recovery Treatment Plan (Attachment 12-F)** with the inmate and outline specific targeted goals and objectives. Documentation that the IRP was completed with the inmate will be made in the **ICAR**.

9. The BMU Treatment Team shall conduct an initial review of the inmate's IRP within three working days.

10. Within seven working days, a ***Psychiatric Admission Summary Note with treatment recommendations shall be completed. Summary of the BMU admission shall include at a minimum, but not limited to the following information:***

    a. ***history of present illness/reasons for BMU admission***;

    b. ***past psychiatric treatment history in the community/Department***;

    c. ***mental status examination***;

    d. ***diagnosis***;

    e. ***risk assessment***, ***and***

    f. ***treatment recommendations and any needed referrals***.

11. While the inmate progresses through Phases 5, 4, 3, and 2, the Psychiatrist/CRNP will see the inmate weekly. At least one session per week will be held out-of-cell.

## K. Transfers of Inmates in the BMU System

1. An inmate who is participating in the BMU program may be permanently transferred between BMUs, only when the BMU Treatment Team believes it would be of therapeutic benefit and then only with the approval of both the receiving and sending facility's **EDSI**/Regional Deputy Secretary with input from the Director of the Psychology Office. These transfers will be coordinated through the Psychology Office and OPM. Any permanent transfer of a BMU inmate to a non-BMU location will require written approval by the Executive Deputy Secretary.

   **NOTE**: Transfers between BMUs will be coordinated with an exchange of transfer packets, a **DC-46** including a transfer rationale, and a copy of the most recent Psychiatric Assessment.

2. At times it may be necessary to temporarily transfer an inmate from a BMU to a non-BMU facility. In these cases, the BMU inmate may be housed in a Psychiatric Observation Cell (POC), unless written approval has been granted by the Executive Deputy Secretary. The Director of the Psychology Office must be notified within 24 hours of any temporary transfer of a BMU inmate.

3. Prior to a BMU inmate's temporary or permanent transfer, a member of the transferring facility's BMU Treatment Team shall communicate, with a member of the BMU Treatment Team or PRT at the receiving facility. The sending facility shall document the date, names of participants, and issues discussed in the conference call in the **ICAR** and on the **DC-472**.

4. If an inmate is committed to a Department MHU or the FTC, that inmate's BMU bed will be held open for a reasonable period of time, pending the inmate's return from the MHU or FTC. At the time of discharge, alternative placement into a Secure Residential Treatment Unit (SRTU) may be recommended and considered. Should this be recommended, the BMU will generate a formal SRTU Referral Packet and send to Central Office for review.

## L. Treatment Programs/Levels of Treatment

1. The program components in the BMU include a multidisciplinary treatment environment.

2. All inmates in the BMU will have an IRP. These IRPs will be created using the "Recovery Model" of treatment. The Recovery Model has the goal of enhancing the individual's quality of life. It supposes that the treatment delivered will be tailored to the individual's strengths, needs, and directions; and treatment decisions are made in partnership with the individual. In adopting the recovery model, we understand that the focus is on a path of recovery, not just goals. We also understand that recovery is an ongoing process and does not mean there is an absence of symptoms. Overall, this person-centered approach

Issued: 12/11/2018
Effective: 12/18/2018

can reduce therapeutic disruption, noncompliance, de-compensation, and violence and self-harm.

a. The first step in developing a "Recovery Model" IRP is to identify the "person-centered" goal. Listening to the individual with empathy, acceptance, and validation will allow the goal to be expressed. Second, identify the individual's strengths. This will indicate what is already working that can be amplified, supported, and used as a resource to facilitate change. Third, identify obstacles that prevent the individual from reaching his/her goal. Fourth, identify treatment objectives. These treatment objectives need to be measurable, concrete, and clear. It is important that the treatment objectives are relevant to the individual's stated recovery goal and to the obstacles that are hindering the inmate from reaching his/her goal. Fifth, identify treatment interventions. Treatment interventions will be chosen that are likely to increase the individual's strengths.

b. Treatment planning may also include variations to the standard phases, treatment goals, and length of time in a phase, privileges, and management of problematic behavior. Modifications to the inmate's level of security related to restraints and escort will also be noted on the IRP. These security modifications will also be clearly noted in the Unit Control Booth. An overview of property and privileges associated with each Phase of treatment is found in the **BMU Property, Privileges, and Services Chart (Attachment 12-G)**.

c. In conjunction with the BMU Treatment Team, the Psychology staff will update the initial IRP, using the **BMU Recovery Treatment Plan Review (Attachment 12-H)**, every 30 days while the inmate is in Phases 5 through 1. The IRP shall be reviewed out-of-cell with the BMU inmate at a minimum of every 30 days. The inmate must have input into the goals rather than all of them being generated by the BMU Treatment Team in a standardized fashion. All inmates will be invited to personally attend and participate in all BMU Treatment Team meetings. Treatment plan reviews will be documented in the **ICAR**.

d. The goals on the IRP, established collaboratively with the BMU Treatment Team and the inmate, shall drive the clinically structured out-of-cell offerings on the BMU.

3. Participation in treatment programs is based on a phase system. Movement to a lower treatment phase is based on appropriate inmate behavior and compliance with the IRP. The initial treatment phase shall be determined by the inmate's present level of functioning, recent historical information, and mental status. The BMU Treatment Team shall recommend all treatment phase changes. Ultimately the PRC, with input from the BMU Treatment Team, has the final decision on awarding or terminating privileges and granting phase changes.

4. The BMU treatment program includes a progressive phase system that may include, but is not limited to, Phases 5 through 1, plus Accountability Status and Post-BMU aftercare. The length of time spent in each phase is dependent on the inmate's demonstrated level

Issued: 12/11/2018
Effective: 12/18/2018

of adjustment. The specific time parameters for each phase movement will be defined in the inmate's IRP.

5. Changes in status from phase to phase shall be accomplished through staff action by the BMU Treatment Team and documented by circulating a **BMU Program Review Sheet**, with final approval by the Facility Manager. All status changes will be documented in the **ICAR** by the Unit Counselor. A **DC-46** is not required for phase change following placement on Accountability Status. A **DC-46** will be required to be circulated for all Phase 1 approvals.

6. The BMU is designed to support inmates with a severe personality disorder exhibiting functional impairment in achieving the highest level of functioning within a safe environment. The phase system is designed to provide incentives for inmates who are able to remain free of self-injury, aggression, and other problematic behaviors as well as engage in appropriate behavior. Incentives may be purchased weekly via the points system and points are deducted at the time they are redeemed.

7. The BMU Treatment Team is aware that from time to time participation in programming may be difficult for some individuals. They may exhibit a lack of meaningful participation in the milieu offered. It is the goal of the BMU that all participants receive the maximum benefit from treatment. Therefore, the BMU Treatment Team will closely monitor program participation. Each month, every participant's IRP and out-of-cell participation will be reviewed by the Treatment Team. Should an individual's participation in out-of-cell offerings fall below 60% of the minimum of 20 hours programming, the institution's LPM will lead the Treatment Team in collaborating with the individual to discuss goals/objectives/barriers to out-of-cell participation. Part of that review will include a discussion of the programming offered in order to ensure that it addresses the individual's expressed needs.

8. ***The Treatment Team will also assess whether a higher level of care is indicated.*** The institution's LPM/***designee may*** coordinate a videoconference/***teleconference consultation*** with their Treatment Team, their respective LPM, and the Mental Health Advocate at Central Office, to discuss and review the Recovery Plan changes recommended by the institution's LPM and their treatment plan.

9. Consequences for engaging in self-injurious, aggressive, or other problematic behavior will be immediate with the inmate being placed on Accountability Status where the capacity to earn incentives is limited.

10. Phase advancement will be recommended by the BMU Treatment Team, which includes mental health staff, security staff, and unit team staff. Phase advancement shall be based on behavior and attendance as well as participation in programming. The BMU is an incentive-based program, meaning that as behavioral stability is demonstrated, more privileges are earned. Inmates who engage in problematic behavior will not be afforded these privileges until they demonstrate they are able to function more independently. Overriding goals include no disciplinary reports, treatment compliance, and active program participation.

12-15

11. Criteria for consideration of cutting set-aside-disciplinary sanctions and for advancement from phase to phase include:

    a. remain free of misconducts and problematic behavior reports;

    b. remain free of self-injury;

    c. attend at least 60% of the minimum 20 hours out-of-cell structured and unstructured programming;

    d. attend at least 90% of individual sessions; and

    e. other individualized recommendations on the IRP made by the BMU Treatment Team.

12. Phase System

    a. Phase 5 (seven days)

        (1) This is the starting point for new admission to the program. The inmate is eligible to advance to Phase 4 programming after seven days with no problematic behavior demonstrated and active participation in out-of-cell programming. This phase includes:

            (a) the initial assessment of the inmate;

            (b) working with staff to develop an IRP to identify behavioral and clinical needs and goals;

            (c) attending initial BMU Treatment Team session and orientation to the unit;

            (d) introduction to incentive plan;

            (e) rules of the unit;

            (f) behavioral expectations;

            (g) overview of the phase system;

            (h) group descriptions; and

            (i) unit schedule of activities and programs.

        (2) Phase 5 privileges and restrictions include the following:

            (a) as outlined in the **BMU Property, Privileges, and Services Chart**;

      (b)    may earn up to 50 incentive points per week. Incentive points may be used on Phase 5 for items approved on the **BMU Incentive Order Form (Attachment 12-I)**; and

      (c)    escorted in restraints to all out-of-cell activities. Restrained inmates will not be in mixed out-of-cell groups/activities with unrestrained inmates.

  b.  Phase 4 (60 days or longer based on clinical recommendation)

    (1)  After 14 consecutive days on the Phase 5/Stabilization Phase without problematic behavior, the inmate is eligible for transition to Phase 4. Advancing through phases depends on active participation in programming. After 60 days on Phase 4, the inmate is eligible to move to Phase 3.

    (2)  Phase 4 privileges and restrictions include the following:

      (a)    as outlined in the **BMU Property, Privileges, and Services Chart**;

      (b)    may earn up to 50 incentive points per week;

      (c)    15 incentive points may be used for food items;

      (d)    30 additional earned points may be used for Phase 4 incentive point menu items; and

      (e)    escorted in restraints to and from all activities. Restrained inmates will not be in mixed out-of-cell groups/activities with unrestrained inmates.

  c.  Phase 3 (60 days or longer based on clinical recommendation)

    (1)  An inmate may be considered appropriate for transition from Phase 3 to Phase 2 when the following is evident:

      (a)    demonstrates the ability to maintain safe behavior for at least 60 days;

      (b)    compliant with facility regulations for at least 60 days;

      (c)    demonstrates an overall level of functioning that is consistent with general population; and

      (d)    compliant with treatment objectives as outlined in the inmate's IRP.

    (2)  Phase 3 privileges and restrictions include the following:

      (a)    as outlined in the **BMU Property, Privileges, and Services Chart**;

      (b)    may earn up to 50 incentive points per week;

    (c)    30 incentive points may be used for food items;

    (d)    any incentive point value may be used for incentive point menu items other than food items up to a total of 70 points per week;

    (e)    in Phase 3 the inmate can be considered for on-unit employment based on team approval and job-availability. The Phase 3 inmate may be permitted to eat meals out-of-cell. Phase 3 inmates will be paid General Labor Pool (GLP) for five days per week; and

    (f)    restraints – upon placement on Phase 3 the Treatment Team may approve reduced restraints during escort to and from therapeutic modules for groups, recreation, and showers. However, Phase 3 inmates are generally unrestrained for regular movement within the unit unless out with another inmate who requires restraints.

d.    Phase 2 (30 days or longer based on clinical recommendation) privileges and restrictions include the following:

    (1)    as outlined in the **BMU Property, Privileges, and Services Chart**;

    (2)    may earn up to 50 incentive points per week;

    (3)    any incentive point value may be used for any incentive point menu item including food up to a total of 70 points per week;

    (4)    may generally move unrestrained out-of-cell unless out with another inmate who requires restraints;

    (5)    in Phase 2 the inmate can be considered for on-unit employment based on team approval and job-availability and may be permitted to consume meals out-of-cell. Phase 2 inmates will be paid GLP for five days per week;

    (6)    may exercise in a group with up to six other unrestrained inmates;

    (7)    at the discretion of the BMU Treatment Team, during Phase 2 the inmate may begin a Step-down Plan. The plan will begin by allowing the BMU inmate to wear institutional browns and state-issued boots. A CPS will meet the BMU inmate on that unit and will then escort the BMU inmate to the mainline lunch or dinner meal. Staff will be aware of when the inmate is leaving and returning to the BMU. Upon returning to the unit, he will return the institutional browns and boots and will be issued BMU clothing. As per policy, the BMU inmate will be strip-searched before leaving the unit and when returning to the unit;

    (8)    after Step 7 above has occurred several times, the same system may be utilized to have the CPS escort the BMU inmate to receive a haircut or commissary. The

procedure will be similar to the above; staff will be aware when the inmate is leaving and returning to the unit;

(9)  once all BMU Treatment Team members believe that the inmate is ready, the BMU inmate may be escorted by the CPS to another supervised activity such as, but not limited to, Chapel or Library, following the same procedure as above; and

(10)  once all BMU Treatment Team members believe that the inmate is ready, the BMU inmate may be escorted to the yard or gym utilizing the same system. The RTU yard/gym may be considered given that it is a smaller, less crowded environment. However, another suitable location may be utilized at the discretion of the BMU Treatment Team. The inmate will be escorted by the CPS and the same procedures will be utilized as outlined above.

e.  Phase 1 (90 days or longer)

(1)  An inmate attaining this phase is considered ready to begin reintegrating into a housing unit deemed appropriate by the Treatment Team at the current treating facility or another BMU facility. This probationary phase will be 90 days in length; with an option to extend probation for another 90 days through the Vote Sheet process. However, the maximum amount of time this phase will last is 180 days. Should the inmate be away from the facility for any reason such as Authorized Temporary Absence (ATA), or a Mental Health Commitment, Phase 1 time will be suspended until such time as the inmate returns to the facility.

(2)  While on Phase 1, the BMU Treatment Team will continue to review the individual's IRP every 30 days. Incentive points will not be earned nor can they be used while an inmate is on Phase 1. The focus of this phase will be to continue to address treatment goals while adjusting to the general population setting. Thus, acclimating and blending into the general population routine is vital. Incentive points should be used prior to earning Phase 1. Once promoted to Phase 1, any unused points will be lost.

(3)  When an inmate successfully completes the probationary status after 90 or 180 days without any significant incidents of behavioral or mental health regression, the BMU Treatment Team will staff him/her for discharge/graduation from the program. Graduation from the BMU will be completed by Vote Sheet with final approval from the Facility Manager. Since the inmate has completed/graduated from the program, the Treatment Team may consider transferring him/her to another facility, or permit him/her to remain at the current facility. The graduation of any Phase 1 inmate to general population requires facility approval via the ***EDSI***/Regional Deputy Secretary.

## M.  Accountability Status

Accountability Status is a temporary placement within the unit or off-of-the unit for BMU inmates whose behavior is acutely dangerous to self or others or whose behavior is

threatening and disruptive to programming and the operational functioning of the unit. The inmate on Accountability Status will be evaluated daily with a plan for his/her timely return to the program.

1. Purpose of Accountability Status

    a. It is the goal of the BMU to provide quality out-of-cell programming to inmates who can benefit from treatment, but who, because of their behavior, have been restricted to units where intensive therapy is difficult to provide. An essential part of all Behavior Management programs is the provision for an immediate consequence for serious negative behavior. Therefore, Accountability Status may be instituted to temporarily address an acutely aggressive, threatening, disruptive inmate participating in BMU programming. This ensures the education of the inmate, safety of staff and other inmates, and the smooth continuation of the program for treatment compliant inmates.

    b. The BMU inmate may be held on Accountability Status for as little as one day, but no longer than 72 hours. Additional placement on Accountability Status may be approved by the Facility Manager in 24-hour increments up to an additional 72 hours. If the individual's status has not stabilized after the first 72 hours, the Psychiatrist will be consulted to determine the need for POC or inpatient placement. In addition, upon reaching the initial 72-hour timeframe, the institution's LPM will forward the BMU Change of Status IRP to the institution's Regional LPM and the Chief of Psychology for review. Also, the BMU Treatment Team will schedule and conduct a videoconference with the Department's Mental Health Advocate. Recommendations for case management will be made in conjunction with Central Office.

2. Indicators for Accountability Status Process

    a. BMU inmates who are exhibiting acutely aggressive and/or threatening behavior toward themselves or others or are exhibiting extremely disruptive behavior that interferes with the safe and orderly functioning of the program will be immediately (i.e., when appropriate) assessed by a Psychology staff member, if the behavior(s) occur(s) during normal business hours, or by a nursing staff member, if during off business hours, to determine whether or not the inmate requires a higher level of care (e.g., POC placement). These behaviors may be reported and documented by utilizing the:

        (1) **DC-141, Part 1, Misconduct or Other Report**; or

        (2) **DC-121, Part 3, Employee Report of Incident**.

    b. Additionally, once a staff member observes a harmful, potentially harmful, or disruptive behavior, they will inform the Area Lieutenant, Unit Manager, and the LPM/designee. They will also complete one of the above noted documents. In consultation with the LPM/designee or a nursing staff member, the Area Lieutenant will notify the Shift Commander of the noted behavior and recommendation, if appropriate, to place the inmate on Accountability Status. The Lieutenant, Unit

Manager, or LPM will complete the **BMU Accountability Status Restriction Form (Attachment 12-J)**. Recommended property and privilege restrictions must relate to the behavior which prompted the inmate's placement on Accountability Status. All documentation will be completed immediately and forwarded to the Shift Commander for initial disposition.

c.  In general, cells utilized for Accountability Status should be away from the routine activity of the BMU program. However, cells should be outfitted to ensure the maximum ability to observe and ensure the safety of the inmate.

d.  Prior to placing the inmate into Accountability Status, he/she will be strip searched and given property and privileges as indicated on the **BMU Accountability Status Restriction Form**. Once placed on Accountability Status, the inmate will be seen by his/her assigned Psychology staff member within 24 hours or as soon as normal facility operations permit for the purpose of collaboratively completing the **BMU Accountability Status – Recovery Treatment Plan (Attachment 12-K)**. This treatment plan will specifically address the inmate's goals related to why he/she is on Accountability Status and his/her return to regular programming. Placement in Accountability Status and subsequent treatment planning will be documented in the **ICAR**. After being reviewed by the institution's LPM, the **BMU Accountability Status – Recovery Treatment Plan** will then be scanned to the institution's Regional LPM for review. They will then be scheduled for the next Treatment Team meeting. All other staff contacts will occur as described in the Accountability Status Monitoring Protocol as follows:

(1)  the assigned Psychology staff member will offer daily 30-minute AM and PM out-of-cell contacts for the duration of the Accountability Status placement. Contacts will be documented with **ICAR** and **DC-560** documentation copied to the medical record;

(2)  additional psychological contacts, if requested by the inmate or a staff member, will be provided by the assigned psychologist during his/her scheduled daily psychology unit rounds;

(3)  one 30-minute daily out-of-cell Therapeutic Recreation Specialist contact;

(4)  one 30-minute daily out-of-cell Social Worker contact;

(5)  one 30-minute daily out-of-cell CPS contact;

(6)  one hour of yard daily;

(7)  PRC review during the Accountability Status placement;

(8)  BMU Treatment Team review at the initiation of the Accountability Status placement, including review of treatment compliance and property and privileges

permitted with recommendations forwarded to PRC on a new **BMU Accountability Status Restriction Form**; and

(9)    continued 30-minute daily out-of-cell CC visits.

e.  While on Accountability Status, the Treatment Team will make the final decision as to when and whether the inmate may have more property privileges or qualify for ending Accountability Status. While on Accountability Status, inmates may earn one incentive point for each day without exhibiting acute aggressive and/or threatening behavior toward themselves or others or are exhibiting extremely disruptive behavior to the safe and orderly functioning of the program.

f.  To be removed from Accountability Status, an inmate must be treatment compliant, in behavioral control, and misconduct free to finish Accountability Status. The Treatment Team will decide when an inmate has successfully completed Accountability Status. The inmate will then be returned to the program phase deemed appropriate by the BMU Treatment Team.

## N. Structured Versus Unstructured Programming

1.  All structured and unstructured programming will take place in therapeutic modules and Restart Chairs upon determination by the Treatment Team. Each facilitator of structured and unstructured programming will document his/her group contact with each individual on the **BMU Group Participation Form (Attachment 12-L)**. Each facilitator will keep the **Group Participation Form** in his/her possession. At the end of each 30 days, the **Group Participation Form** will be forwarded to Medical Records for filing. At the same time, the facilitator will place a brief monthly summary in the ICAR.

2.  Structured activities are those that are lead/facilitated by a Department or contracted staff member or a Volunteer. These may include: Morning Meetings, Mental Health groups, the HELPING: Multimodal Self-Change Approach, Carey Guides, Relapse Prevention Plan, AOD, chaplaincy, Thinking for a Change groups, Taking a Chance on Change groups, Start Now program, groups run by activities staff, education, Reentry groups and modules on accepting mental illness, activities for challenged inmates, body basics, staying healthy on your medications, exploring the United States, handle anger better, personal hygiene, planning for a better life, self-esteem, social skills for challenged inmates, and substance abuse treatment introduction and other treatment interventions. Staff may also choose to use the "Traffic Light" Tool in order to illustrate targeted goals and objectives for each inmate. This visual representation of their immediate objectives can be placed where the inmate may review and have immediate feedback concerning appropriate and inappropriate behavior. This intervention will be utilized in a way that protects the confidentiality of the inmate. These resources and activities may be acquired from the LPM assigned to the region.

3.  Unstructured activities are defined as activities occurring outside the cell but not conducted by Department staff members. For example, law library, recreation, visits, viewing movies, eating in small groups, and reading out-of-cell. They do not include

activities of daily living like showers, however, eating meals in a small group would be considered unstructured.

4. At a minimum, ten structured and ten unstructured out-of-cell hours of programming will be offered to all inmates housed in the BMU. The number of structured out-of-cell hours or portions of an hour of programming the inmate participates in will be logged by the staff member who provides the structured out-of-cell contact. The staff member will log the completed time on the **BMU Accepted/Refused Structured Out-of-Cell Program Log**. The number of unstructured out-of-cell hours or portions of an hour of programming the inmate participates in will be logged by a CO assigned to the unit. The CO will log the completed time on the **BMU Accepted/Refused Unstructured Out-of-Cell Program Log**.

5. Weekly, the BMU Counselor will compile the total hours of programming for each inmate, document the total in the **ICAR,** and report the data on the **Weekly Structured/ Unstructured Out-of-Cell Program Report (Attachment 12-M)**. Completed logs will be forwarded to the BMU Unit Manager for filing. The **Weekly Structured/Unstructured Out-of-Cell Program Report** will be forwarded to the Chief of Psychological Services.

## O. Phase Modification

The BMU treatment program will tailor individualized phase modifications/alternatives when necessary. The modifications will be documented on the IRP with the rationale and goals for the modification and the steps to be taken to reach those goals. These alternatives include, but are not limited to:

1. Accountability Status for a BMU inmate who is celled in an area apart from the BMU (if available) due to his/her behavior, psychiatric symptoms, and/or facility need. The inmate may be committed to an MHU, or other appropriate housing unit;

2. temporary phase change and/or phase demotion;

3. phase freeze (a hold in one phase for various reasons, where privileges may be modified); and

4. modified phase (e.g., an inmate with previous assaults on female staff will lock-up when female staff are on the unit, or a Phase 4 inmate may be permitted uncuffed out-of-cell time when other inmates are all in their cells).

## P. Incentive Program

1. The Incentive Program is designed to allow inmates in the BMU the opportunity to earn incentive points that may be redeemed for items on a regularly scheduled basis. Incentive points are earned based on individual performance and for positive and pro-social behaviors.

Issued: 12/11/2018
Effective: 12/18/2018

2. Incentives are a proven method for increasing pro-social behavior and reducing problematic (target) behaviors. Once the target behaviors and goals are identified with the inmate, incentives are used as a reward for achieving identified goals. Within the incentive program design is also life skill opportunities such as basic math and reading, learning to save and plan, and facilitating positive social communications.

3. Program Design

   a. Inmates who follow facility rules and regulations evidenced by not receiving a misconduct report or demonstrating any problematic behavior will earn a point for the day. A notation in the **ICAR** will be written as supporting documentation for an inmate who does not earn his/her point for the day. This will be noted by the Unit Counselor.

   b. Treatment points are earned based on treatment attendance and participation without problematic disruptive behavior. Inmates earn two points for each hour of structured activity and one point for each hour of unstructured activity they attend. Structured and unstructured programming will occur daily. Inmates are assigned to specific groups based on individual needs. Inmates who do not have an excused absence, who ask to leave group before it is finished, or who are escorted out due to disruptive behavior do not earn points for that group.

   c. Inmates' points are aggregated each week. Inmates are informed, weekly, both verbally and in writing of all points earned. Inmates then may order items or purchase privileges using their points. Items are given point values from five to 60 points. Unused points may be carried over from week to week and month to month, but an inmate may not use more than the total stated for each phase in a given week. Once a point or privilege is earned, it cannot be taken away. Points and privileges will be held in abeyance should the inmate be placed in Accountability Status.

   d. The following is an overview of the incentive points that may be earned in each week:

      (1) seven daily points for no disciplinary reports or information reports (maximum to be earned is seven);

      (2) seven daily points for Good/Fair ratings for Cell Cleanliness and Hygiene (maximum to be earned is seven);

      (3) two points for each hour of attendance and participation in structured programming (maximum to be earned is 20);

      (4) one point for each hour of attendance and participation in unstructured programming (maximum to be earned is ten);

      (5) six bonus points for attending and participating in all groups and meeting recovery plan requirements for one week; and

(6)   seven daily points for no disciplinary reports or information reports while under Accountability Status (maximum to be earned is seven).

e.   At the end of each week, the BMU Counselor will tabulate each inmate's incentive point total for the previous week using the **BMU Weekly Point Summary (Attachment 12-N)**. The total points will be transposed to the **BMU Monthly Point Summary (Attachment 12-O)** in order to track the total incentive points earned and redeemed over time. After tabulating the weekly point totals, the BMU Counselor will then distribute the **BMU Incentive Order Form** to each inmate. They will then complete and return the forms by the end of the day. Incentives earned will then begin to be distributed no later than the week following when they are redeemed.

## Q. Misconducts

1.   The alleged commission of a Class 1 Misconduct charge 1 to 14 will result in formal disciplinary action if found guilty and Accountability Status for no more than three days.

2.   The alleged commission of a Class 1 Misconduct charge 15 to 25 may result in formal disciplinary action if found guilty and placement in Accountability Status for no more than three days.

3.   If a misconduct is eligible for informal resolution, staff will complete the **BMU/SRTU Informal Resolution Action Form (Attachment 12-P)** to document his/her sanction for that misconduct.

4.   An inmate will not be issued misconducts for self-mutilation, however, a **DC-121, Part 3** will be generated. This may result in the inmate's placement in the POC or on Accountability Status.

5.   The assigned Psychology staff will provide input to the Hearing Examiner for all formal hearings in regard to whether the infraction was due to the inmate's mental illness or volitional. The Hearing Examiner will use this input for sanctions or modifying sanctions.

6.   An inmate on probationary status in Phase 1 in a general population RTU does not automatically need to be returned to the BMU. This decision will be made by the PRC with input from the BMU Treatment Team.

## R. Change in Status

1.   Inmates may be transferred to the BMU in either AC or DC status. DC sanctions should not be cut by the sending facility. The major goal of the BMU program is to stabilize the inmate's behavior so he/she can progress to placement in the least restrictive environment, based on his/her demonstrated behavior. Any remaining DC time will be addressed by the PRC at the BMU facility.

Issued: 12/11/2018
Effective: 12/18/2018

2. While in the BMU, DC status is set aside. As stated above, the DC sanction time continues to expire while the inmate is in the BMU. An inmate can earn further reductions in his/her DC sanctions for appropriate behavior.

3. An inmate who exhibits misconduct-related behavior while in the BMU will generally serve a period of suspension on Accountability Status with a phase change (reduction in privileges level) based on the recommendation of the BMU Treatment Team and approval of PRC.

4. All changes in status in regard to phase progression will be completed via the **BMU Program Review Sheet**. Once the unit team makes a recommendation to PRC to advance a phase, and PRC approves, an **ICAR** entry will be made by the counselor indicating such.

**S. Release of BMU Inmates**

1. Phase 1 constitutes the release of the inmate to a general population housing unit, generally within the treating facility. The release of any Phase 1 inmate from the BMU to a general population housing unit requires approval of the ***EDSI***/Regional Deputy Secretary.

2. An inmate who is being considered for release to general population as a result of placement on Phase 1 must have completed all requirements of his/her IRP for Phase 2.

3. Approval to move to Phase 1 and release to a general population RTU shall be requested via memo to the office of the effected ***EDSI***/Regional Deputy Secretary. Documentation should include the BMU Treatment Team's approval, PRC action, Facility Manager's approval, and submission of appropriate rationale concerning the inmate's progress in the BMU program. The release is usually to the general population RTU of the treatment facility.

4. If approval is granted for transition to Phase 1 and ultimate discharge to the designated facility, the Unit Manager/designee shall verify the status and move date.

5. The Unit Manager shall ensure that the following are completed:

   a. the inmate is readied for transition on the approved date;

   b. the inmate packs his/her property and cleans the cell;

   c. the inmate's property is inventoried by unit staff;

   d. all BMU property, clothing, etc., is returned to the BMU inventory;

   e. the inmate's property is released to the inmate and/or the Department transportation crew;

Issued: 12/11/2018
Effective: 12/18/2018

f.  if the inmate is being released to the BMU facility's general population, request appropriate staff to escort the inmate to the newly assigned housing unit;

g.  review all documentation to ensure proper log entries, forms, location boards, and BMU paperwork is completed accurately and in a timely manner;

h.  notify the facility's Control Center to ensure inmate movement forms for count procedures are completed; and

i.  in a case where the inmate is being discharged to a general population placement at another facility with a BMU, the BMU Treatment Team shall conduct a videoconference or teleconference call, with the Unit Management Team of the receiving facility to discuss the inmate's response to treatment. The referring facility shall document in the **ICAR** and on the **DC-560** the date, name of participants, and issues discussed in the conference call. At a minimum, the following issues shall be addressed:

   (1)  the inmate's progress toward meeting the goals of his/her IRP;

   (2)  the extent to which he/she has achieved maximum benefit from treatment available at the BMU;

   (3)  any ongoing resistance to program participation; and/or

   (4)  any treatment needs to be addressed when the inmate arrives at his/her designated facility.

6.  An inmate being transferred to another facility as a Phase 1 BMU inmate on probationary status will be afforded the same privileges and services as defined in the **BMU Property, Privileges, and Services Chart** (Phase 1) and placed in general population.

7.  In the event that an inmate's behavior deteriorates during his/her Phase 1 probationary period, the inmate may be returned to the BMU. If the inmate's behavior deteriorates after he/she has completed Phase 1, return to the BMU is an option, but is not mandated. If a decision has been made to place the inmate back into BMU programming, a new Referral Packet will be generated and the packet submitted for review as stated in this policy. Depending on the nature of the deterioration, the inmate may require a short time stay in the RHU and/or a mental health inpatient setting. If there is question regarding the preferred option, cases in this status can be reviewed with the COSN/PRT and the Regional LPM.

## T.  Discharge Procedures

1.  Discharge/Graduation of an inmate from BMU programming after successful completion of the Phase 1 probationary period shall be considered when:

Issued: 12/11/2018
Effective: 12/18/2018

    a.  the IRP goals have been satisfied with successful reintegration into a general population unit for three to six months in a permanent facility;

    b.  it is necessary to place a BMU graduate in the RHU, he/she will be managed according to his/her Stability Rating and Department policy **DC-ADM 801**; or

    c.  an inmate successfully completing Phase 1 probationary period and graduating from BMU programming may be eligible for transfer to a facility in his/her home region by submission of a permanent transfer petition utilizing the purpose: Other, and Comments: BMU Graduate.

2.  Discharge of an inmate from the BMU for other than successful program completion shall be considered when:

    a.  the BMU Treatment Team concludes that the inmate remains resistant to participation in the IRP that was developed for him/her; and/or the inmate engages in repeated negative behavior which is contrary to the mission of the BMU, and undermines the treatment of other BMU participants, e.g., evidence of both disruptive actions and detrimental impact on valid BMU inmates' progress; and

    b.  all inmates being considered for discharge from the BMU for reasons other than successful completion shall be automatically referred to the SAU for review and recommendation for subsequent placement. The SAU recommendations will then be included in the Referral Packet.

3.  The facility recommending an inmate for removal from BMU programming should send a Referral Packet to the OPM for review at COSN/PRT. The Referral Packet should include the following information:

    a.  a completed **Special Program Referral Approval/Rejection Form**, which will serve as the face sheet. In the Requested Action Section, the Program/Unit Removal box should be checked;

    b.  **DC-46** circulated through the BMU Treatment Team and the referring facility's administrative staff;

    c.  rationale for the inmate's removal from BMU programming to include listing of disruptive behaviors, misconducts, and actions of self-injury;

    d.  the review and recommendations as prepared by the SAU; and

    e.  documented evidence of behaviors to include, but not limited to Misconduct Report(s), **DC-121's**, **ICAR** entries from BMU Treatment Team, and PRT notes.

4.  If the COSN/PRT determines that removal from the BMU programming is not appropriate, all inmates will be reviewed and a decision as to the disposition of the inmate's case will be generated.

5. If the final recommended disposition by COSN/PRT does not include placement in another BMU, the Executive Deputy Secretary will conduct the final review.

6. If removal from BMU Programming is approved by the COSN/PRT and the Executive Deputy Secretary, then a Transfer Petition will be completed by the OPM. COSN/PRT will determine where the inmate should be placed and the OPM will assign a facility accordingly.

7. The receiving facility can submit the inmate for consideration by COSN/PRT for reentry into the BMU programming, if the inmate displays behaviors consistent with BMU admission criteria.

8. ***Prior to discharge or transfer to another BMU, or other placement, documentation from the psychiatric provider shall include at a minimum, but not limited to, the following information:***

   a. ***overall progress, any symptoms which have not responded to treatment;***

   b. ***summary of response to medication trials, reasons/need to continue any polypharmacy, and any significant events while in the BMU;***

   c. ***BMU discharge treatment recommendations; and***

   d. ***any inmate whose Psychiatric Evaluation is over five years old shall have an updated Summary Psychiatric Assessment at the time of his/her discharge from the BMU which shall include the above information.***

## U. Release via Sentence Complete (Formerly Final Discharge Maximum Expiration [FDME])

1. If an inmate is scheduled for release via Sentence Complete before completion of the BMU program, the inmate shall be referred to the facility Psychology Department 12 months prior to release for continuity of care/release planning, in accordance with **Section 2** of this manual.

2. ***The inmate may be referred to the SAU in accordance with this procedures manual for an evaluation. The inmate may be placed on the Hard to Place Offender List in accordance with Department policy 7.3.1, "Reentry and Transition."***

3. Any release of a highly assaultive inmate due to sentence completion shall follow procedures set forth in Department policy **6.5.1.** ***Reentry services shall be offered in accordance with Department policies 6.5.1 and 7.3.1.***

Issued: 12/11/2018
Effective: 12/18/2018

## V. Unit Operation Evaluation

1. Monday of each week, the BMU Unit Manager/designee will provide, via email, the Licensed Psychologist Director (LPD) at Central Office with an updated roster to include BMU inmates on Mental Health (MH) commitment, WRIT, etc. This roster shall include phases, effective date of current phase, and date admitted to the BMU.

2. Also, on Monday of each week, the BMU Unit Manager/designee will submit via email, to the LPD at Central Office, the effected Regional LPM, the effected ***EDSI***/Regional Deputy Secretary/Inspection Team, the log sheet of out-of-cell hours on the **BMU Accepted/Refused Structured Out-of-Cell Program Log** and the **BMU Accepted/Refused Unstructured Out-of-Cell Program Log**.

3. In conjunction with this review, the BMU Unit Manager/designee will submit a list of BMU individuals who participated in out-of-cell programming at less than a 60% average for the previous month. This list will be reviewed by the institution's LPM who will ensure that all listed individual's IRPs have recovery goals/objectives related to program participation and overcoming obstacles to treatment. This list will be forwarded to the institution's Regional LPM and the Chief of Psychology. The type and content of programming offered will be evaluated as to its efficacy in engaging the individuals in the therapeutic process. Upon Central Office review, consultations with the institution may occur with recommendations to modify the programming delivered in the BMU.

4. The BMU Unit Manager/designee shall provide, via email, a summary of the monthly Treatment Team meetings to the LPD at Central Office on the first of each month.

5. In order to evaluate the operation of the BMU, each Facility Manager/designee shall ensure that a **BMU Semi-Annual Report (Attachment 12-Q)** is completed and submitted to the Executive Deputy Secretary, the LPD at Central Office, the effected Regional LPM, and the effected ***EDSI***/Regional Deputy Secretary/Inspection Team by July 31 (reporting period 1/1 to 6/30) and January 31 (reporting period 7/1 to 12/31) of each calendar year. This report shall include, but not be limited to, the following:

   a. the number of inmate receptions by month;

   b. a list of facilities transferring inmates to the unit;

   c. the name and Department number of every inmate transferred to the unit;

   d. the name and Department number of every inmate promoted to Phase 1;

   e. the average length of an inmate's stay in all Phases (5, 4, 3, 2 and 1);

   f. the name and Department number of every inmate released from the unit (i.e., including BMU graduates) and the location where he/she was transferred;

g.  the name and Department number of every inmate with Sentence Complete expiring while in the unit;

h.  the name and Department number of every inmate moved to Accountability Status and Post BMU;

i.  the number of grievances filed by inmates in the unit;

j.  the number of misconducts issued to inmates in the unit;

k.  the number of BMU inmates at the beginning and end of the reporting period;

l.  any recommendations to facilitate the operation of the unit; and

m.  any concerns regarding the operation of the unit.

Issued: 12/11/2018
Effective: 12/18/2018

## Section 13 – Special Needs Unit (SNU)

### A. Facility Responsibilities

1. *Facilities shall operate a Special Needs Unit (SNU) in accordance with this section.*

2. *At facilities that operate a Residential Treatment Unit (RTU), the SNU shall be located on a separate housing unit when feasible.*

3. *If it is not operationally feasible to physically separate the distinct "units" (i.e., if the RTU and the SNU are located on the same housing unit), the following shall apply:*

   a. *in general, an SNU inmate shall not occupy space on the housing unit at the expense of an inmate who is in need of RTU placement;*

   b. *an inmate who is determined to need RTU placement shall not wait to be placed in an RTU because bed space is taken by an SNU inmate; and*

   c. *staff making housing unit and bed assignments shall consider any vulnerabilities that may exist in order to ensure appropriate placement of all inmates.*

### B. Admission Guidelines and Process for Transfer

1. The SNU is for an inmate with physical, mental, emotional or other vulnerabilities, which may make it difficult for him/her to adjust in general population. *Any adult inmate, age 18 or older*, custody level (except custody level 5), program code, and sentence structure is eligible. The following factors are among those that can be considered to determine appropriate placement:[1]

   a. *A, B, C, and D Roster inmates ("functional Cs or Ds" or mental health cases not more appropriately placed in a RTU and active mental health cases who have vulnerabilities not related to mental illness);*

   b. *physical disabilities or illness;*

   c. *sensory impairment;*

   d. *intellectual disability;*

   e. *age-related vulnerability; and/or*

   f. *other relevant risk factors or vulnerabilities.*

---

[1] 4-4305, 4-4399

Issued: 3/2/2015
Effective: 3/9/2015

> **NOTE: Functionally impaired "C" and "D" Roster inmates should be considered for housing on a RTU, not a SNU. A SNU is no longer considered appropriate housing for inmates who are mentally ill and are functionally impaired.**

2.  Referrals

    a.  **Referrals of inmates who are identified as "C" and "D" Roster (and as further defined in Subsection B.1.a. above)** from within the facility may be made by the Unit Management Team, medical or psychology staff, Program Review Committee (PRC), or any other staff member who perceives an inmate as having adjustment difficulties due to a limitation.[2]

        (1)  The referral shall be made to the Psychiatric Review Team (PRT), **through the Licensed Psychology Manager (LPM), who shall screen and evaluate the referred inmate.[3]**

             **NOTE: The referring Unit Management Team as well as the SNU Unit Management Team shall be present for the review.**

        (2)  **Following the evaluation, the referring Counselor participating on the PRT during the screening/evaluation shall prepare a DC-46, Vote Sheet recommending for or against SNU placement. The referring Unit Management Team shall consult with the SNU Unit Management Team when preparing the DC-46. The DC-46 must contain information for consideration regarding how or if the inmate is expected to benefit from the SNU placement.**

        (3)  **The recommendation shall be forwarded for administrative staff review and action through the Major for Unit Management, the Corrections Classification and Program Manager (CCPM), the Deputy Superintendent for Centralized Services (DSCS), and the Deputy Superintendent for Facility Management (DSFM). The Facility Manager must review any split votes regarding SNU program admission or rejection.**

    b.  **Referrals of non-mental health cases (refer to Subsections B.1.b.-f. above) may be made by the Unit Management Team, medical or psychology staff, PRC, or any other staff member who perceives an inmate as having potential adjustment difficulties due to a limitation.**

        (1)  **The referral shall be made to the assigned Counselor for Unit Management Team consideration.**

        (2)  **The Unit Management Team shall screen and evaluate the referred inmate.**

---

[2] 4-4305
[3] 4-4399

(3) *If deemed an appropriate referral, the case shall be forwarded to the SNU Unit Management Team for screening.*

(4) *After consulting with the SNU Unit Management Team, the referring Counselor shall then prepare a DC-46 recommending for or against SNU placement. The referring Unit Management Team shall work closely with the SNU Unit Management Team when preparing the DC-46. The DC-46 must contain information for consideration regarding how or if the inmate is expected to benefit from the SNU placement.*

(5) *The recommendation shall be forwarded for administrative staff review and action through the Major for Unit Management, the CCPM, the DSCS, and the DSFM. The Facility Manager must review any split votes regarding SNU program admission or rejection.*

c. *New receptions and others may be placed immediately, but temporarily, on the SNU by a Unit Manager or higher-ranking staff member (e.g., Shift Commander/Captain, in the absence of other administrative staff) pending review by the SNU Unit Management Team. The review shall be completed on the next business day.*

(1) *The Counselor participating in the SNU Unit Management Team review shall prepare a DC-46 recommending for or against SNU placement. The DC-46 must contain information for consideration regarding how or if the inmate is expected to benefit from the SNU placement.*

(2) *The recommendation shall be forwarded for administrative staff review and action through the Major for Unit Management, the CCPM, the DSCS, and the DSFM. The Facility Manager must review any split votes regarding SNU program admission or rejection.*

(3) *If the case is determined to be inappropriate for continued SNU placement, the inmate shall be discharged to another general population housing unit.*

d. *Staff shall make detailed and appropriate ICAR entries in order to document the status of the referral.*

3. A referral from a facility where there is no SNU, from a facility that has an inmate whose special needs it cannot accommodate, or where a separation is required, may be considered. *The inmate will be placed and reviewed in accordance with Subsection B.2. above.* Transfer requests shall be made via the transfer petition process as outlined in Department policy **11.1.1, "Population Management."**

4. In cases where an inmate has been approved for SNU placement and space is not available, *the facility must augment their current SNU bed capacity (i.e., designate additional appropriate housing space) to meet the demands of the population needs.*

13-3

5. Every attempt shall be made to place any inmate who needs SNU housing into a suitable unit within 30 days of the initial evaluation.[4]

6. In those cases where an inmate is seriously disruptive within the unit, the SNU Unit Management Team shall determine the appropriate housing.[5]

## C. SNU Cell Assignment

1. ***SNU inmates shall be single or double-celled (double-celling shall be considered the standard) in accordance with Department policy 11.2.1, "Reception and Classification," Section 5, Single Celling and Double Celling Housing.***

2. ***The Involuntary Double-Celling Checklist (refer to Section 5, Attachment 5-A) shall be used prior to involuntary double celling an SNU inmate. Any "yes" response in the Staff Review section of the Checklist stops the process, pending review by the Unit Manager.***

3. ***Involuntary SNU double-celling which occurs after normal working hours is prohibited except in the event of extenuating circumstances, and only with authorization from the Shift Commander.***

4. ***All SNU beds shall be appropriately filled. Examples of other populations that can be housed on the unit without causing negative consequences to the SNU population are peer assistants, Certified Peer Support Specialists, etc.***

## D. Staffing

***The staffing of SNUs shall be in accordance with established guidelines for staffing general population housing units (i.e. SNUs will be staffed no differently than other comparable general population housing units).***

## E. SNU Yard and Activities

1. ***A SNU shall have a separate yard, or yard period, as is operationally feasible.***

2. ***Each facility that operates a SNU shall have an On-Unit Activities Schedule appropriate for the population (refer to Attachment 13-A for a sample schedule).***

## F. Discharge and Transfer Procedures

1. An inmate shall be considered for discharge by the SNU Unit Management Team when he/she no longer needs the security or support provided by the unit, and/or when ***there is***

---

[4] 4-4399
[5] 4-4399

Issued: 3/2/2015
Effective: 3/9/2015

***a need to prioritize others for SNU placement.*** This process is also to be used when alternate housing may be appropriate for a seriously disruptive inmate.

2. The recommendation for discharge of the inmate to general population or to other housing shall be done via a **DC-46** by the SNU Unit Management Team. Included in the body of the **DC-46** shall be information that documents the inmate's adjustment and level of functioning, and whether any vulnerabilities continue to exist, and reason(s) for discharge. The **DC-46** shall be sent through the Major for Unit Management, the CCPM and Deputy Superintendents for final action. The Facility Manager must review every split vote.

3. In those cases where the inmate is to be returned to another facility, a transfer petition shall be submitted in accordance with Department policy **11.1.1**.

13-5

## Section 14 – Diversionary Treatment Units (DTU)

### A. General

The Department strives to avoid prolonged placement of inmates with a Serious Mental Illness (SMI) and/or Intellectual Disability (ID) in Restricted Housing Units (RHU). However, due to safety and/or security concerns, an inmate with a SMI or ID may need to be placed in a secure housing unit where he/she will continue to receive mental health care commensurate with his/her treatment needs. Inmates being considered for placement into the DTU will not meet commitment criteria according to the Pennsylvania Mental Health Procedures Act.

### B. Admission Criteria

Admission criteria shall include the following:

1. a diagnosis of a SMI/ID (i.e. D Roster) as defined in the **Definition of a SMI/ID Outline** (refer to **Section 10** of this procedures manual);

2. the inmate currently presents safety and/or security needs that cannot be accommodated by a less restrictive housing unit operated by the Department;

3. general population Residential Treatment Unit (RTU) participants who are in Administrative Custody (AC) or Disciplinary Custody (DC) may be considered for placement in the DTU by the Program Review Committee (PRC) with the recommendation of the Psychiatric Review Team (PRT);

4. a discharge from the Mental Health Unit (MHU) may be considered for placement in the DTU with recommendation from the MHU and the treating PRT;

5. a Psychiatric Observation Cell (POC) discharge may be considered for placement in the DTU with the recommendation of PRT and approval by PRC;

6. an unsentenced county inmate (5B transfer) may be placed in the DTU if clinical judgment indicates it as an appropriate placement; and

7. any inmate being placed in restricted housing who is under the age of 18, at the State Correctional Institution (SCI) Pine Grove, SCI Muncy, or any other facility shall be offered all the procedures and provisions as listed in **Subsection C. below**.

### C. General Procedures and Provisions

1. Each facility that houses SMI/ID inmates shall make provisions to designate secure pods to function as a DTU. In the absence of bed capacity to dedicate a full pod/unit to a DTU, the facility shall designate a range of cells to function as the DTU. These units shall be painted brightly with murals including recovery-based language and focus on the mental health treatment of those confined there. There should be sufficient out-of-cell (OOC)

space for inmates to receive treatment in individual or congregated settings depending on the mental health and security needs displayed. These cells shall be designated as "DTU" cells in the bed management system.

2. If an exceptional circumstance exists preventing a D Roster inmate from being housed on the DTU (e.g., separation, bed space, etc.) he/she shall receive all DTU services, as per Department policy **DC-ADM 801, "Inmate Discipline," Section 4, Disposition of Charges and Misconduct Sanctions**. He/she shall be moved to the DTU within 13 days, as per Department policy **DC-ADM 801, Section 4**. If circumstances prohibit the inmate from being moved into a DTU within the 13 day time period, notifications will be made to the Executive Deputy Secretary, Regional Deputy Secretary, Office of Population Management (OPM), Office of Psychology, and the Office of Chief Counsel.

3. All DTU inmates will be scheduled and offered a minimum of 20 hours OOC activity weekly. Ten of these hours are structured (e.g., run by appropriately credentialed staff) and ten of these hours will be unstructured (e.g., yard/exercise, contact with peer specialists, etc.). These OOC offerings commence the first day an inmate is placed in the DTU. All disciplines (e.g., psychology staff, psychiatric providers, counselors, treatment specialists, education, chaplaincy, drug and alcohol treatment specialists, medical staff, activities staff, social workers, therapeutic activities services workers) and departments are expected to offer services to the inmates in the DTU to achieve the minimum offering of OOC activity. Individual Recovery Plan (IRP) goals established collaboratively with the PRT and inmate shall drive structured OOC programming offerings on the unit.

The number of structured OOC hours or portions of an hour of programming that the inmate participates in will be logged by the staff member who provides the structured OOC contact. The staff member will log the completed time on the **DTU Accepted/Refused Structured Out-of-Cell Program Log (Attachment 14-A)**. The number of unstructured OOC hours or portions of an hour of programming that the inmate participates in will be logged by a Corrections Officer (CO) assigned to the unit. The CO will log the completed time on the **DTU Accepted/Refused Unstructured Out-of-Cell Program Log (Attachment 14-B)**. The cumulative offering, acceptance, and refusal shall be entered into the **Inmate Cumulative Adjustment Record (ICAR)** on a weekly basis by a designated Corrections Counselor for each inmate and shall cover the reporting period from Monday to Sunday.

4. ***DTU inmates will be handcuffed in the front using a security belt with two COs escorting. Tethers and leg shackles are optional and only used with inmates whose demonstrated behavior warrants their use.***

5. Weekly, the DTU Counselor will compile the total hours of programming for each inmate, document the total in the **ICAR,** and report the data on the weekly **Structured/Unstructured Out-of-Cell Program Report (Attachment 14-C)**. Completed logs will be forwarded to the DTU Unit Manager for filing. The weekly **Structured/Unstructured Out-of-Cell Program Report** will be forwarded to the Chief of Psychological Services and the respective Regional Licensed Psychology Manager (RLPM).

Issued: 7/19/2017
Effective: 7/26/2017

6. The DTU treatment team is aware that from time to time participation in programming may be difficult for some individuals. They may exhibit a lack of meaningful participation in the milieu offered. It is the goal of the DTU that all participants receive the maximum benefit from treatment. Therefore, the DTU treatment team will closely monitor program participation. Each month, every participant's IRP and OOC participation will be reviewed by the treatment team. Should an individual's participation in OOC offerings fall below 60% of the minimum 20 hours programming, the facility's Licensed Psychology Manager (LPM)/designee will lead the treatment team in collaborating with the individual to discuss goals/objectives/barriers to OOC participation. Part of that review will include a discussion of the programming offered in order to ensure that it addresses the individual's expressed needs. In addition, as a part of the treatment team, the Psychiatric provider will review the individual's medication and ensure there are no medication side effects which may be hindering program participation. The Psychiatric provider will also assess the individual for possible in patient treatment if clinically indicated. The facility's LPM/designee will forward the updated IRP for review to the facility's RLPM and the Chief of Psychology at Central Office. The facility's LPM/designee may coordinate a videoconference with their treatment team, their respective RLPM, and the Mental Health Advocate at Central Office, to discuss and review the Recovery Plan changes recommended by the facility's LPM/designee and their treatment team if needed.

7. ***Each DTU unit team, in conjunction with PRT and PRC, will introduce an incentive system to encourage prosocial behavior and participation in OOC offerings.***

8. The programming day is not considered to be Monday through Friday during daylight hours. Activities shall be scheduled during evenings and on weekends to achieve the minimum of 20 hours OOC per week offering.

9. All inmates in the DTU will be offered two hours of exercise per day, at least five days per week and shall be permitted to shower daily and shave three days per week.

10. Inmates housed in the DTU will be issued royal blue hobby jeans and a royal blue shirt with DOC printed in large block letters on the back. They will be provided appropriate footwear. Outerwear for exercise shall be provided as needed.

11. The PRC shall review each inmate in the DTU weekly in conjunction with the LPM/designee. This OOC contact shall be offered in a private, confidential area. This contact shall be documented in the **ICAR** and on a **DC-560, Mental Health Contact Note** filed in the medical record. The **DC-560** must assess continued appropriateness for DTU placement and likelihood of suicidality to include risk and protective factors. The LPM/designee must make a recommendation to PRC regarding removal from the DTU at every PRC meeting. The LPM/designee can also report to PRC on the inmate's adherence to medication regime.

12. If an inmate refuses to attend PRC, the committee will go to the inmate's cell.

Issued: 7/19/2017
Effective: 7/26/2017

13. During the first PRC review, an orientation to the unit will explain the purpose, expectations, etc., of the DTU. During this first review, an administrative review will be conducted to determine if the inmate should be removed from the DTU or if exceptional circumstances exist allowing PRC to continue to hold the inmate in the DTU. Exceptional circumstances include:

    a. release would pose a substantial risk to the safety of the inmate or others;

    b. placement in a general population RTU would pose a substantial threat to the security of the facility; or

    c. the PRC, in concert with the PRT, determines DTU confinement is in the inmate's best interest based on his/her mental condition and that removing the inmate and placing him/her in a general population RTU or Secure Residential Treatment Unit (SRTU) would be detrimental to his/her mental condition.

14. Any D Roster inmate who cannot be released to general population from the DTU within 30 days of being in AC status after completion of DC Status, will have his/her name, case synopsis, updated IRP and a plan for release forwarded to the appropriate Regional Deputy Secretary and the Licensed Psychologist Director for the Office of Psychology. These cases will then be reviewed by the Central Office Special Needs Psychiatric Review Team (COSNPRT).

15. If a D Roster inmate is deemed to meet the criteria in **Subsection C.*13*.a. & b. above**, PRC, in conjunction with PRT, will consider initiating a referral to a SRTU if warranted and appropriate.

16. Psychology staff will create an IRP in collaboration with the inmate, to present at the first PRC meeting. This plan shall address the behaviors that brought the inmate to the DTU. A discussion shall be conducted in regard to the behaviors, including participating in OOC programming without being disruptive, the inmate has to demonstrate to earn early release from the DTU and earn privileges. The goals of this IRP drive the clinical structured OOC offerings on the unit, e.g. if an inmate's goal is to control anger, then they shall be in an anger management group, or if an inmate wants to address managing anxiety related to trauma, they shall be in a seeking safety group.

17. IRPs are to be completed every 30 days after the initial change of status IRP, unless there is a sentinel event (e.g., POC placement, serious suicide attempt, self-injurious behavior, etc.) which requires the IRP to be updated sooner. An IRP will also be completed when an inmate is released from the DTU back to general population.

18. PRT shall convene monthly to review IRP progress. The inmate will be invited to attend this structured OOC programming in a private area ensuring confidentiality. Psychology staff shall document the meeting in the **ICAR**. PRT shall review IRPs collectively and determine what groups shall be offered on the unit and also review overall participation rates to determine if the groups being offered are effective in regard to attendance by the

Issued: 7/19/2017
Effective: 7/26/2017

inmates. If an inmate refuses to attend PRT, they will be seen cell side and encouraged to attend OOC PRTs.

19. A member of the psychology staff shall be assigned to the DTU and offer a weekly OOC individual contact with each inmate. The offering of this contact and its acceptance shall be documented on the **ICAR** and on the **DC-560**. In the event that the inmate is offered and refuses OOC contact and it occurs at the cell door, this should be documented in addition to its impact on confidentiality. Psychology shall have a current copy of the IRP during all psychology contacts.

20. Psychology staff shall make rounds daily on the DTU, Monday through Friday excluding weekends and holidays. Each inmate will be spoken to every day. The inmate can be removed from his/her cell for OOC contact if it is required in the clinical opinion of the Psychological Services Associate (PSA)/Psychological Services Specialist (PSS). An inmate may request OOC contact and psychology staff, in conjunction with the unit team, will decide if it is warranted. If OOC contact is denied upon request, a reason will be entered on the **DC-17X, Adjustment Record for Security Level 5 Inmates**, and on the **ICAR**. Rounds do not have to be documented in the **ICAR** with a **DC-560** to the medical record, but rather are documented in the unit log book. The **ICAR** and the **DC-560** are required documentation for meaningful contacts but not for rounds. Meaningful contacts should include but are not limited to OOC contacts, cell-side contacts following refused OOC offering, contacts indicating clinically indicated need for OOC contact, or contacts that precipitate non-emergent and/or emergent referrals to psychiatry.

21. The assigned Counselor shall see every inmate weekly. Each inmate's Unit Management Team will review his/her case weekly. The Counselor's weekly interview and the Unit Management Team's weekly review are to be documented in the **ICAR**. The Unit Management Team shall forward a recommendation to the PRC for early release, if appropriate.

22. Certified Peer Specialists (CPS) are expected to provide supportive services on the DTU. Only those CPS services offered OOC may be counted towards unstructured OOC offerings.

23. Basic issue items shall be provided in accordance with Department policy, **6.5.1, "Administration of Security Level 5 Housing Units" Section 1**. Three pairs of personal undergarments are permitted.

24. Inmates in the DTU are prohibited from using, purchasing, or possessing tobacco products while confined in the DTU. Commissary purchases are limited to approved items from the AC commissary catalogue. Outside purchases are prohibited.

25. Inmates in the DTU shall have privileges determined by PRC with input from PRT including radio, television, telephone calls, and commissary purchases. Privileges, especially the possession of certain property, should be provided unless circumstances or behavior dictate otherwise. The default presumption should not be that privileges or possessions are contraindicated.

Issued: 7/19/2017
Effective: 7/26/2017

26. DTU inmates shall be provided access to the facility law library and may request other law library books by requesting legal materials and/or by using the mini law library in accordance with Department policy **DC-ADM 007, "Access to Provided Legal Services."**

27. DTU inmates are permitted to maintain the equivalent of one records center box of any combination of personal property in his/her cell. Additional boxes of legal materials may be granted for open and active cases through the Corrections Superintendent's Assistant (CSA).

28. In case of a verified emergency, the Unit Manager or a Commissioned Officer may approve a telephone call. Every approved emergency telephone call shall be logged in the DTU Log Book and in the inmate's **DC-17X**.

29. Visits initially are limited to one non-contact visit per month, which may be limited to weekdays only, with immediate family. Legal visits shall be permitted. The inmate may be permitted one non-contact visit per month with his/her religious advisor, as per Department policy **DC-ADM 812, "Inmate Visiting Privileges."** However, visits can be increased in frequency or considered on weekends by PRC with input from PRT depending on non-disruptive OOC participation and demonstrated appropriate behavior and progress toward the IRP.

30. If a determination is made that the DTU is not the least restrictive environment for an inmate due to his/her being a threat in the DTU or a less secure environment, a SRTU or Behavior Management Unit (BMU) referral may be made. When an inmate is being recommended for a transfer to the SRTU or BMU, the PRC with input from PRT shall review the recommendation and inform the inmate of the reasons for proposed recommendation. The inmate shall be given the opportunity to respond to the rationale given and object to the inmate placement in the SRTU/BMU if he/she so desires. The recommendation shall be documented on the **DC-141, Part 4, Facility Manager's Review** with a copy to the inmate. The inmate may appeal the recommendation for SRTU or BMU to the Facility Manager and to the Chief Hearing Examiner's Office at Central Office.

31. Any inmate assigned to the DTU who goes to another facility on WRIT/Authorized Temporary Absence (ATA) will continue to be offered everything outlined in this procedures manual.

32. When an inmate's service of consecutive DC in the DTU is interrupted, for example the inmate goes out on WRIT/ATA to a county facility, or non-Department facility, his/her remaining DC imposed time is tolled during the ATA. At the time of the inmate's return from ATA, the receiving facility shall determine if, and to what extent, the inmate's owed DC time should be credited because while ATA, the inmate was housed in a custodial or housing arrangement similar to DTU in a Department facility. After credit, if any is awarded, any remaining Department DC time shall be served until completed. The PRC shall be responsible to review placement while ATA, determine credit and the inmate's status upon return to the facility.

14-6

## D. Staff Training

All staff selected or assigned to the DTU to provide programming and supervision will be required to complete Crisis Intervention Team Training (CITT) within six months of placement into the unit. If it is necessary to assign a staff member to the DTU who has not completed this training, the facility shall, within two weeks, advise the CITT Program Coordinator. The facility's Training Coordinator shall also communicate such training needs to the CITT Program Coordinator to ensure that sufficient training is conducted to meet the needs of the facility. CO Trainees (COTs) will not be assigned to the DTU.

## E. Unit Operation Evaluation

1. Every Monday, the DTU Unit Manager/designee will provide, via email, the Licensed Psychologist Director at Central Office and the respective RLPM with an updated roster to include DTU inmates on MH commitment, WRIT, etc., using the **Structured/Unstructured Out-of-Cell Program Report**. This roster shall include date admitted to the DTU.

2. Every Monday, the DTU Unit Manager/designee will submit, via email, to the Licensed Psychologist Director at Central Office and the respective RLPM, the log sheet of OOC hours on the **DTU Accepted/Refused Structured Out-of-Cell Program Log** and the **DTU Accepted/Refused Unstructured Out-of-Cell Program Log**.

3. The DTU Unit Manager/designee shall provide, via email, a summary of the monthly PRTs to the Licensed Psychologist Director at Central Office and the respective RLPM on the first of each month.

4. In order to evaluate the operation of the DTU, each Facility Manager/designee shall ensure that a **DTU Semi-Annual Report (Attachment 14-D)** is completed and submitted to the Executive Deputy Secretary, appropriate Regional Deputy Secretary, Licensed Psychologist Director at Central Office, and the RLPM by July 31 (reporting period 1/1 to 6/30) and January 31 (reporting period 7/1 to 12/31) of each calendar year. Only facilities that operate DTUs are required to complete this report. This report shall include, but not be limited to, the following:

   a. the number of inmate receptions by month;

   b. the amount of DC time reductions per inmate (names and numbers) who have received time cuts;

   c. unit classifications transferring inmates to the unit and the number of inmates transferred to the DTU from those units (e.g., three for General Population, two from the RTU, and one from the POC);

   d. the name and Department number of every inmate transferred to the unit;

e.   the average length of an inmate's stay in the DTU;

f.   the name and Department number of every inmate released from the unit and the location where he/she was transferred;

g.   the name and Department number of every inmate with Sentence Complete (SC) expiring while in the unit;

h.   the number of grievances filed by inmates in the unit;

i.   the number of misconducts issued to inmates in the unit;

j.   the number of DTU inmates at the beginning and end of the reporting period;

k.   any recommendations to facilitate the operation of the unit; and

l.   any concerns regarding the operation of the unit.

Issued: 7/19/2017
Effective: 7/26/2017

## Section 15 – Certified Peer Specialist (CPS) Initiative

### A. General Considerations

1. The purpose of the Certified Peer Specialist (CPS) initiative is to train select individuals from the *inmate* population to serve as CPSs.

2. The certification process will afford all successful participants the opportunity to become a recognized CPS by the Pennsylvania Department of Human Services (DHS) and the Pennsylvania State Civil Service Commission (SCSC). Certification will provide the potential for employment in a peer support setting after release from a state correctional facility.

3. The CPS employment wage is .51 cents per hour. The work day can be between six to eight hours, dependent upon the needs of the facility. A CPS can be employed full or part time and does not have to give up his/her existing employment to work as a CPS. However, he/she must provide CPS services a minimum of 10-15 hours per week in order to maintain his/her CPS position.

4. CPS training will provide selected *candidates* with the skills required to act as mentors/role models for other *inmates* in specialized units and other places within a state correctional facility, such as:

   a. visiting rooms;

   b. Residential Treatment Units (RTUs);

   c. Special Needs Units (SNUs);

   d. Secure Residential Treatment Units (SRTUs);

   e. Therapeutic Communities (Alcohol and Other Drug [AOD] TC);

   f. Restricted Housing Units (RHUs);

   g. *Diversionary Treatment Units (DTUs)*;

   h. *Behavior Management Unit (BMU)*;

   i. Psychiatric Observation Cells (POCs);

   j. General Population housing units;

   k. *Diagnostic and Classification*;

   l. library;

Issued: 5/21/2018
Effective: 5/28/2018

m. Transitional Housing Units/Reentry Service Offices (THUs/RSOs);

n. infirmary (to include the oncology and hospice wards);

o. chapel;

p. med lines;

q. education center;

r. commissary;

s. dietary section;

t. Veteran Service Units (VSUs);

u. recovery units;

v. Mental Health Units (MHUs);

w. Capital Case Unit; and

x. Forensic Treatment Center (FTC).

5. A CPS can be utilized to augment staff's efforts to effectively support **inmates with mental health or emotional concerns** thus enhancing their own recovery and wellness. In addition to **promoting recovery** skills, such as **personal wellness and positive coping skills**, a CPS can:

a. utilize his or her first-hand knowledge about mental health recovery to help his/her peers **in their recovery**;

b. demonstrate recovery in a way that inspires his/her peers and helps them to see their own potential for recovery;

c. assist his/her peers with the identification of their **short and** long-term goals and to subdivide those goals into manageable steps;

d. provide his/her peers with an opportunity to evaluate the choices and decisions that they make/have made;

e. demonstrate the value of self-determination and personal responsibility;

f. assist in establishing/maintaining a recovery environment within the facility setting that empowers others to succeed in accomplishing goals, reconnecting to themselves, reconnecting with others, and having purpose in life;

15-2

g.  demonstrate the power of resilience;

h.  assist assigned *inmates* in understanding the grievance process; and

i.  assist his/her peers with shifting their focus from symptom management to recognizing and developing their wellness, their accomplishments, and their abilities.

6.  ***CPSs are trained in the Copeland Center's Wellness Recovery Action Plan (WRAP©) Seminar I and should introduce WRAP© to those they support as a CPS. WRAP© is an evidenced based wellness practice to assist a person in his/her daily wellness and to prevent a crisis. When assisting an individual who chooses to develop a WRAP©, notebook paper, outlining the sections of a WRAP© may be used.***

7.  In addition to providing individual services, a CPS may also facilitate workshops and didactic groups. The workshops provided by a CPS shall be periodically monitored by a member of the Unit Management Team and/or the Psychology Department.

8.  ***CPSs selected by the CPS Committee may act as mentors to newly certified CPSs, CPSs who are on suspension or probationary status, and CPSs who are experiencing difficulty in their CPS capacity. Identification of mentors/mentees should be coordinated by a CPS Committee designee. CPSs serving as mentors must limit this role to CPS-related activity.***

9.  The Unit Manager will post a notice of CPS facilitated workshop/group schedules on the bulletin board in his/her housing unit. An *inmate* interested in attending these sessions will submit a **DC-135A, Inmate's Request to Staff Member** in order to be scheduled for attendance.

10. ***In addition to providing peer support, a CPS may be asked to address specific concerns assigned by his/her supervisor(s).*** The Licensed Psychology Manager (LPM), ***CPS Supervisor(s)***, or Unit Manager will be available to the CPS for consultation and assistance as needed.

11. Each facility shall develop an identification (ID) badge that acknowledges the ***inmate*** is a CPS. This ID badge shall be worn/carried along with the inmate ID at all times while performing CPS services. ***The recommended badge is the cell door card and will state that the inmate is a CPS, work assignments, and will be signed by the Deputy Superintendent for Centralized Services (DSCS)/designee.***

12. ***Photos of CPSs shall be placed in the control center on the housing unit so staff are aware of which CPSs are assigned to a particular unit.***

13. ***Photos of CPSs shall be placed on the unit so that residents of the unit are aware of who the CPS is for that particular unit.***

Issued: 5/21/2018
Effective: 5/28/2018

B. *Certified Peer Specialist (CPS) Candidate* **Selection**

1. *A candidate* shall be selected via a **DC-46, Vote Sheet** process. To be considered for selection as a CPS candidate, *he/she* must meet specific criteria:

   a. must be a custody level two or three;

   b. must be misconduct free for a minimum of one year *(misconducts will be reviewed by the CPS Committee)*;

   c. have no misconducts for assaultive behavior in the last two years;

   d. *have no history of substantiated allegations of institutional sexual abuse or sexual harassment; and not found to be at high-risk of being sexually abusive via the Department's risk screening pursuant to Prison Rape Elimination Act (PREA) standard §115.41. PREA standard §115.42 requires that information from the risk screening process inform housing, bed, work, education, and programming assignments with the goal of keeping separate inmates at high risk of being sexually victimized from those at high risk of being sexually abusive. Any individual identified at high risk of being sexually abusive through the most recent risk screening score shall disqualify an individual from serving as a CPS*;

   e. a history of mental health treatment/services while incarcerated and/or in the community. *B Roster candidates may be considered only if a mental health diagnosis during incarceration or while in the community has been validated. Steps to obtain community information is required prior to selecting a candidate identified as B Roster stability; it is the inmate's responsibility to obtain this information and present it to the CPS Supervisor*;

   f. program compliancy. *If a candidate has refused to participate in programming, he/she is ineligible*;

   g. recommended by the LPM and/or Psychiatric Review Team (PRT);

   h. if the *candidate* is on the AOD TC waiting list, his/her potential start date for AOD TC may not begin before the conclusion of his/her CPS training and he/she must be permitted to provide CPS services while in the TC;

   i. have more than *three* years remaining on his/her *minimum release date*, unless he/she qualifies under the Long-Term Offender (LTO)/lifer criteria listed below;

   j. have a high school diploma or General Education Diploma (GED);

   k. if the *candidate* is a LTO/lifer with positive adjustment records, he/she may be given consideration and the requirement for high school diploma/GED may be waived; and

15-4

    l. *each State Correctional Institutions (SCI) shall determine the number of LTOs, but should not have a majority of LTOs as CPSs.*

2. The Facility Manager/designee shall designate the maximum number of LTO/lifers on the CPS Roster at his/her facility. D Roster facilities should have a minimum of *30* CPSs. Non-D Roster facilities should have a minimum of *20* CPSs.

3. *The CPS complement shall be supervised by staff that are designated by the Facility Manager/designee. If a facility determines there is an increased need for additional CPSs, a request shall be made to Office of Mental Health Advocate (OMHA)/ designee.*

4. Staff designated by the Facility Manager/designee will review *inmate* records to identify potential participants in the program.

5. *When a CPS worker is transferred to another SCI, the sending SCI CPS supervisory staff should inform the CPS supervisory staff at the receiving SCI of any information pertaining to his/her status as a CPS and any other important information, including security concerns.*

6. *Parole Violators (PVs) returning to an SCI who have a valid CPS certification may request employment. The CPS Supervisor(s)/designee shall verify certification of the certification and continuing education requirements prior to approving CPS employment status. CPS employment for PVs is determined on a case-by-case basis; employment as a CPS will not begin until 60 days after a return to an SCI and approval from the CPS Committee.*

## C. Certified Peer Specialist (CPS) Training *Program*

1. The CPS Training Program is designed to provide selected *inmates* with basic educational training on the following topics:

    a. *mental health* recovery;

    b. the philosophy and practice of the power of peer support;

    c. the development of self-esteem and managing self-talk;

    d. community, culture, and environment;

    e. emotional intelligence;

    f. employment as a path to recovery;

    g. substance *misuse*;

    h. conflict resolution;

Issued: 5/21/2018
Effective: 5/28/2018

   i.   *suicide prevention;*

   j.   working with other professionals; and

   k.   *trauma informed approach to peer support.*

2. *Select* Department staff *who are certified by an approved vendor through the DHS Office of Mental Health and Substance Abuse Services* will deliver the CPS *core certification* training. All requests for training shall be routed through OMHA/*designee* at Central Office.

3. *A selected candidate* may not miss more than six hours *of the CPS certification* training and *may only miss six hours if approved by the instructor and/or CPS Supervisor(s) prior to the date of the anticipated absence. The CPS candidate* must make up any missed work under the direction of the CPS training facilitator(s). All selected *candidates* must also participate in classroom activities and must successfully complete the mid-term and final exam.

4. The CPS training instructor has the discretion to *disqualify* a CPS student if there are indications that the student is unable to fulfill the requirements of the course, such as classroom exercises, homework assignments, and fidelity to the CPS model.

5. Any student observed cheating on the exam will be *disqualified* from the class and unable to continue. *He/she* may apply to be a CPS candidate at a later date, *but not less than one year of removal from the original class.* Approval *to be considered for future CPS certification training* will be determined by designated facility staff.

6. *A candidate* who receives the certification and signs the **CPS Confidentiality Acknowledgement Form (Attachment 15-A)** may be utilized as a CPS at an assigned facility.

7. *Once certification is completed, all CPSs will sign the CPS Orientation Checklist (Attachment 15-B) which will be maintained by the CPS Supervisors.*

8. *All CPSs must earn at least 18 continuing education hours per year to maintain his/her state certification. Training topics must primarily focus on wellness, life skills, boundaries, and other related topics. Code of Ethics and PREA Level 2 Contractors/Volunteers training is mandatory for all CPSs. In accordance with Department policy DC-ADM 008, "PREA" the Contractors/Volunteers PREA Training (Attachment 2-G) shall be utilized for this training, which shall be documented under the "Other" group of the PREA Training and Understanding Verification Form (Attachment 2-F). Weekly or monthly meetings should not be counted as education hours.*

9. *Continuing education will be facilitated by facility staff, CPSs, or volunteer facilitators as approved by the facility staff and will include:*

15-6

    a. *review of modules from the original certification training annually; and*

    b. *wellness topics, life skills, and other recovery topics.*

10. *CPS Supervisor(s)/designee should be present during continuing education workshops as often as possible.*

11. *Training facilitated by external facilitators must be supervised at all times by facility staff.*

12. A CPS must report for the scheduled workshops/groups during the designated time.

13. *All CPSs completing the annual education requirements will receive a CPS Continuing Education Certificate (Attachment 15-C) at the end of the calendar year verifying completion of the requirement.*

**D. Supervisory Staff**

1. *All SCIs will convene a CPS Committee which will consist of, but is not limited to Unit Management, Psychology, Security, Deputy, Training Sergeant/Lieutenant, and Counselor.*

2. *All SCIs will have a minimum of two certified CPS Supervisors. CPS Supervisors shall:*

    a. *provide guidance, support, and supervision of CPS workers;*

    b. *oversee daily operations of the CPS program; and*

    c. *meet with the CPS Committee quarterly; minutes will be taken of each meeting and submitted to OMHA within two weeks of the meeting.*

3. *Operation* of the CPS program should be facilitated as a committee whose members, including treatment and security staff, are united and equal in their decision-making authority.

4. A designated *committee* member shall function as the primary CPS Coordinator who develops all CPS schedules and on call schedules/*needs, work assignments*, and coordinates CPS Committee meetings.

5. *CPS Supervisor(s)/designee will track the 18 required continuing education hours on the CPS Training Tracking Form (Attachment 15-D)* to include the *CPSs* name and number, his/her *CPS* state certification number which appears on his/her training certificate, the topic of the *training*, how many hours the session spanned, and the date the session was facilitated. *Continuing education hours* correlate to the calendar year, January through December. *The CPS Training Tracking Form* shall be forwarded to OMHA at Central Office each year by December *31*.

15-7

6. ***The facility CPS Coordinator/designee will provide an informational overview of the CPS program, titled "CPS Defined Power Point" (Attachment 15-E) to all staff assigned to areas where CPSs are utilized. This overview will include familiarization with the roles, responsibilities, and expectations of a CPS to include specific training received by a CPS in suicide prevention. Other benefits of the program, such as providing support to inmates with mental illness and assistance in de-escalating situations, will be addressed during the overview as well as identifying the facility CPS Supervisor for staff to contact with any additional questions or concerns.***

## E. General Conduct

1. When providing one-on-one peer support, a **Daily Contact Record *Book*** will be maintained by the CPS and will be turned into the CPS Supervisor(s) at the end of the ***week*** that the ***peer*** support takes place. ***The Daily Contact Record Book will be provided to all SCIs from OMHA***.

2. All information shared in peer sessions is to remain confidential except when threats of suicide or expressions of intent to harm others are verbalized ***and/or witnessed, when there is a threat to the security of the SCI, and disclosure and/or witnessing of sexual abuse or harassment***.

3. The CPS statewide certification includes CPSs as para-professionals ***who*** have a "duty to warn." In these ***circumstances***, the CPS shall report such threats and expressions to staff immediately. (The CPSs are informed of this duty during their training and confirm their agreement to do so by signing the **CPS Confidentiality Acknowledgement Form**.)

4. Abuse of ***position/***privileges by a CPS shall be reason for suspension/termination from the program.

5. A CPS may be terminated for a breach of confidentiality.

6. Every CPS is subject to random urinalysis testing, in accordance with Department policy **6.3.12, "Drug Interdiction."** ***If a CPS refuses to random urinalysis, he/she may be terminated from CPS employment.***

7. A CPS and the ***inmates*** attending such workshops/groups are subject to monitoring at any time by Department staff. Staff will provide intervention as needed.

8. A CPS may be ***suspended or placed on probationary status at the discretion of the CPS Committee or subject to termination*** if he/she receives any Class 1 misconduct (assault, fighting, sexual misconduct, possession of drugs) ***and/or is a threat to the security of the SCI***.

9. Termination of CPS employment will result in the ***inmate*** being rendered ineligible for rehire as a CPS and training opportunities related to maintaining CPS certification.

10. A CPS may receive a **Letter of Recommendation (Attachment 15-*F*)** from the multi-disciplinary team and/or the immediate supervisor for use upon release for employment purposes.

**F. *CPS Guidelines for Level 5 Housing***

1. *When assigning a CPS to the RHU, DTU, or SRTU, a CPS should be informed of the assignment and that he/she will be required to be strip searched upon entering the unit and at any time there is a security or safety concern. If a CPS refuses to follow this procedure, he/she is ineligible to work on these units and may be subject to CPS status review.*

2. *CPSs who work on a level 5 housing unit should be rotated periodically. Rotation should be determined by the CPS Supervisor(s)/designee.*

3. *CPSs shall provide services on the RHU/DTU during all three shifts daily and shall be informed of new receptions so they can conduct a check in with the new reception. It is a priority to have a CPS on second and third shifts.*

   a. *A CPS shall provide services on the RHU/DTU throughout the 6:00 AM-2:00 PM shift.*

   b. *A CPS shall make rounds during the 2:00 PM-10:00 PM and 10:00 PM-6:00 AM shift and visit each person who has arrived within the last seven days as soon as possible. The CPS should make contact with every individual regardless if there has been indication of suicidal ideation or not. It is not the expectation that a CPS be assigned for the duration of second and third shifts.*

4. *CPSs shall be on call to provide services to inmates in a level 5 unit.*

5. *CPSs will be visually supervised by level 5 staff at all times.*

6. *CPSs will not give or receive any item to/from an inmate without staff permission.*

**G. *CPS Guidelines for Psychiatric Observation Cells (POCs)***

1. *CPSs shall provide services in the POC area during all three shifts daily and shall be informed of new receptions so they can conduct a check in with the new reception. It is a priority to have a CPS on second and third shifts.*

2. *A CPS shall provide services in the POC area throughout the 6:00 AM-2:00 PM shift.*

3. *A CPS shall make rounds during the 2:00 PM-10:00 PM and 10:00 PM-6:00 AM shift and visit each person who has arrived as soon as possible. It is not the expectation that a CPS be assigned for the duration of shifts.*

4. *CPSs shall be on call to provide services to inmates in a POC.*

Issued: 5/21/2018
Effective: 5/28/2018

5. ***CPSs shall be visually supervised by staff at all times.***

6. ***CPSs shall not give or receive any item to/from an inmate.***

Issued: 5/21/2018
Effective: 5/28/2018

**Acute Dynamic Risk Factor** - A risk factor that may change rapidly and/or have a stronger temporal association with re-offending (negative mood, intoxication).

**Adjusted Actuarial Approach** – A risk assessment strategy, involving initially the use of an actuarial tool to determine a baseline level of static risk, proceeding with adjustment based upon the number and intensity of dynamic risk factors (criminogenic needs) present for an individual inmate.

**Chief Psychologist's Office** – Refers to the office of Chief of Psychological Services, which provides professional supervision to the Psychology Departments in the state correctional facilities. The Chief Psychologist's Office is responsible for tracking the transfers of inmates with mental illness.

**Comprehensive Assessment Plan** – A plan that provides for extensive assessments of the inmate. It identifies an inmate's strengths, needs and reason(s) for admission to the unit. It also identifies inmate and staff responsibilities in the assessment process.

**Corrections Classification and Program Manager (CCPM)** – Responsible for planning, organizing, and directing a broad program of classification, treatment, and program activities for inmates in a correctional facility.

**Corrections Health Care Administrator (CHCA)** – The on-site administrator responsible for monitoring on-site contractual compliance and/or directing the daily operations of the Medical Department at the facility and providing supervision and direction to Department medical personnel.

**Court-Ordered Involuntary treatment or 304 Commitment** – Refers to long-term treatment for (a) individuals who are determined to be a danger to self or others or (b) persons who are already subject to involuntary treatment.

**Department** – The Pennsylvania Department of Corrections.

**Department of Public Welfare (DPW) Forensic Mental Health Units** – Refers to the forensic mental health units operated by the Office of Mental Health and Substance Abuse Services (OMHSAS), Department of Welfare. These units are located at Norristown State Hospital, Mayview State Hospital, and Warren State Hospital.

**Department Regional Mental Health Units (MHUs)** – Refers to forensic mental health units that are housed within Department facilities and are approved annually by the Office of Mental Health (OMH) in the Department of Public Welfare. The operation of the MHUs is guided by the Regulations for Inpatient Forensic Psychiatric Programs, Chapter 5320 of the Title 55, published by the Office of Mental Health.

**Deputy Superintendent for Centralized Services (DSCS)** – The facility staff member responsible for coordinating efforts between facility and the Medical Department. As the Facility Manager's representative, he/she has joint responsibility with the Bureau of Health Care Services to address those issues outlined in this policy.

**Deputy Superintendent for Facility Management (DSFM)** – A management level employee directly responsible for the uniformed corrections officers, Unit Management (housing), counseling services, facility maintenance, facility safety, and the facility Security Office.

**Diagnostic and Classification Center/Facility (DCC)** – A correctional facility, which assesses custody, security levels, programmatic and special needs, of inmates who are newly received into the Department, returned as parole violators, or temporarily transferred for presentence assessment.

**Diagnostic and Classification Center/Facility Initial Orientation Group** – These groups are provided to help orient new commitments to the programs and services available at housing facilities, and offer information on how to access these programs and services.

**Diagnostic and Classification Center/Facility Mental Health Staff** – The counseling, substance abuse, psychological and psychiatric staff that provides mental health services to inmates in reception status.

**Diagnostic and Classification Center/Facility Staff** – All staff in the Diagnostic and Classification Center/Facility including the mental health staff, officer, and ancillary staff.

**Disciplinary Custody (DC Status)** – The maximum restrictive status of confinement to which inmates found guilty of a Class I misconduct may be committed.

**DSM** – The American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders.

**Dynamic Risk Factor** – A risk factor that is considered changeable through intervention, also referred to a criminogenic need.

**Extended Involuntary Emergency Treatment or 303 Commitment** – Refers to the court ordered extension of the 302 application for a period not to exceed 20 days.

**Facility** – A State Correctional Facility, State Regional Correctional Facility, Motivational Boot Camp, Training Academy, Community Corrections Center, and the Central Office Complex as a group and/or individually.

**Facility Manager** – The Superintendent of a State Correctional Facility, State regional Correctional Facility, or Motivational Boot Camp, Director of a Community Corrections Center or Director of the Training Academy.

**Forensic Treatment Center** – Refers to the forensic psychiatric hospital operated by the Department. The unit is located at SCI-Waymart, and its operation is guided by the Regulations for Inpatient Forensic Psychiatric Hospitals, Chapter 5333 of Title 55, Published by the Office of Mental Health.

**General Population Housing Unit** – A general housing unit within which an inmate may engage in various educational, vocational, and treatment programs.

**Guilty But Mentally Ill (GBMI)** – Sentencing provisions established by Act 286-81, 18 PA C.S.A. §§314, 315, 42 PA C.S.A. §9727 for persons found or pleas of guilty but also having a mental illness at the time of commission of their offense. Persona adjudicated as GBMI were determined by the court to be mentally ill, but not legally insane, at the time they committed their offense. They may or may not be mentally ill at the time of sentencing or reception. This is a legal, not a psychiatric diagnosis, classification.

**Hard Cell** – A secure cell usually located in a Mental Health Unit, Infirmary, or Special Needs Unit that is free of breakable objects, protrusions, screens, and other features which an inmate might harm him/herself. The area is also structurally reinforced so that the inmate will have difficulty damaging the cell. Window and doors are located and the cell is configured in such a manner as to allow custody and treatment staff provide constant observation of, and immediate access to, the resident, to prevent self-harm. Some hard cells may be equipped with medical restraints and/or observation cameras.

**Housing Unit Officer** – A corrections officer who is assigned to the living quarters where inmates are housed.

**Individual Treatment Plan (ITP)** – A series of written statements specifying the particular course of treatment and the roles of staff in carrying it out. It is based on an assessment of the inmate's needs, and it includes a statement of short and long-term goals as well as the methods by which these goals will be pursued. When clinically indicated, the treatment plan gives inmates access to the range of supportive and rehabilitative services (such as physical therapy, individual or group counseling, and self-help groups) that the treatment plan deems appropriate. To the extent feasible, the inmate shall participate in the development of his/her ITP.

**In-House Regional Mental Health Unit (MHU)** – A Department of Public Welfare Office of Mental Health Certified mental health unit housed within a Department facility. Vendors under contract to the Department operate these units. The Regulations for Inpatient Forensic Psychiatric Programs, Chapter 5320 of the Title 55, published by OMH, guide the operation of the MHUs.

**Initial Assessment Plan** – A plan developed by the Special Assessment Unit (SAU) Team that identifies the reason(s) for admission to the unit, and presents problems and goals to be addressed by the inmate and members of the Multidisciplinary Team.

**Intermediate Care Unit (ICU)** – A 50-bed unit at SCI Waymart designed to provide mental health treatment to inmates who, due to their psychiatric condition, have demonstrated an inability to function in general population, have not been successful in adapting to a Special Needs Unit (SNU), and have not evidenced behaviors necessitating commitment to the Forensic Treatment Center.

**International Classification of Diseases, Current Edition, Clinical Modification (ICD-CM)** – The official coding used in the publication of the DSM-IV. The Department requires the psychiatrist to assign ICD diagnoses to all inmate patients.

**Involuntary Emergency Examination and Treatment or 302 Application** – Refers to a brief emergency commitment to a licensed psychiatric unit of an individual who is severely mentally ill and a danger to self or others. The 302 application shall not exceed five days.

**Licensed Psychology Manager** – A Civil Service title for the Chief Psychologist within a facility.

**Mental Health Commitment** – The procedure to commit an inmate to a Regional Mental Health Unit, Forensic Treatment Center, or DPW Forensic Mental Health Unit in accordance with the Mental Health Procedures Act. This is the same procedure applicable to civil commitments in the community.

**Mental Health Coordinator** – Refers to staff member in the Facility Psychology Department who coordinates the mental health services provided to the inmates with mental illness in the facility. If the facility does not have a MHC, then another member of the psychology staff shall assume the mental health coordination duties.

**Mental Health Procedures Act** – Refers to legislation 50 P.S. §7101 of 1976, Act #143 as amended by Act #324 of 1978, which governs the mental health procedures employed in Pennsylvania and provides for treatment and rights of mentally disabled persons, as well as for voluntary and involuntary examination and treatment.

**Mental Health Service Review Committee (MHSRC)** – A committee chaired by the Facility Chief Psychologist, which is composed of all key mental health figures in the facility including the facility psychiatrist, CHCA, CCPM, Special Needs Unit manager (if appropriate), Mental Health Unit Director (if appropriate), and any other staff members assigned by the Facility Manager. The MHSRC meets regularly to review the mental health procedures in the prison and completes an annual review of the Department and facility mental health policy and operations submitted to the BHCS.

**Mental Health Unit (MHU)** – A housing area or group of cells designated for inmates confined in a facility-based mental health unit licensed by the Pennsylvania Department of Welfare, Office of Mental Health.

**Mentally Retarded** – Refers to individuals whose general intellectual functioning is sub-average and exists concurrently with deficits in adaptive behavior with onset before age 18. Sub-average intelligence is defined as a score on a standard intelligence test of 69 or below.

**Military Experience Scale** – An instrument used to record an individual's level of experience in military service.

**Military Veterans Scale** – A self-report scale regarding physical and emotional feelings currently being experienced.

**Multi-Disciplinary Team** – This team is chaired by the Corrections Health Care Administrator and consists of the Medical Director/designee, the inmate counselor, psychiatrist, psychologist, Unit Manager, and nursing supervisor. This team addresses the mental and medical health treatment needs of referred inmates. This shall include screening and appraisal of data, direct

updated: 8/17/2018

observation of behavior, diagnostic review of personality issues; mental health history and treatment plan referral.

**Parenteral Medication** – Medication administered intramuscularly or intravenously.

**Patient** – For the purpose of this policy/procedures manual, when an inmate is admitted to a Mental Health Unit he/she shall be referred to as a patient who is undergoing mental health treatment.

**Post-Traumatic Stress Disorder (PTSD)** – The development of characteristic symptoms following a psychologically traumatic event that is generally outside the range of usual human experience. The characteristic symptoms involve re-experiencing the traumatic event; numbing of responsiveness to, or reduced involvement with, the external world; and a variety of autonomic; dysphonic; or cognitive symptoms.

**Preventive Mental Health Services** – Services designed to maintain or improve the mental health of inmates before they develop emotional problems or reach a crisis. Programs include, Anger Management, Assertiveness, General Adjustment Groups, and Therapeutic Recreational Activities.

**Program Review Committee (PRC)** – A committee consisting of three staff members that conduct Administrative Custody Hearings, periodic reviews, makes decisions regarding continued confinement in the Restricted Housing Unit (RHU) and/or Special Management Unit (SMU), and hears all first level appeals of misconducts. The committee shall consist of one staff member from each of the following staff classifications: Deputy Superintendent, who shall serve as the chairperson, Corrections Classification Program Manager, Unit Manager, School Principle, Drug and Alcohol Treatment Specialist Supervisor, or Inmate Records Officer Supervisor and a Commissioned Officer. The Facility Manager may designate other staff as committee members, however, if such designations are made, they must be in writing and the Facility Manager must maintain a list of all designees. Whenever a PRC is convened, at least one member of the committee must be a staff member who is not directly involved in the administration of the RHU/SMU in which the inmate is currently housed.

**Psychiatric Observation Cell (POC)** – A cell located in the Infirmary area of the facility that is used to hold inmates who are mentally decompensating to the point where they are considered a danger to themselves, other inmates, and/or property. These cells provide a means of retraining the inmate, if necessary, and allow for constant supervision of the inmate to be maintained in order to treat the inmate.

**Psychiatric Restraints** – Physical devices such as leather ***Belted Wrist Restraints (BWR), 2, 4, or 5-point*** restraints, ***which are ordered by the psychiatric provider.*** These restraining devices do not include security restraints used for confinement purposes or facilitating inmate movement.

**Psychiatric Review Team (PRT)** – A team, chaired by the facility's Chief Psychologist/ designee, including the ***psychiatric provider***, Unit Manager, and other staff as designated by the Facility Manager. The Psychiatric Review Team reviews the cases of those inmates who

experience adjustment or behavioral difficulties related to emotional problems and who require more in-depth evaluation, closer monitoring and support.

**Psychiatric Review Team Roster** – This roster includes that subset of inmates on the mental health/mental retardation roster who suffer from a serious mental illness, who are having severe difficulty adjusting to institutional life, and whose cases require closer, regular monitoring by the multi-disciplinary Psychiatric Review Team.

**Psychological Services Staff** – Those individuals working in a facility and who are in positions of Psychological Services Associate-Corrections, Psychological Services Specialist-Corrections, Psychologist (licensed) and Licensed Psychologist Manager (Chief Psychologist, generic). Staff provides a range of psychological assessment. Treatment and mental health services to the various units. Staff may be assigned to one or more units and are expected to visit the units to interact with the unit staff and inmates on a regular basis.

**Psychologist** – The term "psychologist" used herein shall mean any psychologist or psychological services associate.

**Psychotropic Medication** – Drugs that affect the mental state.

**Qualified Mentally Ill** – Refers to inmates who are determined to be mentally ill in accordance with the Mental Health Procedures Act.

**Qualified Personnel** – Staff licensed as psychiatrists or psychologist, or meet the State civil Service classification for corrections counselor I or II or corrections casework supervisor, psychological services associate I or II, psychological services associate supervisor, psychological services specialist, registered nurse, or licensed practical nurse.

**Receiving Officer** – The corrections officer responsible for receiving new commitments into the facility.

**Reception Committee** – Those members of the unit/facility team who meet with and review the cases of inmates newly assigned to the unit/facility or housing unit.

**Restricted Housing Unit (RHU)** – An area or group of cells housing inmates assigned to disciplinary or administrative custody status pursuant to Department policy **DC-ADM 801, "Inmate Discipline"** or **DC-802, "Administrative Custody Procedures."**

**Serious Mental Illness** – A substantial disorder of thought or mood, which significantly impairs judgment, behavior, capacity or recognize reality, or cope with the ordinary demands of life.

**Sex Offender Treatment Committee (SOTC)** – An advisory committee comprised primarily of Department of Corrections' providers of sex offender-specific treatment.

**Social Security disability Insurance (SSDI)** – SSDI comprises a number of disability benefits for workers and their dependents and survivors. Entitlement is based on contributions to the Social Security trust funds through Federal Insurance Contribution Act (FICA) taxes. Individuals who qualify for SSDI benefits are entitled to receive medical benefits from the federal Medicare

program generally after they have been entitled to benefits for 24 months. SSDI benefits include Disability Insurance Benefits, Widow's Insurance Benefits, and Child's Insurance Benefits.

**Special Assessment Unit** – A program located in the SCI Waymart RHU, designed to provide independent assessment of inmates who, because of mental illness, have demonstrated an inability to function successfully in general population and have been confined to a Restricted Housing Unit for a lengthy period.

**Special Assessment Unit Team** – A team assigned to operate and provide extensive assessments on the Special Assessment Unit. The team will consist of the Zone Lieutenant and/or his/her designee, a psychologist, ***psychiatric provider***, registered nurse, corrections counselor and any other staff designated by the Chief Psychologist with input from the Corrections Classification Program Manager. This team is responsible for security, risk management and the delivery of mental health services to inmates identified as being seriously mentally ill and housed on this unit.

**Special Needs Unit (SNU)** – A housing unit established to provide a safe and secure setting and specialized treatment services for those inmates identified as being unable to function in a general population-housing unit. Inmates in this category may include those diagnosed as mentally ill, emotionally unstable, mentally retarded, and physically or developmentally challenged. Placement does not require the mental health commitment process.

**Stable Dynamic Risk Factor** – A risk factor that is considered changeable through intervention, but tends to be more stable in the inmate's life (personality disorder, sexual preference for children).

**Static Risk Factor** – a risk factor that is predominantly historical and cannot be changed through intervention.

**Supplemental Security Insurance (SSI)** – SSI is a means-tested program that provides a basic floor of income for individuals with limited incomes and resources. SSI benefits are paid to aged (age 65 and older), blind, and disabled individuals who have limited means. Individuals under age 65, including children (individuals under age 18) must be blind or disabled to qualify for benefits.

**Training Coordinator** – An employee assigned by each facility, CCC region and center, Central Office, and Training Academy who is responsible for supervising the planning, coordinating, facility and ACA training record maintenance, and on-site monitoring of training.

**Unit Management Team** – The individuals assigned to operate a housing unit with the responsibilities for security, risk management, and program delivery. The team is composed of, at a minimum, a Unit Manager, Corrections Officers, and a counselor. Other staff may be assigned to the team or provide supportive services to the unit.

**Unit Manager** – The staff person responsible for managing the staff and programs in a Unit(s). The individual who is responsible for the supervision of all members of the Unit Management Team and the delivery of security and program services.

**Unit Staff** – Staff who are assigned specifically to the unit, including but not limited to correction officers, and counselors, full time and who provide services and programs in a unit under the direction of the Unit Manager.

**Voluntary Application for Examination and Treatment or 201 Application** – Refers to the procedures whereby an inmate who believes he/she is mentally ill and understands the nature of voluntary treatment may apply to be treated in one of the Department Mental Health Units.

# Exhibit 2

# WEEKLY STRUCTURED/UNSTRUCTURED OUT-OF-CELL PROGRAM REPORT

### Week of: _____ to _____

## *Capital Case Unit*

| Inmate Name & Number | Inmates Status | # OF STRUCTURED HOURS | | # OF UNSTRUCTURED HOURS | | Total out-of-cell hours offered | Total out-of-cell hours accepted | Notes |
|---|---|---|---|---|---|---|---|---|
| | | Offered | Accepted | Offered | Accepted | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Issued: TMF M block CCU
Effective: 8/13/2018

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**NOTES: Out of cell does not include any inmate visits or legal mail pick up**

# Exhibit 3

Layout of Capital Case Yard : Option #3  11/01/18

Exterior Fence

CELL AA-1013
CELL AA-1014
CELL AA-1015
CELL AA-1016
CELL AA-1017
CELL AA-1018
CELL AA-1108
JANITOR'S CLOSET AA-1109
DUCT CHASE AA-1107
CELL AA-1019
CELL AA-1020
CELL AA-1021
CELL AA-1022
CELL AA-1023

DAYROOM AA-1110
STAIR A-1112
UP
UP

HEARING A-1110
PROPERTY STORAGE A-1111
SALLYPORT A-1113
JANITOR'S CLOSET A-1114
LAW LIBRARY A-1116
TRIAGE A-1115

M-Block Control Room

CELL AA-1024
CELL AA-1025
CELL AA-1026
CELL AA-1027
CELL AA-1028
CELL AA-1029
CELL AA-1030
CELL AA-1031
CELL AA-1032
CELL AA-1033
CELL AA-1034
CELL AA-1035
CELL AA-1036

DUCT CHASE AA-1106
JANITOR'S CLOSET AA-1105

Yard #1
Approximately 6000 sq ft

1-Basketball Hoop or 1-Bocce Bag Toss

50 ft
130 ft

Yard #3
15 ft
14 ft
310 sq ft

Yard #2
15 ft
14 ft
310 sq ft

• Texas Tables
• Multi-Fitness Machines

Install a Roll-Up Door so inmates do not have access to the Exit Doors.

# Exhibit 4



L Block Yard