IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY REID, et alia, | **FILED** | Honorable John E. Jones, III |
| Plaintiffs | HARRISBURG, PA | |
| versus | MAR 0 9 2020 | No. 18-CV-0176 |
| | PER____ | |
| | DEPUTY CLERK | |
| JOHN WETZEL, et alia, | | |
| Defendants | | Complaint Filed January 25, 2018 |

OBJECTION TO PROPOSED SETTLEMENT AGREEMENT

I. INTRODUCTION

On January 25, 2018, Plaintiffs filed this lawsuit on behalf of a class of prisoners--of which undersigned objector is a part--currently sentenced to death and confined in the Pennsylvania Department of Corrections (hereafter "Department"). Plaintiffs allege-- and objector maintains--the Department and Defendants have violated the Eighth and Fourteenth Amendments to the United States Constitution.

Objector concedes that the Department and Defendants have implemented some improvements since the filing of the complaint; however, objector notes that the Department and Defendants have offered no express promises to not revert to the former conditions. Objector apprehends that risk.

Objector was first officially notified of the proposed Settlement Agreement two weeks

after its preliminary approval and approximately one month in advance of the deadline to object. On December 3, 2019, the objector observed staff of the Capital Case Unit ("CCU") disseminating notices to some class members and making available a single copy of the Settlement Agreement in common areas (or "dayrooms"). Objections pertaining to the Notice are presented *infra*, Section III(B).

As the objector, an unnamed member of the plaintiff class, has had no participation in the shaping of the Settlement Agreement, the objector implores the court to take particular care in the guarding of his interests as a party absent from settlement negotiations and approval hearings.

Herein offered are good-faith objections designed to aid the court in evaluating the proposed Agreement in light of its ambiguities, contradictions, and deficiencies. The vociferousness of the objections is tempered only by due respect for the court.

Objections conform to Fed. R. Civ. P. 23(e)(5)(A) in that they are sufficiently specific to sections of the Notice of Proposed Settlement, the Agreement itself, or to related proceedings and circumstances.

In most instances, these objections apply to the entire class except where, as indicated, they apply to a specific subset of the class housed at Pennsylvania's State Correctional Institution ("SCI") Phoenix.

Most objections contained herein are grounded in a provision's failure to comport with the guiding spirit of the Agreement which first appears in the Notice's summary as the purported chief benefit to the plaintiff class: "Plaintiffs and the Class will be provided with all the rights and privileges afforded to prisoners housed on standard general population units." *See* Section II, "Especial Approval", *infra*.

2

Section III, "Objections", is organized into two main parts: A) The Settlement Agreement and B) Notice of Proposed Settlement. In Part A, the court is asked to review specific objections to the text of the Agreement before considering two general, or chief, objections. Part B deals with the individual and cumulative effect of objectionable circumstances on the fairness and sufficiency of the Notice.

In the Conclusion, Section IV, the objector permits himself a less formal summary of his objections and final thoughts before asking the court to disapprove the Settlement and challenging the Parties to truly make good on the words of their proposal.

## II. ESPECIAL APPROVAL

The hopes of the objector were dashed, not because the highest of them had to yield to the sureness of resolution that compromise provides, but because the promise given in the Notice and again in the Agreement itself scarcely survived the turn of a page.

The settlement would instead have the enthusiastic support of the objector had it not strayed from "Plaintiffs and the class will be provided with all the rights and privileges afforded to prisoners housed on standard general population units." (Notice, p. 2). This principle appears again in the Agreement, albeit with a very unfortunate variation of terms: "Prisoners *confined to the CCU* shall be provided..." (Agreement, Section V(A)(1), emphasis supplied).

The phrase "confined to the CCU" is unfortunate because it is not possible to be *confined* to *any* housing unit but still be "provided with all the rights and privileges afforded to prisoners housed on standard general population units." Such rights and privileges entail movement off the housing unit to eat, to work, to exercise, to go to school, to

3

recreate, to receive healthcare, to visit, to worship, etc.

The objection is not to being *housed on* a unit exclusively populated by other death-sentenced prisoners, but to being *confined to* the unit whereas the Agreement purports to equality with prisoners who are not, in this context, so confined.

The objector especially APPROVES of Section V(A)(1) of the Agreement but would strike the language "prisoners confined to the CCU" wherever it appears in the Agreement referring to "plaintiffs and class members." The objector would then place a period at the end of the sentence and excise the entire remainder of Section V, leaving that sole provision to constitute the whole of the Agreement between the parties.

## III. OBJECTIONS

A. The Proposed Settlement Agreement

    1. Specific Objections to the Text

    Divergence from the "equality principle" of Agreement Section V(A)(1) has given rise to most of the specific objections to the text of the Agreement:

- Section V(A)(2)(b)(iii) states: "Prisoners confined to the CCU likewise shall not be subjected to strip-searching or to shackling, tethering, or other physical restraint when traveling outside the CCU." The Objector would amend this subsection to preclude the use of officer-escorts.

- Section V(A)(2)(d) states: "[W]ork assignments shall include on-unit jobs, as well as jobs occuring outside, but adjacent to, the CCU." Objector would strike the phrase "but adjacent to" and end the sentence after the quoted portion in order to offer the class equal employment opportunity.

This subsection creates some of the concern about equitable treatmeant of class members relative to one another which a court considers according to Fed. R. Civ. P. 23(e)(2)(D). The existence of a "satellite kitchen" at SCI Greene appears to be a true "off-unit" employment assignment that has no analogue at SCI Phoenix. Revising the subsection eliminates any concern about equitable treatment.

- The objector would strike Section V(A)(2)(k) entirely.

Since the Agreement is silent on this point and the objector cannot know whether counsel fulfilled their responsibility of providing the court with necessary information in their Joint Motion for Preliminary Approval or elsewhere, it falls to the objector to apprise the court of the rights and privileges afforded to prisoners in general population as it regards outdoor recreation.

Each housing unit at SCI Phoenix, including the CCU, has its own attached "side yard" that is paved concrete enclosed by fencing or, on level 5 units such as the CCU, by sheer concrete walls topped with razor wire. *See* Agreement Ex. 3.

SCI Phoenix also has four "main" yards--2 on each side, East & West--that are available to general population units on a rotating basis. These yards are vastly larger in size and feature grassy areas, running tracks, diverse exercise equipment, basketball and handball courts, etc. *See* Objection Exhibit A, SCI Phoenix Main Yard Schedule. The CCU (M-Unit) is now, and seemingly will remain, excluded from this schedule under the Agreement.

Affording class members the same privileges as general population means granting access to a main yard every other day. M-Unit could be bundled with

5

and follow the same schedule as S & T Units. Alternatively, if Defendants insisted upon segregating the capital population, M-Unit alone could use Yard 4 on days that P, Q, & R are assigned to their side yards.

Under normal operating conditions, general population units have four hours of outdoor recreation some of the year, and approximately six during part of the year when evening recreation is run outdoors. *See* Ex. B, SCI Phoenix Daily Operational Schedule.

Subsection (k) stipulates a two hour minimum alottment of outdoor recreation per day. The proponents would argue that objectors ought to ignore the minimums because "the goal in managing the CCU is to approximate as closely as possible the residential setting" of general population. But the objector knows full well how the Defendants arrived at this two hour minimum.

As currently operated, prisoners confined to the CCU do receive the exact same amount of outdoor recreation as general population prisoners--albeit only in the CCU "side yard." However, the status quo is contingent upon the CCU being filled to less than a third of its capacity: only about 30 of the unit's 96 cells are occupied.

For now, all 30 men are eligible* to attend the side yard during each recreation period. But how long will the Department operate the CCU at a third of capacity? Agreement Section V(F)(2) envisions a time when "the Department may elect to consolidate the CCU's." What happens when there are 90 men on the unit?

------

* With the exception of one handicapped, bed-ridden class member, Samuel Randolph, who the Department seems unwilling to accomodate and who always registers 0 hours out-of-cell time.

The CCU yard--constructed to contain 14 exercise enclosures--is nowhere near adequate for 90 men. Officials have proposed splitting the unit into halves (bundling two of the unit's four lettered "pods" together to allow a maximum of 48 prisoners out at one time), and establishing a rotation schedule.

An analysis of the square footage of the CCU "side yard" is necessary. Agreement Exhibit 3 roughly calculates the area of the yard by multiplying the entire width by a segment of its length, arriving at a figure of 6k sq. ft. This generous estimate neglects the trapezoidal shape; deductions must be made for the 120' x 50' rectangle being impinged upon by the building. A better estimate of square footage is 5k sq. ft.

Dividing that figure by the number of proposed occupants gives an estimate of square feet per occupant (not accounting for the space taken by the awkward central door-cage, eight large tables, and other obstacles). The remaining exercise enclosures--relics of the CCU's design as a level 5 unit--provide a handy 210 sq. ft. benchmark against which to gauge personal space.

If there are 30 prisoners in the CCU exercise yard, that equates to approximately 166 sq. ft. per man--less than a prisoner enjoys inside of a level 5 enclosure. If the number of occupants is bumped up to 48, that leaves little more than 100 sq. ft. per man, at which point a prisoner is better off alone inside a cell!

The objector's nightmare scenario: its a hot summer day in July, 2021. M-Unit is filled to near-capacity following the consolidation of CCU's. Today, M-Unit's C & D pods have yard in the morning and evening. But A & B get their two hours of outdoor recreation during the sweltering hours between 1 & 3pm.

7

48 men pack the giant concrete oven. They can't move around much, so instead they talk about how prisoners from S & T blocks frolicked for six hours in the grassy football-field-sized Main Yard 3. And here's the kicker: Main Yard 4-- which half the men can see from their East-facing windows--was unoccupied all day!

In the above scenario, the Department is in full compliance with Agreement Section V(A)(2)(k). But was the plaintiff class provided with the same rights and privileges afforded to general population?

- Section V(A)(2)(p) states: "[E]ach faith representative will visit the CCU for the purposes of providing congregate religious activity." Objector would strike subsection (p) in favor of allowing CCU prisoners the opportunity to visit the facility Chapel.

Subsection (p) has been implemented early by the Department. However, the CCU, even at capacity, is not a large enough population from which to draw a congregation of each faith. Often, one man attends religious services by himself. A lone soul does not a "congregation" make.

- Section V(A)(2)(q)(iii) states: "A typewriter, computer, or word processor shall be kept in each law library." Objector would not allow this library equipment provision to be satisfied by having obsolete and inferior equipment that is not in use elsewhere in the prison.

Given the grave nature of a capital sentence, it is entirely unjustifiable for the plaintiff class to be materially disadvantaged in the preparation of legal defense.

The objector would substitute a requirement that library equipment in the CCU be equivalent to and have equivalent capability of those used by general population prisoners.

- Section V(A)(2)(v) states: "A CCU prisoner shall not be required to change cells every ninety days unless there is a finding of elevated escape risk for that prisoner." The objector would require details as to what criteria establish a finding of "elevated escape risk" and what process would be utilized to review and appeal such a finding.

- Section V(E) regards Phased Contact Visitation. Because death-sentenced prisoners have had full contact visitation since July 2019, the objector would strike this section in its entirety as a fait accompli. Failing that, there are several objections to the language of the section.

- Section V(E)(6) allows for the Department to initiate a "re-evaluation" of contact visitation if it documents "multiple serious security breaches." The objector contends this subsection conflicts with Section V(B) which states that, "Prisoners confined in the CCU shall be subject to the same disciplinary rules and procedures as prisoners housed in general population units." This disciplinary provision is a corollary to the "equality principle" of which the objector especially approves.

The practical result of this subsection would be the Department holding the entire class liable for the conduct of individuals. Aside from the fundamental due process issue of penalty-without-charge for uninvolved class members, the Parties propose to subject accused offenders to the collateral consequence of the

9

potentially violent disapprobation of their capitally-convicted peers.

The necessity of this provision is belied by facts invisible on the record and again left for the objector to pass along to the court: in the first six months of full contact visitation for CCU prisoners at SCI Phoenix, there has been nothing that could conceivably qualify as a "serious security breach"--in fact, there have been *no incidents of any kind.*

In light of the SCI Phoenix sub-class's impressive 100% compliance rate with Department visitation rules over a sustained period, the objector would not make an exception to Agreement Section V(B) and would treat disciplinary issues on an individual basis.

- Failing the removal of Section V(E)(6), the objector would insist that the phrase "serious security breach" be defined in the glossary of the Agreement. The objector recommends the definition: "The commission of violent misconduct or the introduction of Class I contraband as defined by DC-ADM 801 (Inmate Discipline)." The objector would strike the word "multiple" in favor of a defined number in excess of three, over a defined period not more than six months.

- If some form of Section V(E) must remain, the objector would have it contain a provision that class members receive the same number of visits per month--disbursable in the same manner (i.e., not restricted to one per week)--as general population prisoners. The objector would add a provision that expressly mandates all the same general population procedures be used to handle class members' visits and *visitors.*

- Section V(F) calls for "phased integration" into general population for those

10

prisoners whose sentences have been modified by the courts. The objector would have all parts of this subsection use the procedure of part 3: "Defendants shall, within 30 days...re-classify each CCU prisoner under the Pennsylvania Additive Classification Tool," rather than move them into temporary housing of unspecified duration.

• Should the "phased integration" of Section V(F)(1) remain, the objector would seek to clarify the vagueness created by having a prisoner spending an "appropriate" amount of time in a transitional unit. The objector would insert a defined timeframe.

• The objector would insert a new subsection (G) into Section V which deals with "Phase II" CCU prisoners. (A "Phase II" prisoner is one whose death warrant has been signed by the Governor/designee and is technically pending execution.)

In Pennsylvania, a death warrant is issued after each unsuccessful layer of appeal even when all appellate avenues are not yet exhausted, i.e., even though the prisoner will not be executed. This practice has been criticized in the 2018 Joint State Government Commission Task Force Report on Capital Punishment (p. 157-8).

When a prisoner's death warrant is signed, it is the Department's policy to isolate that prisoner to the greatest extent possible and impose a number of onerous restrictions. The objector would insert language that would require the Department to determine, through their Office of Chief Counsel, whether a prisoner with an active death warrant has appeals remaining. Given such a finding, no modifications to that prisoner's housing conditions should be made.

2. Chief Objections

Chief objections are those which pertain to the whole of the Agreement generally and the condition of class members if the Agreement takes effect. Chief objections are supported by, and represent the sum total of, the numerous specific objections to the Settlement Agreement text outlined immediately *supra*.

- a) The Agreement is Unreasonable
  Objector submits that the built-in contradictions render the Agreement inherently unreasonable and unworkable because conflicting provisions will likely confuse the Compliance team as to which controls; and the risk that conflicting provisions may become a source of dispute between the Parties is intolerably high.

- b) The Agreement Fails to Remedy the Due Process Violation
  Since class members will be left in conditions that continue to impose atypical and significant hardship as compared with the ordinary incidents of prison life; and since class members will still have no meaningful opportunity to challenge their automatic and indefinite confinement under these conditions that serve no credible penological objective, the Agreement fails to remedy the due process violation claimed in the initial complaint.

B. The Notice of Proposed Settlement Agreement

The proposed Agreement was preliminary approved on November 20, 2019, at which time the court ordered notice to be given by December 4, 2019. The day before that deadline, the objector observed employees of the Department disseminating notice to some class members at SCI Phoenix.

1. The undersigned strenuously objects to members of the class being given only 34

calendar days to read and register an objection to the Agreement. Additionally, since objections "must be postmarked by January 6, 2020" (Order, p. 2, 11/20/19), the realities of the prison mailroom dictate that filings must be placed in mail receptacles by Friday, January 3, or risk untimeliness. Objectors have been given only 31 calendar days.

Although some courts have upheld slightly shorter notice, this particular class is characterized by the pervasiveness of mental illness and cognitive deficiences caused or exacerbated by the Defendants' conduct. The existence of an intellectually inhibited plaintiff class cannot possibly have escaped the attention of the court, central as it is to the claims in this case.

Within the one month afforded the class members is the winter holiday period of Christmas, Hanukkah and Kwanzaa followed closely by New Year's. This is a period during which it would be especially difficult, if not impossible, for interested class members to secure counsel to assist in the thorough comprehension of the Agreement's terms and issue a counseled objection. Objectors have been given a "rump" month, consisting of as little as 14 true business days.

2. The objector wonders if there are class members who haven't received notice at all. The method selected by the parties and approved by the court calls for notice to be "distributed to class members and posted in the [CCU's]," and for "complete copies of the Settlement Agreement [to be] available for review in the dayroom/library of each [CCU]." (Order, 11/20/19). However, because the Defendants were quick to implement the changes in disciplinary procedure referred to in Agreement Section V(B), not all class members reside in CCU's.

For that reason, the objector questions whether posting notices and placing copies of the Agreement in common areas of the CCU was a reasonably selected means to apprise

13

interested parties. Out of pure concern for the rights of fellow class members, the objector begs the indulgence of the court to register this somewhat speculative objection. If the Defendants were scrupulous about notifying all class members--and affording each an opportunity to review the Agreement--then this objection will be withdrawn.

If, however, there were any class members who failed to receive notice, a grave objection is indeed appropriate. Though courts have held that notice need not be perfect and that complete "actual notice" is not strictly required, the objector again asks for consideration of this particular class.

Unlike in many class actions, there is a definite, known, and relatively small number of class members (death-sentenced prisoners in Pennsylvania) whose whereabouts are certain at all times: in the close custody of Defendants. This is a case where it was easily within the grasp of the parties and the court to reasonably select--and execute--a method of notice; failure here--*if* it occured--would be a manifest injustice.

3. The objector next submits that the Notice of Proposed Settlement was erroneous and substantively misinformed class members as to the primary benefit they could expect. The Notice's proclamation of class members being provided with all the rights and privileges afforded to prisoners housed on standard general population units is a pie-in-the-sky that class members can never hope to thumb under the Agreement.

The headlining provision is blatantly untrue. The Notice could have recovered some fairness had it hinted at the exceptions to equality of treatment contained within the Agreement. Instead, it further mislead: e.g., a spiritually exhausted class member who

14

took heart to learn of "access to congregate religious activities" (Notice, p.3) has been forsaken.

Of course, notice is only meant to generally summarize the settlement and need not be unduly specific; however, it must contain a *fair* recital of the facts and must never, as here, falsely state the chief benefit to the class.

An average person would remain misinformed by the Notice until that person a) was given some knowledge of the rights and privileges afforded prisoners in general population in Pennsylvania and b) applied that knowledge to an analysis of the terms of the Agreement.

A semi-literate death row prisoner, who has just enough wherewithal to grasp the simple language of the Notice, but either a) does not know much about prison life outside of the CCU, or b) is unable to fully fathom the complexities of the Agreement, would remain materially misinformed and thus unable to formulate meaningful commentary or properly judge the need for an objection. For this reason, the court cannot assume tacit approval from members of the class who are silent on the docket sheet. Simply put: they may have been tricked!

4. The objector asks the court to consider each of these objections independently of one another but then to consider the interrelationship of their elements and the combined effect on the fairness and sufficiency of the Notice. That the largely uneducated, disproportionately mentally ill and cognitively impaired member class be given substantively misleading notice of a complicated and self-contradictory Agreement with only a rump month's worth of time to object is violative of the due process principles which underpin the notice provisions of Fed. R. Civ. P. 23.

## IV. <u>CONCLUSION</u>

Members of a plaintiff class rarely, if ever, have quite as much at stake as the class does here. This is greater than a coupon for a truck's defective fuel tank or any recompense of a fraudulent investment; greater even than being made whole after bodily injury.

This class suffered the decades: the gradual decomposition of mind, body, and soul while in the hands of the Department. Death--the jurors' penalty: a mercy compared to the twisting miseries about which they, the Defendants, *they knew*. And for which, we now know with certainty, there was *no need*.

Yet we came before the court seeking not a nickel. Declare against torture, we asked; impose an evolution to match the decency of the age, your honor; compel them to *hear* us! Such modest relief we beseeched.

Across America, justice is rendered by barter. Our agents went to the table to haggle with our custodians, just as courts, by necessity, encourage. Every facet of our lives was at issue. The Agreement will effect our every waking moment; the lasting impact of this suit will resonate inside damaged minds and extend, remarkably, far into future class members' futures.

The Defendants, evidently, offered: "We'll step off their necks a bit"--the pressure is getting hard to maintain--"but we won't treat them like the rest." What was class counsel's reply? Was it: "We'll draft something that gives equal treatment some lip service."? "They'll never notice. Half of them are too poor and retarded to do anything about it."?!

Your honor, this Agreement is laced with contradictions; it shall unravel. Further, it

leaves class members in a state of irremediable violation--no way out of the CCU, which remains a place of unusual and undue hardship compared with any other cell block in Pennsylvania, even if not as plainly barbarous as formerly.

The objector respectfully and humbly requests disapproval of the Agreement.

Signed: _____

Name & DOC#: _Walte J. Ogrd DC416_

SCI Phoenix

Box 244

Collegeville, PA 19426

Date: _3-4-20_

17

Walter J. Ogrod

SCI Phoenix
Box 244
Collegeville, PA 19426

RECEIVED
HARRISBURG, PA
MAR 09 2020
PER
DEPUTY CLERK

Clerk of Court
United States District Court
Reagan Federal Bldg. & U.S. Ilourthouse
228 Walnut Street
Harrisburg, PA 17101

PA DEPARTMENT OF
CORRECTIONS
INMATE MAIL

neopost®
03/06/2020
US POSTAGE
$000.80⁰

FIRST-CLASS MAIL

ZIP 19426
041M12252211

1710181727 0008