IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY REID, *et al.,* | : | 1:18-cv-176 |
| | : | |
| Plaintiffs, | : | Hon. John E. Jones III |
| | : | |
| v. | : | |
| | : | |
| JOHN WETZEL, *et al.,* | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM AND ORDER

### April 9, 2020

Before the Court is the parties' Joint Motion for Final Approval of Class Action Settlement (Doc. 99), filed on January 21, 2020.  The matter has been briefed by the parties (Docs. 101 and 102), and the Court has received and reviewed written objections from Class Members.  A fairness hearing was conducted in this matter on March 16, 2020.[1]

## I.    BACKGROUND

On January 25, 2018, Plaintiffs Anthony Reid, Ricardo Natividad, Mark Newton Spotz, Ronald Gibson and Jermont Cox filed suit on behalf of a class of death-sentenced prisoners confined in one of the Capital Case Units (the "CCU") of Pennsylvania's Department of Corrections ("DOC").   Plaintiffs' Complaint

---

[1] Due to health concerns attendant to the COVID-19 pandemic, the 5 Class Representatives participated in the hearing via videolink from their respective institutions.  The Court also heard additional testimony from 28 other Class Members via videolink.

alleged that the Commonwealth's policy and practice of holding class members in permanent solitary confinement violated the 8th and 14th Amendments of the United States Constitution. (Doc. 1). On April 3, 2018, we certified their class as a class action on behalf of "all current and future death-sentenced prisoners in the Commonwealth of Pennsylvania," with the Reid, Natividad, Spotz, Gibson an Cox serving as Class Representatives. (Doc. 29).

The Complaint alleged that, for decades, inmates on Pennsylvania's death row were subjected to indefinite isolation, devoid of mental stimulation, with only limited, sporadic human interaction.  CCU prisoners were segregated entirely from the general prison population.  On weekdays, they were confined alone in a small cell for 22 hours per day.  On the weekends, they were confined alone in their cell for 24 hours per day.  They were commonly denied human contact for as long as 70 hours between Friday morning and Monday morning.

In August of 2018, following class certification and extensive discovery, counsel began settlement negotiations.  These discussions culminated in a Settlement Agreement dated November 12, 2019 ("the Agreement").  (Doc. 99, Ex. A).  The terms of the Agreement represent a sea change in the class members' conditions of confinement.  As a result, the CCU will no longer be classified as a "Level 5" housing unit requiring enhanced security protocols.  It will instead be operated as a general population unit of exclusively death-sentenced prisoners.

CCU inmates will no longer be strip-searched, shackled, tethered, or physically restrained when moving about their own prison unit, nor will they be marked by different colored clothing.  They will be permitted to obtain jobs both on the unit and at least some off-unit placements.  They will have access to congregate religious activities.  Importantly, class members will be offered at least 42.5 hours of out-of-cell time per week and allowed contact visits lasting at least one hour. DOC compliance with the Agreement's terms will be monitored by an independent Technical Compliance Consultant for the duration of the Agreement.  Finally, and as is fairly customary in amicable settlements of this sort, no party admits wrongdoing.

We preliminarily approved the settlement on November 20, 2019 and ordered notice be provided to the class.  (Doc. 48).  The initial deadline for filing objections (as contained in the notice to class members) was January 6, 2020.  The fairness hearing was originally scheduled for February 12, 2020 but was postponed until March 16, 2020. In late February, we received multiple requests to extend the objection period or to take objections past the deadline.  Accordingly, we issued an Order on February 27, 2020 permitting objectors until March 9th (postmarked) to file objections for consideration.  (Doc. 115).

As noted above, an evidentiary hearing was conducted on March 16, 2020. The record is now closed and this matter is ripe for disposition.

## II.   DISCUSSION

### A.   Settlement Agreement

A district court may approve a class action settlement upon a finding that it is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  The court's role is as "a fiduciary who must serve as a guardian of the rights of absent class members." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liability Litig.*, 55 F.3d 768, 785 (3d Cir. 1995) (citation and internal quotation marks omitted).

As a guide to district courts considering approval of class action settlements, the Third Circuit has adopted a nine-factor test to guide, referred to as the *Girsh* test, which considers:

> (1) The complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation.

*In re Gen. Motors*, 55 F.3d at 785 (citing *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)).  The proponents of the settlement agreement bear the burden to demonstrate that these factors weigh in favor of approval.  *See id.*

We shall now turn to an analysis of the relevant *Girsh* factors.

### 1.      The complexity and duration

The first *Girsh* factor considers "the probable costs, in both time and money, of continued litigation."  *In re Cendant Corp. Litig.*, 264 F.3d 201, 233-34 (3d Cir. 1992) (internal quotation marks omitted).  The following analysis of this factor clearly weighs in favor of approval.

It is undisputed that significant further resources were due to be expended if the matter were to go to trial.  Trial would be very costly for both sides, considering that much of the evidence would come from expert witnesses, who would opine on how the conditions on Pennsylvania's death row impacted the constitutional rights of the class members.  *Williams v. City of Philadelphia*, 2011 WL 3471261, at *3 (E.D. Pa. Aug. 8, 2011)(first *Girsh* factor supported approval because much of the evidence would have come from experts).  Further, if the case proceeded to the remedy phase, crafting a remedy that vindicated the Plaintiffs' constitutional rights without improperly impacting the Defendants' ability to run a safe, secure correctional system would also have been a protracted, contentious process.  And all of this would almost certainly have precipitated a lengthy period of appellate review.

Lastly, ongoing litigation would also mean that class members would continue to suffer under the draconian conditions of death row before the

settlement. Ending their former, draconian conditions of confinement now through settlement rather than through lengthy litigation heavily favors approval.

## 2.     Reaction of class to the settlement

The second *Girsh* factor "attempts to gauge whether members of the class support the settlement." *In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions*, 148 F.3d 283, 318 (3d Cir. 1998)(citing *Bell Atlantic v. Bolger*, 2. F.3d 1304, 1313 n. 15 (3d Cir. 1993)).

At first blush, given the volume of filings by the class members, it would appear that the reaction of the class was negative.  By the Court's calculation, we have received approximately 65 filings by 62 different class members.[2]  However, a careful review of these filings reveal that most of them do not challenge the substantive or procedural aspects of the Agreement.  Rather, most of the class members are concerned about the implementation of the Agreement.  Many of the objectors also discuss issues unique to that particular class member's circumstances.

As the parties argue, the objectors' concerns about implementation of the Agreement do not justify denying final approval.  Rather, the reverse: the best, most expeditious way to answer the class members' concerns over the DOC's

---

[2] Exact calculation of the numbers was difficult given that several filings were signed onto by multiple class members, and at times signatures were difficult to read.

future and present compliance with the Agreement is to approve the Agreement, so that active monitoring by both the independent monitor and Plaintiffs' counsel can commence.

Further, at the hearing, the Court heard from numerous class members as well as the Class Representatives.  Importantly, Reid, Natividad, Gibson and Cox unequivocally endorsed the Agreement and urged the Court render its approval. Class representative Spotz declined to fully support approval of the Agreement, but rather indicated his belief that additional negotiation was needed in certain areas. In their individual comments, several class members indicated their approval of the Agreement and thanked the Class Representatives and the attorneys for their efforts in reaching the terms of the Agreement.

At the conclusion of the evidentiary hearing, tt was the Court's overall sense that the class members generally supported the Agreement and hoped for its approval, but that they would have desired additional changes to the CCUs.  Thus, we find that this *Girsh* factor weighs in favor of approval.

### 3.    Stage of the proceeding

The third factor considers the stage of the proceeding and asks whether "the degree of case development that class counsel accomplished prior to settlement" enabled counsel to have "an adequate appreciation of the merits of the case before negotiating."  *In re Warfarin Sodium Antitrust Litig*, 391 F.3d 516, 537 (3d Cir.

2004)(internal citations omitted).  *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 439 (3d Cir. 2016)("What matters is not the amount or type of discovery class counsel pursued, but whether they had developed enough information about the case to appreciate sufficiently the value of the claims.")

Here, Plaintiffs' counsel conducted an extensive investigation into the conditions of confinement of the class members.  They reviewed over 23,500 documents produced by the DOC.  Plaintiffs' counsel also retained and consulted with multiple experts, and the experts spent over 25 hours at SCI Phoenix and Greene touring the CCUs, discussing issues with staff and conducting cell-front interview of prisoners.

Finally, Plaintiffs' counsel are experienced in prisoner rights and class-action litigation and fully appreciate the strengths and weaknesses of their case. They gathered enough information to understand the merits of their case and to achieve a highly advantageous resolution.  This factor thus weighs in favor of approval.

### 4.    Risks of establishing liability

On this factor, we "examine what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them."  *Cendant*, 264 F.3d at 237.  To some degree, we should credit the appraisal of class counsel as to the case's probability of success and the potential

defenses that may have been raised against their causes of action.  *See Parks v. Portnoff Law Assoc.*, 243 F.Supp.2d 244, 251 (E.D. Pa. 2003).

Plaintiffs allege that the policies and practices of the Commonwealth violate their rights under the 8th and 14th Amendments of the United States Constitution. Pursuant to the now-familiar standard set forth in *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), to succeed on an 8th Amendment claim, Plaintiffs must establish that they are "incarcerated under conditions posing a substantial risk of serious harm."  *Id.* Further, Plaintiffs must show that prison officials acted with "deliberate indifference."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), which occurs when officials know of and disregard "a substantial risk of serious harm."  *Farmer*, 511 U.S. at 837.

While the Plaintiffs note that they are confident in the merits of their case, they acknowledge the risks that evidence could be excluded or that the fact-finder would not find the evidence comprehensive or compelling enough to meet the exacting standards of the 8th Amendment.  Likewise, the 14th Amendment due process claim also presents challenges, inasmuch as the use of long-term solitary confinement is not unique to Plaintiffs and thus it could be difficult to prevail on the claim.  The Defendants additionally note that since the DOC had already begun making improvements on CCUs prior to and throughout the negotiations, it could have been difficult for the Plaintiffs to establish a constitutional violation at trial.

Finally, Plaintiffs faced a significant risk that, even if they succeeded on the merits, that they would not be able to secure a remedy as favorable as they achieved in the Agreement.  On balance, this factor militates in favor of approval.

### 5.    Risks of establishing damages

Plaintiffs are seeking injunctive relief rather than damages. If this matter proceeded to trial, the class members risked a court-constructed remedy, which could look very different then the negotiated settlement terms.  Moreover, even if the Plaintiffs were successful on the merits, there would be risks in "demonstrating the propriety of an injunction," especially one of the scale set forth in the Agreement.  *Inmates of the Northumberland Cty. Prison v. Reish,* No. 08-cv-345, 2011 WL 1627951 at *3 (M.D. Pa. Apr. 29, 2011). Thus, it seems that this factor also weighs heavily towards approval.

### 6.    Risks of maintaining a class action

The sixth *Girsh* factor, maintaining class certification through trial, is neutral here.  Here, absent a fundamental shift in the way in which the DOC houses death-sentenced prisoners, there is comparatively little risk in maintaining the class through trial.

### 7.    Factors 7, 8 and 9

The last three *Girsh* factors focus on the reasonableness of the settlement in monetary terms, thus are inapplicable here, because this action was certified under Fed. R. Civ. P. 23(b)(2) for injunctive relief.  As such, the Court will not engage in an analysis on these factors.  *See Pastrana v. Lane*, 2012 WL 602141 at *5 (E.D. Pa. Feb. 24, 2012)(dispensing with an analysis of the last three factors because the class was certified under Rule 23(b)(2) for injunctive relief).

Given the foregoing analysis of the nine *Girsh* factors, the Court finds that the balance weighs in favor of approving the Agreement.

### B.    Attorneys' Fees Settlement

We are also tasked with approving the parties' agreement concerning attorneys' fees.  In the Agreement, the parties agreed that the Defendants would pay Plaintiffs' reasonable attorneys' fees and costs, in an amount to be determined by the Court.  (Doc. 102, Agreement, § XII.A.).  The parties have negotiated an amount and proffer that an award of $507,500 would be reasonable under the circumstances.  The parties have memorialized this attorneys' fee award amount in a separate agreement.  (Doc. 102, Ex. C).

As the filings indicate, Plaintiffs expended 2,453.37 hours litigating this case and incurred $57,485.29 in costs.[3]  Since this matter is subject to the requirements and limitations of the Prison Litigation Reform Act ("PLRA"), the rate for reasonable attorney fees is set by 42 U.S.C. § 1997e(d)(3) and capped at $223.50 per hour.  Utilizing this rate multiplied against the submitted hours by Plaintiffs' counsel yields a total of $548,328.20, which exceeds the figure agreed to by the parties.  In addition to their fees, Plaintiffs' counsel incurred at least $57,485.29 in costs, a large portion of which was expended on the retention of experts.  Thus, the agreed upon attorneys' fee award represents at least a $100,000 discount off of what Plaintiffs' counsel actually expended in man hours and costs.  Accordingly, we find this fee award to be entirely reasonable and we shall approve it in the Order that follows.

### III.   CONCLUSION

To reiterate, while the number of filings by class members might trigger concerns when first viewed, a reading of those submissions indicates otherwise. Moreover, any such apprehensions were dispelled by allowing those class members to vocalize their positions during the fairness hearing.  It is unsurprising that these class members, who by the circumstances of their confinement have had

---

[3] The Court notes that these figures represent the amount of attorney hours and costs up to July of 2019, when Plaintiffs' counsel tendered their initial fee demand.  Given that the Agreement was finalized in November of 2019 and the instant Motion was filed in January, it bears emphasizing that Plaintiffs' attorneys expended far more than 2,453.37 hours in bringing this matter to closure.

abundant time to study, restudy, and ruminate about the proposed settlement, would find terms therein they hoped would be better.  But we should not make perfect the enemy of the very good.  This Agreement, as aforestated, effectuates a sweeping alteration of the class members' conditions of confinement.  As such, we have absolutely no hesitancy in approving it.[4]

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT**:

1.  The Joint Motion for Final Approval of Class Action Settlement (Doc. 99) is **GRANTED**.

2.  The Court hereby **APPROVES** the Settlement Agreement pursuant to Fed. R. Civ. P. 23€

3.  The attorneys' fees agreement outlined in the Settlement Agreement and the parties' separate agreement on the payment of attorneys' fees is **APPROVED**.

4.  The Court expressly retains jurisdiction throughout the duration of the Settlement Agreement, as set forth by the Settlement Agreement, in order to enter any further orders that may be necessary or appropriate in administering or implementing the terms and provisions of the Settlement Agreement.

5.  The Clerk of Court is directed to **CLOSE** the file on this case.

---

[4] We commend all counsel for the collective spirit of compromise that led to the formation of this remarkable Agreement.

s/ John E. Jones III
John E. Jones III
United States District Judge